# EXHIBIT 5


some nonimmigrant students may wish to obtain a TPS-related EAD in light of certain extensions that may be available to EADs with an A–12 or C–19 category code. The nonimmigrant student should check the appropriate box when filling out Form I–821 to indicate whether a TPS-related EAD is being requested. Again, so long as the nonimmigrant student maintains the minimum course load described in this notice and does not otherwise violate the student's nonimmigrant status, included as provided under 8 CFR 214.1(g), the nonimmigrant will be able to maintain compliance requirements for F–1 nonimmigrant student status while having TPS.

**When a student applies simultaneously for TPS and benefits under this notice, what is the minimum course load requirement while an application for employment authorization is pending?**

The F–1 nonimmigrant student must maintain normal course load requirements for a ''full course of study''[17] unless or until the nonimmigrant student receives employment authorization under this notice. TPS-related employment authorization, by itself, does not authorize a nonimmigrant student to drop below twelve credit hours, or otherwise applicable minimum requirements (*e.g.,* clock hours for language students). Once approved for Special Student Relief employment authorization, the F–1 nonimmigrant student may drop below twelve credit hours, or otherwise applicable minimum requirements (with a minimum of six semester or quarter hours of instruction per academic term if at the undergraduate level, or for a minimum of three semester or quarter hours of instruction per academic term if at the graduate level). *See* 8 CFR 214.2(f)(5)(v), (f)(6), and (f)(9)(i) and (ii).

**How does a student who has received a TPS-related EAD then apply for authorization to take a reduced course load under this notice?**

There is no further application process with USCIS if a student has been approved for a TPS-related EAD. The F–1 nonimmigrant student must demonstrate and provide documentation to the DSO of the direct economic hardship resulting from the crises in Cameroon. The DSO will then verify and update the student's record in SEVIS to enable the F–1 nonimmigrant student with TPS to reduce the course load without any further action or application. No other

[17] *See* 8 CFR 214.2(f)(6).

EAD needs to be issued for the F–1 nonimmigrant student to have employment authorization.

**Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?**

Yes. Current regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision might apply to students who worked on a TPS-related EAD or dropped their course load before publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

**How long will this notice remain in effect?**

This notice grants temporary relief until December 7, 2023,[18] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Cameroon. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

**Paperwork Reduction Act (PRA)**

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the crises in Cameroon must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by making a recommendation in SEVIS and entering information in the remarks field of the SEVIS student record. The authority to collect this information is in the SEVIS collection of information

[18] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a ''full course of study,'' *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of December 7, 2023, provided the student satisfies the minimum course load requirement in this notice. DHS also considers students who engage in online coursework pursuant to ICE coronavirus disease 2019 (COVID–19) guidance for nonimmigrant students to be in compliance with regulations while such guidance remains in effect. *See* ICE Guidance and Frequently Asked Questions on COVID–19, Nonimmigrant Students & SEVP-Certified Schools: Frequently Asked Questions, *https://www.ice.gov/coronavirus* (last visited May 10, 2022).

currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control No. 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2022–12227 Filed 6–6–22; 8:45 am]
**BILLING CODE 9111–28–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2707–21; DHS Docket No. USCIS–2022–0005]**

**RIN 1615–ZB95**

**Designation of Cameroon for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) designation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is designating Cameroon for Temporary Protected Status (TPS) for 18 months, effective June 7, 2022, through December 7, 2023. This designation allows Cameroonian nationals (and individuals having no nationality who last habitually resided in Cameroon) who have continuously resided in the United States since April 14, 2022, and who have been continuously physically

present in the United States since June 7, 2022, to apply for TPS.

**DATES:**

*Designation of Cameroon for TPS:* The 18-month designation of Cameroon for TPS is effective on June 7, 2022, and will remain in effect for 18 months, through December 7, 2023.

*Registration:* The registration period for individuals to submit TPS applications begins June 7, 2022, and will remain in effect through December 7, 2023.

**FOR FURTHER INFORMATION CONTACT:**
Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about Cameroon's TPS designation by selecting ''Cameroon'' from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register

Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Cameroon (or individuals having no nationality who last habitually resided in Cameroon) to submit an initial registration application under the designation of Cameroon for TPS and apply for an Employment Authorization Document (EAD). Under the designation, individuals must submit an initial Cameroon TPS application (Form I–821) and they may also submit an Application for Employment Authorization (Form I–765), during the 18-month initial registration period that runs from June 7, 2022, through December 7, 2023.[1] In addition to demonstrating continuous residence in the United States since April 14, 2022,[2] and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they

---

[1] In general, individuals must be given an initial registration period of no less than 180 days to register for TPS, but the Secretary has discretion to provide for a longer registration period. *See* 8 U.S.C. 1254a(c)(1)(A)(iv). In keeping with the humanitarian purpose of TPS and advancing the goal of ensuring ''the Federal Government eliminates . . . barriers that prevent immigrants from accessing government services available to them'' under *Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,* 86 FR 8277 (Feb. 5, 2021), the Secretary has recently exercised his discretion to provide for TPS initial registration periods that coincide with the full period of a TPS country's initial designation or redesignation. *See, e.g.,* 86 FR 41863 (Aug. 3, 2021) (providing 18-mos. registration period under new TPS designation of Haiti); 86 FR 41986 (Aug. 4, 2021) (''Extension of Initial Registration Periods for New Temporary Protected Status Applicants Under the Designations for Venezuela, Syria and Burma). For the same reasons, the Secretary is similarly exercising his discretion to provide applicants under this TPS designation of Cameroon with an 18-month initial registration period.

[2] The ''continuous physical presence date'' (CPP) is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or such later date as the Secretary may establish. The ''continuous residence date'' (CR) is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA section 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i)–(ii) (discussing CR and CPP date requirements).

have been continuously physically present in the United States since June 7, 2022, the effective date of this designation of Cameroon, before USCIS may grant them TPS. DHS estimates that approximately 11,700 individuals are eligible to file applications for TPS under the designation of Cameroon.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## Why was Cameroon designated for TPS?

Based on DHS's review of country conditions in Cameroon, and in consultation with the Department of State (DOS), the Secretary has determined that an 18-month TPS designation is warranted because of ongoing armed conflict and the extraordinary and temporary conditions described below.

### Overview

The extreme violence between government forces and armed separatists in the English-speaking regions (Northwest and Southwest) of Cameroon, as well as deadly attacks by the terrorist organization Boko Haram (including its breakaway faction, ISIS-West Africa (ISWAP) and vigilante self-defense groups in the Far North Region) continue to negatively impact the

populations in the affected regions and beyond.[3] Thousands of people have been killed in the English-speaking regions, and hundreds of thousands more remain in internally displaced person camps, while tens of thousands have sought refuge in the neighboring country of Nigeria. Moreover, the government has increased restrictions on political opposition groups and civil society and there are reports that the government of Cameroon has committed human rights violations and abuses. As detailed below, the crisis in the English-speaking regions, instability in the Far North Region, and restrictions on political space and reports of human rights violations and abuses have led to various challenges, including violence against civilians, a humanitarian crisis, and economic decline.[4]

*Security Situation*

i. The Crisis in the English-Speaking Regions

The English-speaking regions—the Southwest and Northwest—make up approximately 20% of the country's population.[5] The two regions continue to suffer from extreme violence, a crisis more severe than any other in contemporary Cameroon.[6] In 2016, the peaceful protests calling for federalism led to fighting and to a demand for full independence after the government

clamped down on protest leaders.[7] On October 1, 2017, separatist groups unilaterally declared an independent state called the Republic of Ambazonia.[8] The declaration escalated confrontation and paved the way for more human rights abuses in the two English-speaking regions.

Since 2017, confrontation between government forces and separatists has "killed more than 3,000 people, forced over 900,000 people from their homes, and kept around 800,000 children out of school."[9] In 2020, the United Kingdom Home Office report assessed, "[o]ne in 3 people in the Anglophone regions are in need of humanitarian aid, including assistance with education, food, healthcare, shelter, water and sanitation. Many of the internally displaced persons (IDPs) remain in the English-speaking regions, hiding in remote bush areas. Sexual assault, exploitation and rape are frequently reported by female IDPs, and humanitarian assistance is hampered by the volatile security situation, especially in remote areas."[10] According to Amnesty International, both the Cameroonian armed forces and the various separatist groups involved in the fighting in Cameroon's English-speaking regions have engaged in human rights abuses, and civilians are caught in the middle.[11]

Separatist groups kill security forces and commit serious abuses against civilians, including unlawful killings, often involving mutilations.[12] They have targeted civil servants, relatives of members of defense and security forces,

and ordinary people who fail to adhere to lockdowns (referred to as "ghost towns") and instructions to close schools.[13] Ghost town operations require businesses to close and residents to largely stay home, limiting much economic activity. As of September 2021, "deadly attacks by various separatist groups on military posts and vehicles of the Cameroonian army continue to be a daily occurrence."[14]

Regarding abuses by the Cameroonian government, its security forces have targeted civilians, leading analysts to note that "killing civilians and looting their homes in the name of security are serious human rights crimes that fuel the escalating cycles of violence and abuse in Cameroon's Anglophone regions."[15]

In September 2019, amid increasing violence and following sustained international pressure, President Biya called for a national dialogue, a series of nationwide discussions aimed at addressing the crisis.[16] The dialogue took place between September 30 and October 4, 2019, and resulted in a series of recommendations, including changing the country's name back to the "United Republic of Cameroon" and the adoption of a Special Status for the two English-speaking regions.[17] However, separatist groups rejected the recommendations as illegitimate.[18]

The English-speaking regions remain unsafe and marred by widespread human rights abuses. In 2020, Amnesty International reported that "fighting between various armed groups and the Cameroonian armed forces has continued unabated for the past three years, with civilians bearing the brunt of unlawful killings, kidnappings, and

[3] *CAMEROON 2021,* Amnesty International, 2022, available at: *https://www.amnesty.org/en/location/africa/west-and-central-africa/cameroon/report-cameroon/* (last visited May 13, 2022); *Cameroon: Boko Haram Attacks Escalate in Far North,* Human Rights Watch, Apr. 5, 2021, available at: *https://www.hrw.org/news/2021/04/05/cameroon-boko-haram-attacks-escalate-far-north* (last visited May 13, 2022; *Human Rights in Africa: Review of 2019—Cameroon [AFR 01/1352/2020],* Amnesty International, 2020, Apr. 8, 2020, available at: *https://www.ecoi.net/en/document/2028266.html* (last visited May 13, 2022).

[4] *See generally CAMEROON 2021,* Amnesty International, 2022, available at: *https://www.amnesty.org/en/location/africa/west-and-central-africa/cameroon/report-cameroon/* (last visited May 13, 2022); *Cameroon: Boko Haram Attacks Escalate in Far North,* Human Rights Watch, Apr. 5, 2021, available at: *https://www.hrw.org/news/2021/04/05/cameroon-boko-haram-attacks-escalate-far-north* (last visited May 13, 2022; *Human Rights in Africa: Review of 2019—Cameroon [AFR 01/1352/2020],* Amnesty International, 2020, Apr. 8, 2020, available at: *https://www.ecoi.net/en/document/2028266.html* (last visited May 13, 2022).

[5] *Cameroon: Witness testimony and satellite images reveal the scale of devastation in Anglophone regions,* Amnesty International, Jul. 28, 2021, available at: *https://www.amnesty.org/en/latest/news/2021/07/cameroon-satellite-images-reveal-devastation-in-anglophone-regions/* (last visited Apr. 14, 2022).

[6] *Cameroon's Anglophone Crisis at the Crossroads,* International Crisis Group, Aug. 2, 2017, available at: *https://www.crisisgroup.org/africa/central-africa/cameroon/250-cameroons-anglophone-crisis-crossroads/* (last visited Apr. 14, 2022).

[7] *"These Killings Can Be Stopped"*, Human Rights Watch, Jul. 19, 2018, available at: *https://www.hrw.org/report/2018/07/19/these-killings-can-be-stopped/abuses-government-and-separatist-groups-cameroons* (last visited Apr. 14, 2022).

[8] *Ambazonia Defense Forces,* Stanford University Center for International Security and Cooperation, May 2019, available at: *https://cisac.fsi.stanford.edu/mappingmilitants/profiles/ambazonia-defense-forces* (last visited Apr. 14, 2022).

[9] *Ahead of peace talks, a who's who of Cameroon's separatist movements,* The Humanitarian, Jul. 8, 2020, available at: *https://www.thenewhumanitarian.org/analysis/2020/07/08/Cameroon-Ambazonia-conflict-peace-whos-who* (last visited Apr. 14, 2022).

[10] *Country Policy and Information Note: Cameroon: North-West/South-West crisis,* UK Home Office, Dec. 2020, available at: *https://www.justice.gov/eoir/page/file/1345186/download* (last visited Apr. 14, 2022).

[11] *Cameroon: Witness testimony and satellite images reveal the scale of devastation in Anglophone regions,* Amnesty International, Jul. 28, 2021, available at: *https://www.amnesty.org/en/latest/press-release/2021/07/cameroon-satellite-images-reveal-devastation-in-anglophone-regions/* (last visited Apr. 14, 2022).

[12] *Human Rights in Africa: Review of 2019—Cameroon [AFR 01/1352/2020],* Amnesty International, 2020, Apr. 8, 2020, available at: *https://www.ecoi.net/en/document/2028266.html* (last visited May 13, 2022).

[13] *Cameroon 2019,* Amnesty International, 2020, available at: *https://www.amnesty.org/en/documents/afr01/1352/2020/en/* (last visited Apr. 14, 2022).

[14] *Separatism in Cameroon: 5 years of violent civil war,* Deutsche Welle (DW), Oct. 1, 2021, available at: *https://www.dw.com/en/separatism-in-cameroon-5-years-of-violent-civil-war/a-59369417* (last visited Apr. 14, 2022).

[15] *Cameroon: Nine Killed in Army Attack,* Human Rights Watch, Feb. 4, 2021, available at: *https://www.hrw.org/news/2021/02/04/cameroon-nine-killed-army-attack* (last visited Apr. 14, 2022).

[16] *Cameroon: Events of 2019,* Human Rights Watch, 2020, available at: *https://www.hrw.org/world-report/2020/country-chapters/cameroon* (last visited Apr. 14, 2022).

[17] *Country Policy and Information Note: Cameroon: North-West/South-West crisis,* UK Home Office, Dec. 2020, available at: *https://www.justice.gov/eoir/page/file/1345186/download* (last visited Apr. 14, 2022).

[18] *Cameroon grants 'special status' to its restive regions. They don't feel special,* African Arguments, Jan. 2020, available at: *https://africanarguments.org/2020/01/cameroon-grants-special-status-anglophone-conflict/* (last visited Apr. 14, 2022).

widespread destruction of houses and villages.'' [19]

## ii. Attacks by Boko Haram in the Far North Region

Boko Haram and its breakaway faction, ISWAP,[20] continue to engage in violence in the Far North region.[21] In that region, the ongoing armed conflict between government forces and Boko Haram has killed over 3,000 Cameroonians, displaced about 250,000 and triggered the rise of vigilante self-defense groups.[22]

In November 2020, the Africa Center for Strategic Studies described the situation in the Far North Region as follows: ''Northern Cameroon has experienced the sharpest spike of Boko Haram violence in the Lake Chad Basin over the past 12 months, namely in the form of attacks on civilians . . . The number of violent incidents linked to militant Islamist groups in Cameroon's Far North Region jumped 90 percent, to roughly 400 events, over the past 12 months . . . Most of the violence reported in Cameroon has been in the form of attacks against civilians (over 59 percent). The number of attacks against civilians in Cameroon over the last 12 months (234) is higher than in Nigeria (100), Niger (92), and Chad (12) combined. These attacks consist of Boko Haram raids, kidnapping for recruitment and ransom, and looting of villages and displaced persons camps.'' [23] According to a Human Rights Watch report, Boko Haram has stepped up attacks on civilians in towns and villages in the Far North region since December 2020, killing at least 80 civilians, and looting hundreds of homes in the region.[24]

### Humanitarian Crisis

As of February 2022, the extreme violence in Cameroon had triggered a large and growing humanitarian crisis, creating 936,767 IDPs within Cameroon.[25] Additionally, Cameroon hosts 478,066 refugees, 8,368 asylum seekers, and 518,853 returnees (former IDPs).[26] While people have been displaced in the English-speaking regions due to confrontation between government forces and separatist armed groups, IDPs in Cameroon's Far North Region were displaced by escalating Boko Haram attacks.[27] With respect to refugees, UNHCR has reported that tens of thousands of Cameroonians have sought refuge in neighboring Nigeria, and many others have fled to nearby forests.[28]

In addition, Cameroon is experiencing economic deterioration linked to the aforementioned violence, impacts of the COVID–19 pandemic, and oil prices.[29] In the English-speaking regions, the crisis has ''devastated the local economy and contributed to food insecurity in an already poor and remote region.'' [30] The violence has significantly impacted the economy. In hard-to-reach areas where non-state armed groups have increased their presence, ''[t]he weekly 'ghost town' [or lockdown] days, set up by nonstate armed groups, particularly affect displaced persons and host communities, limiting their movements and, therefore, their economic and agricultural activities.'' [31]

According to the World Bank, the extreme violence in the English-speaking regions has resulted in the significant destruction of critical assets; schools, health facilities, and infrastructure have been deliberately targeted and destroyed. Moreover, the arrival of IDPs in the West and Littoral regions has overstrained a health sector that was already lacking in adequate workforce, supplies, and services in those regions.[32]

Food insecurity in Cameroon is a serious concern. According to the World Bank, the food situation in the Northwest and Southwest regions is alarming and continues to worsen.[33] Additionally, ''[a]griculture has been greatly disrupted in Cameroon's Far North region, where the army is fighting against a Boko Haram insurgency, and the West, where English speaking separatist [sic] are trying to create a breakaway state.'' [34] According to the Africa Center for Strategic Studies, 4.9

million Cameroonians faced acute food insecurity.[35]

*Government Restrictions on Political Space and Human Rights Violations and Abuses*

In its 2021 annual report, DOS indicated that human rights violations and abuses in Cameroon include reports of ''unlawful or arbitrary killings, including extrajudicial killings by the government and nonstate armed groups; forced disappearances by the government; torture and cases of cruel, inhuman, or degrading treatment or punishment by the government and nonstate armed groups; . . . serious abuses in a conflict, including abductions and unlawful recruitment and use of child soldiers by nonstate armed groups; serious restrictions on freedom of expression and media, including violence, threats of violence, or unjustified arrests or prosecutions against journalists, censorship, and criminal libel laws; substantial interference with the right of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; . . .''[36]

Observers assert that the government has increased restrictions on political opposition groups and civil society since President Biya won a seventh term in 2018.[37] Politically, the situation has remained tense, due in part to disputes over the 2018 presidential elections.[38] Before that election, ''Cameroonian authorities cracked down on the political opposition, violently broke up peaceful protests, and arrested hundreds of opposition party leaders, members, and supporters.''[39] Additionally,

political tensions continue between the government and the main opposition—Cameroon Renaissance Movement—led by Maurice Kamto.[40]

The ongoing violence in Cameroon has had significant civilian costs.[41] The two most disruptive crises are those between government forces and armed separatists in the English-speaking Northwest and Southwest regions of Cameroon and attacks by armed groups, such as Boko Haram jihadists, ISWAP combatants, and vigilante self-defense groups, in the Far North Region.[42] These two crises continue to have severe consequences for the population throughout the country and more specifically in the affected regions.[43] Thousands of people have been killed in the English-speaking regions, while hundreds of thousands more remain in IDP camps and tens of thousands have sought refuge in the neighboring country of Nigeria. Deadly attacks in the Far North region by Boko Haram and ISWAP continue unabated. Additionally, reports of human rights violations and abuses may create a precarious situation for some civilians. These three issues—crisis in the English-speaking regions, instability in the Far North region, and reports of human rights violations and abuses—have been creating various insurmountable challenges for people across Cameroon, including violence against civilians, economic decline and resulting humanitarian crises.

*What authority does the Secretary have to designate Cameroon for TPS?*

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary,[44]

after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[45] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[46] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Notice of the Designation of Cameroon for TPS**

By the authority vested in me as Secretary under INA section 244, 8

---

[35] *Food Insecurity Crisis Mounting in Africa,* Africa Center for Strategic Studies, Feb. 16, 2021, available at: *https://africacenter.org/spotlight/food-insecurity-crisis-mounting-africa/* (last visited Apr. 14, 2022).

[36] 2021 Country Reports on Human Rights Practices: Cameroon, U.S. Department of State, 2021, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cameroon/* (last visited Apr. 14, 2022).

[37] *Cameroon: Key Issues and U.S. Policy,* Congressional Research Service, Sept. 22, 2021, available at: *https://crsreports.congress.gov/product/pdf/R/R46919/2* (last visited: Apr. 14, 2022).

[38] *Cameroon: Opposition Leaders Arrested,* Human Rights Watch, Feb. 1, 2019, available at: *https://www.hrw.org/news/2019/01/30/cameroon-opposition-leaders-arrested* (last visited Apr. 14, 2022).

[39] *HRW World Report for Events of 2019,* Human Rights Watch, 2020, available at: *https://www.hrw.org/world-report/2020/country-chapters/cameroon;* the main opposition leader, Maurice Kamto, who declared himself the winner of the 2018 presidential election, was arrested in February 2019 but released in October 2019. Kamto's political party, the Cameroon Renaissance

Movement (*Le Mouvement pour la Renaissance du Cameroun-MRC*), boycotted the February 2020 municipal and parliamentary elections, arguing that electoral laws must be reviewed before any polls. The boycott paved the way for the ruling party to secure an overwhelming majority in parliament.

[40] *Easing Cameroon's Ethno-political Tensions, On and Offline,* International Crisis Group, Dec. 3, 2020, available at: *https://www.crisisgroup.org/africa/central-africa/cameroon/295-easing-cameroons-ethno-political-tensions-and-offline* (last visited Apr. 14, 2022).

[41] *Cameroon: Boko Haram Attacks Escalate in Far North,* Human Rights Watch, Apr. 5, 2021, available at: *https://www.hrw.org/news/2021/04/05/cameroon-boko-haram-attacks-escalate-far-north* (last visited May 13, 2022).

[42] *Cameroon: Boko Haram Attacks Escalate in Far North,* Human Rights Watch, Apr. 5, 2021, available at: *https://www.hrw.org/news/2021/04/05/cameroon-boko-haram-attacks-escalate-far-north* (last visited May 13, 2022).

[43] *Cameroon—Global Humanitarian Overview 2022,* United Nations, 2022, available at: *https://gho.unocha.org/cameroon* (last visited May 13, 2022).

[44] INA § 244(b)(1) prescribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135.

[45] INA § 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. *Id.,* at § 244(b)(1).

[46] This issue of judicial review is the subject of litigation. *See, e.g., Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Cameroon's designation for TPS on the basis of ongoing armed conflict and extraordinary and temporary conditions are met. *See* INA sections 244(b)(1)(A) and (C), 8 U.S.C. 1254a(b)(1)(A) and (C). I estimate approximately 11,700 individuals may be eligible for TPS under the designation of Cameroon. On the basis of this determination, I am designating Cameroon for TPS for 18 months, from June 7, 2022, through December 7, 2023. See INA section 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2).

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

## Eligibility and Employment Authorization for TPS

*Required Application Forms and Application Fees To Register for TPS*

To register for TPS based on the designation of Cameroon, you must submit a Form I–821, Application for Temporary Protected Status, and pay the filing fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometrics services fee, you may request to have the fee waived. Please see additional information under the ''Biometric Services Fee'' section of this notice.

To work in the United States, you are not required to submit Form I–765 or have an Employment Authorization Document (EAD) but see below for more information if you want to work in the United States.

## How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?

All employees must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. TPS applicants who want to obtain an EAD must file a Form I–765, Application for Employment Authorization, and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form along with their TPS application, or at a later date, provided their TPS application is still pending or has been approved.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

## Refiling an Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request

If you receive a denial of a fee waiver request, you must refile your Form I–

821 for TPS along with the required fees during the registration period, which extends until December 7, 2023. You may also file for your EAD on Form I–765 with payment of the fee along with your TPS application or at any later date you decide you want to request an EAD during the registration period.

## Filing Information

USCIS offers the option to applicants for TPS under Cameroon's designation to file Form I–821 and related requests for EADs online or by mail. When filing an initial TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[47] To file these forms online, you must first create a USCIS online account.[48]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses*

Mail your completed Form I–821, Application for Temporary Protected Status and Form I–765, Application for Employment Authorization, Request for Fee Waiver (Form I–912), if applicable, and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are using the U.S. Postal Service (USPS) ...................................... | USCIS, Attn: TPS Cameroon, P.O. Box 4091, Carol Stream, IL 60197–4091. |
| You are using FedEx, UPS, or DHL ...................................................... | USCIS, Attn: TPS Cameroon (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

## Supporting Documents

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (*i.e.,* registering) for TPS on the USCIS website at *uscis.gov/tps* under ''Cameroon.''

## Travel

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for

travel authorization if you wish to travel outside the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

---

[47] Find information about online filing at Forms Available to File Online, *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[48] *https://myaccount.uscis.gov/users/sign_up.*

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a

pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
| --- | --- |
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/ privacy.*

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/ contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on the last page of Form I–

9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/i-9-central.* An EAD is an acceptable document under List A.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through December 7, 2023, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation such as evidence of my status or proof of my Cameroonian citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Cameroonian citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English and many other

languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship,

immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, individuals approved for TPS may show their Form I–797, Notice of Action, indicating approval of their Form I–821 application, or their EAD with category code A12 or C19 to prove that they have TPS or a pending TPS application. However, while Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:
- Your new EAD with a TPS category code of A12 or C19, regardless of your country of birth;
- Your Form I–94, Arrival/Departure Record; or
- Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or
- Your Form I–797, Notice of Action, reflecting approval or receipt of a current Form I–821, if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits. SAVE can verify when an individual has TPS based on the documents above. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *https://www.save.uscis.gov/casecheck/.*

CaseCheck is a free service that lets you follow the progress of your SAVE

verification case using your date of birth and one immigration identifier number (A-number, USCIS number or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save/save-resources,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2022–12229 Filed 6–6–22; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**National Park Service**

[NPS–WASO–NAGPRA–NPS0033998; PPWOCRADN0–PCU00RP14.R50000]

**Notice of Inventory Completion: University of Wisconsin Oshkosh, Oshkosh, WI**

**AGENCY:** National Park Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The University of Wisconsin Oshkosh has completed an inventory of human remains in consultation with the appropriate Indian Tribes or Native Hawaiian organizations and has determined that there is no cultural affiliation between the human remains and any present-day Indian Tribes or Native Hawaiian organizations. Representatives of any Indian Tribe or Native Hawaiian organization not identified in this notice that wish to request transfer of control of these human remains should submit a written request to the University of Wisconsin Oshkosh. If no additional requestors come forward, transfer of control of the human remains to the Indian Tribes or Native Hawaiian organizations stated in this notice may proceed.

**DATES:** Representatives of any Indian Tribe or Native Hawaiian organization not identified in this notice that wish to request transfer of control of these human remains should submit a written request with information in support of the request to the University of Wisconsin Oshkosh at the address in this notice by July 7, 2022.

**FOR FURTHER INFORMATION CONTACT:** Adrienne Frie, University of Wisconsin Oshkosh, 800 Algoma Blvd., Oshkosh,