# EXHIBIT 6

# CAMEROON 2017 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cameroon is a republic dominated by a strong presidency. The country has a multiparty system of government, but the Cameroon People's Democratic Movement (CPDM) has remained in power since its creation in 1985. In practice, the president retains the power to control legislation. In 2011 citizens re-elected CPDM leader Paul Biya president, a position he has held since 1982, in a flawed election marked by irregularities, but observers did not believe these had a significant impact on the outcome. In April 2013 the country conducted the first Senate elections in its history that were peaceful and considered generally free and fair. In September 2013 simultaneous legislative and municipal elections were held, and most observers considered them free and fair.

Civilian authorities maintained a degree of control over security forces, including police and gendarmerie.

The most significant human rights issues included: arbitrary and unlawful killings through excessive use of force by security forces; disappearances by security forces and Boko Haram; torture and abuse by security forces including in military and unofficial detention facilities; prolonged arbitrary detentions including of suspected Boko Haram supporters and individuals in the Anglophone regions; harsh and life threatening prison conditions; violations of freedoms of expression and assembly; periodic government restrictions on access to the internet; trafficking in persons; criminalization and arrest of individuals engaged in consensual same-sex sexual conduct; and violations of workers' rights.

Although the government took some steps to punish and prosecute officials who committed abuses in the security forces and in the public service, it did not often make public actual sanctions, and offenders often continued acting with impunity.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports security force officials committed arbitrary and unlawful killings through excessive use of force in the execution of official duties. Amnesty International and the International Crisis Group reported that defense and

security forces used excessive and disproportionate force to disperse demonstrations in the country's Anglophone regions, killing at least 40 individuals between September 28 and October 2 alone.  On November 17, the UN High Commissioner for Human Rights called on the government to conduct an impartial and independent investigation into the allegations of human rights violations committed during and after the October incidents but as of December no investigations into these allegations were underway.

In the Far North region, security forces also were reported responsible for holding incommunicado, torturing, and in at least 10 cases killing suspected Boko Haram and Islamic State (ISIS)-West Africa supporters in detention facilities run by the military and intelligence services, including the Rapid Intervention Battalion (BIR) and the General Directorate of External Research (DGRE).  Civil society organizations and media sources generally blamed members of the three primary security forces--the BIR, the Motorized Infantry Battalion, and the gendarmerie--for the deaths.  Per Amnesty International, no security force officials responsible for human rights violations documented in their reporting on the Far North region had been held to account as of November.

The terrorist organization Boko Haram as well as ISIS-West Africa continued killing civilians, including members of vigilance committees, and members of defense and security forces in the Far North region.  According to Amnesty International, Boko Haram conducted at least 120 attacks between July 2016 and June 2017, including 23 suicide bombings, resulting in the deaths of more than 150 civilians.

## b. Disappearance

There continued to be reports of arrests and disappearances of individuals by security forces, particularly in the northern and Anglophone regions.  According to nongovernmental organizations (NGOs), some activists arrested in the context of the crisis fueled by perceptions of marginalization in the northwest and southwest Anglophone regions could not be accounted for as of November.  Family members and friends of detained persons were frequently unaware of the missing individual's location in detention until after a month or more of attempting to locate the missing individual.

Boko Haram insurgents kidnapped civilians, including women and children, during numerous attacks in the Far North region.  Some of their victims remained unaccounted for as of November.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 3 of 352

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, there were reports that security force members tortured, beat, harassed, or otherwise abused citizens. According to credible NGOs, members of the BIR, DGRE, and other security officials, including police and gendarmes, tortured persons inside and outside detention facilities.

Amnesty International reported in July on the cases of 101 individuals whom security forces allegedly tortured between March 2013 and March 2017 in detention facilities run by the BIR and the DGRE. While most of the cases documented involved persons arrested in 2014 and 2015 and tortured between 2014 and 2016, Amnesty International asserted that the practice continued into 2017. It stated that torture took place at 20 sites, including four military bases, two intelligence centers, a private residence, and a school. Specific sites named in the report included the BIR bases in Salak, Kousseri, and Kolofata, in the Far North region, and the DGRE facilities in Yaounde. Amnesty International said victims of torture described at least 24 different methods used to beat, break, and humiliate them, usually with the aim of forcing confessions or gaining information but also to punish, terrify, and intimidate. Most commonly, detainees were beaten with various objects, including electric cables, machetes, and wooden sticks; forced into stress positions and suspended from poles in ways that caused extreme pain to joints and muscles; and subjected to simulated drowning. A significant number of those arrested, according to the report, believed they had been targeted in part due to their Kanuri ethnicity. As of November no known investigations into these allegations had begun.

Press reporting from November 2016 indicated police and gendarmes in Buea, Southwest region, removed students, some of whom had recently been involved in protests at the local university, from their hostels, forced them to roll over in mud, and beat them with batons. According to reports, students were crammed onto military trucks and taken to undisclosed locations, where some were held for months. Some female students were allegedly raped.

Rape and sexual abuse were reported in several instances. The International Crisis Group reported that security forces were responsible for sexual abuse during their response to unrest in the Anglophone regions in September and October. International humanitarian organizations reported that members of the security

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 4 of 352

forces stopped female refugees who travelled without national identity cards and sexually exploited them in exchange for letting the women pass through security checkpoints.

The United Nations reported that as of October it had received four allegations of sexual exploitation and abuse against Cameroonian peacekeepers. One allegation of an exploitative relationship, one allegation of transactional sex, and two allegations of the rape of a child were made against military personnel serving with the UN Multidimensional Integrated Stabilization Mission in the Central African Republic. As of October 26, all investigations were pending. In two cases the United Nations suspended payments to the accused personnel; in the other two, interim actions were pending the identification of the personnel involved.

**Prison and Detention Center Conditions**

Prison conditions remained harsh and potentially life threatening due to gross overcrowding, inadequate food and medical care, physical abuse, and poor sanitary conditions.

<u>Physical Conditions</u>: Overcrowding remained pervasive in most prisons, especially in major urban centers. Officials held prisoners in dilapidated, colonial-era prisons, where the number of inmates was as much as four to five times the intended capacity. Prisons generally had separate wards for men, women, and children, but authorities often held detainees in pretrial detention and convicted prisoners together. In many prisons, toilet areas were common pits with multiple holes. In some cases, women benefitted from better living conditions, including improved toilet facilities and less crowded living quarters. Authorities claimed to hold sick persons separately from the general prison population, but this was often not the case.

The central prison in Maroua, Far North region, built in the 1930s and with an intended capacity of 350, held an estimated 1,600 inmates as of June. The central prison in Garoua, North region, with an intended capacity of 500, held nearly 2,000 inmates as of June 30. The central prison in Ngaoundere, Adamawa region, was designed for 500 inmates yet hosted 1,286 detainees as of July, over half of whom had not been convicted of any crime. As of July the principal prison in Edea, Littoral region, which had an intended capacity of 100, held 402 inmates, most of whom slept on the floor. The Kondengui central prison in Yaounde held approximately 4,000 inmates as of June, but its intended capacity was 1,500. The

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 5 of 352

central prison in Buea, Southwest region, built to host 300 inmates, held 1,175 inmates as of July.

Amnesty International recorded testimonies by suspected Boko Haram affiliates who were held at different times and in various detention facilities from 2014 to March 2017. Poor detention conditions included extreme overcrowding, inadequate and insufficient food and water, little or no access to sanitation, denial of medical assistance, and lack of access to fresh air or sunlight.

As in 2016, physical abuse by prison guards and prisoner-on-prisoner violence were also problems. According to media outlets and NGOs, on March 12-13, inmates of Garoua Central Prison launched a protest that developed into a mutiny. The prisoners were reportedly protesting life-threatening overcrowding. Prisoners denounced lack of potable water and other inhuman conditions. Some detainees besieged the main prison courtyard and refused to return to their cells because of excessive heat and poor ventilation. The protest allegedly became violent when security force members attempted to return the prisoners to their cells forcibly. Three inmates died, according to official sources, and more than 40 were injured.

Disease and illness were widespread. Malnutrition, tuberculosis, bronchitis, malaria, hepatitis, scabies, and numerous other untreated conditions, including infections, parasites, dehydration, and diarrhea, were rampant. The number of deaths associated with detention conditions or actions of staff members or other authorities was unknown. Observers indicated there had been 26 cases of tuberculosis in the central prison in Garoua, North region, since January. Amnesty International estimated that dozens of detainees died in both BIR and DGRE-run detention facilities between late 2013 and May 2017 because of torture and other mistreatment.

Corruption among prison personnel was reportedly widespread. Visitors were forced to bribe wardens to access inmates. Some visitors reported paying 2,000 CFA francs ($3.73)--the minimum daily wage is roughly CFA francs 570 ($1.06). Prisoners bribed wardens for special favors or treatment, including temporary freedom, cell phones, beds, and transfers to less crowded areas of the prisons. Due to inability to pay fines, some prisoners remained imprisoned after completing their sentences or receiving court orders of release.

As in the previous year, Amnesty International reported cases of persons held in unofficial detention sites, including BIR and/or DGRE-run facilities and other detention centers run by the security forces. As of mid-March the number of

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK      Document 142-6      Filed 01/13/25      Page 6 of 352

persons held in Salak (Maroua, Far North region) and DGRE Lac (Yaounde, Center region) was at least 20 in each facility, based on estimates by Amnesty International. Local news sources reported that authorities had released 18 presumed Boko Haram members on August 10 after holding them for more than 10 months in Salak. Some sources stated that a number of Salak prisoners had been transferred to the central prison in Maroua.

Administration: Independent authorities often investigated credible allegations of life-threatening conditions. Visitors needed formal authorization from the state counsel; without authorization, they had to bribe prison staff to communicate with inmates. In addition, visits to Boko Haram suspects were highly restricted. Some detainees were held far from their families, reducing the possibility of visits.

Independent Monitoring: The government permitted international humanitarian organizations access to prisoners in official prisons. For example, the International Committee of the Red Cross had access to five prisons, including Maroua and Kousseri in the Far North region, Garoua in the North, Bertoua in the East, and Kondengui principal prison in Yaounde, Center region. Observers did not have access to prisoners held in unofficial military detention facilities. The National Commission on Human Rights and Freedoms (NCHRF) and NGOs, including the Commission for Justice and Peace of the Catholic Archdiocese, made infrequent unannounced prison visits. In July authorities denied a request by a joint delegation of foreign experts to visit the Yaounde Kondengui principal and central prisons. As of September, authorities had not approved an August 11 request by the NCHRF to visit detention facilities at the Secretariat of State for Defense (SED), DGRE, and National Surveillance Directorate.

Authorities allowed NGOs to conduct formal education and other literacy programs in prisons. At the principal prison in Edea, Littoral region, NGO Christian Action for the Abolition of Torture sponsored a Literacy and Social Reintegration Center that provided primary and lower secondary education to inmates. Human IS Right, a Buea-based civil society organization, in partnership with Operation Total Impact, continued their formal education and reformation education program in principal prisons of Buea and Kumba, Southwest region.

Improvements: An international humanitarian organization reported that health conditions, especially malnutrition, had improved in the prisons it worked in since it started collaborating more closely with government. It also stated it had agreements with some hospitals and took care of some medical bills of prisoners who required outside medical attention.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 7 of 352

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide for the right of any person to challenge the lawfulness of their arrest or detention in court. The law states that, except in the case of an individual discovered in the act of committing a felony or misdemeanor, the officials making the arrest shall disclose their identity and inform the person arrested of the reason. The law also provides that persons arrested on a warrant shall be brought immediately before the examining magistrate or the president of the trial court who issued the warrant, and that the accused persons shall be given reasonable access to contact their family, obtain legal advice, and arrange for their defense. On several occasions the government did not respect these provisions.

**Role of the Police and Security Apparatus**

The national police, DGRE, Ministry of Defense, Ministry of Territorial Administration and Decentralization, and, to a lesser extent, Presidential Guard, are responsible for internal security. The Ministry of Defense--which includes the gendarmerie, army, and the army's military security unit--reports to an office of the Presidency, resulting in strong presidential control of security forces. The army is responsible for external security; the national police and gendarmerie have primary responsibility for law enforcement. The gendarmerie alone has responsibility in rural areas. The national police--which includes the public security force, judicial police, territorial security forces, and frontier police--report to the General Delegation of National Security (DGSN), which is under the direct authority of the Presidency.

The government took some steps to hold police accountable for abuses of power. Police remained ineffective, poorly trained, and corrupt. Impunity continued to be a problem.

Civilian authorities maintained some control over the police and gendarmerie, and the government had some mechanisms in place to investigate and punish abuse and corruption. The DGSN and gendarmerie investigated reports of abuse and forwarded cases to the courts. Lesser sanctions were handled internally. The DGSN, Ministry of Defense, and Ministry of Justice claimed members of security forces were sanctioned during the year for committing abuses, but few details were known about investigations or any subsequent accountability.

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 8 of 352

The National Gendarmerie and the army have special offices to investigate abuse. The secretary of state for defense and the minister-delegate at the Presidency are in charge of prosecuting abusers. The minister-delegate of defense refers cases involving aggravated theft, criminal complicity, murder, and other major offenses to the military courts for trial.

As of November, the Military Court had not issued a decision in the prosecution of gendarme officer Lazare Leroy Dang Mbah, who was placed on pretrial detention following his involvement in the death of Moupen Moussa in March 2016 at an SED detention facility. Mbah detained and beat Moussa for failing to produce his national identity card. In the criminal procedure, the accused pleaded guilty of the charges listed against him. In addition the trial for Colonel Charles Ze Onguene, former commander of the Far North Gendarmerie Legion, continued before the Military Court in Yaounde. Colonel Ze was charged in connection with a cordon-and-search operation carried out in the villages of Magdeme and Double, Far North region, in 2014, during which more than 200 men and boys were arbitrarily arrested and taken to the gendarmerie in Maroua. At least 25 of them died in custody the same night, according to official sources.

## Arrest Procedures and Treatment of Detainees

The law requires police to obtain a warrant before making an arrest, except when a person is caught in the act of committing a crime, but police often did not respect this requirement. The law provides that detainees be brought promptly before a magistrate, although this often did not occur. Police may legally detain a person in connection with a common crime for up to 48 hours, renewable once. This period may, with the written approval of the state counsel, be exceptionally extended twice before charges are brought. Nevertheless, police and gendarmes reportedly often exceeded these detention periods. The law also permits detention without charge for renewable periods of 15 days by administrative authorities such as governors and civilian government officials serving in territorial command. The law provides for access to legal counsel and family members, although police frequently denied detainees access to both. The law prohibits incommunicado detention, but it occurred, especially in connection with the fight against Boko Haram. The law permits bail, allows citizens the right to appeal, and provides the right to sue for unlawful arrest, but these rights were seldom respected.

Arbitrary Arrest: Police, gendarmes, BIR officials, and government authorities reportedly continued to arrest and detain persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado. "Friday

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 9 of 352

arrests," a practice whereby individuals arrested on a Friday typically remained in detention until at least Monday unless they paid a bribe, continued albeit to a limited extent.  There were several reports police or gendarmes arrested persons without warrants on circumstantial evidence alone, often following instructions from influential persons to settle personal scores.  There were also reports police or gendarmes arbitrarily arrested persons during neighborhood sweeps for criminals and stolen goods or arrested persons lacking national identification cards, especially in connection with the Anglophone crisis and the fight against Boko Haram.

There were several reports the government arbitrarily arrested and detained innocent citizens.  Between November 2016 and July 2017, authorities arrested dozens of Anglophone activists and bystanders for no apparent reason.  Police arrested some persons without informing them of the charges.  In some instances the government did not inform family members where relatives were taken.  On August 31 and September 1, the government released 55 Anglophone detainees.  Others, up to 69 by some estimates, remained in detention as of September 30.  In some cases, journalists covering events in the Anglophone regions were arrested and held for long periods of time without being notified of the charges against them.

On January 21, unidentified individuals in civilian clothing arrested Ayah Paul Abine, advocate general at the Supreme Court.  The men took Ayah from his private home to the SED, where they held him without charge.  In March, Ayah's lawyers filed an application for immediate release with the Mfoundi High Court in Yaounde.  On March 16, Ayah learned the charges against him.  Lawyers believed Ayah's detention was arbitrary because it happened over a weekend, he did not learn about the charges until several weeks later, and the arrest was in violation of the provisions of the criminal procedure code applicable to magistrates.  On August 30, President Biya ordered the discontinuance of proceedings pending before the Military Court against Ayah, Nkongho Felix Agbor Balla, Fontem Aforteka'a Neba, and 52 others arrested in relation to the Anglophone crisis.

Amnesty International's July report indicated that arbitrary arrests and detentions continued on a large scale in the Far North region, and even the basic legal safeguards concerning arrest and detention were rarely respected.  According to the report, individuals were arrested arbitrarily and held in secret detention for several weeks or even months.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 10 of 352

<u>Pretrial Detention</u>:  The law provides for a maximum of 18 months' detention before trial, but many detainees waited for years to appear in court.  No comprehensive statistics were available on pretrial detainees.  As of July, the central prison in Ngaoundere, Adamawa region, hosted 1,286 inmates, 735 of whom were pretrial detainees and appellants.  Some pretrial detainees had been awaiting trial for more than two years.  An international humanitarian organization claimed some alleged terrorists in detention had been in prison for so long that they no longer knew the addresses of their relatives.  The increase in pretrial prison populations was due in large part to mass arrests of Anglophone activists and persons accused of supporting Boko Haram; staff shortages; lengthy legal procedures; lost files; administrative and judicial bottlenecks, including procedural trial delays; and corruption.

As of November, Oben Maxwell, an activist, remained in pretrial detention in the central prison in Buea, Southwest region.  He was arrested in 2014 for holding an illegal meeting.  The Military Court initially handled the case, but it was then assigned to the Court of First Instance in Buea with no progress.  On October 30, the Military Court in Yaounde sentenced Abdoulaye Harissou, a public notary, to three years' imprisonment for nondenunciation.  Having already served his sentence, he was released on November 12.  The court sentenced another defendant in the case, Aboubakar Sidiki, president of opposition party Patriotic Movement of the Cameroonian Salvation, to 25 years.  He appealed the court decision.  Harissou and Sidiki were accused of hostility against the homeland and illegal possession of weapons of war and had been in pretrial detention since their arrests in August 2014.

## e. Denial of Fair Public Trial

The constitution and law provide for an independent judiciary, but the judiciary was frequently controlled by the president and majority party.  Individuals reportedly accused innocent persons of crimes, often due to political motivations, or caused trial delays to solve personal disputes.  Although authorities generally enforced court orders, there was at least one instance where a public entity was reluctant to respect a court decision.

The court system is subordinate to the Ministry of Justice.  The constitution designates the president as "first magistrate," thus "chief" of the judiciary, making him the legal arbiter of any sanctions against the judiciary.  The constitution specifies the president is the guarantor of the legal system's independence.  He appoints all judges, with the advice of the Higher Judicial Council.  During the

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 11 of 352

year the president invoked the military code of justice and ordered the discontinuance of proceedings pending before military courts against Anglophone activists, including those for whom the court had previously denied bail. While judges hearing a case should be governed only by the law and their conscience as provided for by the constitution, in some matters they are subordinate to the minister of justice, or to the minister in charge of military justice. The Special Criminal Court must have approval from the minister of justice before it may drop charges against a defendant who offers to pay back the money he/she was accused of having embezzled. Despite the judiciary's partial independence from the executive and legislative branches, the president appoints all members of the bench and legal department of the judicial branch, including the president of the Supreme Court, and may dismiss them at will.

The legal system includes statutory and customary law, and many criminal and civil cases may be tried using either. Criminal cases generally were tried in statutory courts.

Customary courts served as a primary means for settling domestic cases, including succession, inheritance, and child custody cases. Customary courts may exercise jurisdiction in a civil case only with the consent of both parties. Either party has the right to appeal an adverse decision by a customary court to the statutory courts.

Customary court convictions involving alleged witchcraft are automatically transferred to the statutory courts, which act as the courts of first instance.

Customary law is deemed valid only when it is not "repugnant to natural justice, equity, and good conscience," but many citizens in rural areas remained unaware of their rights under civil law and were taught they must abide by customary law. Customary law partially provides for equal rights and status; men may limit women's rights regarding inheritance and employment. Customary law as practiced in rural areas is based on the traditions of the predominant ethnic group and is adjudicated by traditional authorities of that group. Some traditional legal systems regard wives as the legal property of their husbands.

Military courts may exercise jurisdiction over civilians for offenses including: offenses committed by civilians in military establishments; offenses relating to acts of terrorism and other threats to the security of the state including piracy; unlawful acts against the safety of maritime navigation and oil platforms; offenses relating to the purchase, importation, sale, production, distribution, or possession of military effects or insignia as defined by regulations in force; cases involving civil

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 12 of 352

unrest or organized armed violence; and crimes committed with firearms, including gang crimes, banditry, and highway robbery.

**Trial Procedures**

The constitution and law provide for the right to a fair and public hearing, without undue delay, in which the defendant is presumed innocent, but authorities did not always respect the law. Defendants have the right to be informed promptly and in detail of the charges, with free assistance of an interpreter. Many pretrial suspects were treated as if they were convicted. Defendants have the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, particularly in cases of alleged support for Boko Haram. When defendants cannot pay for their own legal defense, the court may appoint counsel at the public's expense; however, the process was often burdensome and lengthy. Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf. Defendants have the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt. Defendants may appeal convictions. The law extends these rights to all citizens, although they were not always extended in the cases of suspected Boko Haram affiliates.

Persons suspected of complicity with Boko Haram or considered likely to compromise the security of the state were consistently tried by military courts, and typically the quality of legal assistance was poor. The government assigned cases to trainee lawyers, who received 5,000 CFA francs ($9.32) per hearing for legal fees, and the payment procedure was cumbersome. Consequently, attorneys lacked motivation to handle such cases. In an interview published in *L'Oeil du Sahel* on March 1, barrister Richard Dzavigandi noted that for some lawyers, defending a terrorist suspect was an immoral cause. In addition, designated lawyers were often not allowed to access case files or visit their clients, which contributed to the poor quality of legal assistance. According to estimates by the Cameroon Bar Association, the military court in Maroua, Far North region, announced approximately 200 capital punishment sentences in 2016, 114 of which were between August and December. Sentences by military courts could be and were appealed to civilian courts. For example, on January 12, the Court of Appeals acquitted Abamat Madam Alifa and Gueme Ali, whom a military tribunal initially sentenced to death on terrorism-related charges. The same day the Court of Appeals also cancelled a military court decision and requalified the offenses concerning Damsa Dapsia Nadege Nadia, whom the military court initially had sentenced to death. The state has not executed anyone sentenced since 1997.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 13 of 352

**Political Prisoners and Detainees**

No statistics were available on the precise number of political prisoners. Political prisoners were detained under heightened security, often in SED facilities. Some were allegedly held in DGRE facilities and at the central and principal prisons in Yaounde. The government did not permit access to such persons on a regular basis, or at all, depending on the case.

**Civil Judicial Procedures and Remedies**

Citizens and organizations have the right to seek civil remedies for human rights violations through administrative procedures or the legal system; both options involved lengthy delays. Unlike in the previous year, there were no reports the government failed to comply with court decisions on labor issues.

Individuals and organizations may appeal adverse domestic decisions to regional human rights bodies. Marafa Hamidou Yaya and Yves Michel Fotso, both accused of corruption, filed a complaint against the government with the United Nations' working group on arbitrary detention.

**Property Restitution**

Over the past few years, to implement infrastructure projects, the government seized land occupied or used by civilians. The government failed to resettle or compensate those displaced in a prompt manner, leading them to protest in the streets on several occasions. In a few cases, corrupt officials misappropriated the money the government had earmarked for compensation. In 2016 the government identified some offenders and opened cases against them. The cases were pending as of November. There was no reporting of intentional targeting of particular groups for discriminatory treatment.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

Although the constitution and law prohibit arbitrary interference with privacy, family, home, or correspondence, these rights were subject to restriction for the "higher interests of the state," and there were credible reports police and gendarmes harassed citizens and conducted searches without warrants.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 14 of 352

The law permits a police officer to enter a private home during daylight hours without a warrant if he is pursuing a criminal suspect. Police and gendarmes often did not comply with this provision. A police officer may enter a private home at any time in pursuit of a person observed committing a crime.

An administrative authority, including a governor or senior divisional officer, may authorize police to conduct neighborhood sweeps without warrants, and this occurred.

Police and gendarmes sometimes sealed off a neighborhood, systematically searched homes, arrested persons, sometimes arbitrarily, and seized suspicious or illegal articles. In the early morning of March 18, security forces allegedly conducted a cordon-and-search operation in the neighborhoods of Metta Quarter, Azire, and T-Junction in Bamenda, Northwest region. They arrested and detained citizens without national identity cards until their identities could be established. They allegedly transported some of the persons arrested to unknown destinations in military trucks.

There were several reports police arbitrarily confiscated electronic devices and did not return them, especially in Anglophone regions.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Expression, Including for the Press**

The law provides for freedom of expression, including for the press, but the government often restricted this right.

Freedom of Expression: Government officials penalized individuals or organizations that criticized or expressed views at odds with government policy. Individuals who criticized the government publicly or privately frequently faced reprisals. On several occasions, the government used the law requiring permits or government notification of public protests to stifle discourse, and many civil society and political organizations reported increased difficulty in obtaining approval to organize public gatherings. The government attempted to impede criticism by monitoring political meetings. In May government authorities reportedly shut down an Amnesty International news conference at which the rights group planned to discuss the plight of three students sentenced to a decade in prison for a Boko Haram joke.

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 15 of 352

The government also used antiterrorism legislation to exercise control over public and private expression.  On April 24, the military court in Yaounde sentenced Radio France International (RFI)'s Hausa service journalist Ahmed Abba to 10 years in prison for "nondenunciation of acts of terrorism" and "laundering the proceeds of terrorist acts."  Authorities arrested Abba in 2015 in Maroua, Far North region, on suspicion of collaborating with Boko Haram and withholding information.  After a 29-month imprisonment, Abba was released on December 22 when an Appeals Court judge acquitted him of "laundering of the proceeds of terrorism."  The judge, however, upheld the "nondenunciation of acts of terrorism" charge and sentenced Abba to 24 months in prison (time served) and a fine of CFA 55 million francs ($102,611).

Press and Media Freedom:  Independent media were active and expressed a wide variety of views, although there were restrictions, especially on editorial independence, in part due to stated terrorism concerns, the fight against Boko Haram, and the crisis in the two Anglophone regions.  Journalists reported practicing self-censorship to avoid repercussions for criticizing the government, especially on security matters.

Violence and Harassment:  Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists for their reporting.

Based on estimates by the National Commission on Human Rights and Freedoms, and the Committee to Protect Journalists (CPJ), authorities arrested at least eight journalists in connection with their reporting of the Anglophone crisis.  On February 9, security forces arrested Atia Tilarious Azohnwi, a political journalist with *The Sun* and Amos Fofung, bureau chief at *The Guardian Post*.  Both were released in August without charges.  Tim Finnian and Hans Achomba were arrested in January for reporting critical of the government; they were released after the president's August 30 decree, which freed 55 detainees.

Censorship or Content Restrictions:  The National Communication Council (NCC) is empowered to ensure all printed media comply with the legal requirement that editors in chief deposit two signed copies of each newspaper edition with the Prosecutor's Office for scrutiny within two hours of publication.  Journalists and media outlets practiced self-censorship, especially if the NCC had suspended them previously.  The NCC issued several warnings and suspensions during the year.

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 16 of 352

NCC president Peter Esoka publicly warned journalists several times in the year to refrain from publishing stories on secession and federalism activities in the two Anglophone regions.  On January 10, Northwest regional authorities sealed the premises of Bamenda-based Hot Cocoa 94 FM Radio.  The authorities allegedly accused the station of inciting the population to civil disobedience.  According to a CPJ report, the station was allowed to resume broadcasting within 48 hours with the condition that it handle sensitive issues objectively, especially during crisis situations.  *Epervier Plus* and its editor received a six-month suspension for publishing allegations of embezzlement involving a senior divisional officer.

Libel/Slander Laws:  Press freedom is further constrained by strict libel laws.  These laws authorize the government, at its discretion and the request of the plaintiff, to criminalize a civil libel suit or to initiate a criminal libel suit in cases of alleged libel against the president or other high government officials.  Such crimes are punishable by prison terms and heavy fines.  The libel law places the burden of proof on the defendant.  The government contended libel laws were aimed at safeguarding citizens whose reputations could be permanently damaged by defamation.  The government and public figures reportedly used laws against libel or slander to restrict public discussion.  On February 22, police arrested Medjo Lewis, editor of *La Detente Libre*.  The High Court of Bafoussam, West region, subsequently sentenced him to two years in prison plus a fine of 10 million CFA francs ($18,656) for defamation.  Lewis was granted an early release in September.

**Internet Freedom**

From January 17 to April 20, the government blocked access to the internet in the Southwest and Northwest regions.  On January 17, the country's four telephone operators, including South Africa's MTN and France's Orange, informed their subscribers in both regions that internet services were no longer available for reasons "beyond their control."  In late March the minister of telecommunications acknowledged authorities were behind the internet shutdown.  Government authorities claimed the shutdown was an attempt to limit the propagation of images and misinformation about the crisis in the Anglophone regions, which the government perceived as a threat to peace and national unity.  The Global Network Initiative released a statement in January expressing deep concerns about the restrictions on the internet and urging the government to lift the restrictions immediately.

Civil society organizations reported renewed, targeted Internet disruptions in select locations in the Southwest and Northwest regions after September 22 and

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 17 of 352

following major protests in the Anglophone regions on October 1. Public announcements from the government indicated a willingness to block internet access again should the government deem it necessary. In October the Office of the UN High Commissioner for Human Rights voiced concern over tensions in the country's Anglophone regions, noting that people should be allowed to exercise their rights to freedom of expression, including through uninterrupted access to the internet.

The International Telecommunication Union estimated that 25 percent of the population used the internet in 2016.

**Academic Freedom and Cultural Events**

Although there were no legal restrictions on academic freedom or cultural events, state security informants reportedly continued to operate on university campuses. There were no reports the government censored curricula; sanctioned academic personnel for their teachings, writing, or research; restricted academic travel or contacts; intimidated academics into self-censorship; or attempted to influence academic appointments based on political affiliation. There were a few reports, however, of security personnel disrupting student extracurricular activities.

**b. Freedoms of Peaceful Assembly and Association**

The government restricted freedoms of peaceful assembly and association.

**Freedom of Peaceful Assembly**

Although the law provides for freedom of peaceful assembly, the government often restricted this right. The law requires organizers of public meetings, demonstrations, and processions to notify officials in advance but does not require prior government approval of public assemblies and does not authorize the government to suppress public assemblies that it has not approved in advance. Nevertheless, officials routinely asserted the law implicitly authorizes the government to grant or deny permission for public assemblies. The government often refused to grant permits for assemblies and used force to suppress assemblies for which it had not issued permits. Authorities typically cited "security concerns" as the basis for deciding to block assembly. The government also prevented civil society organizations and political parties from holding press conferences. Police and gendarmes forcibly disrupted meetings and demonstrations of citizens, trade unions, and political activists throughout the year.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 18 of 352

The Divisional Officer (DO) for Douala V, Littoral region, prohibited a meeting and rally that the opposition Social Democratic Front party intended to organize on March 4 at "Carrefour Le Pauvre" intersection, followed by a march along a specific itinerary. The DO stated the event was likely to disrupt public order. On March 4, authorities allegedly deployed police and gendarmerie antiriot cars, as well as armed gendarmes and police officers, around the planned meeting spot. Security forces erected barricades along the planned course for the rally. In the early hours of the day, authorities also deployed troops around the DO's residence in Ndogpassi neighborhood in Douala.

In May authorities banned two events scheduled to take place in Yaounde, including press conferences by Amnesty International and NGO New Human Rights (NDH). The objective of Amnesty International's conference was to communicate the contents of letters and petitions requesting President Biya to release three students whom a military court sentenced to 10 years' imprisonment for exchanging jokes about Boko Haram by short message service. A dozen security agents in uniform and plainclothes invaded the meeting venue early in the morning and asked hotel officials to close the meeting hall. The NDH conference intended to focus on the topic "human rights and the fight against terrorism in Cameroon." The DO alleged the event was likely to disturb public order. In August the Cameroon Political Journalists Club could not hold the ninth edition of its monthly Cafe Politique, which was scheduled to host a National Democratic Institute representative. Yaounde's DO claimed the conference would disturb the public order and peace.

**Freedom of Association**

The constitution and law provide for freedom of association, but the law also limits this right. On the recommendation of the senior divisional officer, the Ministry of Territorial Administration and Decentralization may suspend the activities of an association for three months on grounds the association is disrupting public order. The minister may also dissolve an association if it is deemed a threat to state security. National associations may acquire legal status by declaring themselves in writing to the ministry but the ministry must explicitly register foreign associations and religious groups; if they do not, the law imposes heavy fines for individuals who form and operate any such association. The law prohibits organizations that advocate a goal contrary to the constitution, laws, and morality, as well as those that aim to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 19 of 352

The conditions for recognition of political parties, NGOs, or associations were complicated, involved long delays, and were unevenly enforced. This resulted in associations operating in legal uncertainty, their activities tolerated but not formally approved.

On January 17, the minister of territorial administration and decentralization banned the Southern Cameroons National Council and the Cameroon Anglophone Civil Society Consortium, officially prohibiting all activities, meetings, and demonstrations initiated by either group or anyone sympathetic to them. The minister stated the purpose and activities of these organizations were contrary to the constitution and could jeopardize the security of the state, territorial integrity, national unity, and integration.

### c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

### d. Freedom of Movement

Although the constitution and law provide for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government restricted these rights. The government worked closely with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations to provide protection and assistance to internally displaced persons (IDPs), refugees, asylum seekers, stateless persons, and other persons of concern.

In-country Movement: Police and gendarmes at roadblocks and checkpoints in cities and on most highways often extorted bribes and harassed travelers. Police frequently stopped travelers to check identification documents, vehicle registrations, and tax receipts as security and immigration control measures. Between September 29 an October 5, authorities in the two Anglophone regions closed regional land and sea borders, banned movement from one division to another, and in some cases, prevented people from leaving their homes on October 1.

### Internally Displaced Persons (IDPs)

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 20 of 352

Several thousand persons abandoned their homes in some villages on the border with Nigeria and fled to cities in the Far North region because of frequent attacks by Boko Haram. The International Organization for Migration's Displacement Tracking Matrix Round 11 for the Far North region indicated a total displaced population of 335,016 individuals, including 241,987 IDPs, 29,337 unregistered refugees, and 63,692 returnees. Of the IDP population, 92 percent was reportedly displaced due to the conflict with Boko Haram; and 8 percent was displaced due to flooding and other climatic factors.

## Protection of Refugees

Refoulement: Following security measures taken by authorities in the Far North region to counter Boko Haram, UNHCR and NGOs reported more than four thousand cases of forced returns in the year to December, mostly of Nigerians. In a press release on February 23, UNHCR expressed concern over the forced expulsion of 517 Nigerians, including 313 who had requested asylum. During a press conference on March 23, the minister of communications refuted all allegations of forced returns. He acknowledged, however, that the government escorted refugees from several localities of Mayo Sava Division to Banki, Borno State, Nigeria. The minister said the operations were carried out in agreement with Nigerian authorities, especially the National Emergencies Management Agency and Borno's State Emergency Management Agency. UNHCR also reported that 887 Nigerian refugees, who were alleged to have been forcibly returned, arrived in Banki on June 27.

Access to Asylum: The laws provide for granting asylum or refugee status, and the government has established a system of providing protection to refugees. UNHCR continued to provide documentation and assistance to the refugee population. UNHCR and the government continued to conduct biometric verification and registration of refugees, including of those not living in refugee camps. Nevertheless, local authorities did not always recognize these documents as official, which prevented refugees from travelling and engaging in business activities. As of November 30, the country hosted 247,777 refugees from the Central African Republic (CAR) and 90,728 from Nigeria. The country hosted 652,967 persons of concern to UNHCR as of November 30.

Access to Basic Services: Most refugees had access to health care, education, and limited employment opportunities. Access to these services varied according to the location of the refugees, with those in camps receiving support through

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 21 of 352

humanitarian organizations while refugees living in host communities faced difficulty receiving services.

Durable Solutions:  On March 2, UNHCR and the governments of Cameroon and Nigeria signed a tripartite agreement concerning voluntary repatriation.  On August 10, the tripartite commission met for the first time and directed its technical working group to set up a timetable and procedures "to ensure the safe, dignified, voluntary return and sustainable reintegration of Nigerian refugees from Cameroon."  Between April and June, the number of Nigerian refugees returning from Cameroon to Banki, Nigeria, reached 15,036.  In addition the Nigerian Immigration Service (NIS) registered 5,224 individuals who had earlier returned to Banki between January and March.  In total the NIS registered 20,260 returnees between January and June, according to UNHCR.  Observers and NGOs, however, continued to report as of November that the agreement had yet to be fully implemented and that Cameroon continued forcibly to repatriate Nigerian refugees to Nigeria.

Temporary Protection:  The government provided temporary, unofficial protection to individuals who may not qualify as refugees, extending this protection to hundreds of individuals during the year, including third-country nationals who had fled violence in the CAR.  Due to their unofficial status and inability to access services or support, however, many of these persons were subject to harassment and other abuse.

**Section 3. Freedom to Participate in the Political Process**

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. President Biya and the majority Cameroon Peoples Democratic Movement (CPDM), however, controlled key elements of the political process, including the judiciary.

**Elections and Political Participation**

Recent Elections:  In the three elections held in 2013, the CPDM was the most popular party except in the Northwest, where it faced strong competition from the Social Democratic Front.  The CPDM remained dominant in state institutions, partially due to strategic redrawing of voter districts, use of government resources for CPDM campaigning, interference with the right of opposition parties to

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 22 of 352

organize and publicize views during electoral campaigns, and privileges associated with belonging to the ruling party.

In September 2013 the country held simultaneous legislative and municipal elections, with 29 parties participating in the legislative elections and 35 in the municipal elections. The CPDM won 148 of 180 parliamentary seats and 305 of 360 municipal council positions, representing slight gains for opposition parties, compared with the parliament elected in 2007. In preparation for the 2013 legislative and municipal polls, Elections Cameroon (ELECAM), whose members the president appointed, compiled new voter rolls using biometric technology and issued biometric voter identification cards that were required at polling booths. Despite irregularities, such as the inconsistent use of identification cards due to a lack of expertise among local polling officials, opposition parties generally accepted the results. The high voter turnout (70 percent of registered voters) and ELECAM's administration of the election were viewed as major improvements over previous elections.

In April 2013 the country held its first Senate elections. The ruling CPDM won 54 of the 70 elected seats; the president, in accordance with the constitution, appointed an additional 30 senators. The elections were peaceful and generally free and fair.

In 2011 President Biya was re-elected in a poll marked by irregularities, but one that most observers believed reflected popular sentiment.

Political Parties and Political Participation: The country had 300 registered political parties. Membership in the ruling political party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service. The president appoints all ministers, including the prime minister; the governors of each of the 10 regions, who generally represented CPDM interests; and important lower-level members of the 58 regional administrative structures. The government pays the salaries of (primarily nonelected) traditional leaders, which supports a system of patronage.

Authorities sometimes refused to grant opposition parties permission to hold rallies and meetings.

Participation of Women and Minorities: There are no laws preventing women or members of minority groups from voting, running for office, and serving as electoral monitors, or otherwise participating in political life on the same basis as

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 23 of 352

men or nonminority citizens.  The law provides that lists of candidates for legislative and municipal elections should take into account the sociological components of the constituency, including gender.  Cultural and traditional factors, however, reduced women's political participation compared to that of men. Women remained underrepresented at all levels of government, but their political participation continued to improve.  For the 2013-18 electoral period, women occupied 26 of 374 council mayor positions, in comparison with 23 in 2007-13 and 10 in 2002-07.  Women occupied 10 of 62 cabinet positions, 76 of 280 parliamentary seats, and senior government offices, including territorial command and security/defense positions.

The minority Baka people took part as candidates in municipal and legislative elections but were not represented in the Senate, National Assembly, or higher offices of government.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, although these were seldom enforced.  The penal code identifies different offenses as corruption, including influence peddling, involvement in a prohibited employment, and nondeclaration of conflict of interest.  Reporting of corruption is encouraged through exempting whistleblowers from criminal proceedings.  Corruption in official examinations is punished with imprisonment of up to five years, fines up to two million CFA francs ($3,731), or both.  Nevertheless, corruption remained pervasive at all levels of government.  The government did not always effectively address high-profile cases, and officials continued to engage in corrupt practices with impunity.  The judiciary was not always free to independently investigate and prosecute corruption cases.  In the context of the fight against Boko Haram, local sources indicated that corruption-related inefficiencies and diversion of resources from their intended purposes continued to represent a fundamental national security vulnerability.

Corruption:  Launched in 2006 to fight corruption, including embezzlement of public funds, Operation Sparrow Hawk continued.  As in the previous year, the court opened new corruption cases and issued verdicts on some pending cases. During the year vehicle owners in Yaounde consistently complained about corrupt city officials, including police, pocketing communal taxes and parking fines.  In March the Special Criminal Court (SCC) issued an arrest warrant against former minister of agriculture and rural development, Lazare Essimi Menye, who fled the country in 2015.  Essimi Menye was charged with complicity in the

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 24 of 352

misappropriation of more than one billion CFA francs ($1.87 million) in public funds.  On July 31, the prosecution case against Amadou Vamoulke, former director general of Cameroon Radio Television, and two others, opened at the SCC after 12 months of pretrial detention.  The defendants pled not guilty during this initial hearing session.  The judges then adjourned the case to August 16.  The examining magistrate placed Vamoulke in pretrial detention in July 2016 for the alleged misappropriation of more than 10 billion CFA francs ($18.7 million).

Some officers convicted of corruption were relieved of their duties but continued to be paid due to weak oversight, accountability, and enforcement mechanisms for internal disciplining.  Individuals reportedly paid bribes to police and the judiciary to secure their freedom.  Police demanded bribes at checkpoints, and influential citizens reportedly paid police to make arrests or abuse individuals with whom they had personal disputes.  There were reports some police associated with the issuance of emigration and identification documents collected additional fees from applicants.  The minister-delegate in charge of defense and the secretary of state for defense in charge of the gendarmerie were charged with investigating and sanctioning officers involved in unethical practices, including corruption.

Financial Disclosure:  The constitution requires senior government officials, including members of the cabinet, to declare their assets, but a law passed to implement this provision has itself never been implemented.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A number of domestic and international human rights groups investigated and published findings on human rights cases.  As in previous years, government officials impeded the effectiveness of many local human rights NGOs by harassing their members, limiting access to prisoners, refusing to share information, and threatening violence against NGO personnel.  Human rights defenders and activists received anonymous threats by telephone, text message, and email.  The government took no action to investigate or prevent such occurrences.  The government criticized reports from international human rights organizations including Amnesty International and the International Crisis Group, accusing the organizations of publishing baseless accusations, with the intention of discrediting the government and military.  Despite these restrictions, numerous independent domestic human rights NGOs continued operations to the best of their ability, although many reported that government threats and intimidation limited their capability to operate in the country.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 25 of 352

There were several reports of intimidation of, threats against, and attacks on human rights activists, including members of the Network of Human Rights Defenders in Central Africa (REDHAC), NDH, the Mandela Center, and Front Line Fighters for Citizens' Interests, among others.  For example, the intimidation of Maximilienne Ngo Mbe, executive director of REDHAC, continued.  The threats increased after REDHAC spoke out against the crackdown on protests that Anglophone citizens and activists carried out since November 2016, which resulted in numerous arrests and arbitrary detentions of citizens.  In an August 28 release, NGO Mandela Center alleged the NDH executive director was nearly abducted on August 22 while trying to retrieve a package sent to her by Amnesty International.  She was not able to retrieve the package, and on the following day, the senior divisional officer of Mfoundi, Center region, asked the Yaounde I police district commissioner to seize the 20 copies of Amnesty International's report that were intended for NDH and to refer to the prosecutor any person who challenged the order.

Government Human Rights Bodies:  The National Commission on Human Rights and Freedoms (NCHRF) is an independent, government-funded institution for consultation, monitoring, evaluation, dialogue, concerted action, promotion, and protection of human rights.  The NCHRF was established by a 1990 presidential decree and subsequently given more powers by a 2004 law.  NCHRF powers are limited, however.  It can only make recommendations to competent authorities.  The commission publishes yearly reports on the human rights environment and may engage in research, provide education, coordinate actions with NGOs, and visit prisons and detention sites.  As of September 30, the NCHRF had not released its 2016 human rights report.  NGOs, civil society, and the general population considered the NCHRF dedicated and effective, albeit inadequately resourced and with insufficient ability effectively to hold human rights violators to account.  Its budget was far smaller than that of most other agencies with comparable status, such as the National Anti-Corruption Commission and ELECAM.

The National Assembly's Constitutional Laws, Human Rights and Freedoms, Justice, Legislation, Regulations, and Administration Committee was adequately resourced and reviewed the constitutionality of proposed legislation.  It approved most ruling party legislation, however, and was not an effective check on ruling party initiatives.

**Section 6. Discrimination, Societal Abuses, and Trafficking in Persons**

**Women**

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 26 of 352

<u>Rape and Domestic Violence</u>:  The law criminalizes rape of men and women and provides penalties of between five and 10 years' imprisonment for convicted rapists.  Police and courts, however, rarely investigated or prosecuted rape cases, especially since victims often did not report them.  The law does not address spousal rape.

The law does not specifically prohibit domestic violence, although assault is prohibited and punishable by imprisonment and fines.

The DGSN, in partnership with UN Women, also carried out activities to combat rape and other forms of gender-based violence (GBV).  From January 30 to March 31, the two organizations trained 250 police officers in the Far North region on the protection of rights of women and children vis-a-vis national and international legal frameworks.  Following the training, four special units referred to as "gender desks" were established in four divisions where Boko Haram was active:  Diamare, Mayo-Tsanaga, Mayo-Sava, and Logone and Chari.  The units were intended to serve as counseling centers for victims of GBV.

<u>Female Genital Mutilation/Cutting (FGM/C)</u>:  The law protects the physical and bodily integrity of persons, and the 2016 penal code prohibits genital mutilation of all persons.  Whoever mutilates the genitals of a person is subject to imprisonment from 10 to 20 years, and imprisonment for life if the offender habitually carries out this practice, does so for commercial purposes, or if the practice causes death.  FMG/C remained a problem, but its prevalence remained low.  As in the previous year, children were reportedly subjected to FGM/C in isolated areas of the Far North, East, and Southwest regions and in the Choa and Ejagham tribes, although the practice continued to decrease.  For more information, see data.unicef.org/resources/female-genital-mutilation-cutting-country-profiles/.

<u>Other Harmful Traditional Practices</u>:  Widows were sometimes forcibly married to one of the deceased husband's relatives to secure continued use of property left by the husband, including the marital home.  To protect women, including widows, better, the government included provisions in the 2016 penal code addressing the eviction of one spouse from the marital home by any person other than the other spouse.

<u>Sexual Harassment</u>:  The law prohibits sexual harassment.  The penal code provides for imprisonment from six months to one year and fines from 100,000 to one million CFA francs ($187-$1,865) for whoever takes advantage of the

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 27 of 352

authority conferred on them by their position to harass another using orders, threats, constraints, or pressure to obtain sexual favors. The penalty is imprisonment for one to three years if the victim is a minor and from three to five years if the offender is in charge of the education of the victim. Despite these legal provisions, sexual harassment was widespread.

Coercion in Population Control: There were no reports of coerced abortion, involuntary sterilization, or other coercive population control methods. Estimates on maternal mortality and contraceptive prevalence are available at: www.who.int/reproductivehealth/publications/monitoring/maternal-mortality-2015/en/.

Discrimination: The constitution provides for the same legal status and rights for women and men; however, in law women did not enjoy the same rights and privileges as men. Although local government officials including mayors claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions.

**Children**

Birth Registration: Citizenship is derived from parents, and it is the parents' responsibility to register births. Because many children were not born in formal health facilities and many parents were unable to reach local government offices, many births were unregistered. (For data, see the UNICEF *Multiple Indicator Cluster Survey*.

Education: The law provides for tuition-free compulsory primary education but does not set an age limit. Children were generally expected to complete primary education at age 12. Secondary school students had to pay tuition and other fees in addition to buying uniforms and books. This rendered education unaffordable for many children.

Teachers and students from the Northwest and Southwest regions boycotted classes as part of broader Anglophone protests during the year. In the Far North region, the 2016-17 academic year was largely lost for many children due to the fight against Boko Haram. Stand Up For Cameroon, a Cameroon People's Party platform for political leaders, civil society activists, and engaged citizens, stated in August that the Boko Haram conflict had made approximately 114,000 school-aged children IDPs.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 28 of 352

<u>Child Abuse</u>:  Boko Haram continued to abduct children and, according to reports, used 83 children, including 55 girls, as "suicide bombers" between January 1 and July 31.  News reports also cited cases of child rape and the kidnapping of children for ransom.  (For additional data, see the UNICEF *Multiple Indicator Cluster Survey*.)

Security force abuse of children was also a problem.  In March a gendarme in Boumba and Ngoko Division, East region, raped a 10-year-old girl after breaking into her home.  The child's parents filed complaints with the gendarmerie brigade commander, the company commander, and the DO, but the officials allegedly took no immediate action.  On March 27, the prosecutor at the local military court allegedly transferred the case to the gendarmerie commander in Bertoua, East region, for preliminary investigations.  The suspect and a person considered to be his facilitator were arrested and detained at the Bertoua Central Prison pending the preliminary investigation.  On September 19, the government commissioner at the Bertoua Military Court reportedly ordered their release, and as of November no information was publicly available on the reason for the release.  Since then, the suspect reportedly threatened the victim's family with reprisal.

<u>Early and Forced Marriage</u>:  The minimum legal age for marriage is 18.  The law punishes anyone who compels another to marry with imprisonment for five to 10 years, and with fines of 25,000 CFA francs ($47) to 1,000,000 CFA francs ($1,865).  When victims are minors, punishment may not be less than a two-year prison sentence, regardless of mitigating circumstances.  The court may also take away custody from parents who give away their underage children in marriage.  Despite these legal provisions, some families reportedly tried to marry their girls before age 18.  (For data, see the UNICEF website.)

<u>Sexual Exploitation of Children</u>:  The law prohibits the commercial sexual exploitation of children, as well as practices related to child pornography.  A conviction, however, requires proof of the use of a threat, fraud, deception, force, or other forms of coercion.  Penalties include imprisonment of 10 to 20 years and a fine of 100,000 to 10 million CFA francs ($187-$18,656).  The law does not specifically provide a minimum age for consensual sex.  Children under age 18 were exploited in prostitution, especially by restaurant and bar promoters, although no statistics were available.

<u>Child Soldiers</u>:  The government did not recruit or use child soldiers, but Boko Haram continued to utilize child soldiers, including girls, in their attacks on

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 29 of 352

civilian and military targets. There were also limited reports that some vigilance committees in the Far North region incorporated children in their ranks to combat Boko Haram. For example, Child Soldiers International reported that vigilance committees in Amchide, Fotokol, Kolofata and Maroua used children. The NGO further stated the children were mostly between the ages of 15 and 17 and accounted for 10 percent of vigilance committee membership. UN agencies and NGOs operating in the region could not confirm these numbers.

Displaced Children: The International Organization for Migration's Displacement Tracking Matrix Round 11 estimated that 67 percent of IDPs and refugees were children. Many children lived on the streets of major urban centers, although their number apparently declined as a result of stringent security measures against Boko Haram and the amended penal code that criminalizes vagrancy.

International Child Abductions: The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at travel.state.gov/content/childabduction/en/legal/compliance.html.

**Anti-Semitism**

The Jewish community was very small, and there were no known reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

The law does not specifically address discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the constitution explicitly forbids all forms of discrimination, providing that "everyone has equal rights and obligations." Secondary public education is tuition free for persons with disabilities and children born of parents with disabilities, and initial vocational training, medical treatment, and employment must be provided "when possible," and public assistance "when needed."

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 30 of 352

The majority of children with disabilities attended schools.  The curriculum of the Government Teacher Training College in Buea, Southwest region, was modified to include training in inclusive education skills for teaching the deaf, blind, and developmentally disabled, among others.  The government aimed to introduce inclusive education nationwide.

**National/Racial/Ethnic Minorities**

The population consists of an estimated 286 ethnic groups.  Members of the president's Beti/Bulu ethnic group from the South region held key positions and were disproportionately represented in the government, state-owned businesses, security forces, and CPDM.

**Indigenous People**

An estimated 50,000 to 100,000 Baka, including Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East regions.  The government did not effectively protect the civil or political rights of either group.  Other groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices.  There were credible reports the Mbororos, itinerant pastoralists living mostly in the North, East, Adamawa, and Northwest regions, were subject to harassment, sometimes with the complicity of administrative or judicial authorities.

The government continued long-standing efforts to provide birth certificates and national identity cards to Baka.  Most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in accessing their homes deep in the forest.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

Consensual same-sex sexual activity is illegal and punishable by a prison sentence of six months to five years and a fine ranging from 20,000 to 200,000 CFA francs ($37-$373).

Lesbian, gay, bisexual, transgender, and intersex (LGBTI) rights organizations such as the Cameroonian Foundation for AIDS (CAMFAIDS), Humanity First Cameroon, Alternatives Cameroun, National Observatory of the Rights of LGBTI Persons and Their Defenders, and others reported several arrests of LGBTI

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 31 of 352

persons. LGBTI individuals received anonymous threats by telephone, text message, and email, including of "corrective" rape, but authorities did not investigate allegations of harassment. Police were generally unresponsive to requests to increase protection for lawyers who received threats because they represented LGBTI persons. Both police and civilians reportedly continued to extort money from presumed LGBTI individuals by threatening to expose them.

Humanity First Cameroon and Alternatives Cameroun claimed in their joint 2017 annual report that eight LGBTI persons remained imprisoned for homosexuality in the Kondengui central prison in Yaounde. The two NGOs also documented 578 other cases of human rights abuses related to homosexuality, including 27 arbitrary arrests.

On August 11, police summoned CAMFAIDS' leadership to the DGSN for "promotion of homosexual practices." On August 16, police interrogated four members of CAMFAIDS. While some questions concerned the legal status of the advocacy group and its funding sources, police also requested a list of its members and a list of similar organizations.

Some LGBTI persons had difficulty accessing birth registration and other identification documents. Officials at identification units refused to issue identification cards for persons whose physical characteristics were not consistent with their birth certificate.

In 2016 Johns Hopkins University, Metabiota Cameroon, and Care USA, in collaboration with the National AIDS Coordinating Council, conducted an Integrated Biological and Behavioral Survey on gay men, using a sample of 1,323 men. The preliminary report released in March showed inter alia that 14.7 percent were arrested for being homosexual. (For more information, see jhu.pure.elsevier.com).

Human rights and health organizations continued to advocate for the LGBTI community by defending LGBTI individuals under prosecution, promoting HIV/AIDS initiatives, and working to change laws prohibiting consensual same-sex activity. Organizations undertaking these activities faced obstacles securing official registration, as well as, limited or non-existent responses from police when they experienced harassment.

**HIV and AIDS Social Stigma**

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 32 of 352

Persons afflicted with HIV or AIDS often suffered social discrimination and were isolated from their families and society due to social stigma and lack of education about the disease.

Unlike previous years, there were no credible reports of specific cases of discrimination in employment.

**Other Societal Violence or Discrimination**

Several cases of vigilante action and other attacks were reported during the year.

Several arson attacks were also recorded, involving the destruction of both public and private property.  On March 30, unidentified individuals set fire to the Old Market in Limbe, Southwest region.  The fire lasted about four hours and destroyed at least fifty shops.

The law provides for sentences of between two and 10 years' imprisonment and fines of between 5,000 and 100,000 CFA francs ($9-$187) for witchcraft.  There were no reported arrests or trials for alleged witchcraft reported during the year.

**Section 7. Worker Rights**

**a. Freedom of Association and the Right to Collective Bargaining**

The law provides for the rights of workers to form and join independent unions, bargain collectively, and conduct legal strikes.  The law also prohibits antiunion discrimination and requires reinstatement of workers fired for union activity. Statutory limitations and other practices substantially restricted these rights.  The law does not permit the creation of a union that includes both public- and private-sector workers or the creation of a union that includes different, even if closely related, sectors.  The law requires that unions register with the government, permitting groups of no fewer than 20 workers to organize a union by submitting a constitution and by-laws; founding members must also have clean police records. The law provides for heavy fines for workers who form a union and carry out union activities without registration.  Trade unions or associations of public servants may not join a foreign occupational or labor organization without prior authorization from the minister responsible for "supervising public freedoms."

The constitution and law provide for collective bargaining between workers and management as well as between labor federations and business associations in each

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 33 of 352

sector of the economy. The law does not apply to the agricultural or informal sectors, which included the majority of the workforce.

Legal strikes or lockouts may be called only after conciliation and arbitration procedures have been exhausted. Workers who ignore procedures to conduct a legal strike may be dismissed or fined. Before striking, workers must seek mediation from the Ministry of Labor and Social Security at the local, regional, and ministerial levels. Only if mediation fails at all three levels can workers formally issue a strike notice and subsequently strike. The provision of law allowing persons to strike does not apply to civil servants, employees of the penitentiary system, or workers responsible for national security, including police, gendarmerie, and army personnel. Instead of strikes, civil servants are required to negotiate grievances directly with the minister of the appropriate department in addition to the minister of labor and social security. Arbitration decisions are legally binding but were often unenforceable if one party refused to cooperate.

Employers guilty of antiunion discrimination are subject to fines of up to approximately one million CFA francs ($1,866).

Free Industrial Zones are subject to labor law, except for the following provisions: the employers' right to determine salaries according to productivity, the free negotiation of work contracts, and the automatic issuance of work permits for foreign workers.

In practice, the government and employers did not effectively enforce the applicable legislation on freedom of association and the right to collective bargaining. Penalties for violations were rarely enforced and useless as a deterrent. Administrative judicial procedures were infrequent and subject to lengthy delays and appeals. The government and employers often interfered in the functioning of workers' organizations. The government occasionally worked with nonrepresentative union leaders to the detriment of elected leaders, while employers frequently used hiring practices such as subcontracting to avoid hiring workers with bargaining rights. Blacklisting of union members, unfair dismissal, promotion of employer-controlled unions, and threatening workers trying to unionize were common practices.

New trade unions did not have easy access to registration. In a letter dated July 30, officials of the newly formed Private Security Workers Union in Wouri Division, Littoral region, informed the Registrar of Trade Unions of the creation of their organization in April 2016 and at the same time requested its affiliation with the

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 34 of 352

Confederation of Workers' Unions of Cameroon (CSTC). The registrar requested additional time to authenticate the documents provided.

More than 100 trade unions and 12 trade union confederations operated, including one public-sector confederation.

The government undermined the leadership of the CSTC elected in 2015 by continuing to cooperate with former leaders of the CSTC. Jean Marie Zambo Amougou, the former leader, continued to use the title of "President of the CSTC," despite a January 17 court decision ordering him to stop doing so with immediate effect. The Minister of Labor and Social Security continued to consider Zambo Amougou as the official representative of the CSTC, inviting him to meetings and sending all CSTC correspondence to him, to the detriment of CSTC's legitimate leader, Andre Moussi Nolla, and other new leaders, despite multiple complaints by the CSTC. The minister also appointed Zambo Amougou, Tsoungui Fideline Christelle, Beyala Jule Dalamard, Nintcheu Walla Charles, Malloum Lamine, and Hamadou Nassourou, all members of the former CSTC management team, to be workers' representatives in the country's delegation at the 106th International Labor Conference in Geneva June 5-16. In a May 31 letter to the International Labor Organization's Credentials Committee, the new leaders of the CSTC unsuccessfully attempted to oppose the inclusion of these delegates.

As in 2016, trade unionists reported on officials prohibiting the establishment of trade unions in their private businesses, including Fokou, Afrique Construction, Eco-Marche, and Quifferou, or otherwise hindering union operations. Some companies based in Douala II, IV, and V and in Tiko (Southwest region), for example, retained 1 percent of unionized workers' salaries but refused to transfer the money to trade unions. Some companies that were initially against unionization of their workers changed their minds and allowed their employees to join trade unions, such as DANGOTE Ciment Cameroon, which allowed elections of workers' representatives.

Many employers frequently used hiring practices such as subcontracting to avoid hiring workers with bargaining rights. Workers' representatives stated that most major companies, including parastatal companies, engaged in the practice, citing ENEO, CDE, Cimencam, Guinness, Alucam, and many others. Subcontracting was reported to involve all categories of personnel, from the lowest to senior levels. As a result, workers with equal expertise and experience did not always enjoy similar advantages when working for the same business; subcontracted personnel typically lacked a legal basis to file complaints.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 35 of 352

A number of strikes were announced, some of which were called off after successful negotiation. Others, however, were carried out without problems, or with some degree of repression. Workers' grievances generally involved poor working conditions, including lack of personal protective equipment, improper implementation of collective agreements, nonpayment of salary arrears or retirement benefits, illegal termination of contracts, lack of salary increases, and failure of employers to properly register employees and pay the employer's contribution to the National Social Insurance Fund, which provides health and social security benefits.

The government suspended the salaries of 11 workers' representatives affiliated with the Wouri divisional union of council workers following a strike on April 10. Employees of the city council in Douala demanded health insurance for themselves and their immediate relatives. The government-delegate fired the complainants, but was overruled by the Minister of Labor and Social Security. The government-delegate, however, had not reinstated the employees as of December.

Medical doctors staged a series of strikes for better working conditions and higher pay in April and May, after unsuccessful negotiations with health minister Andre Mama Fouda in January had failed to yield positive outcomes. Minister Fouda cautioned the doctors against striking, which he described as illegal, stating that the doctors union was not registered. In an attempt to neutralize the movement after the April strike, he transferred union leaders to health facilities in remote rural areas in the northern part of the country. In none of the transfers did the technical level of the health facility match the profile of the doctors.

Teachers and lawyers in the Anglophone regions also went on a strike that lasted for many months to protest what they referred to as their marginalization by the French-speaking majority. After initially restricting the lawyers significantly, the government subsequently implemented a series of measures aimed at diffusing tension. Lawyers and teachers resumed work in the two regions by November.

**b. Prohibition of Forced or Compulsory Labor**

The constitution and law prohibit all forms of forced and compulsory labor. The law prohibits slavery, exploitation, and debt bondage and voids any agreement in which violence was used to obtain consent. Violations of the law are punishable by prison terms of five to 20 years and fines ranging from 10,000 to 10 million francs ($18-$17,668). In cases of debt bondage, penalties are doubled if the

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 36 of 352

offender is also the guardian or custodian of the victim. The law also extends culpability for all crimes to accomplices and corporate entities. Although the statutory penalties are fairly severe, the government did not enforce the law effectively, due to lack of knowledge of trafficking and limited labor inspection and remediation resources. In addition, due to the length and expense of criminal trials and the lack of protection available to victims participating in investigations, many victims of forced or compulsory labor resorted to amicable settlement.

There continued to be reports of hereditary servitude imposed on former slaves in some chiefdoms in the North region. Many Kirdi, whose tribe had been enslaved by Fulani in the 1800s, continued to work for traditional Fulani rulers for compensation, while their children were free to pursue schooling and work of their choosing. Kirdi were also required to pay local chiefdom taxes to Fulani, as were all other subjects. The combination of low wages and high taxes, although legal, effectively constituted forced labor. While technically free to leave, many Kirdi remained in the hierarchical and authoritarian system because of a lack of viable options.

In the South and East regions, some Baka, including children, continued to be subjected to unfair labor practices by Bantu farmers, who hired the Baka at exploitive wages to work on their farms during the harvest seasons.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The law generally protects children from exploitation in the workplace and specifies penalties ranging from fines to imprisonment. The law sets a minimum age of 14 for child employment, prohibits children from working at night or longer than eight hours per day, and enumerates tasks children under 18 cannot legally perform, including moving heavy objects, undertaking dangerous and unhealthy tasks, working in confined areas, and prostitution. Employers were required to train children between ages 14 and 18, and work contracts must contain a training provision for minors. The Ministry of Social Affairs and the Ministry of Labor and Social Security were responsible for enforcing child labor laws through site inspections of registered businesses. Although the government did not allocate sufficient resources to support an effective inspection program, workers' organizations reported child labor was not a major problem in the formal sector.

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 37 of 352

The use of child labor, including forced labor, in informal sectors remained rampant. According to an International Labor Organization 2012 survey, 40 percent of children between the ages of six and 14 were engaged in economic activity; 89 percent of working children were employed in agriculture, 5 percent in commerce, and 6 percent in either industrial work or domestic service. UNICEF's 2014 *Multiple Indicator Cluster Survey* indicated that 47 percent of children ages five-14 engaged in child labor. Children working in agriculture frequently were involved in clearing and tilling the soil and harvesting crops, such as bananas and cocoa. In the service sector, children worked as domestic servants and street vendors. Children worked at artisanal mining sites under dangerous conditions. Children were also forced to beg by adults, often by their parents to provide additional income for the household. According to anecdotal reports, child labor, especially by refugee children, was prevalent in the building construction sector. Chinese firms also reportedly resorted to child labor in the manufacture of children's shoes.

Parents viewed child labor as both a tradition and a rite of passage. Relatives often brought rural youth, especially girls, to urban areas to exploit them as domestic helpers under the pretense of allowing them to attend school. In rural areas many children began work at an early age on family farms. The cocoa industry and cattle-rearing sector also employed child laborers. These children originated, for the most part, from the three northern and the Northwest regions.

The Ministry of Social Affairs implemented activities to sensitize parents to the negative impact of child labor. For example, during the vacation period in June, the ministry, in collaboration with the second police district in Yaounde, conducted a two-week campaign to identify children from ages seven to 17 selling items on the streets of Mokolo. Police took the children to the district police station, where they registered and held the children until they could notify the parents. Police interrogated the parents, informed them of the risks to which their children were exposed, and warned them they would be prosecuted if the children returned to the streets.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The law contains no specific provisions against discrimination.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 38 of 352

Discrimination in employment and occupation allegedly occurred with respect to ethnicity, HIV status, disability, gender, and sexual orientation, especially in the private sector. Ethnic groups often gave preferential treatment to fellow ethnic group members in business and social practices, and persons with disabilities reportedly found it difficult to secure employment. There were no reliable reports of discrimination against internal migrant or foreign migrant workers, although anecdotal reports suggested such workers were vulnerable to unfair working conditions. During the year, however, no reliable reports highlighted any concrete case of discrimination with respect to employment. The government did not report publicly or privately on its efforts to prevent or eliminate employment discrimination.

### e. Acceptable Conditions of Work

The minimum wage in all sectors is 36,270 CFA francs ($68) per month. Premium pay for overtime ranges from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it is weekend or late-night overtime. Despite the minimum wage law, employers often negotiated with workers for lower salaries, in part due to the high rate of unemployment in the country. Salaries lower than the minimum wage remained prevalent in the public works sector, where many positions required unskilled labor, as well as in the domestic work sector, where female refugees were allegedly vulnerable to unfair labor practices.

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities. There are exceptions for guards and firefighters (56 hours a week), service-sector staff (45 hours), and household and restaurant staff (54 hours). The law mandates at least 24 consecutive hours of weekly rest.

The law mandates paid leave at the employer's expense at the rate of one and one-half working days for each month of actual service. For persons under age 18, leave accrues at the rate of two and one-half days per month of service. A maximum of 10 days per year of paid special leave, not deductible from annual leave, is granted to workers on the occasion of immediate family events. For mothers the leave is increased by either two working days for each child under age six on the date of departure on leave, where the child is officially registered and lives in the household, or one day only if the mother's accrued leave does not exceed six days. The leave is increased depending on the worker's length of service with the employer by two working days for each full period whether

*Country Reports on Human Rights Practices for 2017*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 39 of 352

continuous or not of five years of service.  For mothers, this increase is in addition to the one described above.

The government sets health and safety standards in the workplace.  The minister in charge of labor establishes the list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety.  These regulations were not enforced in the informal sector.  The labor code also mandates that every enterprise and establishment of any kind provide medical and health services for its employees.  This stipulation was not enforced.  By law workers may remove themselves from situations that endanger health or safety without jeopardy to their employment, but authorities did not effectively protect employees in these situations.

The Ministry of Labor and Social Security is responsible for national enforcement of the minimum wage and work-hour standards.  Ministry inspectors and occupational health physicians are responsible for monitoring health and safety standards, but the ministry lacked the resources for a comprehensive inspection program.  Although there were ministries tasked with upholding the labor laws, resources were inadequate to support their mission.  For example, the city of Douala, which has six subdivisions, hundreds of companies, and thousands of employees, had only one labor inspectorate, which was generally poorly staffed. Meme Division of the Southwest region had only one labor delegate and no labor inspectors.  This labor delegate did not have any means or transportation to travel throughout the division.  The office had not had computers since 2016 due to a burglary, so the delegate often visited the communal technology center or other government offices to type and print official correspondence and notices.

Country Reports on Human Rights Practices for 2017
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK      Document 142-6      Filed 01/13/25      Page 40 of 352

# CAMEROON 2018 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cameroon is a republic dominated by a strong presidency. The country has a multiparty system of government, but the Cameroon People's Democratic Movement (CPDM) has remained in power since its creation in 1985. In practice the president retains the power to control legislation. On October 7, citizens re-elected CPDM leader Paul Biya president, a position he has held since 1982. The election was marked by irregularities, including intimidation of voters and representatives of candidates at polling sites, late posting of polling sites and voter lists, ballot stuffing, voters with multiple registrations, and alleged polling results manipulation. On March 25, the country conducted the second senate elections in its history. They were peaceful and considered generally free and fair. In 2013 simultaneous legislative and municipal elections were held, and most observers considered them free and fair. New legislative and municipal elections were expected to take place during the year; however, in consultation with the parliament and the constitutional council, President Biya extended the terms of office of parliamentarians and municipal councilors for 12 months, and general elections were expected to take place in fall 2019 or early 2020.

Civilian authorities at times did not maintain effective control over the security forces, including police and gendarmerie.

The sociopolitical crisis that began in the Northwest and Southwest Regions in late 2016 over perceived marginalization developed into an armed conflict between government forces and separatist groups. The conflict resulted in serious human rights violations and abuses by government forces and Anglophone separatists.

Human rights issues included arbitrary and unlawful killings by security forces as well as armed Anglophone separatists; forced disappearances by security forces, Boko Haram, and separatists; torture by security forces and Anglophone separatists; prolonged arbitrary detentions including of suspected Anglophone separatists by security forces; harsh and life-threatening prison conditions; arbitrary or unlawful interference with privacy; violence and harassment targeting journalists by government agents; periodic government restrictions on access to the internet; laws authorizing criminal libel; substantial interference with the right of peaceful assembly; refoulement of refugees and asylum seekers by the government; restrictions on political participation; violence against women, in part due to government inaction; unlawful recruitment or use of child soldiers by

Anglophone separatists, government-supported vigilance committees, and Boko Haram; violence or threats of violence targeting lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, and criminalization of consensual same-sex relations; child labor, including forced child labor; and violations of workers' rights.

Although the government took some steps to identify, investigate, prosecute, or punish officials who committed human rights abuses in the security forces and in the public service, it did not often make public these proceedings, and some offenders, including serial offenders, continued to act with impunity.

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

**a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings**

There were several reports that the government or its agents committed arbitrary and unlawful killings through excessive use of force in the execution of official duties.

In July, Human Rights Watch reported that, during government operations in 12 villages in the Northwest and Southwest Regions between January and April, government security forces shot and killed more than a dozen civilians, including at least seven persons with intellectual or developmental disabilities who had difficulty fleeing.  On May 25, in Menka-Pinyin, Santa Subdivision of the Northwest Region, elements of the Gendarmerie, the 51st Motorized Infantry Brigade, and the Special Operations Group of the National Police carried out a raid on a location believed to harbor Anglophone activists, killing 27 persons, according to official sources.  Security forces battling Anglophone secessionists in the Northwest and Southwest Regions allegedly killed two clerics.  Anglophone separatists attacked and killed several dozen civilians considered loyal to the central government and members of defense and security forces in these two regions.  According to the government's Emergency Humanitarian Assistance Plan, as of June 11, the death toll attributed to separatists within defense and security forces was 84, including 32 members of defense forces, 42 gendarmes, seven policemen, two prison guards, and one Eco-guard, some of whom were mutilated or decapitated and their bodies exhibited on social media.  Civilian victims included the following:  the chief of Esukutan in Toko Subdivision of the Southwest Region, murdered on February 5; the divisional officer for Batibo in the Northwest, abducted on February 11 and subsequently killed; and Ashu Thomas

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 42 of 352

Nkongho, discipline master of the government bilingual high school in Kossala, Meme Division of the Southwest Region, killed on school premises on April 25. Unidentified gunmen killed a local chief in a church and a priest, supposedly because of their alleged opposition to secession by the Northwest and Southwest Regions.

Boko Haram and ISIS-West Africa (ISIS-WA) continued killing civilians, including members of vigilance committees, which were organized groups of local residents cooperating with government forces in the fight against Boko Haram, and members of defense and security forces in the Far North Region. According to the *L'Oeil du Sahel* newspaper, as of June 30, at least 153 civilians and 12 members of defense and security forces had been killed in the attacks.

## b. Disappearance

Government security forces were widely believed to be responsible for disappearances of suspected Anglophone separatists, with reports of bodies dumped far from the site of killings to make identification difficult. According to credible nongovernmental organizations (NGOs), the government did not readily account for some of the activists arrested in connection with the Anglophone crisis. Family members and friends of the detainees were frequently unaware of the missing individuals' location in detention for a month or more. For example, authorities held incommunicado Ayuk Sisiku Tabe, the "interim president" of the so-called Republic of Ambazonia, along with 46 other Anglophone separatists, from January 29 until late June when they were allowed to meet with their lawyers and the International Committee of the Red Cross (ICRC).

In an August 24 release, Ekombo Favien, vice president of human rights NGO Frontline Fighters for Citizen Interests (FFCI), announced the disappearance of FFCI national president Franklin Mowha. According to the release, Mowha arrived in Kumba, Southwest Region, on August 2 to monitor human rights abuses. He was last seen leaving his hotel room on August 6. Ekombo indicated that authorities had previously targeted Mowha on several occasions because of his human rights reporting.

Boko Haram insurgents kidnapped civilians, including women and children, during numerous attacks in the Far North Region. According to *L'Oeil du Sahel*, as of June 30, at least 51 civilians had been victims of Boko Haram abductions, and some of them remained unaccounted for.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 43 of 352

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

Although the constitution and law prohibit such practices, there were reports that security force members beat, harassed, or otherwise abused citizens, including separatist fighters. Amnesty International and Human Rights Watch documented several cases in which security forces severely mistreated suspected separatists and detainees.

Amnesty International reported in July 2017 on the cases of 101 individuals whom security forces allegedly tortured between March 2013 and March 2017 in detention facilities run by the Rapid Intervention Battalion (BIR) and the General Directorate of Counter Intelligence (DGRE). While most of the cases documented involved persons arrested in 2014 and 2015 and allegedly tortured between 2014 and 2016, Amnesty International asserted that the practice continued into 2017. It stated that torture took place at 20 sites, including four military bases, two intelligence centers, a private residence, and a school. Specific sites named in the report included the BIR bases in Salak, Kousseri, and Kolofata in the Far North Region, and DGRE facilities in Yaounde. As of October the government had not shared results of its internal investigations but claimed it had investigated some, if not all, of the allegations.

Human Rights Watch documented the case of 22-year-old Fredoline Afoni, a third-year student at the Technical University of Bambili whom security forces beat to death on January 29. Witnesses told Human Rights Watch that Fredoline was home near Kumbo in the Northwest Region when he received a telephone call requesting that he pick up luggage at a nearby junction. Once at the location, persons dressed in civilian clothes forcefully took him away by truck. A truck belonging to the gendarmerie subsequently drove through the same junction with Fredoline sitting in the back, naked and handcuffed, with signs of having been badly beaten. Individuals reportedly appeared at a relative's home and collected Fredoline's laptop and cell phone. Fredoline's uncle subsequently discovered that he was in gendarmerie custody. The uncle reportedly told Human Rights Watch that he discovered the victim's naked and decaying corpse outside the local mortuary three days later. After a postmortem examination, the medical professional who examined the body told Human Rights Watch that Fredoline died as a result of his beatings.

Social media diffused a video in June showing security force members at the Cameroon Protestant College of Bali in the Northwest Region forcing two girls to

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 44 of 352

crawl through the mud while referring to them as Ambazonian spies.  Media
reports indicated that the gendarmes were arrested and placed in detention and
were awaiting trial by the military tribunal, but there was no further information on
the case.

Press reporting indicated there were cases of rape and sexual abuse by persons
associated with the government and separatists in Anglophone regions.  For
example, there were credible reports that on July 3, during security operations in
Bamenda, Northwest Region, first-class soldier Mbita Arthur allegedly raped a
female victim he called aside for a routine national identity check.  The soldier was
arrested, although there was no further information on the case.

During the year the United Nations reported that it received five allegations of
sexual exploitation and abuse against peacekeepers from Cameroon deployed in
the UN Multidimensional Integrated Stabilization Mission in the Central African
Republic (MINUSCA).  Three cases alleged sexual exploitation (exploitative
relationship, transactional sex), and three cases sexual abuse (rape), one of which
involved minors.  Several allegations each referred to more than one alleged
perpetrator, more than one victim, or both.  Investigations both by the United
Nations and the government were pending.  Interim action by the United Nations
was taken in one case.  Nine allegations reported previously were pending.

**Prison and Detention Center Conditions**

Prison conditions were harsh and life threatening.

Physical Conditions:  Overcrowding remained a significant problem in most
prisons, especially in major urban centers.  Officials held prisoners in dilapidated,
colonial-era prisons, where the number of inmates was as much as five times the
intended capacity.  Prisons generally had separate wards for men, women, and
children.  Authorities often held detainees in pretrial detention and convicted
prisoners together.  In many prisons toilets were nothing more than common pits.
In some cases women benefitted from better living conditions, including improved
toilet facilities and less crowded living quarters.  Authorities claimed to hold sick
persons separately from the general prison population, but this was often not the
case.

According to prison administration officials, the country had 79 operational
prisons, with an intended capacity of 17,915 but which held close to 30,000
inmates as of June.  For example, the central prison in Ngaoundere, Adamawa

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 45 of 352

Region, was initially designed to accommodate 150 inmates. Successive expansions raised the capacity to 500 inmates. As of June 19, the prison held 1,600 inmates, more than two-thirds of whom had not been convicted of any crime. A third of the inmates were awaiting trial, hearings had begun for another third, and one-third had been convicted.

The quality of food, access to potable water, sanitation, heating, ventilation, lighting, and medical care were inadequate. As a result illness was widespread. Malnutrition, tuberculosis, bronchitis, malaria, hepatitis, scabies, and numerous other untreated conditions, including infections, parasites, dehydration, and diarrhea, were rampant. The number of deaths associated with detention conditions or actions of staff members or other authorities was unknown.

Physical abuse by prison guards and prisoner-on-prisoner violence were problems. Corruption among prison personnel was reportedly widespread. Visitors were at times forced to bribe wardens to be granted access to inmates. Prisoners bribed wardens for special favors or treatment, including temporary freedom, cell phones, beds, and transfers to less crowded areas of the prisons. Due to their inability to pay fines, some prisoners remained incarcerated after completing their sentences or after they had received court orders of release.

Administration: Independent authorities often investigated credible allegations of mistreatment. Visitors needed formal authorization from the state counsel; without authorization, they had to bribe prison staff to communicate with inmates. In addition visits to Boko Haram suspects were highly restricted. Some detainees were held far from their families, reducing the possibility of visits. Authorities allowed prisoners and detainees to observe their religions without interference.

As in 2017, authorities allowed NGOs to conduct formal education and other literacy programs in prisons. At the principal prison in Edea, Littoral Region, the NGO Christian Action for the Abolition of Torture sponsored a Literacy and Social Reintegration Center that provided primary and lower secondary education to inmates. Because of the sociopolitical unrest in the Southwest Region, Human IS Right, a Buea-based civil society organization, and the NGO Operation Total Impact discontinued their formal education and reformation education program in the principal prisons in Buea and Kumba. The central prison in Garoua, North Region, continued to run a full-cycle primary school.

Independent Monitoring: Unlike in the previous year, the government restricted international humanitarian organizations' access to prisoners in official prisons.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 46 of 352

For example, as of June authorities had not allowed the ICRC access to its target prisons and detention centers. On July 3, however, the ICRC was able to visit the 47 Anglophone separatists repatriated from Nigeria, and some of the detainees delivered messages through the organization to their families. The National Commission on Human Rights and Freedoms (NCHRF) and the Commissions for Justice and Peace of the Catholic archdioceses also conducted prison visits but were denied access to some detention centers. In January NCHRF members visited prisons in Monatele in the Center Region; Bertoua, Doume, and Abong-Mbang in the East Region; and Maroua in the Far North Region. The NCHRF reported that it did not have access to some prisons in Yaounde, including those hosting the 47 suspected separatists repatriated from Nigeria. The NCHRF also alleged authorities did not grant access to a victim who was shot and admitted at the Yaounde Emergency Center.

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide the right to challenge the lawfulness in court of an arrest or detention. The law states that, except in the case of an individual discovered in the act of committing a felony or misdemeanor, the officials making the arrest shall disclose their identity and inform the person arrested of the reason. The law also provides that persons arrested on a warrant shall be brought immediately before the examining magistrate or the president of the trial court who issued the warrant, and that the accused persons shall be given reasonable access to contact their family, obtain legal advice, and arrange for their defense. The law provides that any person who has been illegally detained by the police, the state counsel, or the examining magistrate may receive compensation. On several occasions the government did not respect these provisions.

## Role of the Police and Security Apparatus

The national police, DGRE, Ministry of Defense, Ministry of Territorial Administration, and, to a lesser extent, presidential guard are responsible for internal security. The Ministry of Defense--which includes the gendarmerie, army, and the army's military security unit--reports to the Office of the Presidency, resulting in strong presidential control of security forces. The army is responsible for external security, while the national police and gendarmerie have primary responsibility for law enforcement. Historically the gendarmerie has responsibility in rural areas. Increasingly in the Anglophone regions, responsibility for security in the rural areas is left to another security force, the BIR. The BIR falls outside

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 47 of 352

the purview of conventional forces. The national police--which includes public security, judicial, territorial security, and frontier police--reports to the General Delegation of National Security (DGSN), which is under the direct authority of the presidency. The government took some steps to hold police accountable for abuses of power. Police remained ineffective, poorly trained, and corrupt. Impunity continued to be a problem.

Civilian authorities maintained some control over the police and gendarmerie, and the government had some mechanisms in place to investigate and punish abuse and corruption. The DGSN and gendarmerie investigated reports of abuse and forwarded cases to the courts. Lesser sanctions were handled internally. The DGSN, Ministry of Defense, and Ministry of Justice stated that members of security forces were sanctioned during the year for committing abuses, but few details were known about investigations or any subsequent accountability.

The national gendarmerie and the army have special offices to investigate abuse. The secretary of state for defense and the minister delegate at the presidency are in charge of prosecuting abusers. The minister delegate of defense refers cases involving aggravated theft, criminal complicity, murder, and other major offenses to the military courts for trial.

In March authorities opened an investigation into the case of taxi driver Jean Nga Mvondo, who died a few hours after the Ngousso gendarmerie brigade in Yaounde released him from detention. Pending the outcome of the investigation, on March 23, the secretary of state in charge of the National Gendarmerie (SED) relieved the brigade commander of his duties.

As reported above, on July 24, the minister delegate for defense announced that the gendarmerie in Bamenda, Northwest Region, arrested first class soldier Mbita Arthur and referred him to the office of the Bamenda military court prosecutor. The minister also promised to take disciplinary action against the soldier in accordance with the law. Mbita Arthur allegedly raped a female victim on July 23.

**Arrest Procedures and Treatment of Detainees**

The law requires police to obtain a warrant before making an arrest, except when a person is caught in the act of committing a crime, but police often did not respect this requirement. The law provides that detainees be brought promptly before a magistrate, although this often did not occur. Police may legally detain a person in connection with a common crime for up to 48 hours, renewable once. This period

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 48 of 352

may, with the written approval of the state counsel, be exceptionally extended twice before charges are brought. Nevertheless, police and gendarmes reportedly often exceeded these detention periods. The law also permits detention without charge for renewable periods of 15 days by administrative authorities such as governors and civilian government officials serving in territorial command. The law provides for access to legal counsel and family members, although police frequently denied detainees access to both. Contrary to the wide-reaching antiterror law, civilian law prohibits incommunicado detention, but it occurred, especially in connection with the sociopolitical unrest in the two Anglophone regions. The law permits bail, allows citizens the right to appeal, and provides the right to sue for unlawful arrest, but these rights were seldom respected. On August 8, Supreme Court Chief Judge Daniel Mekobe Sone commissioned the first members of the Compensation Commission for Illegal Detention, a body created to provide citizens with recourse if they believe they were wrongfully detained.

Arbitrary Arrest: Police, gendarmes, BIR soldiers, and government authorities reportedly continued to arrest and detain persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado. "Friday arrests," a practice whereby individuals arrested on a Friday typically remained in detention until at least Monday unless they paid a bribe, continued. There were several reports by media and NGOs that police or gendarmes arrested persons without warrants on circumstantial evidence alone, often following instructions from influential persons to settle personal scores. There were also credible reports that police or gendarmes arbitrarily arrested persons during neighborhood sweeps for criminals and stolen goods or arrested persons lacking national identification cards, especially in connection with the Anglophone crisis and the fight against Boko Haram.

There were credible reports that authorities held some suspects in the Anglophone crisis for long periods without notifying them of the charges. For example, authorities detained Sisiku Ayuk Tabe, the president of the Anglophone separatist movement, and 46 others incommunicado and without official charge for close to six months. The suspects were arrested in Nigeria on January 5 and extradited to Cameroon on January 25. Defense lawyers considered the arrest and extradition illegal and filed an application for immediate release with the Mfoundi High Court in Yaounde. On August 30, the judge dismissed the application on procedural grounds. The court eventually heard the case on November 1 and delivered a verdict denying the release of Sisiku Ayuk Tabe and the nine other leaders of the Anglophone separatist movement on November 15.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 49 of 352

<u>Pretrial Detention</u>:  The law provides for a maximum of 18 months' detention before trial, but many detainees waited years to appear in court.  No comprehensive statistics were available on pretrial detainees.  According to prison authorities, as of June the central prison in Ngaoundere, Adamawa Region, housed approximately 1,600 inmates, two-thirds of whom were pretrial detainees and appellants.  Some pretrial detainees had been awaiting trial for more than two years.  The increase in pretrial prison populations was due in large part to mass arrests of Anglophone activists and persons accused of supporting Boko Haram, staff shortages, lengthy legal procedures, lost files, administrative and judicial bottlenecks, including procedural trial delays, corruption, negligence, and court fees.

The NGO Human IS Right documented the case of 24-year-old Beng Pascal Ngong, who was detained without judgement at the Buea Central Prison for more than 26 months.  Police arrested Beng in 2015 for allegedly not possessing a national identity card, an offense punishable with imprisonment from three to 12 months, a fine of 50,000 to 100,000 CFA francs ($85 to $170), or both.  Following a habeas corpus request filed by the NGO Human IS Right, judicial authorities ultimately released Beng on March 21, after more than double the duration of the sentence he would have served had he been prosecuted and convicted.  Until his release Beng Pascal had never appeared before a judge.

**e. Denial of Fair Public Trial**

The constitution and law ostensibly provide for an independent judiciary, but the judiciary is under and often controlled by the president and, by proxy, the ruling party.  Individuals reportedly accused innocent persons of crimes, often due to political motivations, or caused trial delays to settle personal scores.  Authorities generally enforced court orders.

Musa Usman Ndamba, the national vice president of the Mbororo Social and Cultural Development Association (MBOSCUDA), was prosecuted for "propagation of false information" and "false oath," although he submitted strong evidence that he was not associated with the offense.  He continued to suffer judicial harassment by Baba Ahmadou Danpullo, a businessman and member of the central committee of the ruling CPDM, who pressured the court to continue to hear the case after various instances in which it had been dismissed.  On May 11, the Court of First Instance in Bamenda sentenced Usman Ndamba to six months' imprisonment and a fine of 500,000 CFA francs ($850) after more than 60 hearings that began in 2013.  Human rights defenders believed Danpullo used the judicial

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 50 of 352

system to discourage Usman Ndamba from defending the rights of the minority Mbororo community of nomadic cattle herders.

Despite the judiciary's partial independence from the executive and legislative branches, the president appoints all members of the bench and legal department of the judicial branch, including the president of the Supreme Court, and may dismiss them at will. The court system is subordinate to the Ministry of Justice, which in turn is under the president. The constitution designates the president as "first magistrate," thus "chief" of the judiciary, making him the legal arbiter of any sanctions against the judiciary. The constitution specifies the president is the guarantor of the legal system's independence. He appoints all judges, with the advice of the Higher Judicial Council. While judges hearing a case are technically to be governed only by the law and their conscience as provided for by the constitution, in some matters they are subordinate to the minister of justice or to the minister in charge of military justice. With approval from the minister of justice, the Special Criminal Court may drop charges against a defendant who offers to pay back the money he is accused of having embezzled, which essentially renders the act of corruption free of sanctions.

Military courts may exercise jurisdiction over civilians for offenses including the following: offenses committed by civilians in military establishments; offenses relating to acts of terrorism and other threats to the security of the state, including piracy; unlawful acts against the safety of maritime navigation and oil platforms; offenses relating to the purchase, importation, sale, production, distribution, or possession of military effects or insignia as defined by regulations in force; cases involving civil unrest or organized armed violence; and crimes committed with firearms, including gang crimes, banditry, and highway robbery.

**Trial Procedures**

The constitution and law provide for the right to a fair and public hearing, without undue delay, in which the defendant is presumed innocent, but authorities did not always respect the law. Criminal defendants have the right to be informed promptly and in detail of the charges, with free assistance of an interpreter. Many pretrial suspects were treated as if they were already convicted, frequently held in the same quarters as convicted criminals, and denied visits. Defendants have the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, particularly in cases of individuals suspected of complicity with Boko Haram or Anglophone separatists. When defendants cannot pay for their own legal defense, the court may appoint counsel

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 51 of 352

at the public's expense; however, the process was often burdensome and lengthy, and the quality of legal assistance was poor.  Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf.  Defendants have the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt.  Defendants may appeal convictions.  In at least one case, authorities did not give the victim a chance to confront the offender and present witnesses and evidence to support his case.

In August the High Court for Mfoundi in Yaounde allegedly released a person suspected of trafficking in persons who had been in pretrial detention since 2016.  The victim, Lilian Mbeng Ebangha, returned from Kuwait in 2015 and filed a lawsuit against her alleged trafficker, a pastor of Shiloh Liberation Ministries International.  After preliminary investigations the case was sent to trial in 2016 and thereafter had more than 20 adjournments.  Each time a hearing was scheduled in Yaounde, Ebangha travelled from Douala to attend.  The alleged offender was released in August or September, but it was unconfirmed whether there was a court decision on the matter.  The victim stated that her trafficker had called her to inform her of his release.

**Political Prisoners and Detainees**

There were no reports of newly identified political prisoners or detainees, and no statistics were available on the number of political prisoners.  Previously reported political prisoners were detained under heightened security, often in SED facilities.  Some were allegedly held at DGRE facilities and at the principal prisons in Yaounde.  The government did not permit access to such persons on a regular basis, or at all, depending on the case.

Former minister of state for territorial administration Marafa Hamidou Yaya, convicted in 2012 on corruption charges and sentenced to 25 years' imprisonment, remained in detention.  In May 2016 the Supreme Court reduced the sentence to 20 years.  In June 2016 the UN Working Group on Arbitrary Detention issued a decision qualifying Marafa's detention "a violation of international laws" and asked the government to immediately free and compensate him for damages suffered.  The United Nations noted there were multiple irregularities in the judicial procedure.

**Civil Judicial Procedures and Remedies**

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 52 of 352

Citizens and organizations have the right to seek civil remedies for human rights violations through administrative procedures or the legal system; both options, however, involved lengthy delays. Individuals and organizations may appeal adverse decisions domestically or to regional human rights bodies. There were no reports that the government had failed to comply with civil case court decisions pertaining to human rights. A number of labor rights-related cases involving government entities were ongoing as of the end of August.

**Property Restitution**

The government continued to compensate relocated families over the past few years in connection with infrastructure projects, including the Kribi Sea Port and the Yaounde-Douala highway projects. There were no reported developments in the cases of corrupt officials who had misappropriated money the government had earmarked for compensation previously. There was no report of intentional targeting of particular groups for discriminatory treatment.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

Although the constitution and law prohibit arbitrary interference with privacy, family, home, or correspondence, these rights were subject to restriction for the "higher interests of the state," and there were credible reports police and gendarmes abused their positions by harassing citizens and conducting searches without warrants.

The law permits a police officer to enter a private home during daylight hours without a warrant only if pursuing a person suspected of or seen committing a crime. Police and gendarmes often did not comply with this provision and entered private homes without warrant whenever they wished.

An administrative authority, including a governor or senior divisional officer, may authorize police to conduct neighborhood sweeps without warrants, and this practice occurred.

Police and gendarmes sometimes sealed off a neighborhood, systematically searched homes, arrested persons, sometimes arbitrarily, and seized suspicious or illegal articles. For example, in the early hours of July 10, police and gendarmes conducted a cordon-and-search operation in the neighborhoods of Ndobo at Bonaberi in the Douala IV Subdivision, Littoral Region, arrested dozens of

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 53 of 352

individuals, and detained those found in possession of, or consuming, narcotics. On July 26, police conducted a similar operation in the neighborhood of Biyem Assi in Yaounde 6 Subdivision. They searched houses, requested residents to produce receipts for appliances found in their possession and in some cases confiscating those for which the occupants could not produce receipts, and arrested dozens of individuals. In both cases security forces detained citizens without national identity cards until their identities could be established. The areas in question have a high concentration of Anglophones, and most of the individuals arrested in the July 10 and 26 incidents were Anglophones. Anecdotal reports suggested that with the protracted insecurity in some regions, authorities often forcefully accessed private communications and personal data by exploiting the telephones and computer devices of targeted individuals, during both cordon-and-search and regular identity-control operations.

On September 28 police and gendarmes conducted raids in various neighborhoods in Yaounde. Police raided neighborhoods with heavy Anglophone populations, setting up temporary checkpoints and requesting citizens to provide identification. Some individuals were required to enter a security vehicle and were brought to local police stations, where their identities were verified once more before being released.

## g. Abuses in Internal Conflict

Killings: There were reports that members of government forces deliberately killed innocent citizens. In July a video widely circulated on social media depicted men wearing military-style uniforms executing two women and two children, including an infant. International media, Amnesty International, and domestic human rights organizations, including the Network of Human Right Defenders in Central Africa (REDHAC), Mandela Center, and New Human Rights Cameroon, attributed the actions portrayed in the video to the military. During a press briefing on July 11, Minister of Communication Issa Tchiroma Bakary stated that the video was "nothing but an unfortunate attempt to distort actual facts and intoxicate the public," but he promised a government-sponsored investigation into the killings. Subsequently, in an August 10 press release, the minister announced the investigation had led to the arrest of seven military personnel, including Lieutenant Etienne Fobassou, Sergeant Hilaire Cyriaque Bityala, Lance Corporal Didier Jeannot Godwe Mana, Lance Corporal Tsanga, Private Second Class Barnabas Donossou, Private S Class Jacobai Jonathan Manasse, and Private First Class Ghislain Ntieche Fewou. He stated the government had handed over the suspects

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 54 of 352

to judicial authorities for prosecution.  There were no reports of further developments.

Human Rights Watch reported that government forces killed civilians in the context of the ongoing Anglophone crisis.  Human Rights Watch spoke with witnesses and reported such government operations in 12 villages in the Northwest and Southwest Regions (including Kwakwa, Bole, and Mongo Ndor) between January and April.  Security forces set houses on fire, burning to death at least four elderly women left behind by their relatives at the time of the attack.  A 43-year-old man described to Human Rights Watch how he found his 69-year-old mother's remains after a government operation.  His wife and children allegedly ran away, but his mother could not.

A June report by Amnesty International on the crisis in the Northwest and Southwest Regions recounted attacks perpetrated by armed separatists against security forces, particularly gendarmes and police.  According to the report, at least 44 security force members were killed between September 2017 and May.  In addition Amnesty International reported armed separatists attacked ordinary citizens, including traditional chiefs, teachers, and students.  The report also accused government forces of having raided the village of Kombone in the Southwest Region on February 14, leading to casualties among both security forces and armed separatists.

Abductions:  Armed activists carried out several abductions in the two Anglophone regions and held noncombatants as hostages, including public officials, teachers, schoolchildren, and traditional leaders.  The abductors subsequently freed some of the victims, either after negotiations or payment of ransoms.  Others, including Chief Williams Mbanda Njie of Lysoka Village in the Southwest Region and divisional officer for Batiba in the Northwest Region Marcel Namata Diteng, died in captivity.  Many of the captives remained unaccounted for.

Physical Abuse, Punishment, and Torture:  There were credible reports that members of government forces physically abused and killed prisoners in their custody.  In its July report, Human Rights Watch highlighted the case of Samuel Chiabah, popularly known as Sam Soya, whom members of government forces interrogated under harsh conditions and killed, following the killing of two gendarmes by armed separatists at a checkpoint between Bamenda and Belo in the Northwest Region.  A video widely circulated on social media featured Sam Soya sitting on the floor and being questioned about the killings, along with one other suspect.  In the video Sam Soya could be heard crying in agony and denying

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 55 of 352

participation in the killings.  Photographs were released on social media that showed members of security forces in uniform using a bladed weapon to slice open Sam Soya's neck and the leg of the other man, both of whom were lying face down on the floor and in handcuffs.

In July human rights lawyer Felix Agbor Nkongho Balla reported an incident in which guards at the Yaounde Kondengui maximum security prison abused 18 Anglophone detainees who had been transferred from the Buea Central Prison and the SED.  He indicated that prison guards kept the detainees in tight chains and brutally beat them, repeatedly referring to them as Ambazonians.  In solidarity with the victims, other Anglophone detainees staged a violent protest.  The prison registrar allegedly told the inmates that he had received orders from his hierarchy to keep the detainees in chains.  In an attempt to resolve the tension, after long hours of negotiations, the prison registrar removed the chains and the situation returned to normal.

Child Soldiers:  (see section 6, Children)

Other Conflict-related Abuse:  There were reports that armed separatists perpetrated attacks on health-care facilities and personnel.  In an August 17 letter to health workers of the Northwest and Southwest Regions, Minister of Health Andre Mama Fouda highlighted some of the casualties.  These included the killings of the heads of Njoh-Etu and Kob integrated health centers in Mbengwi, Northwest Region, arson attacks on the Bamuck Ad Lucem health center and Mbonge medicalized health center, the killing of a security guard, and armed attacks on the Bamenda regional hospital's ambulance during which a nurse sustained injuries.  There were also reports the military threatened and perpetrated attacks on health-care facilities and workers suspected of having provided care to separatists.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Expression, Including for the Press**

The law provides for freedom of expression, including for the press, but the government often restricted this right.

Freedom of Expression:  Government officials penalized individuals or organizations that criticized or expressed views at odds with government policy. Individuals who criticized the government publicly or privately frequently faced

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 56 of 352

reprisals. On several occasions the government used the law requiring permits or government notification of public protests to stifle discourse, and many civil society and political organizations reported increased difficulty in obtaining approval to organize public gatherings. The government attempted to impede criticism by monitoring political meetings.

During the year the divisional officer for Yaounde V banned public conferences that Hilaire Kamga, an elections expert, intended to organize at Felydac Hotel on February 15 and June 13 to address the issues of voter registration and peaceful transition. The divisional officer claimed the event was likely to disturb public order.

In September the senior divisional officer for Mfoundi, which encompasses the greater Yaounde area, pressured Hilton Hotel management to cancel a symposium entitled "Digital Rights and Elections in Cameroon," organized by Paris-based Internet without Borders and Lagos-based Paradigm Initiative, days before it was to take place. Eventually, organizers secured a different hotel without any difficulty.

On June 15, authorities prevented the opposition party, the Cameroon Renaissance Movement (CRM), from presenting a documentary on presidential candidate Maurice Kamto. The CRM booked Massago Hotel in Yaounde as the venue for the event. Hotel management asked CRM leaders to leave the premises a few hours before the beginning of the documentary showing, allegedly following intimidation and threats from authorities.

Press and Media Freedom: Independent media was active and expressed a wide variety of views, although there were restrictions especially on editorial independence, in part due to stated security concerns related to the fight against Boko Haram and the crisis in the two Anglophone regions. Journalists reported practicing self-censorship to avoid repercussions for criticizing the government, especially on security matters. According to the 2018 Press Freedom Index by Reporters without Borders, authorities imposed a climate of fear and self-censorship on media practitioners. Journalists faced significant hurdles, some of which led to exorbitant fines, and in some cases, jail terms.

According to the Committee to Protect Journalists, at least seven journalists were in prison. One was Thomas Awah Junior, who was arrested in Bamenda, Northwest Region, on January 2. He wrote for the monthly *Aghem Messenger* magazine and was sentenced to 11 years in prison on May 25 for acts of terrorism

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 57 of 352

against the nation, secession, revolution, and propagation of disinformation through digital means.  Awah Junior was incarcerated at Kondengui Central Prison in Yaounde.  Pictures of a severely emaciated Awah were widely circulated on social media in September.  At the end of September, he was transported to a hospital in Yaounde to be treated for tuberculosis and pneumonia.

Violence and Harassment:  Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists for their reporting.

As in the previous year, authorities arrested journalists in connection with their reporting on the Anglophone crisis.  According to reports by credible organizations, including the Committee to Protect Journalists, on March 20, police arrested Akumbom Elvis McCarthy, a news broadcaster for Abakwa FM Radio, a privately owned media outlet based in Bamenda, Northwest Region.  McCarthy was allegedly taking pictures of police harassing taxi drivers.  He reported in *Pidgin English* for the Media House, which also publishes news on its Facebook page.  Judicial police detained the news broadcaster for three weeks before referring him to the military tribunal.  The tribunal decided to remand McCarthy into custody for a renewable six-month period while police investigated claims that he reported separatist propaganda.

Censorship or Content Restrictions:  Based on a 1990 law on social communication, the Ministry of Communication requires editors to deposit two signed copies of their newspapers within two hours after publication.  Journalists and media outlets practiced self-censorship, especially if the National Communication Council (NCC) had suspended them previously.  The NCC issued warnings and suspensions during the year.  It declared that radio and television broadcasts of political debates during the period of March 10-24 were suspended, alleging that such discussions might cause conflict ahead of the March 25 senate election.  It later clarified that this directive applied only to state-owned media outlets.  Magic FM, a private media outlet, decided to broadcast its Magic Attitude political discussion program.  Galaxy FM, another private media outlet, also continued broadcasting political discussion shows through its popular French-language political program, *Au Coeur de la Republique*.

On March 15, the NCC issued eight separate decisions, warning or suspending journalists, media outlets, and programs for one to three months.  Most were sanctioned for publishing statements deemed unfounded and offensive, which was considered a breach of professional ethics in mass communication.  The media

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 58 of 352

outlets included WB1 Radio, L'Orphelin, Horizon Plus, l'Essentiel du Cameroon, and Watch Dog Tribune. In all cases the alleged breaches occurred in 2017.

Libel/Slander Laws: Press freedom is further constrained by strict libel laws. These laws authorize the government, at its discretion and the request of the plaintiff, to criminalize a civil libel suit or to initiate a criminal libel suit in cases of alleged libel against the president or other high government officials. Such crimes are punishable by prison terms and heavy fines. The libel law places the burden of proof on the defendant. The government contended libel laws were aimed at safeguarding citizens whose reputations could be permanently damaged by defamation. There were no reports the government or public figures used laws against libel or slander to restrict public discussion during the year.

**Internet Freedom**

According to Internet World Stats (IWS), there were 6,128,422 Internet users in December 2017, representing penetration rates of 24.8 percent. There are currently no credible reports that the government monitored private online communications without appropriate legal authority. The government, however, has repeatedly disrupted access to the internet.

The country experienced its first internet shutdown in January 2017, after Anglophone teachers, lawyers, and students went on strike over alleged social bias in favor of Francophones. The government issued a countrywide internet shutdown, which lasted 93 days. Educational, financial, and health-care institutions as well as businesses that relied on internet access were stunted. International bodies applied pressure to the government to restore internet access. Despite internet access being restored in April 2017, there were continuing reports of network instability.

In October 2017 the government effected a second internet blockade, targeting social media and apps such as WhatsApp and Facebook. This continued to affect the country economically, and many citizens were forced to travel back and forth to regions with internet access for business or information.

**Academic Freedom and Cultural Events**

Although there were no legal restrictions on academic freedom or cultural events, state security informants reportedly continued to operate on university campuses.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 59 of 352

There were a few reports of security personnel disrupting student extracurricular activities.

## b. Freedoms of Peaceful Assembly and Association

The government limited and restricted freedoms of peaceful assembly and association.

### Freedom of Peaceful Assembly

Although the law provides for freedom of peaceful assembly, the government often restricted this right. The law requires organizers of public meetings, demonstrations, and processions to notify officials in advance but does not require prior government approval of public assemblies, nor does it authorize the government to suppress public assemblies that it has not approved in advance. Nevertheless, officials routinely asserted the law implicitly authorizes the government to grant or deny permission for public assemblies. The government often refused to grant permits for gatherings and used force to suppress assemblies for which it had not issued permits. Authorities typically cited "security concerns" as the basis for deciding to block assemblies. The government also prevented civil society organizations and political parties from holding press conferences. Police and gendarmes forcibly disrupted meetings and demonstrations of citizens, trade unions, and political activists throughout the year, arrested participants in unapproved protests, and blocked political leaders from attending protests.

On March 9, in Yaounde, police arrested approximately 20 women who participated in a rally, holding up a banner that read, "Stand Up for Cameroon." According to the organizers of the rally, including Edith Kabang Walla, the president of the Cameroon People's Party (CPP), the event was aimed to call attention to the deteriorating sociopolitical situation in the country. Police released the women after keeping them for a few hours at the judicial police's regional headquarters.

Authorities also banned some political rallies. In April the divisional officer of Fokoue in Menoua Division, West Region, banned a meeting meant to encourage voter registration by the CRM opposition party. The CRM claimed they notified the divisional officer that they were organizing an event on April 11. This event would have been 10th in a series organized in conjunction with Elections Cameroon, the organization that oversees and administers elections, to encourage more persons to register to vote. The divisional officer initially told CRM leaders

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 60 of 352

the meeting might not be authorized because April 11 was a market day. On April 9, he reportedly changed his mind and instead referred CRM's leaders to the mayor, whom he said had control over the market place. Organizers said they had contacted the mayor, who said she had planned to conduct a tax collection exercise in the market that day and turned down the request. Further, in June the mayor of Bagangte banned a rally by the CRM at the local ceremonial ground and reportedly justified his decision by saying that the ceremonial ground was meant only for exceptional events and official ceremonies. CRM officials said the ruling CPDM held a meeting at the venue a few days earlier. Authorities also banned rallies by the CRM in Baham and Bandjoun in the West Region.

**Freedom of Association**

The constitution and law provide for freedom of association, but the law also limits this right. On the recommendation of the senior divisional officer, the Ministry of Territorial Administration may suspend the activities of an association for three months on the grounds that the association is disrupting public order. The minister may also dissolve an association if it is deemed a threat to state security. National associations may acquire legal status by declaring themselves in writing to the ministry, but the ministry must explicitly register foreign associations and religious groups. The law imposes heavy fines for individuals who form and operate any such association without ministry approval. The law prohibits organizations that advocate a goal contrary to the constitution, laws, and morality, as well as those that aim to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

Conditions for recognition of political parties, NGOs, or associations were complicated, involved long delays, and were unevenly enforced. This resulted in associations operating in legal uncertainty, their activities tolerated but not formally approved.

Unlike in 2017 the government did not ban any organizations during the year. On July 18, however, Minister of Territorial Administration Paul Atanga Nji unilaterally designated three political figures as spokespersons for three opposition political parties, disregarding these parties' own hierarchies and internal elections. The minister stated the three parties, the Cameroon People's Party (CPP), the Union of the Peoples of Cameroon (UPC), and the African Movement for a New Independence and Democracy (Manidem), were suffering from persistent internal crises. He urged administrative command officers nationwide to authorize only events organized by the appointees. On July 20, all three appointed leaders joined

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 61 of 352

17 other nominally "opposition" leaders to rally with their parties behind President Biya for the October 7 presidential election.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement

Although the constitution and law provide for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government restricted these rights. The government worked with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations to provide protection and assistance to refugees, asylum seekers, stateless persons, and other persons of concern. The government, however, sometimes failed to respect its obligations under relevant international laws. There were instances where it forcibly returned asylum seekers to their countries and did not provide humanitarian organizations such as the United Nations access to internally displaced persons.

In-country Movement: Using minor infractions as a pretext, police and gendarmes at roadblocks and checkpoints in cities and on most highways often extorted bribes and harassed travelers. Police frequently stopped travelers to check identification documents, vehicle registrations, and tax receipts as security and immigration control measures. Authorities restricted movements of persons and goods, including motorbikes, in the Northwest and Southwest Regions and some parts of the East, Far North, and West Regions, sometimes for legitimate security reasons, sometimes in a deliberate attempt to harass and intimidate the local population.

On September 28 and 29, the Northwest and Southwest regional governors issued press releases indicating there would be broad limitations on movement from one subdivision to another for 48 hours from September 30 through October 1. This effort was intended to limit any violence associated with October 1, the self-declared independence day of Ambazonia.

## Internally Displaced Persons (IDPs)

Several hundred thousand persons abandoned their homes in some localities of the Northwest and Southwest Regions because of the sociopolitical unrest. Estimates

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 62 of 352

of IDPs varied depending on the source, with the government estimating 74,994 IDPs as of June, while the United Nations estimated 350,000 IDPs from the Northwest and Southwest Regions as of September.  As of August 31, more than 227,000 persons were internally displaced in the Far North Region, driven from their homes by conflict perpetrated by Boko Haram and the ISIS-WA, according to UNHCR estimates.

In May the United Nations released an Emergency Response Plan for the Anglophone crisis, appealing for more than $15 million to respond to the need for shelter, relief items, sanitation, education, food security, health, and protection of 160,000 persons they estimated were affected by the conflict at the time.  In mid-June the government released a separate Emergency Humanitarian Action Plan, which requested nearly $23 million to assist approximately 75,000 IDPs over 18 months, focusing on humanitarian assistance for a period of three months and early recovery for 15 months.  The government, however, did not provide humanitarian NGOs or international organizations access to IDPs in the Anglophone regions. Although the government made some effort to provide urgently needed assistance to crisis-affected populations, its coordination with the international humanitarian community in the Northwest and Southwest Regions was not forthcoming.

**Protection of Refugees**

Refoulement:  The government stated there was no official policy of forcibly repatriating refugees.  As in the previous year, however, UNHCR and NGOs reported cases of forced returns of asylum seekers, mostly of Nigerians. According to UNHCR, authorities forcibly returned 800 Nigerian refugees from Cameroon as of July 31.  In 2017 UNHCR reported 4,400 known cases of refoulement.

The most recent high-profile case of refoulement took place in the Far North Region.  On August 2, UNHCR expressed concern over the death of six Nigerian asylum seekers, including three children, who were victims of the blast from an improvised explosive device on July 29.  According to UNHCR, 12 asylum seekers were being forcibly returned to Banki, Nigeria, in a Multinational Joint Task Force truck, which struck the device in Homaka, in the Mayo Sava Division. In addition to the six asylum seekers killed, six others along with six Cameroonian soldiers were injured.

Access to Asylum:  The laws provide for granting asylum or refugee status, and the government has established a system of providing protection to refugees.  UNHCR

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 63 of 352

continued to provide documentation and assistance to the refugee population. UNHCR and the government continued to conduct biometric verification and registration of refugees, including of those not living in refugee camps. Nevertheless, local authorities did not always recognize these documents as official, which prevented refugees from travelling and engaging in business activities. As of September the country reported 696,097 persons of concern to UNHCR, including 246,131 Central Africans and 98,590 Nigerian refugees in rural areas; 18,447 Central African and 1,914 Nigerian refugees living in urban areas; and 6,399 Central African and 27 Nigerian asylum seekers living in urban areas.

Access to Basic Services: Like their rural host country inhabitants only more so, most refugees had limited access to health care, education, and employment opportunities. Access to these services varied according to the location of the refugees, with those in camps receiving support through humanitarian organizations, while refugees living in host communities faced difficulty receiving services. Visiting the East Region in June, Deputy UNHCR Commissioner for Operations George Okoth-Obbo remarked that refugees from the Central African Republic (CAR) urgently needed basic assistance, especially food, health care, and livelihood opportunities. He noted that refugees were compelled by their situation to adopt negative coping mechanisms, such as stealing and engaging in prostitution.

Durable Solutions: As of August UNHCR and the governments of Cameroon and Nigeria had not started the voluntary repatriation of the more than 99,000 Nigerians refugees in Cameroon as agreed upon under the 2017 tripartite agreement. In June UNHCR carried out return intention surveys using a sample of 4,000 CAR refugees, which indicated that 24 percent of those surveyed would be interested in going back home, while 74 percent would prefer local integration as a durable solution.

Temporary Protection: The government provided temporary, unofficial protection to individuals who may not qualify as refugees, extending this protection to hundreds of individuals during the year, including third-country nationals who had fled violence in CAR. Due to their unofficial status and inability to access services or support, however, many of these individuals were subject to harassment and other abuses.

**Section 3. Freedom to Participate in the Political Process**

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 64 of 352

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. President Biya and the majority CPDM party, however, exerted strong influence over key elements of the political process, including the judiciary and Elections Cameroon (ELECAM), the election organizing body.

**Elections and Political Participation**

Recent Elections:  In the senate and presidential elections held during the year, the CPDM garnered the majority of votes, except in the Northwest, where it lost to the Social Democratic Front (SDF).  The CPDM remained dominant in state institutions, partially due to strategic redrawing of voter districts, use of government resources for campaigning, interference with the right of opposition parties to organize and publicize views during electoral campaigns, and privileges associated with belonging to the ruling party.

The country conducted a presidential election on October 7, against the backdrop of protracted sociopolitical unrest in the two Anglophone regions and insecurity in the Far North due to attacks by Boko Haram and ISIS-WA.  Eight candidates took part in the election; a ninth dropped out just before election day to support a rival opposition candidate.  The election was marred by irregularities, including intimidation of voters and representatives of candidates at polling sites, late posting of polling sites and voter lists, ballot stuffing, voters with multiple registration, and a lack of transparency in the vote tallying process.  In the countdown to the election, government-sponsored media outlets CRTV and Cameroon Tribune produced three times as much programming for the president as for the other eight candidates; in addition the ruling party violated the electoral code by blanketing cities with larger than regulation-sized campaign posters.  While not illegal under law, government workers and financial resources were committed to supporting the incumbent's campaign.  President Biya was re-elected with 71.28 percent of votes cast.

On March 25, the country held its second senate elections.  The ruling CPDM won 63 of the 70 elected seats, while the opposition SDF won seven elected seats.  The president, in accordance with the constitution, appointed an additional 30 senators, including 24 from the CPDM, two from the National Union for Democracy and Progress (UNDP), and one each from four other nominal opposition parties, including Union of the People of Cameroon (UPC), National Alliance for Democracy and Progress (ANDP), Movement for the Defense of the Republic (MDR), and Cameroon National Salvation Front (FSNC).  Overall, seven political

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 65 of 352

parties were represented in the senate. The March 25 senate elections were considered peaceful and within the boundaries of the legal framework that heavily favors the ruling party.

In 2013 the country held simultaneous legislative and municipal elections, with 29 parties participating in the legislative elections and 35 in the municipal elections. The CPDM won 148 of 180 parliamentary seats and 305 of 360 municipal council positions. New legislative and municipal elections were expected during the year. In July the parliament adopted, and the president promulgated, a law to extend the term of office of members of the National Assembly by one year. On July 11, the president signed a decree extending the term of office of municipal councilors for 12 months, effective from October 15.

Political Parties and Political Participation: As of September the country had 305 registered political parties. Membership in the ruling political party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service. The president appoints all ministers, including the prime minister, the governors of each of the 10 regions, and important lower-level members of the 58 regional administrative structures. The president also appoints 30 of the 100 senators, and most of the appointees were from the ruling party.

Human rights organizations and opposition political actors considered the drawing of voter districts and distribution of parliamentary or municipal councilors' seats unfair, stating that it is not fair to begin with and does not take changes in population into account. Consequently, smaller districts sometimes were allocated more seats than more populated constituencies. Managers of state-owned companies and other high-level government officials used corporate resources to campaign for candidates sponsored by the ruling party in both senate and presidential elections to the detriment of the other candidates. Traditional rulers, who receive salaries from the government, openly declared their support for President Biya prior to the presidential election. Further, authorities frequently sought excuses not to grant opposition parties permission to hold rallies and meetings, while the ruling CPDM held meetings at will.

Participation of Women and Minorities: No laws limit participation of women or members of minorities in the political process. The law provides that lists of candidates for legislative and municipal elections should take into account the sociological components of the constituency, including gender. Cultural and other factors, however, reduced women's political participation compared to that of men. Women remained underrepresented at all levels of government. Two women

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 66 of 352

submitted their candidacy for the October 7 presidential election, but neither met the requirements.  Women occupied 26 of 374 council mayor positions; 81 of 280 parliamentary seats; 11 of 63 cabinet positions; and other senior level offices, including territorial command and security and defense positions.  With the voting age set at 20, youth older than age 18 and younger than 20 are not allowed to vote.  The minority Baka, a nomadic Pygmy people, were not represented in the senate, national assembly, or higher offices of government.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, but the government did not implement the law effectively and often used it to settle political scores.  The penal code identifies different offenses as corruption, including influence peddling, involvement in a prohibited employment, and nondeclaration of conflict of interest.  Reporting of corruption is encouraged through exempting whistleblowers from criminal proceedings.  Corruption in official examinations is punishable by up to five years' imprisonment, fines up to two million CFA francs ($3,400), or both.  During the year the National Anti-Corruption Commission (CONAC) instituted a toll-free number to encourage citizens to denounce acts of corruption of which they were victims or witnesses.  In addition there were a number of organizations under a common platform known as the National Platform of Cameroonian Civil Society Organizations, which under the 2018 Finance Law was provided a budget of 150 million CFA francs ($255,000).  The funds were to permit the organization to monitor the implementation of projects by government entities to confirm that resources disbursed are used appropriately.  Nevertheless, corruption remained pervasive at all levels of government.  The judiciary was not always free to independently investigate and prosecute corruption cases.

Corruption:  The government continued Operation Sparrow Hawk, which was launched in 2006 to fight corruption, including embezzlement of public funds.  As in the previous year, the Special Criminal Court (SCC) opened new corruption cases and issued verdicts on some pending cases.  On May 4, the SCC placed Emmanuel Lebou, Hamadou Haman, and Aïssatou Boullo Bouba in pretrial detention at Yaounde Central Prison.  Authorities accused the three officials from the ministries of finance and communication of fraudulent manipulation of government payrolls, including payments of fictitious salaries and other allowances, which resulted in losses worth hundreds of millions of CFA francs (several thousand dollars).  In August the SCC delivered its verdict in the prosecution case against Doumana Louis Roger, the former transport delegate for the Northwest Region, and Ayafor Mefor Quita Fozo, a contractor with the

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 67 of 352

Ministry of Transport. They were under prosecution since 2016 for misappropriating fiscal revenues at the Northwest Regional Delegation of Transport in Bamenda. The accused were sentenced to 15 and 10 years in prison, respectively, and were required to pay jointly more than 156 million CFA ($265,000) to the public treasury.

Financial Disclosure: The constitution requires senior government officials, including members of the cabinet, to declare their assets, but a law passed to implement this provision had itself never been implemented.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A number of domestic and international human rights groups investigated and published findings on human rights cases. Overturning an earlier decision not to allow them back in the country, the government issued visas to allow Amnesty International and Human Rights Watch personnel to return to present their reports on human rights abuses to the government and to hear its views. As in previous years, however, government officials impeded the effectiveness of many local human rights NGOs by harassing their members, limiting access to prisoners, refusing to share information, and threatening violence against NGO personnel. Human rights defenders and activists received anonymous threats by telephone, text message, and email. The government took no action to investigate or prevent such occurrences. The government criticized reports from international human rights organizations, including Amnesty International, Human Rights Watch, and the International Crisis Group, accusing them of publishing baseless accusations with the intention of discrediting the government and military. Despite these restrictions, numerous independent domestic human rights NGOs continued operations to the best of their ability, although many reported that government threats and intimidation limited their ability to operate in the country.

There were several reports of intimidation, threats, and attacks aimed at human rights activists, including members of the Network of Human Rights Defenders in Central Africa (REDHAC), Nouveaux Droits de l'Homme (NDH), the Mandela Center, and Front Line Fighters for Citizens' Interests (FFCI), among others. FFCI executive president Franklin Mowha was reported missing as of August 6 while he was on a business trip to the Southwest Region. FFCI officials and Mowha's family members alleged that authorities were informed but failed to investigate the case. As of late October, his family members did not have any information concerning his whereabouts and feared he might have been killed.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 68 of 352

<u>Government Human Rights Bodies</u>:  The National Commission on Human Rights and Freedoms (NCHRF) is an independent, government-funded institution for consultation, monitoring, evaluation, dialogue, concerted action, promotion, and protection of human rights.  The NCHRF was established by a 1990 presidential decree and was subsequently given more powers following the passage of a 2004 law.  The NCHRF, however, is limited to making recommendations to competent authorities and can take no action itself.  The commission publishes yearly reports on the human rights environment and may engage in research, provide education, coordinate actions with NGOs, and visit prisons and detention sites.  NGOs, civil society, and the general population considered the NCHRF dedicated and effective, albeit inadequately resourced and with insufficient ability effectively to hold human rights violators to account.  Its budget was far smaller than that of most other agencies with comparable status, such as the National Anti-Corruption Commission and Election Cameroon.

The National Assembly's Constitutional Laws, Human Rights and Freedoms, Justice, Legislation, Regulations, and Administration Committee was adequately resourced and reviewed the constitutionality of proposed legislation, but it was not an effective check on the ruling party's initiatives.  The parliament generally failed to address the Anglophone crisis, resulting in a protest by opposition Social Democratic Front representatives during the March ordinary session of parliament.

**Section 6. Discrimination, Societal Abuses, and Trafficking in Persons**

**Women**

<u>Rape and Domestic Violence</u>:  The law criminalizes rape of men and women and provides penalties of between five and 10 years of imprisonment for convicted rapists.  Police and courts, however, rarely investigated or prosecuted rape cases, especially since victims often did not report them.  The law does not address spousal rape.

The law does not specifically prohibit domestic violence, although assault is prohibited and punishable by imprisonment and fines.

<u>Female Genital Mutilation/Cutting (FGM/C)</u>:  The law protects the bodily integrity of persons, and the 2016 penal code prohibits genital mutilation of all persons.  Whoever mutilates the genitals of another person is subject to a prison sentence of from 10 to 20 years, or imprisonment for life if the offender habitually carries out

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 69 of 352

this practice for commercial purposes or the practice causes death. FMG/C remained a problem, but its prevalence remained low. As in the previous year, children were reportedly subjected to FGM/C in isolated areas of the Far North, East, and Southwest Regions and among the Choa and Ejagham ethnic groups.

According to the Minister of Women's Empowerment and the Family, the government fully adopted a UN General Assembly resolution on the intensification of the global action aimed at eliminating FGM/C. For more than 10 years, the government has carried out initiatives to end FGM/C. These include granting support for the socioeconomic reconversion of male and female excision practitioners and creating local committees to fight against the phenomenon in areas of high prevalence, such as the Southwest and Northern Regions.

Other Harmful Traditional Practices: Widows were sometimes forcibly married to one of their deceased husband's relatives to secure continued use of property left by the husband, including the marital home. To protect women better, including widows, the government included provisions in the 2016 penal code outlawing the eviction of a spouse from the marital home by any person other than the other spouse.

Sexual Harassment: The law prohibits sexual harassment. Offenders can be imprisoned for periods of six months to one year and may be fined between 100,000 and one million CFA francs ($170 and $1,700). If the victim is a minor, the penalty can be between one to three years in prison. If the offender is the victim's teacher, they may be sentenced to between three and five years in prison. Despite these legal provisions, sexual harassment was widespread, and there were no reports that anyone was fined or imprisoned for sexual harassment.

Coercion in Population Control: There were no reports of coerced abortion or involuntary sterilization.

Discrimination: The constitution provides for the same legal status and rights for women and men; in practice, however, women did not enjoy the same rights and privileges as men. Although local government officials including mayors claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions. The government did not implement any official discriminatory policy against women in such areas as divorce, child custody, employment, credit, pay, owing or managing business or property, education, the judicial process, and housing. Although women and men have equal employment

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 70 of 352

rights, fewer women occupied positions of responsibility. Furthermore, anecdotal reports suggest some gender discrimination occurred in places of employment, especially in the private sector.

**Children**

Birth Registration: Children derive citizenship through their parents, and the responsibility to register birth falls upon parents. Many births go unregistered because children are not always born in health facilities, and many parents face challenges in reaching local government offices.

Education: The law provides for tuition-free compulsory primary education but does not set an age limit. The law punishes any parent with sufficient means who refuses to send his or her child to school with a fine between 50,000 to 500,000 CFA francs ($85 and $850). The punishment is imprisonment from one to two years in cases in which the offense is repeated. Children were generally expected to complete primary education at age 12. Secondary school students had to pay tuition and other fees in addition to buying uniforms and books. This rendered secondary education unaffordable for many children.

During the year numerous separatist attacks on the education sector in the Southwest and Northwest Regions, including arson attacks on school facilities and physical assaults on administrative staff, faculty and students, disrupted the normal operation of schools. Many students and teachers were absent during the 2017-18 school year. According to estimates by the UN Office for the Coordination of Humanitarian Affairs (OCHA), 42,500 children were still out of school as of May. In June, UNICEF reported that at least 58 schools in the Northwest and Southwest Regions had been damaged since the beginning of the crisis in 2016. Human Rights Watch documented 19 threats or attacks on schools and 10 threats or attacks on education personnel.

In September individuals believed to be Anglophone separatists perpetrated a series of attacks aimed at disrupting the start of the 2018-19 school year in certain localities of the Northwest and Southwest Regions. During the night of September 1, the headmaster of the Bamali primary school in Ngoketunjia Division in the Northwest Region was killed. On September 3, separatists abducted six students from the Presbyterian Girls Secondary School in Bafut, Mezam Division in the Northwest Region, along with their principal. They later released the students and principal, who had been subjected to torture. On September 4, a dozen individuals stormed a high school in Kumbo, Bui Division, in the Northwest Region and

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 71 of 352

vandalized the administrative building, forcing teachers and students to run for safety.  On the same day, St Joseph's Secondary School in Fako Division in the Southwest Region was attacked.

Child Abuse:  The law prohibits various forms of child abuse, including but not limited to assault, indecency, kidnapping, forced labor, rape, sexual harassment, and cloud on parentage, which refers to a situation where one parent refuses to disclose the identity of the other parent to the child.  Penalties for the offenses range from 10,000 CFA francs ($17) for forced labor to imprisonment for life in the case of assault leading to death or grievous harm.  Despite these legal provisions, child abuse remained a problem.  Children continued to suffer corporal punishment, both within families and at school.  In addition Boko Haram continued to abduct children and used them as suicide bombers.  Press reports cited cases of child rape and the kidnapping of children for ransom.  In its April 20 edition, *Mutation Daily* reported that Reseau National des Associations de Tantines (RENATA), an association working with girls who have become mothers due to early pregnancy, had received 18 reports of sexual abuse of minors since January.

Early and Forced Marriage:  The minimum legal age for marriage is 18.  Despite the law, according to UNICEF's March 2018 child marriage data, 31 percent of women between the ages of 20 and 24 were married before they turned 18, and of these, 10 percent were married before they turned 15.  The law punishes anyone who compels an individual to marry with imprisonment of from five to 10 years, and with fines between 25,000 and one million CFA francs ($42.50 to $1,700).  By law mitigating circumstances may result in a reduction in punishment, but the final penalty may not be less than a two-year prison sentence.  The court may also take custody from parents who give away their underage children in marriage.  Despite these legal provisions, a number of families reportedly tried to marry off their girls before age 18.  To tackle the issue, the Ministry of Women's Empowerment and Family (MINPROFF) organized sensitization campaigns to warn of the problems of early and forced marriages.  MINPROFF conducted these campaigns nationally around major commemorative days, such as the International Day of the Girl Child and International Women's Day.  At the local level, MINPROFF established women's empowerment centers in most divisions where grassroots sensitization activities took place.

Sexual Exploitation of Children:  The law prohibits the commercial sexual exploitation of children, including child pornography.  A conviction, however, requires proof of a threat, fraud, deception, force, or other forms of coercion.  Penalties include imprisonment of between 10 and 20 years and a fine of between

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 72 of 352

100,000 and 10 million CFA francs ($170 to $17,000). The law does not specifically provide a minimum age for consensual sex. According to anecdotal reports, children younger than age 18 were exploited in commercial sex, especially by restaurant and bar promoters, although no statistics were available.

<u>Child Soldiers</u>: The government did not recruit or use child soldiers, but government-affiliated civil defense forces employed child soldiers. Boko Haram continued to use child soldiers, including girls, in its attacks on civilian and military targets. There were also some reports that Anglophone separatists in the Southwest and Northwest Regions used children to combat government defense and security forces. In presenting the government humanitarian emergency action plan in July, the prime minister stated that separatists were recruiting children into their ranks and forcing them to fight after consuming drugs and undergoing cult-like rituals.

<u>Infanticide or Infanticide of Children with Disabilities</u>: There were no reports of infanticide of children with disabilities. According to human rights activists and media outlets, including newspapers *Le Messager*, *Mutations*, and *Nouvelle Expression*, local residents found the head of a decapitated child in a garbage bin on August 27 in the Yaounde neighborhood of Mvog Ebanda, commonly known as "Eleveur." Investigations led to the identification of the mother of the child as the perpetrator of the crime.

<u>Displaced Children</u>: Many displaced children continued to live on the streets of major urban centers, although the trend was in decline as a result of stringent security measures and the amended penal code that criminalizes vagrancy. According to the International Organization for Migration, approximately 65 percent of IDPs in Far North Region were children younger than 18. These children faced many challenges, including limited access to school, health, and protection. In addition thousands of children were negatively impacted by the humanitarian crisis in the Northwest and Southwest. These children faced significant violations of their rights by armed forces and nonstate armed actors alike. The government had not established structures to ensure that internally displaced children were protected from forceful recruitment by nonstate armed groups and terrorist organizations.

<u>International Child Abductions</u>: The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 73 of 352

https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html.

**Anti-Semitism**

The Jewish community was very small, and there were no known reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

The constitution protects the rights of all persons, including persons with disabilities. A 2010 law provides additional protection to persons with physical, sensory, intellectual, or mental disabilities. The protections under the law cover access to education and vocational training, employment, health services, information and cultural activities, communications, buildings, sports and leisure, transportation, housing, and other state services. Public education is tuition-free for persons with disabilities and children born of parents with disabilities. Initial vocational training, medical treatment, and employment must be provided "when possible," and public assistance "when needed." The government did not enforce all these provisions effectively in the past. On July 26, the prime minister issued a decree spelling out a framework for implementing the 2010 law.

There were no reports of police or other government officials inciting, perpetrating, or condoning violence against persons with disabilities during the reporting period. The majority of children with disabilities attended school with nondisabled peers. The government introduced inclusive education in many schools and reviewed the curriculum of teacher training colleges to include training in inclusive education skills. Other children with disabilities continued to attend specialized schools such as the Bulu Blind Center in Buea and the Yaounde Special School for Hearing Impaired Children (ESEDA).

**National/Racial/Ethnic Minorities**

The population consists of more than 275 ethnic groups. Members of the president's Beti/Bulu ethnic group from the South Region held many key positions

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 74 of 352

and were disproportionately represented in the government, state-owned businesses, and security forces.

## Indigenous People

An estimated 50,000 to 100,000 Baka, including Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East Regions.  The government did not effectively protect the civil or political rights of either group.  Logging companies continued to destroy their naturally forested land without compensation.  Other ethnic groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices.  The government continued long-standing efforts to provide birth certificates and national identity cards to Baka.  Most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in accessing their homes deep in the forest.

There were credible reports from NGOs that the Mbororo, itinerant pastoralists living mostly in the North, East, Adamawa, and Northwest Regions, were subject to harassment, sometimes with the complicity of administrative or judicial authorities.

## Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity

Consensual same-sex sexual activity, including between adults, is illegal and punishable by a prison sentence lasting between six months and five years and a fine ranging from 20,000 to 200,000 CFA francs ($34 to $340).

LGBTI rights organizations such as the Cameroonian Foundation for AIDS (CAMFAIDS), Humanity First Cameroon, Alternatives Cameroon, National Observatory of the Rights of LGBTI Persons and Their Defenders, and others reported several arrests of LGBTI persons.  LGBTI individuals received anonymous threats by telephone, text message, and email, including of "corrective" rape, but authorities did not investigate allegations of harassment.  Civil society members stated there were also cases where LGBTI individuals underwent corrective rape, sometimes through the facilitation of the victim's own family.  Police were generally unresponsive to requests to increase protection for lawyers who received threats because they represented LGBTI persons.  Both police and civilians reportedly continued to extort money from presumed LGBTI individuals by threatening to expose them.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 75 of 352

The law does not explicitly prohibit discrimination against LGBTI persons in housing, employment, nationality laws, and access to government services such as health care. The constitution provides for equal rights for all citizens. In practice, however, security forces sometimes harassed persons on the basis of their real or perceived sexual orientation or gender identity, including individuals found with condoms and lubricants. This practice and the fear it generated in turn restricted access to HIV/AIDS services. Anecdotal reports also suggested some discrimination occurred in places of employment with respect to sexual orientation.

In an April 25 release, the Observatory for the Protection of Human Rights Defenders, in partnership with the World Organization against Torture and the International Federation of Human Rights (FIDH), denounced the arrest and arbitrary detention of five staff members of the association Avenir Jeune de l'Ouest (AJO). AJO promoted the rights of LGBTI persons with HIV and sex workers in the West Region. According to the release, men in civilian clothing from the territorial police, on April 20, arrested the executive director and two other members of AJO, including a care worker, as they were leaving the organization's premises. On April 21, two additional care workers from the organization were arrested at their places of residence. Police did not have warrants and took the five members of AJO to the Dschang central police station, where they experienced poor detention conditions on charges related to consensual same-sex conduct. In connection with this incident, 18 other men were arrested. For the first time in many years, authorities in the West Region introduced the prospect of forced anal exams for the 23 arrestees. The men were ordered to undergo such exams, but after intense advocacy by the lawyer representing the men, together with diplomatic pressure, the matter was dropped. The men did not have access to their lawyers until April 24.

In a midterm report covering the period from January to May, Alternatives Cameroon recorded 64 cases of violence against LGBTI individuals, including three cases of arbitrary detention, 30 cases of psychological violence, one case of sexual violence, 18 cases of physical violence, and 12 cases of blackmail and extortion.

**HIV and AIDS Social Stigma**

Persons afflicted with HIV or AIDS often suffered social discrimination and were isolated from their families and society due to social stigma and lack of education on the disease.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 76 of 352

As in the previous year, while there were no specific cases of discrimination to highlight in employment, anecdotal reports indicated some discrimination occurred with respect to HIV status, especially in the private sector.

**Other Societal Violence or Discrimination**

Several cases of vigilante action and other attacks were reported during the year. Several arson attacks were recorded, involving the destruction of both public and private property. On January 21, in Nkambe, in the Donga and Mantung Division of Northwest Region, unidentified men set the dormitory section of St Rita's Secondary School on fire after the management defied the school boycott called for by separatists in the Anglophone regions.

On April 28, on the outskirts of Muyuka, Southwest Region, three gunmen on motorbikes shot and killed Sophie Mandengue Maloba, a pregnant schoolteacher. The incident occurred three days after a similar attack on a school in Kumba took place where assailants riding motorcycles shot and killed the discipline master of the government bilingual high school and chopped off three fingers of a student.

The October presidential election triggered a wave of ethnic-tinged hate speech on social media after Cameroon Renaissance Movement candidate Maurice Kamto prematurely announced he won the election. These attacks mostly split along tribal lines, with Kamto's Bamileke and President Biya's Beti ethnic groups the primary targets.

The law provides for sentences of between two and 10 years' imprisonment and fines of between 5,000 and 100,000 CFA francs ($8.50 and $170) for witchcraft. There were no reported arrests or trials for alleged witchcraft reported during the year.

**Section 7. Worker Rights**

**a. Freedom of Association and the Right to Collective Bargaining**

The law provides for the rights of workers to form and join independent unions, bargain collectively, and conduct legal strikes. This does not apply to groups including defense and national security personnel, prison administration civil servants, and judicial and legal personnel. The law also prohibits antiunion discrimination and requires the reinstatement of workers fired for union activity.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 77 of 352

Statutory limitations and other practices substantially restricted these rights.  The law does not permit the creation of a union that includes both public- and private-sector workers or the creation of a union that includes different, even if closely related, sectors.  The law requires that unions register with the government, permitting groups of no fewer than 20 workers to organize a union by submitting a constitution and by-laws; founding members must also have clean police records.  The law provides for heavy fines for workers who form a union and carry out union activities without registration.  More than 100 trade unions and 12 trade union confederations operated, including one public-sector confederation.  Trade unions or associations of public servants may not join a foreign occupational or labor organization without prior authorization from the minister responsible for "supervising public freedoms."

The constitution and law provide for collective bargaining between workers and management as well as between labor federations and business associations in each sector of the economy.  The law does not apply to the agricultural or informal sectors, which included the majority of the workforce.

Legal strikes or lockouts may be called only after conciliation and arbitration procedures have been exhausted.  Workers who ignore procedures to conduct a legal strike may be dismissed or fined.  Before striking, workers must seek mediation from the Ministry of Labor and Social Security at the local, regional, and ministerial levels.  Only if mediation fails at all three levels can workers formally issue a strike notice and subsequently strike.  The law allowing persons to strike does not apply to civil servants, employees of the penitentiary system, or workers responsible for national security, including police, gendarmerie, and army personnel.  Instead of strikes, civil servants are required to negotiate grievances directly with the minister of the appropriate department in addition to the Minister of Labor and Social Security.  Arbitration decisions are legally binding but were often unenforceable if one party refused to cooperate.

Employers guilty of antiunion discrimination are subject to fines of up to approximately one million CFA francs ($1,700).

Free Industrial Zones are subject to labor law, except for the following provisions: the employers' right to determine salaries according to productivity, the free negotiation of work contracts, and the automatic issuance of work permits for foreign workers.

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 78 of 352

The government and employers did not effectively enforce the applicable legislation on freedom of association and the right to collective bargaining. Penalties for violations were rarely enforced and were ineffective as a deterrent. Administrative judicial procedures were infrequent and subject to lengthy delays and appeals. The government and employers often interfered in the functioning of workers' organizations. The government occasionally worked with nonrepresentative union leaders to the detriment of elected leaders, while employers frequently used hiring practices such as subcontracting to avoid hiring workers with bargaining rights. Blacklisting of union members, unfair dismissal, promotion of employer-controlled unions, and threatening workers trying to unionize were common practices.

Collective agreements are binding until after a party has given three months' notice to terminate. Workers' representatives alleged that the minister of labor and social security often negotiated collective agreements with trade unionists who had nothing to do with the sectors concerned and did not involve trade union confederations that prepared the draft agreements. Following staff representative elections conducted during the year, Syndicat National Libre des Dockers et Activites Connexes du Cameroun (Free National Union of Dockers and Related Activities of Cameroon-SYNALIDOACC) won 14 of the 20 dockers' delegate seats, thus becoming the majority union at the Douala Sea Port, under the leadership of Voundi Ebale Jean Pierre. Oumarou Mouansie, the former dockers' spokesperson, refused to transfer leadership to the new team. The minister of labor and social security did not involve Voundi in the process leading to the new collective agreement. Unionized members of the new team alleged they were victims of discrimination by the Douala Autonomous Port (PAD) authorities, especially in terms of job assignments.

For example, the government continued to undermine the leadership of the Confederation Syndicale des Travailleurs du Cameroun (CSTC), one of the 12 trade union confederations elected in 2015, by continuing to cooperate with former leaders of the CSTC. Jean Marie Zambo Amougou, the former leader, continued to use the title "President of the CSTC" despite a January 2017 court decision ordering him to stop doing so with immediate effect. Despite the court decision, the minister of labor and social security continued to view Zambo Amougou as the official representative of the CSTC. The minister reportedly invited him to meetings and sent all CSTC correspondence to Amougou to the detriment of CSTC's legitimate leader, Andre Moussi Nolla, and other new leaders, and in spite of multiple complaints by the CSTC. The CSTC tabled the issue before the administrative court in Yaounde early in the year. During a June 15 hearing

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 79 of 352

session, the administrative tribunal declined jurisdiction to hear and rule on the case.

As in 2017, trade unionists reported on officials prohibiting the establishment of trade unions in the officials' private businesses, including Fokou, Afrique Construction, Eco-Marche, and Quifferou, or otherwise hindering union operations.  Some companies based in Douala II, IV, and V and in Tiko (Southwest Region), retained 1 percent of unionized workers' salaries as union dues but refused to transfer the money to trade unions.

As in 2017, many employers frequently used hiring practices such as subcontracting to avoid hiring workers with bargaining rights.  Workers' representatives stated most major companies, including parastatal companies, engaged in the practice, citing the electricity company Energy of Cameroon, the water company Camerounaise des Eaux, cement manufacturer Cimencam, Guinness, Aluminum Smelter (Alucam), and many others.  Subcontracting was reported to involve all categories of personnel, from the lowest to senior levels.  As a result workers with equal expertise and experience did not always enjoy similar advantages when working for the same business; subcontracted personnel typically lacked a legal basis to file complaints.

A number of strikes were announced during the year.  Some were called off after successful negotiation, some were carried out without problems, while others faced some degree of repression.  Workers' grievances generally involved poor working conditions, including lack of personal protective equipment, improper implementation of collective agreements, and nonpayment of salary arrears or retirement benefits.  Workers also often complained of illegal termination of contracts, lack of salary increases, and failure of employers to properly register employees and pay the employer's contribution to the National Social Insurance Fund, which provides health and social security benefits.

In April 2017 the government delegate to the Douala City Council suspended 11 workers' representatives affiliated with the Wouri Divisional Union of Council Workers following a strike they held that same month.  Employees of the City Council in Douala demanded health insurance for themselves and their immediate relatives.  The government delegate fired the complainants but was overruled by the minister of labor and social security.  The government delegate, however, did not reinstate the employees in their positions.  In February the workers staged a hunger strike requesting their reinstatement and 10 months' arrears, but the strike failed to bring about a positive outcome.  On September 27, the Littoral Court of

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 80 of 352

Appeals delivered a verdict requesting that the government immediately reinstate and pay the salaries of the 11 workers' representatives. The court threatened to impose a fine of 20,000 CFA francs ($34) per day for any delay. As of mid-November, the 11 workers' representatives had not been reinstated, nor had they received their salaries following the court's decision.

Dockers from PAD staged a series of strikes on February 13, June 22, and June 25, after unsuccessful negotiations with authorities. The dockers first went on strike in May 2017 and reached a poststrike agreement with their employer, the Groupement Professionnel des Acconiers du Cameroun (GPAC), to improve working conditions. Because their employer did not fulfill promises made, the dockers went on strike again on June 22 and were dispersed with tear gas. They staged yet another strike on June 25, despite a strong deployment of security forces, to denounce what they referred to as an "advanced state of slavery" imposed by their employer. Specific grievances included the lack of salary increases, insurance coverage, family allowances, and fair distribution of work, among others. Anecdotal evidence suggested that a few striking dockers sustained injuries.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit all forms of forced and compulsory labor. The law prohibits slavery, exploitation, and debt bondage and voids any agreement in which violence was used to obtain consent. Violations of the law are punishable by prison terms of five to 20 years and fines ranging from 10,000 to 10 million CFA francs ($17 to $17,000). In cases of debt bondage, penalties are doubled if the offender is also the guardian or custodian of the victim. The law also extends culpability for all crimes to accomplices and corporate entities. Although the statutory penalties are fairly severe, the government did not enforce the law effectively, due to lack of knowledge of trafficking and limited labor inspection and remediation resources. In addition, due to the length and expense of criminal trials and the lack of protection available to victims participating in investigations, many victims of forced or compulsory labor resorted to accepting amicable settlement.

There continued to be anecdotal reports of hereditary servitude imposed on former slaves in some chiefdoms in the North Region. Many Kirdi, whose ethnic group was heavily of Christian and traditional faiths and who had been enslaved by the Muslim Fulani in the 1800s, continued to work for traditional Fulani rulers for compensation, while their children were free to pursue schooling and work of their

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 81 of 352

choosing.  Kirdi were also required to pay local chiefdom taxes to Fulani, as were all other subjects.  The combination of low wages and high taxes, although legal, effectively constituted forced labor.  While technically free to leave, many Kirdi remained in the hierarchical and authoritarian system because of a lack of viable options.

In the South and East Regions, some Baka, including children, continued to be subjected to unfair labor practices by Bantu farmers, who hired the Baka at exploitive wages to work on their farms during the harvest seasons.  The NGO Mandela Center documented the case of Mohounga Paul Alias, who resided in a Baka camp, died in December 2017 after he fell from the roof of a Bantu family house in an attempt to escape from captivity.

Also see the Department of State's *Trafficking in Persons Report* at [www.state.gov/j/tip/rls/tiprpt/](www.state.gov/j/tip/rls/tiprpt/).

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the worst forms of child labor and sets 14 as the minimum age of employment.  The law prohibits children from working at night or longer than eight hours per day, it and enumerates tasks children younger than 18 cannot legally perform, including moving heavy objects, undertaking dangerous and unhealthy tasks, working in confined areas, and prostitution.  Employers are required to train children between ages 14 and 18.  Because compulsory education ends at age 12, children who are not in school and not yet 14 are particularly vulnerable to child labor.  In addition laws relating to hazardous work for children younger than age 18 are not comprehensive, since they do not include prohibitions on work underwater or work at dangerous heights.  The government, however, earmarked funds for the Ministry of Labor and Social Security to revise the hazardous work list during the year.  The law provides penalties ranging from fines to imprisonment for those who violate child labor laws.

The Ministry of Social Affairs and the Ministry of Labor and Social Security are responsible for enforcing child labor laws through site inspections of registered businesses.  The government did not effectively enforce the law in all sectors.  Authorities did not allocate sufficient resources to support an effective inspection program.  Fines were not sufficient to deter violations, and court action was often ineffective, but workers' organizations reported child labor was not a major problem in the formal sector.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 82 of 352

The use of child labor, including forced labor, in informal sectors remained rampant. UNICEF's 2014 Multiple Indicator Cluster Survey indicated that 47 percent of children ages five to 14 were engaged in labor. Children working in agriculture frequently were involved in clearing and tilling the soil and harvesting crops, such as bananas and cocoa. In the service sector, children worked as domestic servants and street vendors. Children, including refugee children from the Central African Republic, worked at artisanal mining sites under dangerous conditions. Children were also forced to beg by adults, often by their parents to provide additional income for the household. According to anecdotal reports, child labor, especially by refugee children, was prevalent in the building construction sector. Chinese firms based in the country also reportedly used local child labor in the manufacture of children's shoes. In March 2017 the government convened a three-day assessment of the 2014-17 Decent Work Country Program and provided training to labor inspectors, including on child labor issues. During the year the government also increased the number of labor inspectors from 132 to 286, but this number was still insufficient for the size of the workforce.

Parents viewed child labor as both a tradition and a rite of passage. Relatives often brought rural youth, especially girls, to urban areas to exploit them as domestic helpers under the pretense of allowing them to attend school. In rural areas many children began work at an early age on family farms. The cocoa industry and cattle-rearing sector also employed child laborers. These children originated, for the most part, from the Far North, North, Adamawa, West, and Northwest Regions.

The Ministry of Social Affairs, in collaboration with the Ministry of Territorial Administration and the national police, continued to implement activities to sensitize parents to the negative impact of child labor. In June authorities in Kribi, in the Ocean Division of the South Region, conducted an operation leading to the identification of at least 21 children, ages six to 13 years, who were selling items on the city's streets. Police took the children to the Kribi central police station, where they registered and held the children until they could notify the parents. Police interrogated the parents, informed them of the risks to which their children were exposed, and warned them they would be prosecuted if the children returned to the streets. The operation was in line with a decision taken two years earlier by the senior divisional officer for Ocean Division to ban commercial activities by children in his jurisdiction.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 83 of 352

### d. Discrimination with Respect to Employment and Occupation

The law contains no specific provisions against discrimination, but the constitution in its preamble provides that all persons shall have equal rights and obligations and that every person shall have the right and the obligation to work. Discrimination in employment and occupation allegedly occurred with respect to ethnicity, HIV status, disability, gender, and sexual orientation, especially in the private sector. Ethnic groups often gave preferential treatment to members of their respective ethnic group members in business and social practices, and persons with disabilities reportedly found it difficult to secure and access employment. There were no reliable reports of discrimination against internal migrant or foreign migrant workers, although anecdotal reports suggested such workers were vulnerable to unfair working conditions. The government took no action to eliminate or prevent discrimination and kept no records of incidents.

### e. Acceptable Conditions of Work

The minimum wage in all sectors is 36,270 CFA francs ($62) per month, greater than the World Bank's international poverty line of $1.90 per day. Premium pay for overtime ranges from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it is weekend or late-night overtime. Despite the minimum wage law, employers often negotiated with workers for lower salaries, in part due to the extremely high rate of underemployment in the country. Salaries lower than the minimum wage remained prevalent in the public-works sector, where many positions required unskilled labor, as well as in the domestic work sector, where female refugees were particularly vulnerable to unfair labor practices.

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities. There are exceptions for guards and firefighters (56 hours a week), service-sector staff (45 hours), and household and restaurant staff (54 hours). The law mandates at least 24 consecutive hours of weekly rest.

The law mandates paid leave at the employer's expense at the rate of one and one-half working days for each month of actual service. For persons younger than age 18, leave accrues at the rate of two and one-half days per month of service. A maximum of 10 days per year of paid special leave, not deductible from annual leave, is granted to workers on the occasion of immediate family events. For

*Country Reports on Human Rights Practices for 2018*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 84 of 352

mothers, leave is generally increased by two working days for each child in the household younger than age six.

The government sets health and safety standards in the workplace. The minister in charge of labor issues establishes the list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety. These regulations were not enforced in the informal sector. The labor code also mandates that every enterprise and establishment of any kind provide medical and health services for its employees. This stipulation was not enforced. By law workers may remove themselves from situations that endanger health or safety without jeopardy to their employment, but authorities did not effectively protect employees in these situations. Representatives for dockers claimed that, in the event of an accident at work, the employer allows treatment for two months and fires the victim if he or she does not recover.

The Ministry of Labor and Social Security is responsible for national enforcement of the minimum wage and workhour standards, but it did not enforce the law. Ministry inspectors and occupational health physicians are responsible for monitoring health and safety standards, but the ministry lacked the resources for a comprehensive inspection program. Penalties were insufficient to deter violations. Although there were ministries tasked with upholding the labor laws, resources were inadequate to support their mission. For example, the city of Douala, which has six subdivisions, hundreds of companies, and thousands of employees, had only one labor inspectorate, which was generally poorly staffed.

Country Reports on Human Rights Practices for 2018
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 85 of 352

# CAMEROON 2019 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cameroon is a republic dominated by a strong presidency. The president retains the power over the legislative and judicial branches of government. In October 2018 Paul Biya was reelected president in an election marked by irregularities. He has served as president since 1982. His political party--the Cameroon People's Democratic Movement (CPDM)--has remained in power since its creation in 1985. New legislative and municipal elections are scheduled to take place in February 2020. Regional elections were also expected during the year, but as of late November, the president had not scheduled them.

The national police and the national gendarmerie have primary responsibility over law enforcement and maintenance of order within the country and report, respectively, to the General Delegation of National Security and to the Secretariat of State for Defense in charge of the Gendarmerie. The army is responsible for external security but also has some domestic security responsibilities and reports to the Ministry of Defense. The Rapid Intervention Battalion (BIR) reports directly to the president. Civilian authorities at times did not maintain effective control over the security forces.

Maurice Kamto, leader of the Cameroon Renaissance Movement (CRM) party and distant runner-up in the October 2018 presidential elections, challenged the election results, claiming he won. On January 26, when Kamto and his followers demonstrated peacefully, authorities arrested him and hundreds of his followers. A crisis in the Anglophone Northwest and Southwest Regions that erupted in 2016 has led to more than 2,000 persons killed, more than 44,000 refugees in Nigeria, and more than 500,000 internally displaced persons. A five-day national dialogue to address the crisis took place from September 30 to October 4, producing a number of recommendations, including some new ones. Anglophone separatists in the Northwest and Southwest Regions as well as in the diaspora shunned the meeting. On October 3, President Biya announced the pardoning of 333 lower-level Anglophone detainees, and on October 5, the Military Tribunal ordered the release of Kamto and hundreds of his associates.

Significant human rights issues included: unlawful or arbitrary killings, including extrajudicial killings, by security forces, armed Anglophone separatists, and Boko Haram and ISIS-West Africa (ISIS-WA) fighters; forced disappearances by security forces; torture by security forces and nonstate armed groups; arbitrary

detention by security forces and nonstate armed groups; harsh and life-threatening prison conditions; political prisoners; significant problems with the independence of the judiciary; the worst forms of restrictions on freedom of expression, the press, and the internet, including violence, threats of violence, or unjustified arrests or prosecutions against journalists, and abuse of criminal libel laws; substantial interference with the rights of peaceful assembly and freedom of association; restrictions on political participation; crimes involving violence against women, in part due to government inaction; violence targeting lesbian, gay, bisexual, transgender, or intersex (LGBTI) persons; criminalization of consensual same-sex relations; and child labor, including forced child labor.

Although the government took some steps to identify, investigate, prosecute, and punish officials who committed human rights abuses, it did not do so systematically and rarely made the proceedings public. Some offenders, including serial offenders, continued to act with impunity.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that the government or its agents committed arbitrary and unlawful killings through excessive use of force in the execution of official duties (see also section 1.g., Abuses in Internal Conflict).

According to a credible organization, on January 29, government security forces shot and killed a nurse who was on his way to his duty station at the Oku health district in the Northwest Region. The same organization reported that in March in the Ndu subdivision of the Northwest Region, government security forces burned alive 13 civilians, including seven businesspersons who were returning from a business trip to neighboring Nigeria.

Anglophone separatists attacked and killed members of defense and security forces, as well as civilians considered loyal to the central government. For example, during the night of April 23 and the morning of April 24 in Muyuka, Southwest Region, separatist fighters decapitated and dismembered gendarme Adam Assana and scattered his body parts on the highway.

On September 16, a short video of less than three minutes circulated on social media depicting a woman being buried alive by suspected Anglophone separatist

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 87 of 352

fighters. The perpetrators of the crime forced the woman to lie face down in a shallow grave. One of the captors shot the woman once at close range, and others threw dirt on her body. In a statement issued by the Governing Council of the self-proclaimed State of the Ambazonia shortly after the release of the video online, the spokesperson condemned the killing. Others, including some Francophones, said the video was a fake designed to inflame public opinion against the Anglophones.

Boko Haram and ISIS-WA continued killing civilians, including members of so-called vigilance committees--organized groups of local residents cooperating with government forces in the Far North. On June 10, approximately 300 armed ISIS-WA jihadists attacked military positions in Darak in Logon and Shari division in the Far North Region, killing at least 16 soldiers and eight civilians, according to the defense minister.

While the government repeatedly promised to investigate abuses committed by security forces, it did not do so transparently or systematically and did not provide details. In an interview published in the April 30 edition of the daily newspaper *Le Jour*, Georges Parfait Nana, commander of the operational unit of the National Gendarmerie specialized in the fight against corruption, stated that the gendarmerie disciplined 100 gendarmes in the past year. There were reportedly more than 600 telephone calls made to a toll-free hotline number established in the previous year to report abuses by gendarmes. There were no reported punishments for human rights abuses, and the meaning of the discipline highlighted in the commander's statement was not specified.

## b. Disappearance

As in the previous year, government security forces were widely believed to be responsible for disappearances of suspected Anglophone separatists and political opponents. In a May report, Human Rights Watch (HRW) documented the cases of 26 detainees, including two women and an 18-month-old child, who were held incommunicado at the State Secretariat for Defense for the Gendarmerie (SED) between January 2018 and January 2019, many for several months, without any contact with family, friends, or legal counsel. HRW also reported that it had received additional credible accounts since April indicating that these violations continued (see also section 1.g., Abuses in Internal Conflict).

According to credible nongovernmental organization (NGOs), the government did not readily account for most of the inmates removed from the Yaounde Kondengui and Buea prisons following July 22 and 23 riots provoked by overcrowding, poor

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 88 of 352

living conditions, and extensive delays in cases going to trial. Family members of detainees were unable to obtain information about individuals' welfare or whereabouts. On July 30, the Mandela Center described the situation as forced disappearances. Anglophone separatist leader Julius Sisiku Ayuk Tabe and nine other members of his entourage staged a hunger strike to protest the disappearances. That same day Communication Minister Rene Emmanuel Sadi tweeted that Mancho Bibixy and other insurgent inmates were alive and in good condition but did not disclose their location. On August 2, Sadi stated that prison authorities had transferred 244 Yaounde and 20 Buea insurgents to police and gendarmerie for questioning.

There were no developments concerning the alleged disappearance of Franklin Mowha, the president of human rights NGO Frontline Fighters for Citizen Interests. In an August 24, 2018 press release, Ekombo Favien, Frontline Fighter's vice president, announced that Mowha had disappeared after leaving his hotel room in August 6, 2018 while on a mission to monitor human rights abuses in Kumba, Southwest Region.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, there were reports that security force members tortured or otherwise abused citizens, including separatist fighters and political opponents. Amnesty International and HRW documented several cases in which security forces severely mistreated political opponents, and others where armed separatists mistreated civilians and members of defense forces.

In a July 24 communique, the group of lawyers defending Maurice Kamto and other CRM detainees reported that during a planned peaceful protest on June 1 in Yaounde and Douala, security forces arrested 59 activists and transferred them to SED for questioning. The lawyers claimed the activists suffered from abuse. They cited beatings on the back, buttocks, and soles of the feet with machetes and wooden sticks, asphyxia by simulation of drowning, and being forced to lie in excrement. In a July 26 press release, Amnesty International stated security forces had abused the 59 opposition supporters, including six women, beating them with sticks and forcing them into humiliating positions before they were eventually released.

HRW stated it interviewed 14 detainees held at the SED, all of whom said they were tortured and held incommunicado during their time there. HRW reported

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 89 of 352

hearing credible accounts that individuals had been tortured. A 29-year-old detainee from Kumba, Southwest Region, described being beaten daily with machetes and experiencing unhygienic conditions. A 30-year-old detainee from the Northwest Region told HRW of being subjected to beatings in the middle of the night.

The lawyer of Mamadou Mota, the first vice president of the CRM, told HRW that a prison guard and a gendarme had beaten his client at the Yaounde Central Prison, breaking his arm, and that he was then taken to a security facility where he was held in solitary confinement for 12 days. On July 25, Olivier Bibou Nissack, Kamto's spokesperson, published a live video on his Facebook page alleging Mota suffered harsh treatment during his transfer from the Yaounde Central prison to the SED. In the video, three defense lawyers who were present at Mota's questioning that day at a facility belonging to security forces, including barrister Serges Emmanuel Chendjou, said they saw their client in bad shape, with bruises all over his body, a bandage on his head, and his left arm in a sling.

Police detained a 16-year-old boy named Ibrahim Bello at the Ombessa police station, in the Mbam and Inoubou division of Center Region. As a result of the mistreatment he received at the police station in 2017, Belo lost both legs and his left hand. As of September 30, according to the independent local NGO Mandela Center, which has consultative status with the UN Economic and Social Council, the courts had not issued a verdict, nor did the policemen who allegedly committed the abuse receive any disciplinary action. Human rights organizations, under the leadership of the Mandela Center, filed a complaint with the prosecutor in Bafia and State for Defense in charge of the Gendarmerie.

The lawyers defending Maurice Kamto and his allies reported that security forces arrested more than 200 CRM members and sympathizers in various cities, removing some of them from their hospital beds, and transporting them overnight to Yaounde under inhuman conditions following the January 26 protest. Security forces handcuffed Maurice Kamto from Douala to Yaounde and refused to allow him the opportunity to use the restroom. According to the lawyers, the persons arrested were starved and detained in undisclosed areas without access to lawyers for 70 hours after arriving in Yaounde. According to credible reports, security forces tore the clothes off many detainees involved in the July 22 and 23 prison riots before transferring them from the Yaounde Central Prison to other locations. Most detainees remained naked throughout their detention at the new locations, and at least one detainee was forced to appear in court naked reportedly because no one brought them clothing.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 90 of 352

Press reporting and NGOs indicated there were cases of rape and sexual abuse by persons associated with the government in the Anglophone Northwest and Southwest Regions.  In July HRW reported that on June 21 in Kumbo, a soldier raped a 40-year-old woman.  She reported that five soldiers from the group broke into her house and beat her while asking for the whereabouts of her husband.  Following this, they brought her in front of her neighbor's house and asked her and the neighbor's wife where the separatists were.  After the two women said they knew nothing about the separatists' whereabouts, the soldiers proceeded to beat them.  At some point, one of the soldiers requested a condom from a colleague and demanded the victim to go toward the bathroom located in her neighbor's home.  The soldier raped the woman, threatening to kill her if she reported the attack to anyone.

**Prison and Detention Center Conditions**

Prison conditions were harsh and life threatening due to food shortages and poor-quality food, gross overcrowding, physical abuse, as well as inadequate sanitary conditions and medical care.

Physical Conditions:  Overcrowding remained a significant problem in most prisons, especially in major urban centers.  Prison overcrowding was exacerbated by the significant increase in arrests related to the Anglophone crisis and CRM protests following the October 2018 elections.  Officials held prisoners in dilapidated, colonial-era prisons.  Authorities often held pretrial detainees and convicted prisoners in the same cells.  In many prisons, toilets were only common pits.  In some cases, women benefitted from better living conditions, including improved toilet facilities and less crowded living quarters.  Prisons generally had separate wards for men, women, and children.  Authorities claimed to hold the sick separately from the general prison population, but this was often not the case.

According to prison administration officials, the country had 79 operational prisons, with an intended capacity of 17,915.  During the past five years, the prison population increased steadily, from 23,500 in 2013 to 30,701 in December 2017, according to the latest report published in 2018 by the National Commission on Human Rights and Freedoms (NCHRF).  In its 2018 country report on Cameroon, Amnesty International indicated that the Central Prison in Maroua, Far North Region, held 1,500 detainees, more than four times the planned capacity.  Malnutrition, tuberculosis, bronchitis, malaria, hepatitis, scabies, and numerous

*Country Reports on Human Rights Practices for 2019*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 91 of 352

other untreated conditions, including infections, parasites, dehydration, and diarrhea, were rampant.

In a July 23 press release following the riots at Yaounde's Kondengui and Buea prisons, Amnesty International noted that prison conditions were dire, stating that until the situation improved there was a strong risk of further violence. During an August 2 press briefing, Justice Minister Laurent Esso announced some measures to address overcrowding: acceleration of judicial proceedings, a strengthening of disciplinary measures, modernization of the means of controlling and monitoring prisoners, decongestion of prisons with proven overcrowding, and the prohibition on the use of certain items in the prison environment.

Physical abuse by prison guards and prisoner-on-prisoner violence were problems. For instance, during the July 22 riots at the Kondengui Central Prison, at least two high-profile inmates, including former prime minister Inoni Ephraim and former health minister Olanguena Awono, sustained injuries after other prisoners attacked them for the privileged lifestyles they carried on within the prison. Corruption among prison personnel was reportedly widespread. Visitors were at times forced to bribe wardens to be granted access to inmates. Prisoners bribed wardens for special favors or treatment, including temporary freedom, cell phones, beds, and transfers to less crowded areas of the prisons. Due to their inability to pay fines, some prisoners remained incarcerated after completing their sentences or after they had received court orders of release.

Administration: Independent authorities often investigated credible allegations of mistreatment. Visitors needed formal authorization from the state counsel; without authorization, they had to bribe prison staff to communicate with inmates. Visits to Boko Haram suspects, alleged Anglophone separatists, and political opponents detained after the October 2018 presidential election were restricted. Authorities allowed prisoners and detainees to observe their religions without interference.

Independent Monitoring: The government permitted monitoring by some NGOs, including Buea-based Human Is Right, which in July helped identify at least one case of prolonged illegal detention. The NCHRF and the Commissions for Justice and Peace of the Catholic Archdioceses also conducted prison visits. In a February 27 press release, the NCHRF deplored the challenges in gaining access to CRM activists incarcerated at Kondengui Central Prison. With the exception of the International Committee of the Red Cross, the government restricted international humanitarian organizations' access to prisoners.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 92 of 352

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide for the right of any person to challenge the lawfulness in court of an arrest or detention. The law states that except in the case of an individual discovered in the act of committing a felony or misdemeanor, the officials making the arrest must disclose their identity and inform the person arrested of the reason. Any person illegally detained by police, the state counsel, or the examining magistrate may receive compensation. The government did not always respect these provisions.

The national police and the national gendarmerie have primary responsibility over law enforcement and maintenance of order within the country. The army is responsible for external security but also has some domestic security responsibilities. The national police, which includes public security, judicial, territorial security, and frontier police, reports to the General Delegation of National Security (DGSN), which is under the direct authority of the presidency. The national gendarmerie reports to the Secretariat of State for Defense (SED) in charge of the gendarmerie, a dedicated branch of the Ministry of Defense. In addition to the gendarmerie, the army and the army's military security unit are other components of the ministry, which is headed by a minister delegate under the direct authority of the president. The General Delegation for External Research (DGRE) serves as the intelligence agency for both internal and external security, and like the Ministry of Defense and DGSN, reports to the office of the president, resulting in strong presidential control of security forces. The Rapid Intervention Battalion (BIR) falls outside the purview of conventional security forces, reporting directly to the president. Civilian authorities at times did not maintain effective control over the security forces, including police and gendarmerie.

## Arrest Procedures and Treatment of Detainees

The law requires police to obtain a warrant from a judge or prosecutor before making an arrest, except when a person is caught in the act of committing a crime, but police often did not respect this requirement. The law provides that suspects be brought promptly before a judge or prosecutor, although this often did not occur, and citizens were detained without judicial authorization. Police may legally detain a person in connection with a common crime for up to 48 hours, renewable once. This period may, with the written approval of the state counsel, be exceptionally extended twice before charges are brought. Nevertheless, police and gendarmes reportedly often exceeded these detention periods. The law also permits detention without charge for renewable periods of 15 days by

*Country Reports on Human Rights Practices for 2019*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 93 of 352

administrative authorities such as governors and civilian government officials serving in territorial command. The law also provides that individuals arrested on suspicion of terrorism and certain other crimes may be detained for investigation for periods of 15 days, renewable without limitation with authorization of the prosecutor. The law provides for access to legal counsel and family members, although police frequently denied detainees access to both. The law prohibits incommunicado detention, but such cases occurred, especially in connection with the Anglophone crisis and the postelection situation. The law permits bail, allows citizens the right to appeal, and provides the right to sue for unlawful arrest, but these rights were seldom respected.

Arbitrary Arrest: Police, gendarmes, the BIR, and other government authorities reportedly continued to arrest and detain persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado. "Friday arrests," a practice whereby individuals arrested on a Friday typically remained in detention until at least Monday unless they paid a bribe, continued.

There were credible reports that authorities held some suspects in both the Anglophone and postelectoral crises for long periods without notifying them of the charges. For example, on August 8, the NGO Human is Right reported that during a visit to the Buea Central Prison in July, it came across a minor who had been in pretrial detention since 2017. The minor was 14 at the time of his arrest and had been kept in detention without trial for approximately two years. As of October the Fako High Court had not yet reviewed the case.

Pretrial Detention: The code of criminal procedure provides for a maximum of 18 months' detention before trial, but many detainees waited years to appear in court. The 2014 antiterrorism law provides that a suspect may be held indefinitely in investigative detention with the authorization of the prosecutor. No comprehensive statistics were available on pretrial detainees. While updated numbers were not easy to access, the Ministry of Justice in 2015 indicated that more than 26,000 inmates occupied the 17,000 spaces available in prisons across the country. In an August 20 release following the sentencing of separatist leader Sisiku Ayuk Tabe and others to life imprisonment, the Central Africa Human Rights Defenders Network (REDHAC) indicated that 174 individuals arrested in the context of the Anglophone crisis and detained in Yaounde had been in detention there for more than one year without being presented before an investigating judge. The 2014 antiterrorism law does not require that individuals charged with terrorism be presented to an investigating judge.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 94 of 352

**e. Denial of Fair Public Trial**

The constitution and law provide for an independent judiciary, but the judiciary is under the president. In some instances, the outcomes of trials appeared influenced by the government, especially in politically sensitive cases.

Under the 2014 antiterrorism law, military tribunals have jurisdiction over terrorism and national security-related crimes. When the Military Tribunal declared in August that it was competent to handle the case against the CRM leaders, defense lawyers filed an appeal, requesting the Court of Appeal to rule whether trial of civilians before a military court conformed to the country's constitution and international commitments. The Court of Appeals of the Center Region avoided the question, stating that the Military Tribunal was handling the matter and could not be declared incompetent. Most habeas corpus pleas before the Mfoundi High Court, Center Region, involving Anglophone separatists and CRM leaders ended with the judges maintaining the suspects in detention, despite solid evidence that the detentions deviated from the applicable laws.

On May 31, Joseph Elaba, the investigating magistrate at the Douala High Court, demanded that complainants make a deposit of five million CFA francs ($8,500) before the court could register a case against members of security forces who shot and wounded participants of the CRM protest march in January. When the Yaounde Military Tribunal on August 20 sentenced Ayuk Tabe and nine other Anglophone leaders to life imprisonment, the military court required the victims to pay five million CFA francs ($8,500) before they could appeal the decision.

Despite the judiciary's partial independence from the executive and legislative branches, the president appoints all members of the bench and legal department of the judicial branch, including the president of the Supreme Court, and may dismiss them at will.

Military courts may exercise jurisdiction over civilians in a broad number of offenses including civil unrest.

**Trial Procedures**

The constitution and law provide for the right to a fair and public trial without undue delay, and the defendant is presumed innocent. Authorities did not always respect the law. Criminal defendants have the right to be informed promptly and in detail of the charges, with free assistance of an interpreter. Pretrial suspects were

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 95 of 352

frequently held in the same quarters as convicted criminals. Defendants have the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, restricting access to lawyers, particularly in cases of individuals suspected of complicity with Boko Haram, Anglophone separatists, or political opponents. When defendants cannot pay for their own legal defense, the court may appoint trial counsel at the public's expense; the process was often burdensome and lengthy, and the quality of legal assistance was poor. Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf. Defendants have the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt, but authorities often violated this right. Hearsay testimony and anonymous testimony was sometimes permitted, especially in terrorism cases. Defendants are entitled to an interpreter at no charge, but often the quality of interpretation was described as poor. Defendants may appeal convictions. In some cases, authorities did not give the victim a chance to confront the offender and present witnesses or evidence to support his or her case.

On August 31, the Cameroon Bar Association announced a five-day lawyers' strike from September 16 to 20. The lawyers said that they had consistently been denied access to their clients in various detention centers. They stated the government repeatedly violated at all phases of the judicial process the rights of the defense as enshrined in domestic and international law. They cited as key areas of concern that trials were sometimes held in a language not understood by the accused, the use of torture and inducements to extract confessions, and illegal and prolonged detentions.

**Political Prisoners and Detainees**

There were reports of newly identified political prisoners or detainees, but no comprehensive or accurate statistics were available. Political prisoners were detained under heightened security, often in SED facilities and at the Principal and Central Prisons in Yaounde. Some were allegedly held at DGRE facilities. The government did not readily permit access to such persons.

There were allegations that the government falsely charged peaceful dissidents with violence, including former presidential candidate Maurice Kamto. In a statement signed in March, Kamto and four of his supporters, including campaign manager Paul Eric Kingue, Albert Zongang of the La Dynamique political party, Penda Ekoka of the Mouvement Agir, and popular singer Gaston Philip Abbe, popularly known as Valsero, all of whom were detained at the Kondengui prison,

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 96 of 352

claimed they were political prisoners, along with their 160 supporters in other prisons throughout the country.

On October 3, President Biya announced the pardoning of 333 lower-level Anglophone detainees, and on October 5, the Military Tribunal ordered the release of Kamto and hundreds of his associates.

Former minister of state for territorial administration Marafa Hamidou Yaya, who was convicted in 2012 on corruption charges and sentenced to 25 years' imprisonment, remained in detention despite a June 2016 decision of the UN Working Group on Arbitrary Detention describing Marafa's detention "a violation of international laws."  The government did not respond to repeated requests for members of the diplomatic community to meet with Marafa.

**Politically Motivated Reprisal Against Individuals Located Outside the Country**

There were credible reports that for politically motivated purposes the government attempted to exert bilateral pressure on other countries aimed at having them take adverse legal action against specific individuals, including Anglophones separatists and other political opponents.

On August 20, the Yaounde military court sentenced Julius Sisiku Ayuk Tabe and nine other Anglophone leaders to life imprisonment and a fine of 250 billion CFA francs ($425 million) in the early morning hours without their lawyers present.  In January 2018 Nigerian special forces had arrested Sisiku and 46 other Anglophone separatists in a hotel in Abuja, Nigeria, and forcibly repatriated them to Cameroon, in spite of the fact that some had applied for asylum.  From the time of their transfer to Cameroon, the group had been held in pretrial detention.

**Civil Judicial Procedures and Remedies**

Citizens and organizations have the right to seek civil remedies for human rights violations through administrative procedures or the legal system; both options involved lengthy delays.  Individuals and organizations may appeal adverse decisions domestically or to regional human rights bodies, but the decisions of regional human rights bodies are not compelling.  There were reports that entities associated with the government had failed to comply with civil court decisions pertaining to labor matters.

*Country Reports on Human Rights Practices for 2019*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 97 of 352

**Property Restitution**

The government continued to compensate relocated families in connection with infrastructure projects, including the Kribi Sea Port and the Yaounde-Douala highway projects. In 2014 the government initiated a judicial procedure against officials suspected of having misappropriated money earmarked for compensations. On February 26, the newspaper *Cameroon Tribune* reported that the Special Criminal Court arrested the mayor of Lobo in Lekie division, Center Region, and 13 others under suspicion of embezzling funds from the Yaounde-Douala highway construction project. There were no reported developments on the cases of previously arrested officials.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

Although the constitution and law prohibit arbitrary interference with privacy, family, home, or correspondence, these rights were subject to restriction for the interests of the state, and there were credible reports police and gendarmes abused their positions by harassing citizens and conducting searches without warrants.

The law permits a police officer to enter a private home during daylight hours without a warrant only if pursuing a person suspected of or seen committing a crime. Police and gendarmes often did not comply with this provision and entered private homes without a warrant whenever they wished.

An administrative authority, including a governor or senior divisional officer, may authorize police to conduct neighborhood sweeps without warrants, and this practice occurred, especially in the restive Southwest and Northwest Regions.

**g. Abuses in Internal Conflict**

Killings: There were credible reports that members of government forces deliberately killed innocent citizens. On January 21, for example, according to credible organizations, members of government security forces removed a young man from his bike at Squares Kumbo, Northwest Region, and killed him. The victim reportedly had just dropped off a passenger when security forces laid hands on him. According to the UN Office for the Coordination of Humanitarian Affairs (OCHA), a video circulated on social media showing the military harassing a group of men, reportedly from Kurt-Nwa, Northwest Region. These men were reportedly found dead after the incident.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 98 of 352

Boko Haram and ISIS-WA intensified deadly attacks on civilians and members of security forces in the Far North Region. On July 22, in Amchide, Boko Haram fighters killed a man in his residence because they believed he had notified the army of their presence. On July 28, individuals believed to be Boko Haram operatives killed three vigilance committee members in Double, Far North Region. On August 1, assailants believed to be Boko Haram fighters attacked the border village of Guederou in the Mayo Sava Division and killed four persons, including three brothers ages 11 to 16. On September 14, six security force members were killed and nine others were wounded during a Boko Haram attack on the Multilateral Force Post in Souarem, Far North Region.

Abductions: As in the previous year, armed separatists carried out abductions in the Anglophone Northwest and Southwest Regions and held noncombatants as hostages, including public officials, political leaders, teachers, schoolchildren, and traditional leaders. There were credible allegations that separatists physically abused abduction victims, including forcing them to sit in excrement, putting them in stress positions, beating them, and flogging them with the flat edges of machetes. In most cases, the abductors subsequently freed the victims, after either negotiations or payment of ransoms.

A June 30 situation report by OCHA indicated that kidnapping rates increased in June. On June 7, gunmen kidnapped the owner of a travel agency in Bamenda, Northwest Region, before releasing him hours later. On November 5, armed Anglophone separatists stormed a Presbyterian school in Bamenda, Northwest Region. The head of the Presbyterian Church in Cameroon and the Council of the Protestant Churches of Cameroon reported 79 children and three adults were kidnapped, adding that 11 students had also been kidnapped on October 31. In November Anglophone separatists kidnapped three Franciscan sisters and 13 novices who were traveling in the Northwest Region.

Physical Abuse, Punishment, and Torture: There were credible reports that members of government forces physically abused civilians and prisoners in their custody, including those detained in the conflicts in the Far North and Southwest and Northwest Regions, especially after the July 22-23 riot at the Yaounde and Buea prisons.

Child Soldiers: The government did not directly recruit or use child soldiers, but vigilance committees may have employed children. Some community neighborhood watch groups, known as vigilance committees, may have used and

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 99 of 352

recruited children as young as 12 in operations against Boko Haram. Boko Haram continued to use child soldiers, including girls, in its attacks on civilian and military targets. There were also some reports that Anglophone separatist armed groups in the Southwest and Northwest Regions used children.

Other Conflict-related Abuse: There were reports of repeated attacks on health workers and institutions and the use of firearms around health facilities by both members of security forces and Anglophone separatists. On February 13, security forces reportedly attacked the Bangolan Baptist Health Center using heavy weapons, destroyed property, and took valuable items belonging to the institution and its personnel.

On September 3, according to online media platform *Cameroon Info,* armed men believed to be Anglophone separatists attacked the Bonakanda community radio in Buea, Southwest Region. The assailants abducted Mary Namondo, a journalist working with the station. Namondo was released on September 5.

## Section 2. Respect for Civil Liberties, Including:

## a. Freedom of Expression, Including for the Press

The law provides for freedom of expression, including for the press, but the government often restricted this right, explicitly or implicitly.

Freedom of Expression: Government officials penalized individuals or organizations that criticized or expressed views at odds with government policy. Individuals who criticized the government publicly or privately frequently faced reprisals. On several occasions, the government invoked laws requiring permits or government notification of public protests to stifle discourse. Many civil society and political organizations reported increased difficulty when obtaining approval to organize public gatherings.

In the early hours of February 23, police surrounded CRM headquarters in the Odza neighborhood of Yaounde and the New-Deido in Douala to prevent prospective activists from registering with the party. In other cities, such as Bafoussam and Mbouda in the West Region, security forces disrupted the registration process and arrested CRM activists. In Bafoussam, police seized CRM's campaign truck and detained it along with its driver. On April 30, Zacheus Bakoma, the divisional officer for Douala 5, ordered a 90-day provisional closure

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 100 of 352

of the Mtieki community hall after the CRM used the hall as a venue for a meeting on April 28.

Press and Media, including Online Media:  Independent media were active and expressed diverse views.  This landscape, however, included restrictions on editorial independence, in part due to stated security concerns related to the fight against Boko Haram, the Anglophone crisis, and the postelectoral crisis. Journalists reported practicing self-censorship to avoid repercussions for criticizing the government, especially on security matters.  According to the 2018 Press Freedom Index by Reporters without Borders, the re-election of President Biya for a seventh term of office was accompanied by multiple instances of intimidation, attacks, and arrests of journalists.

Violence and Harassment:  Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists for their reporting.  Journalists were arrested in connection with their reporting on the Anglophone crisis.  According to reports by multiple organizations, including the Committee to Protect Journalists (CPJ), police arrested Pidgin news anchor Samuel Wazizi, who worked for the Buea-based independent station Chillen Muzik and Television.  The arrest occurred on August 2 in Buea, Southwest Region.  Police initially held Wazizi at the Buea police station and subsequently handed him over to the military, who detained him on August 7 without access to his lawyer or family.  As of late November, he was presumed to still be in detention.

Censorship or Content Restrictions:  Under a 1990 law, the Ministry of Communication requires editors to submit two signed copies of their newspapers within two hours after publication.  Journalists and media outlets reported practicing self-censorship, especially if the National Communication Council (NCC) had suspended them previously.  In February the NCC issued a press release calling on journalists to be professional in their publications.  The release was in reaction to media coverage following the January 26 protests called for by CRM, the arrests of hundreds of activists, including Maurice Kamto, and the ransacking of the Cameroonian embassy in Paris by anti-President Biya protesters. The NCC chairman indicated that the government had informed all professional media about the facts through official procedures and regretted that some press organizations continued to spread opinion contrary to government's position, thereby maintaining confusion.

*Country Reports on Human Rights Practices for 2019*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 101 of 352

At its 23rd ordinary session, the NCC issued warning notices in 21 media regulation cases.  The charges stated that the groups engaged in practices contrary to professional ethics, social cohesion, and national integration.

In a July 20 meeting with 100 private media outlet managers, Minister of Communications Rene Sadi chided Cameroon's private media for abandoning its duty to "inform, educate, and entertain" by publishing articles that "sowed divisiveness and promoted tribalism."  He accused the private press of "playing politics under the influence of journalistic cover."  As of year's end, no private television or radio station held a valid broadcasting license.  Although the few that could afford the licensing fee made good-faith efforts to obtain accreditation, the ministry had not issued or renewed licenses since 2007.  The high financial barriers coupled with bureaucratic hurdles rendered Cameroonian private media's very existence illegal.

Libel/Slander Laws:  Press freedom is constrained by libel laws that authorize the government to initiate a criminal suit when the president or other senior government officials are the alleged victims.  These laws place the burden of proof on the defendant, and crimes are punishable by prison terms and heavy fines.

In Yaounde, on May 28, five police officers arrested Paul Chouta, who worked as a reporter for a privately owned *Cameroon Web* news website, in response to a defamation complaint filed by French-Cameroonian writer Calixthe Beyala.  Chouta was detained at the judicial police headquarters following his arrest.  Chouta had reported on a video circulating on the internet depicting Beyala, threatening a man identified as her paramour, with a large rock.  Emmanuel Simh, Chouta's lawyer, reportedly told the CPJ that his client was denied bail on May 31.  On June 10, Chouta was charged with defamation, spreading false news, and hate speech, but the hate speech charge was reportedly dropped the following day.  Chouta was sent to Kondengui maximum-security prison in Yaounde to await trial.  Beyala was known as a supporter of the government and reportedly spread rhetoric against the Bamileke ethnic group.

National Security:  Authorities cited laws against terrorism or protecting national security to arrest or punish critics of the government.  During a security meeting in Douala on August 9, Minister of Territorial Administration Paul Atanga Nji called on the representatives of NGOs and media professionals to be responsible, contribute their own quota to nation building, and avoid derogatory language that discredits government actions.  Atanga Nji said many media houses in Douala organized weekly debates in order to sabotage government actions and promote

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 102 of 352

secessionist tendencies.  He urged private media organizations to exercise responsibility when carrying out their activities, warning them to construct, not destroy, the nation.  He called on opposition political parties to respect the law and not to force his hand to suspend them.  The minister also warned NGOs to respect the contract they signed with his ministry or be suspended.

Nongovernmental Impact:  There were reports that separatist groups in the Southwest and Northwest Regions sought to inhibit freedom of expression, including for the press.  In an August 13 online post, Moki Edwin Kindzeka, a Yaounde-based journalist, said it was becoming impossible for journalists to practice their profession, because they faced pressure from both separatist fighters and the government.  The article was in reaction to Atanga Nji's August 9 statements.

**Internet Freedom**

No credible reports indicated that the government monitored private online communications without appropriate legal authority.  The government occasionally disrupted access to the internet.

**Academic Freedom and Cultural Events**

Although there were no legal restrictions on academic freedom or cultural events, some school authorities reportedly sanctioned academic personnel for their teaching on politically sensitive topics, and administrative officials often deterred teachers from criticizing the government.

On March 5, Jean-Pierre Voundi Abondo, the principal of Yaounde's Government Bilingual High School Mendong, suspended Felix Ningue from his duties as a philosophy teacher.  Ningue reportedly proposed an abstract from Maurice Kamto's 1993 book entitled *L'Urgence de la Pensee* (*The Urgency of Thought*), as one of the topics for student discussion in an examination on February 17.  In an interview on Canal 2 television channel, Voundi said the school was apolitical and that he asked Ningue to stop teaching pending an investigation.

**b. Freedoms of Peaceful Assembly and Association**

The government limited and restricted freedoms of peaceful assembly and association.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 103 of 352

**Freedom of Peaceful Assembly**

Although the law provides for freedom of peaceful assembly, the government often restricted this right. The law requires organizers of public meetings, demonstrations, and processions to notify officials in advance but does not require prior government approval of public assemblies, nor does it authorize the government to suppress public assemblies that it did not approve in advance. Nevertheless, officials routinely asserted the law implicitly authorizes the government to grant or deny permission for public assemblies. The government often refused to grant permits for gatherings and used force to suppress assemblies for which it had not issued permits. Authorities typically cited security concerns as the basis for deciding to block assemblies.

On January 26, in Yaounde, Douala, Bafoussam, and other cities across the country, police arrested several dozen CRM activists who participated in a rally to denounce electoral irregularities in the October 2018 presidential election, the ongoing crisis in the two Anglophone regions, and poor management of infrastructure projects associated with the 2019 African Cup of Nations. The CRM notified authorities in advance of the protests but did not receive authorization. Security forces, in response, used excessive force against demonstrators. According to Amnesty International, more than one hundred protesters were arrested in Douala, Yaounde, Dschang, Bafoussam, and Bafang. Approximately 50 were released the following day, and the remainder were transferred to Yaounde and placed under administrative custody. Seven persons were shot and injured in the city of Douala, including lawyer Michele Ndoki, while other protesters were beaten. Communication Minister Rene Emmanuel Sadi denied the use of live ammunition against protesters, but social media contradicted that account with videos of gunfire in Douala and a member of the riot police firing a rubber bullet at close range into the leg of a peaceful protester.

On April 5, Minister of Territorial Administration Atanga Nji issued a press release prohibiting all meetings or public events by the CRM. Days later, on April 13, the party initiated a series of meetings throughout the country to demand the immediate release of Maurice Kamto, who by that time had been imprisoned for more than two months. The CRM also aimed to denounce "the selective modification of the electoral code" and the mismanagement of the funds dedicated to infrastructure projects associated with the 2019 African Cup of Nations, which was to be hosted by Cameroon before being ultimately awarded to Egypt. The CRM unsuccessfully appealed the ministry's decision.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 104 of 352

**Freedom of Association**

The constitution and law provide for the freedom of association, but the law also limits this right. On the recommendation of the prefet, the Ministry of Territorial Administration may suspend the activities of an association for three months on grounds that the association is disrupting public order. The minister may also dissolve an association if it is deemed a threat to state security. National associations may acquire legal status by declaring themselves in writing to the ministry, but the ministry must explicitly register foreign associations, and the president must accredit religious groups upon the recommendation of the Minister of Territorial Administration. The law imposes heavy fines for individuals who form and operate any such association without ministry approval. The law prohibits organizations that advocate a goal contrary to the constitution, laws, and morality, as well as those that aim to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

Conditions for recognition of political parties, NGOs, or associations were complicated, involved long delays, and were unevenly enforced. This resulted in associations operating in legal uncertainty, their activities tolerated but not formally approved.

During the year the government did not ban any organizations. The Ministry of Territorial Administration, however, regularly used threats of suspension on the heads of political parties and NGOs. At a press conference after the January 26 CRM protests, Minister Atanga Nji indicated that the ministry had the right to take certain precautionary measures, meaning the CRM's suspension. A number of observers stated that political motivations were evident in the government's selective application of the law.

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement**

Although the constitution and law provide for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government restricted these rights. Growing concerns over the entry of armed groups into Cameroon from the Central African Republic (CAR) and the conflict with Boko Haram in the

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 105 of 352

Far North Region appeared to have prompted the government to adopt a more restrictive approach to refugee movement. The government made it more difficult for refugees, asylum seekers, and stateless persons to move freely in the country.

In some instances, the government worked with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations to provide protection and assistance to refugees, asylum seekers, stateless persons, and other persons of concern. The government sometimes failed to respect its obligations under relevant international laws. There were instances where it forcibly returned asylum seekers to their countries and did not readily provide humanitarian organizations such as the United Nations access to asylum seekers before refouling them.

In-country Movement: Using minor infractions as a pretext, police and gendarmes at roadblocks and checkpoints in cities and on most highways often extorted bribes and harassed travelers. Police frequently stopped travelers to check identification documents, vehicle registrations, and tax receipts as security and immigration control measures. Unaccompanied women were frequently harassed when traveling alone. Authorities restricted movements of persons and goods, including motorbikes, especially in the Northwest and Southwest Regions, citing security concerns. Armed Anglophone separatists also restricted the movements of persons and goods in the two Anglophone regions, sometimes in a deliberate attempt to harass and intimidate the local population. Humanitarian organizations cited difficulty in accessing certain areas and in some instances were harassed and denied passage by government authorities.

On June 14, Governor Adolphe Lele Lafrique of the Northwest Region lifted the curfew placed in the region since November 2018. The curfew, which lasted eight months, restricted movement of persons and property in the Northwest Region between 9 p.m. and 6 a.m.

**e. Internally Displaced Persons**

Evolving civil unrest and violence in Northwest and Southwest Regions continued to spur population displacement. According to OCHA, an estimated 710,000 individuals were displaced in Littoral, Northwest, Southwest, and West Regions. In addition, UNHCR estimated that more than 44,000 Cameroonian refugees were in southeastern Nigeria. An August 26 announcement by an armed separatist group on social media imposed a restriction of movement on all persons and closure of businesses starting September 2 for three weeks. This led to a further

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 106 of 352

exodus of persons from the Northwest and Southwest Regions. Even prior to the announcement, relief agencies estimated that more than 2,800 persons fled the two regions to seek refuge in the Littoral and West, and an additional 879 individuals crossed the border into Nigeria between August 1 and 20.

As of September 30, the displaced population in the Far North Region was 488,418, including 271,000 internally displaced persons (IDPs), 106,418 refugees, and 111,000 returnees, in part driven from their homes by attacks perpetrated by Boko Haram and ISIS-WA, according to estimates by the International Organization for Migration and UNHCR.

The government did not put in place mechanisms to promote the safe, voluntary return, resettlement, or local integration of IDPs in the Far North Region. Provision of basic social services to IDPs and assistance to returnees have been carried out by relief actors with minimal support from the government. In the Northwest and Southwest Regions, the government did not manage any efforts to ensure unhindered access for humanitarian actors to deliver aid to persons in need. Its actions were focused on blocking the delivery of aid to show that there is no humanitarian crisis in these regions. Although it made some effort to provide urgently needed in-kind assistance to crisis affected IDPs in the Northwest and Southwest based on its Humanitarian Assistance Response Plan, this assistance was distributed to populations without an assessment of their needs and only to persons in accessible areas, especially in regional capital cities.

## f. Protection of Refugees

According to UNHCR and government estimates, the country hosted 403,208 refugees and 9,435 asylum seekers as of September 30. The refugee population included 291,803 CAR nationals, 108,335 Nigerians, and 1,599 Chadians. The remaining refugee population hailed from Rwanda, the Democratic Republic of Congo, Sudan, Cote d'Ivoire, Burundi, and the Republic of Congo.

In principle, Cameroon operates an open-door policy and has ratified the major legal instruments for refugee protection, including the 1951 Refugee Convention. These commitments were not translated into a progressive legal framework allowing refugees their rights as stated in various legal instruments.

Abuse of Migrants, Refugees, and Stateless Persons: The government cited other concerns, including security and suspicion of criminal activity, to justify arbitrary arrests and detention of refugees and asylum seekers. The government at times

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 107 of 352

cooperated with UNHCR and other humanitarian organizations in providing protection and assistance to IDPs, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

Refoulement:  The government stated there was no official policy of forcibly repatriating refugees.  On January 16, however, Cameroon forcefully returned 267 Nigerian refugees fleeing Boko Haram to northeast Nigeria.  In a February 27 statement, Medicins Sans Frontieres stated Cameroonian and Nigerian authorities ordered 40,000 refugees in Cameroon to return to northeast Nigeria and expressed concern over their possible fate due to continuing insecurity in Rann and a lack of humanitarian assistance.  Tens of thousands of persons had fled the town of Rann in northeast Nigeria to Cameroon after a January attack by Islamist insurgents.  In 2018 UNHCR and NGOs also reported cases of forced returns of asylum seekers, mostly of Nigerians.  According to HRW, in 2017 more than 4,400 asylum-seeking Nigerians were forcibly returned to Nigeria.  UNHCR reported that 1,300 were forcibly returned in 2018 and an estimated 600 in 2019.  In February an estimated 40,000 Nigerian refugees who had fled to Cameroon in the wake of armed attacks were soon after returned to Nigeria, after Nigerian government officials advised that conditions were safe for their return.  Humanitarian organizations, however, stated the conditions were unsafe for return and that the area was largely inaccessible to relief agencies.

Access to Asylum:  The laws provide for granting asylum or refugee status, and the government has established a system of providing protection to refugees, but the implementation of this system is less likely.  UNHCR continued to provide documentation and assistance to the refugee population.  Nevertheless, local authorities did not always recognize these documents as official, which prevented refugees from travelling and engaging in business activities.  UNHCR and the government continued to conduct biometric verification and registration of refugees in the Far North Region, including of those not living in a refugee camp.

Access to Basic Services:  Refugees had limited access to health care, education, and employment opportunities.  Their rural host communities faced similar challenges, but the situation was somewhat worse for refugees.  Access to these services varied according to the location of the refugees, with those in camps receiving support through humanitarian assistance, while refugees living in host communities faced difficulty receiving services.

Durable Solutions:  UNHCR and the governments of Cameroon and Nigeria started the voluntary repatriation of Nigerian refugees in Cameroon as agreed upon

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 108 of 352

under the 2017 tripartite agreement. The first phase of the voluntary repatriation exercise was conducted on August 22, and involved 133 Nigerian refugees, who departed Maroua for Yola in Nigeria's Adamawa State, using a Nigerian Air Force plane.

In June 2018 UNHCR carried out return intention surveys using a sample of 4,000 CAR refugees that indicated that approximately one quarter of those surveyed would be interested in going back home, while three quarters would prefer local integration as a durable solution. As of year's end, UNHCR had assisted more than 2,000 CAR refugees who elected to voluntary return to their areas of origin.

Temporary Protection: The government provided temporary, unofficial protection to individuals who may not qualify as refugees, extending this protection to hundreds of individuals during the year, including third-country nationals who had fled violence in CAR. Due to their unofficial status and inability to access services or support, many of these individuals were subject to harassment and other abuses.

## g. Stateless Persons

Not applicable.

## Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

Recent Elections: In March 2018 the country held its second senate elections. The ruling CPDM won 63 of the 70 elected seats, while the opposition Social Democratic Front won seven elected seats. The president, in accordance with the constitution, appointed an additional 30 senators, including 24 from CPDM, two from National Union for Democracy and Progress, and one each from four other nominal opposition parties, including Union of the People of Cameroon, National Alliance for Democracy and Progress, Movement for the Defense of the Republic, and Cameroon National Salvation Front. The election was largely peaceful.

In October 2018 the country conducted a presidential election, against the backdrop of protracted sociopolitical unrest in the two Anglophone Northwest and Southwest Regions and insecurity in the Far North Region due to attacks by Boko

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 109 of 352

Haram and ISIS-WA. Eight candidates took part in the elections; a ninth dropped out just before election day to support a rival opposition candidate. The election was marred by irregularities, including intimidation of voters and representatives of candidates at polling sites, late posting of polling sites and voter lists, ballot stuffing, voters with multiple registration, and a lack of transparency in the vote tallying process. In its preliminary statement, the African Union election observation mission noted that the security environment resulted in the curtailment of civil and political liberties in certain regions and negatively impacted the level of participation of citizens in the electoral process.

New legislative and municipal elections were expected during the year, but in July the government extended the term of office of members of the National Assembly by two months, effective October 29. On July 15, the president signed a decree extending the term of office of municipal councilors until February 29, 2020. By law regional elections must be held by the end of February 2020.

Political Parties and Political Participation: As of September 2018, the country had 305 registered political parties. The CPDM remained dominant throughout every level of state institution. This was due to restrictions on opposition political parties, including gerrymandering, unbalanced media coverage, use of government resources for CPDM campaigning, interference with the right of opposition parties to organize during electoral campaigns, and influence of traditional rulers, who were largely coopted by the majority party. Additionally, membership in the ruling political party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service.

Human rights organizations and opposition political actors considered the drawing of voter districts and distribution of parliamentary or municipal councilors' seats unfair, stating that smaller districts considered CPDM strongholds were allocated a disproportionate number of seats compared with more populous districts where the opposition was expected to poll strongly. Managers of state-owned companies and other high-level government officials used corporate resources to campaign for candidates sponsored by the ruling party in both senate and presidential elections to the detriment of the other candidates. Traditional rulers, who receive salaries from the government, openly declared their support for President Biya prior to the presidential election, and some reportedly compelled residents of their constituencies to prove that they did not vote for an opposition candidate by presenting unused ballots.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 110 of 352

In March Cabral Libii submitted the documentation for the legalization of his political party, Les Citoyens. Minister of Territorial Administration Paul Atanga Nji refused to legalize the party, and Cabral instead joined the Cameroonian Party for National Reconciliation.

After President Biya announced legislative and municipal elections would be held on February 9, 2020, Kamto's Cameroon Renaissance Movement party reported persistent interference from local government officials as party leaders sought the necessary documents to file candidate lists. Reports included local officials refusing to come to work during the registration period, judges requiring traditional rulers to confirm residency, and local officials refusing to certify birth certificates for CRM candidates. On November 25, as a result of this interference, CRM announced its decision to boycott the elections.

Participation of Women and Minorities: No laws limit participation of women or members of minorities in the political process; however, due to cultural factors, women remained underrepresented at all levels of government. Women occupied 26 of 374 council mayor positions, 81 of 280 parliamentary seats, and 11 of 66 cabinet positions. Similar disparities existed in other senior level offices, including territorial command and security and defense positions. With the voting age set at 20, youths older than 18 and younger than 20 are not allowed to vote. The minority Baka, a nomadic Pygmy people, were not represented in the senate, national assembly, or higher offices of government.

During the year Minister of Territorial Administration Atanga Nji maintained his refusal to recognize Edith Kah Walla, who was elected in 2011 as leader of the Cameroon People's Party (CPP), as the legitimate leader of the party. Atanga Nji continued to maintain his stance that Samuel Tita Fon, who created the party in 1991 but became a supporter of the ruling party, remained the CPP leader.

**Section 4. Corruption and Lack of Transparency in Government**

The law provides criminal penalties for corruption by officials, but the government did not implement the law effectively. The penal code identifies different offenses as corruption, including influence peddling, involvement in a prohibited employment, and nondeclaration of conflict of interest. Reporting of corruption was encouraged through exempting whistleblowers from criminal proceedings. Corruption in official examinations is punishable by up to five years' imprisonment, fines up to two million CFA francs ($3,400), or both. There were

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 111 of 352

reports that senior officials sentenced to prison were not required to forfeit ill-gotten gains.

In 2018 the National Anticorruption Commission instituted a toll-free number to encourage citizens to denounce acts of corruption of which they were victims or witnesses.  In addition, there were a number of organizations who joined a common platform known as the National Platform of Cameroonian Civil Society Organizations, which under the 2018 Finance Law was provided a budget of 150 million CFA francs ($255,000).

Corruption:  The results of the 2019 competitive examination into the National School of Administration and Magistracy highlighted unethical practices surrounding the organization of public service examinations.  Anecdotal reports suggested most successful candidates either hailed from specific localities or were sponsored by or related to senior-level government officials, to the detriment of ordinary candidates.

The government continued Operation Sparrow Hawk that was launched in 2006 to fight embezzlement of public funds.  As in the previous year, the Special Criminal Court opened new corruption cases and issued verdicts on some pending cases.  On March 8, the court placed former defense minister Edgar Alain Mebe Ngo'o and his wife in pretrial detention at the Yaounde Kondengui Central Prison. Authorities accused them of financial malpractices associated with the purchase of military equipment for the army, from the time Mebe Ngo'o served as minister of defense.

Financial Disclosure:  The constitution requires senior government officials, including members of the cabinet, to declare their assets prior to and after leaving office, but the government had not implemented it since its promulgation in 1996.

**Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights**

A number of domestic and international human rights groups investigated and published findings on human rights cases.  Government officials impeded the effectiveness of many local human rights NGOs by harassing their members, limiting access to prisoners, refusing to share information, and threatening violence against NGO personnel.  Human rights defenders and activists received anonymous threats by telephone, text message, and email.  The government took no action to investigate or prevent such occurrences.  The government at times

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 112 of 352

denied international organization access to the country.  The government criticized reports from international human rights organizations, including Amnesty International, HRW, and the International Crisis Group, accusing them of publishing baseless accusations.  On April 12, for example, officials at Douala International Airport refused entry to an HRW researcher, even though she held a valid visa.

There were several reports of intimidation, threats, and attacks aimed at human rights activists including members of the REDHAC and the Network of Cameroonian Lawyers against the Death Penalty, among others.  A female human rights advocate was sexually assaulted by an armed man who warned her to stop harassing the government.

The United Nations or Other International Bodies:  In May UN High Commissioner for Human Rights Michelle Bachelet visited Cameroon, at the invitation of the Cameroonian government, to evaluate progress made in the protection and promotion of human rights.  Bachelet expressed concern to the government over the shrinking of civic space in Cameroon.

Government Human Rights Bodies:  In June the government passed a law establishing the Cameroon Human Rights Commission (CHRC), as a replacement for the existing NCHRF.  Like the NCHRF, the CHRC is a nominally independent but government-funded institution.  The law establishing the CHRC extended its missions to protect human rights, incorporating provisions of Articles 2 and 3 of the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  The CHRC did not become operational during the year, because the president had not yet designated its members.  The NCHRF continued to operate in its place.  It coordinated actions with NGOs, visited some prisons and detention sites, and provided human rights education. NGOs, civil society, and the general population considered the NCHRF dedicated and effective, albeit inadequately resourced and with insufficient ability to effectively hold human rights violators to account.  A number of observers questioned the decision to establish a new institution and expressed concerns about its ability to confront the government that funds it.

**Section 6. Discrimination, Societal Abuses, and Trafficking in Persons**

**Women**

*Country Reports on Human Rights Practices for 2019*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 113 of 352

Rape and Domestic Violence:  The law criminalizes rape and provides penalties of between five and 10 years of imprisonment for convicted rapists.  Police and courts rarely investigated or prosecuted rape cases, especially since victims often did not report them.  The law does not address spousal rape.  In a report on the Northwest and Southwest Regions, OCHA revealed that it had recorded 74 cases of rape as of July 21, with only 13 victims being able to obtain health-care services due to the absence of services in their localities.

The law does not specifically prohibit domestic violence, although assault is prohibited and punishable by imprisonment and fines.  OCHA recorded 785 cases of gender-based violence in July.

Female Genital Mutilation/Cutting (FGM/C):  The law protects the bodily integrity of persons, and the 2016 penal code prohibits genital mutilation.  Perpetrators are subject to a prison sentence of from 10 to 20 years, or imprisonment for life if the offender habitually carries out this practice for commercial purposes or the practice causes death.  FGM/C remained a problem, but its prevalence was low.  As in the previous year, children were reportedly subjected to FGM/C in isolated areas of the Far North, East, and Southwest Regions and among the Choa and Ejagham ethnic groups.

In 2018 the minister of women's empowerment and the family said the government fully adopted a UN General Assembly resolution on the intensification of the global action aimed at eliminating FGM/C and had been carrying out initiatives to end FGM/C for more than 10 years.  These initiatives included granting support for male and female excision practitioners to change professions and creating local committees to fight against the phenomenon in areas of high prevalence, such as the Southwest and North Regions.

Other Harmful Traditional Practices:  Widows were sometimes forcibly married to one of their deceased husband's relatives to secure continued use of property left by the husband, including the marital home.  To protect women better, including widows, the government included provisions in the 2016 penal code outlawing the eviction of a spouse from the marital home by any person other than the other spouse.  The practice of widow rites, by which widows forgo certain activities such as bathing or freedom of movement, was also prevalent in some parts of the country, including in some rural communities of the West Region.

Sexual Harassment:  The law prohibits sexual harassment.  Offenders can be imprisoned for periods of six months to one year and may be fined between

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 114 of 352

100,000 and one million CFA francs ($170 and $1,700). If the victim is a minor, the penalty can be one to three years in prison. If the offender is the victim's teacher, to the penalty can increase to three to five years in prison. Despite these legal provisions, sexual harassment was widespread, and there were no reports that anyone was fined or imprisoned for sexual harassment. This was partially due to sexual harassment victims' reluctance to file official complaints.

Coercion in Population Control: There were no reports of coerced abortion or involuntary sterilization.

Discrimination: The constitution provides for the same legal status and rights for women and men. In practice, women did not enjoy the same rights and privileges as men. Although local government officials including mayors claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions. The government did not implement any official discriminatory policy against women in such areas as divorce, child custody, employment, credit, pay, owning or managing business or property, education, the judicial process, or housing. Although women and men have equal employment rights, fewer women occupied positions of responsibility.

**Children**

Birth Registration: Children derive citizenship through their parents, but not through birth in the country's territory, and the responsibility to register birth falls upon parents. Many births went unregistered because children were not always born in health facilities, and many parents faced challenges in reaching local government offices. According to a recent study by the National Civil Status Bureau (BUNEC), nearly 43,000 final-year primary school children in the Far North Region risked missing their examinations because they did not have birth certificates. In all, 400,000 primary school children in the Far North Region were without birth certificates. In 2018, 18,000 pupils in the Far North Region missed their academic examinations for lack of birth certificates. A three-year pilot project by BUNEC in Betare-Oya Subdivision in Lom and Djerem Division of the East Region and Mokolo Subdivision, Mayo-Tsanaga Division of the Far North Region suggested that close to 1,000,000 children in the country could be without birth certificates.

Education: The law provides for tuition-free compulsory primary education but does not set an age limit. The law punishes any parent with sufficient means who

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 115 of 352

refuses to send his or her child to school with a fine between 50,000 and 500,000 CFA francs ($85 and $850). The punishment is imprisonment from one to two years in cases in which the offense is repeated. Children were generally expected to complete primary education at 12. Secondary school students have to pay tuition and other fees in addition to buying uniforms and books. This rendered secondary education unaffordable for many children.

During the year separatist attacks on the schools in the Anglophone Southwest and Northwest Regions continued to disrupt the normal operation of schools. In its July report on the Southwest and Northwest crisis, OCHA indicated that more than 700,000 children--representing almost nine of every 10 children--had been out of school for nearly three years and that 80 percent of schools remained closed in the Northwest and Southwest Regions.

In May Catholic authorities agreed to close St. Bede's College in Kom, Northwest Region, after the school principal was kidnapped, allegedly for not respecting the separatists' call for a school boycott. The Presbyterian Church also agreed to close all its schools in the two Anglophone regions after armed separatists kidnapped more than 90 children in two separate incidents in October and November.

Dozens of schools remained closed in the Far North Region due to attacks from Boko Haram and ISIS-WA.

Child Abuse: The law prohibits various forms of child abuse, including but not limited to assault, indecency, kidnapping, forced labor, rape, sexual harassment, and situations where one parent refuses to disclose the identity of the other parent to the child. Penalties for the offenses range from 10,000 CFA francs ($17) for forced labor to imprisonment for life in the case of assault leading to death or serious harm. Despite these legal provisions, child abuse remained a problem. Children continued to suffer corporal punishment, both within families and at school. Boko Haram continued to abduct children for use as child soldiers or as suicide bombers.

Early and Forced Marriage: The minimum legal age for marriage is 18. Despite the law, according to UNICEF's March 2018 child marriage data, 31 percent of women between the ages of 20 and 24 were married before they turned 18, and of these, 10 percent were married before they turned 15. Childhood marriages were more prevalent in the northern part of the country. The law punishes anyone who compels an individual into marriage with imprisonment of from five to 10 years, and with fines between 25,000 and one million CFA francs ($43 and $1,700).

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 116 of 352

<u>Sexual Exploitation of Children</u>:  The law prohibits commercial sexual exploitation, sale, offering or procuring for prostitution, and practices related to child pornography.  A conviction requires proof of a threat, fraud, deception, force, or other forms of coercion.  Penalties include imprisonment of between 10 and 20 years and a fine of between 100,000 and 10 million CFA francs ($170 and $17,000).  The law does not specifically provide a minimum age for consensual sex.  According to anecdotal reports, children younger than 18 were exploited in commercial sex, especially by restaurant and bar promoters, although no statistics were available.  Anecdotal reports suggested the ongoing crisis in the two Anglophone regions had contributed to a dramatic increase in the prostitution of underage girls and number of early pregnancies, especially in areas with IDPs.

<u>Infanticide or Infanticide of Children with Disabilities</u>:  There were no reports of infanticide of children with disabilities.  The newspaper *L'Oeil du Sahel* reported that on July 1 local residents found the lifeless body of a child of an estimated age of seven months abandoned in a garbage bin in the neighborhood of Pitoare in Maroua, Far North Region.

<u>Displaced Children</u>:  Many displaced children continued to live on the streets of urban centers, although the trend was in decline as a result of stringent security measures and the amended penal code that criminalizes vagrancy.  According to estimates by the International Organization for Migration, there were approximately 2,570 unaccompanied children in the Far North Region as of April, including IDPs, returnees, out-of-camp refugees, and other migrants (see also sections 1.e. and 1.f.).  These children faced many challenges, including limited access to school, health, and protection.  As in 2018, thousands of children were negatively impacted by the humanitarian crisis in the Northwest and Southwest.  These children faced significant abuses of their rights by armed forces and nonstate armed actors alike.  The government had not established structures to ensure that internally displaced children were protected from recruitment by nonstate armed groups and terrorist organizations.  The government, through the Ministry of Social Affairs and in joint action with the International Organization for Migration, in September provided temporary shelter to unaccompanied children who were rescued from a boat off the coast of Cameroon in Kribi.

<u>International Child Abductions</u>:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at

*Country Reports on Human Rights Practices for 2019*
*United States Department of State • Bureau of Democracy, Human Rights and Labor*
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 117 of 352

https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

**Anti-Semitism**

The Jewish community was very small, and there were no known reports of anti-Semitic acts.  A government minister made comments on a prime-time television program that were widely considered anti-Semitic.  Speaking on Cameroon Radio Television in early February, Justice Minister Delegate Jean De Dieu Momo warned opposition leader Maurice Kamto that he was leading the Bamileke people to a fate similar to that of the Jews under Hitler in World War II.  He said, "educated people like Maurice Kamto need to know where they are leading their people."  The government of Cameroon distanced itself from his comments, saying he was speaking on a strictly personal basis.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**Persons with Disabilities**

The constitution protects the rights of all persons, including persons with disabilities.  A 2010 law provides additional protection to persons with physical, sensory, intellectual, or mental disabilities.  The protections under the law cover access to education and vocational training, employment, health services, information and cultural activities, communications, buildings, sports and leisure, transportation, housing, and other state services.  Public education is free for persons with disabilities and children born of parents with disabilities.  Initial vocational training, medical treatment, and employment must be provided "when possible," and public assistance "when needed."  The government did not enforce these provisions effectively.

There were no reports of police or other government officials inciting, perpetrating, or condoning violence against persons with disabilities during the reporting period. The majority of children with disabilities attended school with nondisabled peers. The government introduced inclusive education in many schools and reviewed the curriculum of teacher training colleges to include training in inclusive education skills.  Other children with disabilities continued to attend specialized schools such

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 118 of 352

as the Bulu Blind Center in Buea and the Yaounde Special School for Hearing-impaired Children.

Persons with disabilities did not receive adequate protection in conflict zones.  In an early August report, HRW remarked that persons with disabilities were among the most marginalized and at-risk population in any crisis-affected country, and that Cameroon was no exception.  Persons with disabilities in the Northwest and Southwest Regions continued to face attack and abuse by belligerents, often because they were unable to flee.  HRW claimed that between January and May, it interviewed 48 persons with disabilities living in the Anglophone regions, their families, representatives of UN agencies, and national and international humanitarian organizations to investigate how the crisis in the two regions had disproportionately affected persons with disabilities.

**National/Racial/Ethnic Minorities**

The population consists of more than 275 ethnic groups.  Members of the president's Beti/Bulu ethnic group from the South Region continued to hold many key positions and were disproportionately represented in the government, state-owned businesses, and security forces.

**Indigenous People**

An estimated 50,000 to 100,000 Baka, including Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East Regions.  The government did not effectively protect the civil or political rights of either group.  Logging companies continued to destroy indigenous peoples' naturally forested land without compensation.  Other ethnic groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices.  The government continued long-standing efforts to provide birth certificates and national identity cards to Baka.  Most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in accessing their homes deep in the forest.

There were credible reports from NGOs that the Mbororo, nomadic pastoralists living mostly in the North, East, Adamawa, and Northwest Regions, continued to be subjected to harassment, sometimes with the complicity of administrative or judicial authorities.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 119 of 352

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

Consensual same-sex sexual activity between adults is illegal and punishable by a prison sentence lasting between six months and five years and a fine ranging from 20,000 to 200,000 CFA francs ($34 to $340).

LGBTI rights organizations such as the Cameroonian Foundation for AIDS (CAMFAIDS), Humanity First Cameroon, Alternatives Cameroon, National Observatory of the Rights of LGBTI Persons and Their Defenders, and others continued to report arbitrary arrests of LGBTI persons, but they had become less frequent in the past year. While formal arrests may be diminishing, LGBTI individuals continued to receive anonymous threats by telephone, text message, and email. Authorities did not generally investigate these allegations. Civil society members stated there were also cases where LGBTI individuals were subjected to so-called corrective rape, sometimes with the complicity of the victim's family. Police were generally unresponsive to requests to increase protection for lawyers who received threats because they represented LGBTI persons. Both police and civilians reportedly continued to extort money from presumed LGBTI individuals by threatening to expose them.

The constitution provides for equal rights for all citizens, but the law does not explicitly prohibit discrimination against LGBTI persons in housing, employment, nationality laws, and access to government services such as health care. Security forces sometimes harassed persons on the basis of their real or perceived sexual orientation or gender identity, including individuals found with condoms and lubricants. Fear of exposure affected individuals' willingness to access HIV/AIDS services, and a number of HIV-positive men who had sex with men took female partners to conceal their activities. Anecdotal reports suggested some discrimination occurred in places of employment with respect to sexual orientation. On September 3, members of Affirmative Action, an LGBTI rights group, remarked that transgender persons often avoided seeking formal employment due to discrimination.

In 2018 the National Observatory for the Rights of LGBTI persons and their Defenders, an umbrella organization representing 33 individual LGBTI organizations who were members of the Unity Platform, produced a report documenting 376 cases of abuses perpetrated against LGBTI persons in 2018. As of August CAMFAIDS alone had documented 206 human rights abuses. The

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 120 of 352

abuses were of a physical, psychological, economic, verbal, cultural, or religious nature.

On September 4, CAMFAIDS reported that members of an army security unit arrested six persons without a warrant at a snack bar in the Yaounde neighborhood of Emombo and detained them at gendarmerie headquarters on September 1. CAMFAIDS claimed the six persons were being detained on charges of homosexuality and indecency. Earlier in April, according to CAMFAIDS, members of security forces arrested 25 persons at the same location. They asked the victims to undress and photographed them while they were naked.

LGBTI organizations could not officially register as such and so sought registration either as general human rights organizations or as health-focused organizations. Many LGBTI organizations found that operating health programs, particularly HIV programs, shielded them from the potential harassment or shutdown rather than promoting advocacy for LGBTI persons as their primary mission.

## HIV and AIDS Social Stigma

Persons with HIV often suffered social discrimination and were isolated from their families and society due to social stigma and lack of education on the disease. As in the previous year, while no specific cases of discrimination in employment were made public, anecdotal reports indicated some discrimination occurred with respect to HIV status, especially in the private sector.

## Other Societal Violence or Discrimination

Several cases of vigilante action and arson attacks were reported during the year, involving destruction of both public and private property. On June 3, members of the Mbororo community killed two persons and burned homes in Wum, Northwest Region, allegedly in retaliation against repeated attacks by Anglophone separatists.

Vigilante and mob justice were a concern. The privately owned newspaper *Le Messager* announced that police on July 20 deposited the burned bodies of two young men at the mortuary of the Douala Bonassama district hospital. A crowd reportedly attacked the boys at a place called Total Nouvelle Route Bonaberi at approximately 10 a.m. the same day, beat them to death, and burned their corpses. The victims were on a motorcycle equipped with a global positioning system (GPS). They allegedly killed the motorbike owner earlier in the Douala Akwa

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 121 of 352

neighborhood before stealing the bike. A relative of the deceased located the engine using the GPS and alerted the crowd. Police reportedly arrested three persons suspected of having organized the mob justice and placed them in custody at the Douala Mobile Response Group number 2.

The privately owned newspaper *The Guardian Post* reported that during the night of August 1, a man, approximately 24 years of age, died as a result of mob vigilante violence in the Yaounde Etoug-Ebe neighborhood for allegedly stealing food from a local shop. Roseline, the lady whose items were stolen, reportedly told a journalist that, during her return to her shop at approximately 3 a.m., she saw the man carrying a bunch of plantains and a basket of tomatoes from her shop. She alerted her neighbors who reacted promptly, caught the thief, and assaulted him while she watched. Police reportedly came to the scene in the morning and took the corpse to the Yaounde University Teaching Hospital.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law provides for the rights of workers to form and join independent unions, bargain collectively, and conduct legal strikes. This does not apply to multiple groups of workers, including defense and national security personnel, prison administration civil servants, and judicial and legal personnel. The law also prohibits antiunion discrimination and requires the reinstatement of workers fired for union activity. Statutory limitations and other practices substantially restricted these rights. The law does not permit the creation of a union that includes both public- and private-sector workers, or the creation of a union that includes different, even if closely related, sectors. The law requires that unions register with the government, have a minimum of 20 members, and formalize the union by submitting a constitution and by-laws. Founding members must also have clean police records. Those who form a union and carry out union activities without registration can be fined under the law. More than 100 trade unions and 12 trade union confederations were in operation, including one public-sector confederation. Trade unions or associations of public servants may not join a foreign occupational or labor organization without prior authorization from the minister responsible for "supervising public freedoms," currently the minister of territorial administration.

The constitution and law provide for collective bargaining between workers and management, as well as between labor federations and business associations in

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 122 of 352

each sector of the economy. The law does not apply to the agricultural or informal sectors, which included the majority of the workforce.

Legal strikes or lockouts may be called only after conciliation and arbitration procedures have been exhausted. Workers who ignore procedures to conduct a legal strike may be dismissed or fined. Free Industrial Zones are subject to some labor laws; however, there are several exceptions. The employers have the right to determine salaries according to productivity, the free negotiation of work contracts, and the automatic issuance of work permits for foreign workers.

The government and employers did not effectively enforce the applicable legislation on freedom of association and the right to collective bargaining. Penalties for violations were rarely enforced and were ineffective as a deterrent. Administrative judicial procedures were infrequent and subject to lengthy delays and appeals.

Collective agreements are binding until after a party has given three months' notice to terminate. Unlike in the previous year, there were no reported allegations that the minister of labor and social security negotiated collective agreements with trade unionists who had nothing to do with the sectors concerned and did not involve trade union confederations that prepared the draft agreements. The government continued to undermine the leadership of the Cameroon Workers Trade Union Confederation (CSTC), one of 12 trade union confederations elected in 2015.

Despite multiple complaints by CSTC's elected leadership, the government continued to work with former leaders. In June for example, the minister of labor reportedly included Celestin Bama, a member of the former leadership team, as CSTC's representative in the Cameroonian delegation to the International Labor Conference in Geneva. The International Trade Union Confederation worked with CSTC's legitimate leadership for its 4th Congress held in Copenhagen, Denmark, in early December 2018.

Trade unionists reported some company officials disregarded labor legislation and prohibited the establishment of trade unions in their companies. They cited the examples of Sarsel and Harjap, two Lebanese-owned businesses based in Douala, as well as several small- and medium-sized Cameroonian companies. Unlike in 2018, there were no reported allegations that some companies retained 1 percent of unionized workers' salaries as union dues but refused to transfer the money to trade unions.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 123 of 352

Many employers used subcontractors to avoid hiring workers with bargaining rights. Workers' representatives said most major companies, including parastatal companies, engaged in the practice, citing the electricity company Energy of Cameroon, the water company Camerounaise des Eaux, cement manufacturer Cimencam, Guinness, Aluminum Smelter (Alucam), COTCO, Ecobank, and many others. Subcontracting was reported to involve all categories of personnel, from the lowest to senior levels. As a result, workers with equal expertise and experience did not always enjoy similar advantages when working for the same business, and subcontracted personnel typically lacked a legal basis to file complaints.

Several strikes were announced during the year. Some were called off after successful negotiation, and some were carried out peacefully, while others faced some degree of repression.

On July 31, the Free National Union of Dockers and Related Activities of Cameroon embarked on a peaceful and lawful strike at the port of Douala. The striking workers demanded improved working conditions, including the effective implementation of a presidential decree of January 24 that offered them hope for better conditions of employment and work. Port officials allegedly called police and administrative authorities to the scene shortly after the start of the strike. They threatened the striking workers with dismissal if they did not return to work and arrested Jean Pierre Voundi Ebale, the elected leader of the dockers' union, and two other members of the union, Guialbert Oumenguele and Elton Djoukang Nkongo. The senior divisional officer for Wouri placed them on a renewable two-week administrative custody at the Douala Central Prison. Voundi Ebale and his codetainees were released on September 1, after one full month of detention, reportedly on banditry-related charges.

As of November 30, the government delegate to the Douala City Council had not implemented a September 2017 decision of the Littoral Court of Appeal's Labor Arbitration Council requesting the delegate to reinstate the 11 workers' representatives he suspended in April 2017. The delegate instead opposed the court decision and referred the issue back to the labor inspector, who once again referred it to the region's Court of Appeal. After multiple postponements, the court on October 29 confirmed the initial decision to reinstate the workers' representatives and pay their salaries and outstanding arrears.

## b. Prohibition of Forced or Compulsory Labor

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 124 of 352

The constitution and law prohibit all forms of forced and compulsory labor. The law prohibits slavery, exploitation, and debt bondage and voids any agreement in which violence was used to obtain consent. Penalties would have likely been sufficient to deter violations if enforced. The law also extends culpability for all crimes to accomplices and corporate entities. Although the statutory penalties are fairly severe, the government did not enforce the law effectively, in part due to a lack of capacity to investigate trafficking and limited labor inspection and remediation resources. In addition, due to the length and expense of criminal trials and the lack of protection available to victims participating in investigations, many victims of forced or compulsory labor resorted to accepting an out-of-court settlement.

There continued to be anecdotal reports of hereditary servitude imposed on former slaves in some chiefdoms in the North Region. Many members of the Kirdi-- whose ethnic group practiced predominately Christian and traditional faiths and who had been enslaved by the Muslim Fulani in the 1800s--continued to work for traditional Fulani rulers for compensation, in room and board and generally a low and unregulated salary, while their children were free to pursue schooling and work of their choosing. Kirdi were also required to pay local chiefdom taxes to the Fulani, as were all other subjects. The combination of low wages and high taxes (although legal) effectively constituted forced labor. While technically free to leave, many Kirdi remained in the hierarchical and authoritarian system because of a lack of viable options.

Anecdotal reports suggested that in the South and East Regions, some Baka, including children, continued to be subjected to unfair labor practices by Bantu farmers, who hired the Baka at exploitive wages to work on their farms during the harvest seasons.

Forced labor was reported involving children in domestic labor, gold mining, quarrying, forced begging, street vending, agriculture, fishing, and spare parts shops. Forced child labor was also committed by terrorist groups, which forced children to work as scouts, porters, and cooks.

Also see the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 125 of 352

The law prohibits the worst forms of child labor and sets 14 as the minimum age of employment. The law prohibits children from working at night or longer than eight hours per day. It also outlines tasks children younger than 18 cannot legally perform, including moving heavy objects, undertaking dangerous and unhealthy tasks, working in confined areas, and prostitution. Employers are required to provide skills training to children between ages 14 and 18. Because compulsory education ends at age 12, children who were not in school and not yet 14 were particularly vulnerable to child labor. Laws relating to hazardous work for children younger than 18 are not comprehensive, since they do not include prohibitions on work underwater or at dangerous heights. Children engaged in hazardous agricultural work, including in cocoa production. The government in 2018 earmarked funds for the Ministry of Labor and Social Security to revise the hazardous work list. There were no reported developments or progress achieved as of late November. The law provides penalties ranging from fines to imprisonment for those who violate child labor laws. These penalties likely would have been sufficient to deter violations, if enforced.

Children worked in agriculture, where they were exposed to hazardous conditions, including handling heavy loads, machetes, and agricultural chemicals. Children worked in mining, where they carried heavy loads and were exposed to dangerous conditions. Children worked as street vendors and in fishing, where they were exposed to hazardous conditions. Children in these sectors mainly worked alongside families and not under formal employers. Children were subjected to forced begging as *talibes* in Quran schools. Children were recruited or coerced by armed groups to work as porters, scouts, cooks, and child soldiers.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

### d. Discrimination with Respect to Employment and Occupation

The law contains no specific provisions against discrimination, but the constitution in its preamble provides that all persons shall have equal rights and obligations and that every person shall have the right and the obligation to work.

Discrimination in employment and occupation allegedly occurred with respect to ethnicity, HIV status, disability, gender, and sexual orientation, especially in the private sector. Ethnic groups often gave preferential treatment to members of their respective ethnic group in business and social practices, and persons with disabilities reportedly found it difficult to secure and access employment. There

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 126 of 352

were no reliable reports of discrimination against internal migrant or foreign migrant workers, although anecdotal reports suggested such workers were vulnerable to unfair working conditions. The government took no action to eliminate or prevent discrimination and kept no records of incidents of discrimination.

## e. Acceptable Conditions of Work

The minimum wage in all sectors was greater than the World Bank's international poverty line. Premium pay for overtime ranged from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it is weekend or late-night overtime. Despite the minimum wage law, employers often negotiated with workers for lower salaries, in part due to the extremely high rate of underemployment in the country. Salaries lower than the minimum wage remained prevalent in the public-works sector, where many positions required unskilled labor, as well as in domestic work, where female refugees were particularly vulnerable to unfair labor practices.

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities. There are exceptions for guards and firefighters (56 hours per week), service-sector staff (45 hours per week), and household and restaurant staff (54 hours per week). The law mandates at least 24 consecutive hours of weekly rest.

The government sets health and safety standards in the workplace. The minister in charge of labor issues establishes the list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety. These regulations were not enforced in the informal sector. The labor code also mandates that every enterprise and establishment of any kind provide medical and health services for its employees. This stipulation was not enforced.

The Ministry of Labor and Social Security is responsible for national enforcement of the minimum wage and work hour standards, but it did not enforce the law. Ministry inspectors and occupational health physicians are responsible for monitoring health and safety standards, but the ministry lacked the resources for a comprehensive inspection program. The government more than doubled the total number of labor inspectors, but the number of labor inspectors was still insufficient. Moreover, the government did not provide adequate access to vehicles or computers, hampering the effectiveness of the inspectors.

Country Reports on Human Rights Practices for 2019
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 127 of 352

# CAMEROON 2020 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cameroon is a republic dominated by a strong presidency. The president retains power over the legislative and judicial branches of government. The ruling political party, the Cameroon People's Democratic Movement, has remained in power since its creation in 1985. The country held legislative elections on February 9, which were marked by irregularities. The ruling party won 152 of 180 National Assembly seats. Paul Biya has served as president since 1982. He was last reelected in 2018 in an election marked with irregularities.

The national police and the national gendarmerie are responsible for internal security. The former reports to the General Delegation of National Security and the latter to the Secretariat of State for Defense in charge of the Gendarmerie. The army is primarily responsible for external security and shares some domestic security responsibilities; it reports to the minister delegate at the presidency in charge of defense. The Rapid Intervention Battalion reports directly to the president. Civilian authorities at times did not maintain control over security forces. Members of security forces committed numerous abuses.

In July jailed separatist leader Julius Sisiku Ayuk Tabe announced he talked with the government regarding the prospects for peace in the Anglophone regions. The government, however, denied Ayuk Tabe's announcement, and other separatists opposed the talks. Cameroon Renaissance Movement president Maurice Kamto urged Cameroonians to stage nationwide peaceful protests on September 22 to demand a resolution to the crisis in the Anglophone regions and for electoral reform before the December 6 regional elections. Hundreds of protesters were arrested, including journalists, and Kamto was placed under unofficial house arrest.

Significant human rights issues included: unlawful or arbitrary killings, including extrajudicial killings by security forces, armed Anglophone separatists, Boko Haram, and ISIS-West Africa; forced disappearances by security forces; torture and cases of cruel, inhuman, or degrading treatment or punishment by the government, Cameroonian peacekeepers deployed to UN missions, and nonstate

Country Reports on Human Rights Practices for 2020
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 128 of 352

armed groups; harsh and life-threatening prison conditions; arbitrary arrests; political prisoners or detainees; politically motivated reprisal against individuals located outside the country; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; serious restrictions on freedom of expression, the press, and the internet, including violence, threats of violence, or unjustified arrests or prosecutions against journalists, censorship, and criminal libel laws; substantial interference with the right of peaceful assembly and freedom of association; serious restrictions on freedom of movement; inability of citizens to change their government peacefully through free and fair elections; restrictions on political participation; serious acts of corruption; lack of investigations and accountability for violence against women; unlawful recruitment or use of child soldiers; trafficking in persons; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, or intersex persons; and the existence or use of laws criminalizing same-sex sexual conduct between adults.

Although the government took steps to identify, investigate, prosecute, and punish officials who committed human rights abuses, it did not do so systematically and rarely made the proceedings public.  Some offenders continued to act with impunity.

# Section 1. Respect for the Integrity of the Person, Including Freedom from

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that the government or its agents committed arbitrary and unlawful killings through excessive use of force in the execution of their official duties.  Most of the killings were associated with the armed conflict in the two Anglophone regions (see also section 1.g., Abuses in Internal Conflict).  Additionally, many included unarmed civilians not in conflict-afflicted areas, and others resulted from the use of excessive force on citizens by government agents, including members of defense and security forces.

# CAMEROON

The Ministry of Defense, through the Secretariat of State in charge of the National Gendarmerie (SED), is responsible for investigating whether security force killings, including police killings, are justifiable. Prosecutions related to these matters are conducted through the Military Tribunal. In some high-profile cases, preliminary investigations are entrusted to a mixed commission of inquiry, including civilian members with relevant professional backgrounds.

On July 23, the Douala-based private television channel Equinoxe TV reported that a taxi driver died in a health center after he was allegedly tortured at the 6th district police station in New Bell, a neighborhood in Douala. According to the nongovernmental organization (NGO) Mandela Center, on July 20, Mitterrand Tchouateum Nja parked his vehicle incorrectly and was subsequently punished for refusing to pay a bribe. Police commissioner Mvoundi Evina and members of the 21st Armored Reconnaissance Battalion of Terminus Saint Michel, including Chief Warrant Officer Lawrence Nkimantap, brutally assaulted Tchouateum. After the assault, police detained Tchouateum at the 6th district police district. He was transferred to Nkoloulou district medical center on July 22 after his condition rapidly deteriorated. Tchoutеum remained chained to his hospital bed until a few hours before his death, which came soon after his release from police custody. As of December 8, the Mandela Center had filed a complaint with the Military Tribunal in Douala, and the Military Tribunal had referred the case to the High Court. No criminal charges had been filed against the perpetrators of the attack as of December 15.

According to the Center for Human Rights and Democracy in Central Africa (CHRDA), on August 13, Cameroonian soldiers raided the village of Mautu in the Southwest Region and killed seven unarmed civilians. The victims, including an elderly man and a pregnant woman known as 'Mami Blessing,' were reportedly shot at close range in their homes. Before these killings, the military raided a church on the outskirts of Mautu and shot the church's pastor. The soldiers executed two boys alongside the pastor and shot another as he tried to escape. The soldiers allegedly invaded the church because the worshipers sympathized with separatist ideology. The CHRDA reported that they were unaware of any ongoing investigation into the incident.

# CAMEROON

On August 11, multiple media outlets reported the beheading of 32-year-old Comfort Tumassang by suspected Anglophone separatists. The incident took place in Muyuka, Southwest Region. A video circulating on social media that day showed a woman seated on the ground with her hands tied behind her. She begged for mercy before she was beheaded; her body was left in the street. Human Rights Watch also reviewed a second video, filmed before the killing, showing separatists interrogating and threatening Tumassang, whom they accused of collaborating with the military. The three main Anglophone separatist groups--the Ambazonia Governing Council, the "interim government" led by Sisiku Julius Ayuk Tabe, and its splinter faction led by Samuel Ikome Sako--condemned the killing and denied responsibility for the crime.

Boko Haram and ISIS-West Africa (ISIS-WA) continued killing civilians, including members of so-called vigilance committees, which are organized groups of local residents cooperating with government forces in the Far North. On January 18, a group of extremist fighters attacked Ganse village in the Kolofata subdivision of the Far North Region, killing at least six civilians. According to credible sources, heavily armed terrorists surrounded the village and shot at the residents as they fled. On August 3, suspected Boko Haram fighters attacked the village of Nguetchewe near Cameroon's border with Nigeria; the village was host to an unofficial internally displaced persons (IDP) camp of 800 to 1,500 persons. The attack resulted in the death of 19 civilians. On August 25, suspected ISIS-WA terrorists killed at least 14 civilians in an attack on the island of Bulgaram in Lake Chad. All those killed were believed to be community leaders who encouraged their communities to deny the terrorists' request to restock on Bulgaram.

On November 24, suspected Islamist terrorists attacked the village of Gabas, located within Mayo Tsanaga in the Far North Region, killing three civilians. On November 25, a member of the Gabas vigilance committee, Jean Baptiste Yagai, told the media that terrorists attacked at about 7:00 p.m., hours before the normal time that residents leave the village to hide in the surrounding hills every evening to avoid Boko Haram and ISIS-WA attacks. The assault on Gabas was the latest in a series of attacks by Boko Haram and ISIS-WA in the Far North Region, especially within Mayo Tsanaga and Mayo Sava. In November at least six

civilians were killed in attacks in Mayo Sava, while five civilians were killed and at least four others abducted in Mayo Moskota.

While the government repeatedly promised to investigate abuses committed by security forces, it did not do so transparently or systematically. Unlike in the previous year, however, some information was made available concerning the outcome of investigations into abuses committed by security forces as well as the status of some ongoing trials. President Biya ordered an investigation into the February 14 killing by security forces of an estimated 23 civilians in the village of Ngarbuh, Northwest Region. On April 22, the president released a summary of the investigation's findings, identifying a sergeant, a gendarme, and a soldier as responsible for the killing of 13 civilians during the incident. President Biya reportedly ordered disciplinary action against the battalion commander, who oversaw the operation, and the arrest of the other three suspects. Their trial was expected to begin on December 17 at the Yaounde Military Tribunal. A total of 17 members of a vigilante group and a former separatist fighter were also charged but remained at large.

On September 21, the Yaounde Military Tribunal issued a sentence in the case against seven soldiers accused of the extrajudicial killing of two women and two children, believed to have taken place in 2015 in the village of Zelevet, Far North Region. The lead officer, Captain Etienne Fabassou, was found guilty of conspiracy to commit murder and breach of regulations for his role and received a sentence of 10 years in prison. Sergeant Cyriaque Bityala, Corporal Barnabas Donssou Gorvo, and Soldier First Class Jean Baptiste Tchanga Chiengang were found guilty of murder and breach of regulations and were also sentenced to 10 years in prison. Of the remaining three soldiers, Soldier First Class Ghislain Landry Ntieche Fewou was found guilty of breach of regulations and sentenced to two years in prison. The two remaining soldiers were found not guilty. Both the prosecution and all those convicted filed appeals. In the case of the prosecution, the sentences were less than those the prosecution had requested.

## b. Disappearance

As in the previous year, government security forces were believed to be responsible for enforced disappearances of suspected Anglophone separatists or

their supporters.  Multiple credible organizations documented the case of Samuel Abue Adjiekha (aka "Wazizi"), a news anchor for Buea-based independent radio station Chillen Muzik and Television Pidgin.  Wazizi was detained on August 2, 2019, and pronounced dead on June 5.  Wazizi was accused of having connections with armed Anglophone separatists.  He was transferred to a military-run facility in Buea on August 7, 2019, and never appeared in court, despite several scheduled hearings.  In a June 5 press release, the Defense Ministry asserted Wazizi died of severe sepsis on August 17, 2019 (see also section 1.c.).  On June 5, the French ambassador to Cameroon told the press at the end of an audience with President Biya that the president had promised to order an investigation into Wazizi's death. As of mid-December, there were no developments reported on the investigation.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, there were reports that security force members tortured or otherwise abused citizens, including separatist fighters and political opponents.  Amnesty International and Human Rights Watch documented several cases in which security forces severely mistreated political opponents and others in which armed separatists mistreated civilians and members of defense forces.  Public officials, or persons acting at their behest, reportedly carried out acts that resulted in severe physical, mental, and emotional trauma.

On July 2, the Cameroon Journalists Trade Union denounced the hijacking of Wazizi's body as a move to conceal signs of torture on the journalist during his detention.

On July 7, according to CHRDA, 39-year-old Ben Uze was tortured and maimed by the military in Wum, Northwest Region.  He reportedly sold 10 liters of palm wine and pineapples to soldiers, who took the items but refused to pay.  An eyewitness reportedly told CHRDA that the victim reported the matter to the army commander, who accused him of associating with separatists.  As a result, when Uze refused to pay the soldiers he encountered, they severely beat him, causing severe damage to his eye and groin area.  Uze reportedly died of his injuries in a hospital.

# CAMEROON

In a September 24 preliminary report, Cameroon Renaissance Movement (MRC) lawyers claimed police violently suppressed the party's peaceful demonstrations throughout the country, beating protesters and arresting journalists. They stated that police elements, who used water cannons, batons, and tear gas, injured demonstrators in cities throughout the country, including Douala, Bafoussam, and Kribi. The lawyers reported cases of torture and inhuman and degrading treatment at Yaounde central police station No. 1, listing Therese Assomo Ondoua, Nde Diffo Jaurel, and Wilfred Siewe as some of those tortured during their arrests. Anecdotal evidence and accounts by some protesters who were released corroborated the lawyers' preliminary report.

Human Rights Watch reported that on May 30, separatists kidnapped and tortured a humanitarian worker in Bali, Northwest Region, accusing him of collaborating with security forces. They released him the following day, and he spent several days in a Bamenda hospital for treatment of the injuries sustained during his detention. The victim told Human Rights Watch that he was blindfolded and taken to a separatist camp on a motorbike. He was later taken to a second location, tied to a tree with a rope, and beaten and kicked before he was released.

According to the *Conduct in UN Field Missions* online portal, five allegations were submitted during the year of sexual exploitation and abuse by Cameroonian peacekeepers deployed to UN peacekeeping missions. There were also 29 other open allegations dating from previous years of sexual exploitation and abuse by Cameroonian peacekeepers deployed to UN peacekeeping missions, including 16 from 2019, four from 2018, four from 2017, two from 2016, and three from 2015. As of September, the Cameroonian government had not yet provided the accountability measures taken for all 34 open cases. Of the open cases, nine allegedly involved rape of a child, 16 allegedly involved transactional sex with one or more adults, five allegedly involved an exploitative relationship with an adult, one allegedly involved rape of an adult, and one allegedly involved sexual assault of an adult. There were also two cases that involved multiple instances within each case. One of those case allegedly involved four instances of rape of a child and two instances of exploitative relationships with an adult. The other case allegedly involved rape by two peacekeepers of two children and an exploitative relationship with an adult.

**CAMEROON**

Credible organizations including the CHRDA reported that Reverend Thomas Nganyu Tangem died chained to his hospital bed in Yaounde in July. He was a member of the Mbengwi Monastery in the Northwest Region and was arrested at Mile 16 in Buea in 2018 and transferred to Yaounde where he was allegedly tortured while in detention for two years without charge. Equinoxe Television reported that on several occasions, prison authorities dismissed concerns expressed by other prisoners regarding his health. On July 25, prison authorities took him to Yaounde Central Hospital, where he was shackled to his hospital bed. He died a few days later on August 5. Tangem was never officially charged with a crime.

Anecdotal reports suggested there were cases of rape and sexual abuse by persons associated with the government in the Anglophone Northwest and Southwest Regions. NGOs also indicated armed separatists were involved in rape and sexual abuse cases in the two regions.

There was at least one report of medical abuse by government forces. Djilieu Pommier alleged that after being arrested during MRC demonstrations on September 22 in Bafang (West Region), army Lieutenant Mvoundi Evina on September 22 injected him with an unknown substance. As a result of the injection, Djilieu lost the use of his legs and was effectively paralyzed pending an official medical diagnosis.

On May 6, the High Court of Mbam and Inoubou in the Center Region sentenced the head of local police to a three-year suspended prison sentence for mistreatment of 16-year-old Ibrahim Bello in 2017 that resulted in his losing both legs and his left hand; a colleague received a four-year prison sentence. The court ordered them jointly to pay 50 million Central African francs (CFA) ($86,800) in damages. Following the ruling, the NGO Mandela Center filed an appeal requesting damages be increased to CFA one billion ($1.74 million) due to the gravity of the injuries. The convicts and the General Delegation of National Security also filed separate appeals, requesting that damages be reduced. In mid-December, the court of appeals of the Center Region in Yaounde opened appeal hearings; there was no ruling as of year's end.

While some investigations and prosecutions were conducted and a few sanctions meted out, especially in high-profile cases, security force impunity remained a

concern. Such impunity involved most defense and security force branches from the Rapid Intervention Battalion (BIR) to police. Few of the reports of trials involved those in command. The General Delegation of National Security and the Secretariat of State for Defense in charge of the National Gendarmerie investigated some abuses. The government meted out some sanctions to convicted low-level offenders, and other investigations were ongoing as of year's end. Factors contributing to impunity included the government's lack of transparency on the steps taken to address allegations of human rights violations.

**Prison and Detention Center Conditions**

Prison conditions were harsh and life threatening due to food shortages and poor-quality food, gross overcrowding, physical abuse, and inadequate sanitary conditions and medical care.

**Physical Conditions:** Overcrowding remained a significant problem in most prisons, especially in major urban centers. Prison overcrowding was exacerbated by sustained increases in the number of arrests related to the conflict in the Anglophone regions and the September 22 protests by the opposition MRC. Officials held prisoners in dilapidated, colonial-era prisons. Authorities often held pretrial detainees and convicted prisoners in the same cells. In many prisons, toilets were only common pits. In some cases, female detainees benefitted from better living conditions, including improved toilet facilities and less crowded living quarters. Prisons generally had separate wards for men, women, and children. Authorities reported that the sick were held separately from the general prison population, but this was often not the case.

According to prison administration officials, the country had 79 operational prisons, with an intended capacity of 17,915. As of October 31, the overall prison population was 22,430, including 580 women and 577 minors. The Ministry of Exterior Relations' Minister Delegate to the Commonwealth Felix Mbayu provided the figures on November 19, within the framework of the 67th Ordinary Session of the African Commission on Human and Peoples' Rights.

Access to food, water, sanitation, heating and ventilation, lighting, and medical care was inadequate. Consequently, malnutrition, tuberculosis, bronchitis, malaria,

CAMEROON

hepatitis, scabies, and numerous other treatable conditions, including infections, were rampant. Hundreds of cases of COVID-19 were recorded among inmates released from five prisons across Cameroon's Central Region in April, according to Reuters, which cited unpublished government data. According to the article, the Yaounde Central Prison was the worst hit. More than 31 inmates died there in April, compared with a prepandemic average of one or two a month. A senior prison official reportedly told Reuters that no inmates were tested for COVID-19.

Physical abuse by prison guards and prisoner-on-prisoner violence were problems. Some credible organizations reported that physical abuse by persons associated with the government was less prevalent in prisons than in gendarmerie and police detention cells, where some officers often used harsh interrogation techniques. Conversely, violence among inmates was reported in virtually all prisons. In an August 18 letter to the Minister of Justice Shufai Blaise Sevidzem Berinyuy representing detained Anglophones separatists at the Kondengui Principal Prison, informed the minister that Reverend Kisob Bertin was attacked on August 16 in his bed by fellow inmates. He stated that witnesses said the attack had the blessing of the prison administrators, who told some inmates they would not face sanctions if they attacked "Ambazonians" and seized their property.

**Administration:** Authorities allegedly did not address all credible allegations of mistreatment. Due to COVID-19 restrictions, independent authorities did not investigate the most credible allegations of mistreatment. Visitors needed formal authorization from the state counsel; without authorization, they had to bribe prison staff to communicate with inmates. Overall prison visits were limited in compliance with COVID-19-related restrictions. Authorities allowed prisoners and detainees to observe their religious practices without interference.

**Independent Monitoring:** Independent monitoring of prisons was constrained by COVID-19-related restrictions. The NGO Nouveaux Droits de l'Homme, however, stated it visited a few prisons up to April and a few others as of August, including in Bafia, Bafoussam, and Nanga Eboko. The Commission for Justice and Peace of the Catholic Archdiocese in Bamenda also stated it conducted regular visits to the Bamenda Central Prison and provided legal assistance to inmates facing crimes related to the ongoing Anglophone conflict at the Military Tribunal.

The National Commission on Human Rights and Freedoms (NCHRF) reported it did not conduct any prison visits as of late August because of a lack of funding.

**Improvements:** The new Douala-Ngoma Central Prison located approximately 12 miles from Douala, was completed. The facility is expected to help address prison overcrowding and improve the living environment of inmates at the Douala-New Bell central prison. The new prison needed equipment and some other finishing touches before receiving inmates. On April 15, President Biya signed a decree to decongest prisons as part of government measures to limit the spread of COVID-19. According to the Office of the UN High Commissioner for Human Rights, approximately 1,800 inmates were freed by May 8. As of July, the total number of inmates who benefitted from the decree was estimated at close to 3,000.

# d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide for the right of any person to challenge the lawfulness in court of an arrest or detention. The law states that except in the case of an individual discovered in the act of committing a felony or misdemeanor, the officials making the arrest must disclose their identity and inform the person arrested of the reason. Any person illegally detained by police, the state counsel, or the examining magistrate may receive compensation. The government did not always respect these provisions.

**Arrest Procedures and Treatment of Detainees**

The law requires police to obtain a warrant from a judge or prosecutor before making an arrest, except when a person is caught in the act of committing a crime, but police often did not respect this requirement. The law provides that suspects be brought promptly before a judge or prosecutor, although this often did not occur, and citizens were detained without judicial authorization. Police may legally detain a person in connection with a common crime for up to 48 hours, renewable once. This period may, with the written approval of the state counsel, be exceptionally extended twice before charges are brought. Nevertheless, police and gendarmes reportedly often exceeded these detention periods. The law also permits detention without charge for renewable periods of 15 days by administrative authorities, such as governors and civilian government officials

serving in territorial command.  The law also provides that individuals arrested on suspicion of terrorism and certain other crimes may be detained for investigation for periods of 15 days, renewable without limitation with authorization of the prosecutor.  The law allows access to legal counsel and family members, although police frequently denied detainees access to both.  The law prohibits incommunicado detention, but such cases occurred, especially in connection with the Anglophone crisis.  The law permits bail, allows citizens the right to appeal, and provides the right to sue for unlawful arrest, but these rights were seldom respected.

**Arbitrary Arrest:**  Police, gendarmes, the BIR, and other government authorities reportedly continued to arrest and detain persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado.  "Friday arrests," a practice whereby individuals arrested on a Friday typically remained in detention until at least Monday unless they paid a bribe, continued, although on a limited scale.

On May 11, six volunteers from "Survival Cameroon," a fundraising initiative launched by opposition leader Maurice Kamto to respond to the COVID-19 pandemic, were arrested while handing out free personal protective equipment in Yaounde.  They were placed in custody at the Yaounde II police district without judicial authorization.  The volunteers were released on bail after several days of detention.  Two other volunteers were arrested on May 14 while filming the transfer of their comrades from the police station to the prosecutor's office.  The prosecutor released them on bail on May 26.  Christian Penda Ekoka, president of the management committee of the initiative, stated that three other volunteers who were peacefully distributing free masks and hand sanitizer in Sangmelima, South Region on May 23 were arrested and placed in custody at the city's central police station.  They were released on bail after several days of detention.  The individuals were accused of unauthorized demonstrations.  If found guilty, they could face four years in prison.

According to Cameroon People's Party (CPP) president Edith Kah Walla, on September 19, members of security forces abducted at least five members of the NGO consortium Stand Up for Cameroon.  The arrest occurred after the members left a "Friday in Black" meeting held at the CPP headquarters in Douala.  The

abductees, including Moussa Bello, Etienne Ntsama, Mira Angoung, and Tehle Membou, were reportedly subjected to brutality and interrogated without legal counsel.

On September 19, 21, and 22, security forces arrested approximately 593 citizens in connection with peaceful protests called for by the MRC opposition party. While some were released, the Military Tribunal charged many with revolution, insurrection, and rebellion and placed them in pretrial detention. MRC women's wing president Awasum Mispa was arrested on November 21 when she led a group of women to visit MRC president Maurice Kamto. On November 23, an investigating magistrate at the Yaounde Military Tribunal charged her with complicity in revolution and rebellion and placed her in pretrial detention for a period of six months renewable. On November 27, the same investigating magistrate dropped the charges and released her. Kamto's de facto house arrest was lifted on December 8, two days after the election of regional councilors. The Yaounde Court of First Instance had not opened any substantive hearings in the proceedings initiated by his lawyers.

**Pretrial Detention:** The code of criminal procedure provides for a maximum of 18 months' detention before trial, but many detainees waited years to appear in court. The 2014 antiterrorism law provides that a suspect may be held indefinitely in investigative detention with the authorization of the prosecutor. Of the 22,430 detainees as of October 31, a total of 14,973 were pretrial detainees.

Amadou Vamoulke, a former general manager of state-owned Cameroon Radio Television, who was arrested and detained in 2016 on embezzlement charges, continued to await trial at the Kondengui Central Prison. After at least 30 hearings as of July 15, the Special Criminal Court failed to produce strong evidence to support the charges against him.

See also section 1.c., Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, case of Thomas Tangem.

## e. Denial of Fair Public Trial

The constitution and law provide for an independent judiciary, but this is not always the case in practice. In some instances, the outcomes of trials appeared

influenced by the government, especially in politically sensitive cases. Authorities did not always respect and enforce court orders.

Despite the judiciary's partial independence from the executive and legislative branches, the president appoints all members of the bench and legal department of the judicial branch, including the president of the Supreme Court, and may dismiss them at will.

Military courts may exercise jurisdiction over civilians in a broad number of offenses including civil unrest.

**Trial Procedures**

The constitution and law provide for the right to a fair and public trial without undue delay, and the defendant is presumed innocent. Authorities did not always respect the law. Criminal defendants have the right to be informed promptly and in detail of the charges, with free assistance of an interpreter. Defendants have the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, restricting access to lawyers, particularly in cases of individuals suspected of complicity with Boko Haram, Anglophone separatists, or political opponents. When defendants cannot pay for their own legal defense, the court may appoint trial counsel at public expense, but the process was often burdensome and lengthy and the quality of legal assistance was poor. Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf. Defendants have the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt, but authorities often violated this right. Hearsay and anonymous testimony were sometimes permitted, especially in terrorism cases. Defendants are entitled to an interpreter at no charge, but often the quality of interpretation was described as poor. Defendants may appeal convictions. In some cases, authorities did not give the victim a chance to confront the offender and present witnesses or evidence to support his or her case.

Courts often limited procedural rights in politically sensitive cases. On July 16, the Court of Appeals in Yaounde heard a case involving 10 Anglophone separatist leaders, including Julius Sisiku Ayuk Tabe, whom the Yaounde Military Tribunal

# CAMEROON

sentenced to life imprisonment in August 2019. On July 17, prison officials denied the Anglophone leaders access to their defense lawyers, according to several lawyers, including Emmanuel Simh. In a July 17 statement, Dabney Yerima, the jailed vice president of the Ambazonian "interim government," confirmed and then denounced the denial of access to legal representation. Although they were present at the court, Sisiku and his companions reportedly refused to be judged in French, demanding that their trial be conducted in English. The case was adjourned until August 20, and then until September 17 when a final decision was to be delivered. They reportedly did not receive a legal opinion from the court official on this case. On August 20, the case was postponed until September, after the magistrate in charge was transferred to the Supreme Court. On September 18, the Court of Appeals eventually confirmed the initial life sentence for separatist leader Ayuk Tabe and others.

There were cases where the courts demonstrated some neutrality. On June 16, the Administrative Court in Yaounde ruled that the minister of territorial administration had acted illegally when he independently declared that the leader of the CPP, Edith Kah Walla, had been replaced by the proregime party founder Samuel Fon before the October 2018 Presidential election.

**Political Prisoners and Detainees**

There were reports of newly identified political detainees as of September, most of whom were associated with the September 22 protests called for by the MRC opposition party. While there were no official statistics available, the number of detainees was estimated to be close to 600. Prominent among the detainees were MRC Treasurer Alain Fogue and Maurice Kamto's spokesperson, Olivier Bibou Nissack. Political prisoners were detained under heightened security, often in SED facilities and at the Kondengui Principal Prison and the Kondengui Central Prison in Yaounde. Some were allegedly held at Directorate General for External Research facilities. The government did not readily permit access to such individuals.

The 10 Anglophone separatist leaders, including Julius Sisiku Ayuk Tabe, whom the Yaounde Military Tribunal sentenced to life imprisonment on August 20, 2019, remained in detention, as the Court of Appeals in September confirmed the

sentence. MRC Vice President Mamadou Mota and a few other MRC members, in addition to the 10 leaders sentenced to life, remained in detention as of December, despite a reduction of their sentences upon appeal. Former minister of state for territorial administration Marafa Hamidou Yaya, who was convicted in 2012 on corruption charges and sentenced to 25 years' imprisonment, remained in detention. In 2016 the UN Working Group on Arbitrary Detention described Marafa's detention as "a violation of international laws." The government did not respond to repeated requests for members of the diplomatic community to meet with Marafa.

## Politically Motivated Reprisal against Individuals Located Outside the Country

There were credible reports that for political reasons the government attempted to exert bilateral pressure on other countries aimed at having them take adverse legal action against specific individuals, including Anglophone separatists and other political opponents.

On August 18, Serge Sihonou, the secretary of MRC's operation in Gabon, was allegedly detained by the counterinterference service of the B2 Brigade in Libreville, where he was harassed and physically abused. He was accused of continuing to run an MRC operation that he created in the town of Oyam, despite a ban on the party in Gabon. On August 21, MRC leader Maurice Kamto sent a letter to the Gabonese ambassador to Cameroon denouncing the treatment and demanding the release of Sihonou. In his letter, Kamto accused the Cameroonian ambassador to Gabon of instigating the harassment of MRC members in Gabon since 2018.

## Civil Judicial Procedures and Remedies

Citizens and organizations have the right to seek civil remedies for human rights abuses through administrative procedures or the legal system; both options involved lengthy delays. Individuals and organizations may appeal adverse decisions domestically or to regional human rights bodies, but the decisions of regional human rights bodies are not binding.

There were reports that the government delegate to the Douala City Council had failed to comply with civil court decisions pertaining to labor matters of city council employees. The Douala City mayor, who replaced the government delegate, however, found a compromise solution after more than 30 months of litigation between Douala City Council workers and the government.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the constitution and law prohibit arbitrary interference with privacy, family, home, or correspondence, these rights were subject to restriction in the interests of the state, and there were credible reports police and gendarmes abused their positions by harassing citizens and conducting searches without warrants.

The law permits a police officer to enter a private home during daylight hours without a warrant only if pursuing a person suspected of or seen committing a crime. Police and gendarmes often did not comply with this provision and entered private homes without a warrant whenever they wished. According to media reports, security forces on June 27 conducted raids in the mostly Anglophone neighborhoods of Obili and Melen in Yaounde, following the detonation of two improvised explosive devices in the city. They entered private homes by force and arrested anyone deemed suspicious or who did not possess a national identification card. Many of those detained told media they had been harassed, humiliated, and abused in the process. A video on social media showed more than 100 men and women sitting on the ground surrounded by security officers within a large courtyard in Obili. At the end of the operation, the security officers took away dozens of persons without identification.

An administrative authority, including a governor or senior divisional officer, may authorize police to conduct neighborhood sweeps without warrants, and this practice occurred. Following a late March decision by Jean Claude Tsila, the senior divisional officer for Mfoundi, approximately 50 prostitutes were placed in police custody after coming in contact with travelers in quarantine due to COVID-19 in some hotels in Yaounde.

## g. Abuses in Internal Conflict

# CAMEROON

**Killings:** There were credible reports that members of government forces and separatist fighters deliberately killed innocent citizens. On April 22, according to credible organizations, members of government security forces executed six unarmed men in Muambong, Southwest Region. The victims included four former separatist fighters who had accepted an amnesty offer in 2019. Most of the executions were reportedly carried out in front of the victims' relatives.

On March 12, according to credible accounts, Anglophone separatists killed at least five civilians held hostage, including the deputy mayor of Babessi council, Chefor Oscar, and the newly elected mayor of the Mbengwi council, Ndangsa Kenedy Akam, who was kidnapped 15 days earlier. The killings took place after the Cameroonian army raided their camp, freed five hostages, and killed seven separatist fighters. According to reports, the hostages were subjected to both physical and sexual violence. On May 10, Anglophone separatists ambushed and killed the newly elected mayor of Mamfe, 35-year-old Priestley Ashu Ojong. Shortly after news of Ashu Ojong's death, Lucas Ayaba Cho, leader of the Ambazonia Defense Forces (ADF), praised ADF fighters for eliminating a high value target.

Boko Haram and ISIS-WA intensified deadly attacks on civilians and members of security forces in the Far North Region. *L'Oeil du Sahel* reported that on June 25 in Goudoumboul, Boko Haram insurgents killed 18-year-old Almada Ali. On June 26, in Cheripouri, assailants believed to be Boko Haram fighters ambushed and killed 12-year-old Ousmane and his older brother while they were asleep in their home.

On October 24, according to Amnesty International, unidentified gunmen in civilian clothes on motorbikes attacked a school in Kumba in the Southwest Region, firing into a classroom. The attackers killed eight schoolchildren and injured another 12 children. On October 28, Minister of Communications Rene Emmanuel Sadi announced security forces had killed one of the gunmen allegedly responsible for the attack. The government declared a national day of mourning and a delegation of government ministers traveled to Kumba to meet with the victims' family members. The government also sent a medical team to provide medical and psychosocial support. On the day of the attack, Communications

Minister Sadi announced an investigation into the killing, but the government did not follow through with an independent investigation into the attack.

On December 6, unidentified gunmen shot at Encho Elias Ambi, a municipal councilor for Widikum in the Northwest Region, after he cast his vote for the election of regional councilors.  He was not harmed during the incident.

**Abductions:**  Armed separatists kidnapped dozens of persons, burned property, and threatened voters in the period before the February 9 legislative and municipal elections.  Armed separatists allegedly kidnapped several traditional leaders in retaliation for the traditional leaders' participation in the December 6 regional elections.  They held noncombatants as hostages, including public officials, political leaders, teachers, schoolchildren, and traditional leaders.  There were credible allegations that separatists physically abused abduction victims, including committing rape, using stress positions, administering beatings, and flogging with machetes.  In some cases the abductors freed the victims after either negotiations or receiving ransom payments.

On July 13, armed individuals abducted at least 60 men, women, and children in the village of Mmouck Leteh in the Southwest Region.  On July 15, a local administrator told the BBC that gunmen entered the village late at night, moved through the community kidnapping persons--many of whom were at a local snack bar--and led them away at gunpoint to an unknown destination.  According to the BBC, a significant number of the victims were children between the ages of 12 and 16.  Later that day, the BBC reported that at least 12 of the abductees had escaped captivity and had returned to the community, and that separatist leader General Ayeke had demanded a ransom totaling $2,500 for the remaining victims.  Several hours later, multiple local media outlets announced the release of the remaining abductees, reportedly after negotiations with separatists.

On July 7, five civilians were kidnapped in Muyuka, Southwest Region, presumably by Anglophone separatists.  A week later, the victims were still missing.  On May 30, according to Human Rights Watch, separatists abducted and mistreated a humanitarian worker, whom they accused of being a spy.  The worker was released the next day.  In Bambui on May 30, separatists abducted seven staff members of a religious nonprofit organization; they were released after two days.

# CAMEROON

On April 24, armed men abducted three government officials in Boyo, Northwest Region.

On January 21, suspected separatists abducted 24 schoolchildren in Kumba in the Southwest Region. Security forces rescued the hostages in an operation later the same day, killing two of the abductors in the process.

On January 5, armed separatists kidnapped Choh Issa Bouba, the opposition party Social Democratic Front's mayor of Babessi, Northwest Region, along with some councilors of his municipality.

On December 12, Anglophone separatists allegedly kidnapped traditional leader Nelson Sheteh in the Northwest Region. On December 13, suspected Anglophone separatists in the Southwest Region abducted three traditional rulers, including Chief Emmanuel Ikome Ngalle. Ngalle died in separatist custody and the other two traditional leaders, Simon Kombe, traditional ruler of Bolifamba, and Emmanuel Efande Ewule, traditional ruler of Lower Bokova, were released on December 14. Many Cameroonians believed that the timing of the abductions and social media statements by separatist leaders suggested the abductions were in retaliation against leaders who participated in the December 6 regional elections.

**Physical Abuse, Punishment, and Torture:** According to anecdotal reports, members of government forces physically abused civilians and prisoners in their custody. Reports suggested that on January 5, a detainee died in Ndu, Northwest Region after being abused by soldiers (See also section 1.a).

In a March 13 report available online, journalist Moki Edwin Kindzeka reported that Anglophone separatists killed four hostages, including a local official, after troops attacked their camp in a western part of the country. The military reportedly freed five others. According to Kindzeka, a young woman recovering at a military base in Bafoussam told a reporter that she had also been raped by her abductors.

**Child Soldiers:** The government did not generally recruit or use child soldiers, but there were allegations that some members of defense and security forces in at least one instance allegedly used a child for intelligence gathering in the Southwest Region in November 2019. Some community neighborhood watch groups, known as vigilance committees, may have used and recruited children as young as 12 in

operations against Boko Haram and ISIS-WA. In July, Human Rights Watch reported that from mid-March to late April, soldiers in Mozogo, Far North Region, forced civilians to perform local night guard duty to protect against attacks by Boko Haram. According to the report, the 42nd Motorized Infantry Battalion in Mozogo worked with local authorities to compile lists of approximately 90 men and at least one boy who were required to join night guard duty.

Boko Haram continued to use child soldiers, including girls, in its attacks on civilian and military targets. There were also some reports that Anglophone separatists in the Southwest and Northwest Regions used children as fighters.

According to UNICEF, from January to December 2019, there were nine incidents involved minors used as forced suicide bombers in the Far North Region (Mayo Sava, Mayo Tsanaga, and Logone-and-Chari divisions). UNICEF's analysis found individuals manipulated into serving as suicide bombers or forced suicide bombers included children whose parents had been killed in violence, abducted orphaned children, and women whose husbands had been killed.

**Other Conflict-related Abuse:** As in the previous year, there were reports of repeated attacks on health workers and institutions and the use of firearms around health facilities by members of security forces and Anglophone separatists.

Human Rights Watch reported in July that security forces and armed separatists attacked hospitals and medical staff on multiple occasions. The organization indicated that on June 10, following clashes between separatists and soldiers, including members of the BIR, a grenade was fired into the courtyard of the district hospital in Bali, Northwest Region. One patient died, four others were injured, and four vehicles were destroyed. Human Rights Watch further reported that on June 30 soldiers forcibly entered St. Elizabeth Catholic Hospital in Shisong, Northwest Region, looking for wounded separatists. They fired three gunshots and broke down doors, causing panic among patients, nurses, and other workers who fled.

On July 6, separatists in the Southwest Region killed a Doctors without Borders community health worker known as Felix, after accusing him of collaborating with the military. In addition, in response to the announcement of the *Presidential Plan for the Reconstruction and Development of the Northwest and Southwest Regions*

on July 5, separatists launched attacks on July 6 in villages across the Anglophone regions, destroying public buildings in Lebialem and Manyu in the Southwest Region as well as in Bui, Donga and Mantung, and Ngoketunjia in the Northwest Region.

# Section 2. Respect for Civil Liberties, Including

## a. Freedom of Expression, Including for the Press

The law provides for freedom of expression, including for the press, but the government often restricted this right, explicitly or implicitly. Government failure to investigate or prosecute attacks on human rights defenders and peaceful protesters led to de facto restrictions on the freedom of speech, assembly, and association.

**Freedom of Speech:** Government officials penalized individuals or organizations that criticized or expressed views at odds with government policy. Individuals who criticized the government publicly or privately frequently faced reprisals. On several occasions, the government invoked laws requiring permits or government notification of public protests to stifle discourse.

On July 24, the senior divisional officer for Upper Plateaux in the West Region, Yampen Ousmanou, sent a warning letter to Jean Rameau Sokoudjou, the traditional ruler of Bamendjou in the West Region, accusing him of rebellion after he organized a meeting in his palace on July 18 without prior approval. The meeting reportedly brought together citizens of diverse political sides and civil society groups to exchange ideas about the country's future.

**Freedom of Press and Media, including Online Media:** Private media were active and expressed a wide spectrum of adherence to journalistic ethics. The landscape included constraints on editorial independence, in part due to fear of reprisal from state and nonstate actors, including separatists connected to the armed conflict in the two Anglophone regions. Journalists reported practicing self-censorship to avoid repercussions, including financial repercussions, for criticizing or contradicting the government.

# CAMEROON

**Violence and Harassment:** Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists. Journalists were arrested in connection with their reporting on the Anglophone crisis. The state's failure to investigate or prosecute attacks on journalists created de facto restrictions.

On May 15, according to reports by multiple organizations, including the National Association of English-speaking Journalists, security forces arrested freelance journalist Kingsley Fomunyoy Njoka. He was taken from his home in Douala and detained incommunicado for 24 days. According to Njoka's legal team, the security forces accused him of criticizing the government's handling of the Anglophone crisis on social media. On June 12, the Yaounde Military Tribunal indicted the journalist on multiple counts, including secession and collusion with an armed group, and placed him in pretrial detention at the Kondengui Central Prison in Yaounde. On July 13, Njoka filed a defamation complaint against Colonel Cyrille Serge Atonfack, the Ministry of Defense's communication officer. The suit followed a July 5 interview on Equinoxe Television, during which Atonfack said that Njoka admitted he participated in the killing of former separatist fighters who surrendered at disarmament, demobilization, and reintegration (DDR) centers in the Northwest and Southwest Regions. He characterized Njoka as the coordinator of the Bui Warriors, an armed separatist group based in Bui, Northwest Region. On June 30, Reporters without Borders noted the allegations against Njoka had not yet been substantiated. They stated that persons close to the journalist characterized his criticism of the government's handling of the Anglophone crisis as factual and stated the security forces probably monitored him because he regularly discussed the conflict with colleagues.

**Censorship or Content Restrictions:** Under a 1990 law, the Ministry of Communication requires editors to submit two signed copies of their newspapers within two hours after publication. Journalists and media outlets reported practicing self-censorship, especially if the National Communication Council had suspended them previously.

Following the February 14 killing of civilians by security forces in Ngarbuh, Minister of Territorial Administration Paul Atanga Nji attacked media for publishing the Human Rights Watch report that accused the Cameroonian army of

# CAMEROON

killing civilians. Atanga Nji particularly targeted Equinoxe Television, STV, Radio Balafon, and *Le Jour*, asking them to stop relaying false information designed to undermine Cameroonian security forces (see also section 1.a.).

**Libel/Slander Laws:** Press freedom is constrained by libel and slander laws. Libel, slander, defamation, and blasphemy are treated as criminal offenses. The law authorizes the government to initiate a criminal suit when the president or other senior government officials are the alleged victims. These laws place the burden of proof on the defendant, and crimes are punishable by prison terms and heavy fines. While the government may initiate criminal suits when the president or other senior government official are alleged victims, ordinary citizens may also file libel or slander suits, but the law is often applied selectively and privileges senior government officials and well connected individuals. Some persons successfully filed defamation suits and prosecuted perpetrators. In other cases, courts were reluctant to open hearings. For example, Paul Chouta was detained for alleged defamation of a person who was close to the government, whereas courts failed to acknowledge Alice Nkom's and Maximilienne Ngo Mbe's defamation suit against someone associated with the government and did not open hearings on the case.

Paul Chouta, who worked as a reporter for the privately owned *Cameroon Web news* website, remained in pretrial detention as a result of a defamation complaint filed by French-Cameroonian writer Calixthe Beyala. Police arrested Chouta in Yaounde in May 2019. He was charged with defamation and spreading false news, an offense punishable with imprisonment for a period not exceeding six months. Chouta was sent to Kondengui Central Prison in Yaounde and was awaiting trial. While the case against Paul Chouta was pending before the Court of First Instance in Yaounde, the plaintiff filed another complaint against a woman for complicity in the same offenses before the same court. The two cases initially were handled by different magistrates. The representative of the public prosecutor requested and obtained a merger of the two cases in September 2019, despite the protest of Chouta's lawyers. The appeal led to the suspension of the case before the Court of First Instance until a decision by the Court of Appeals. While the other defendant appeared to be free, Chouta was denied bail and remained in detention.

# CAMEROON

**National Security:**  Authorities often cited laws against terrorism or protecting national security to threaten critics of the government.

**Nongovernmental Impact:**  There were reports that separatist groups in the Southwest and Northwest Regions sought to inhibit freedom of expression, including for the press.  In a January article available online, journalist Moki Edwin Kindzeka reported that journalists in Cameroon's English-speaking regions said separatists were attacking them because of critical reporting and their refusal to broadcast rebel propaganda.  He said separatist intimidation was reportedly intensifying as the country prepared for local and parliamentary elections, which the separatists had vowed to stop.  Mbuotna Zacks Anabi, the manager and presenter of the community radio station Stone FM in the town of Ndop in the Northwest Region, said the station stopped broadcasting after armed men stormed it on January 27 and set the building on fire.

## Internet Freedom

Anecdotal reports indicated that the government monitored private online communications without appropriate legal authority.  The government occasionally disrupted access to the internet.

## Academic Freedom and Cultural Events

Although there were no legal restrictions on academic freedom or cultural events, some school authorities reportedly sanctioned academic personnel for teaching politically sensitive topics, and administrative officials often deterred teachers from criticizing the government.

On May 6, Horace Ngomo Manga, the vice chancellor of the University of Buea, terminated the contract of Felix Nkongho Agbor Balla, an instructor in the Department of English Law.  The decision was reportedly taken by the university's disciplinary panel after Higher Education Minister Jacques Fame Ndongo urged the vice chancellor to address Agbor Balla's alleged ethics violations.  Ngomo Manga cited an examination question during the first semester of the 2019-20 academic year that read, "The Anglophone crisis since 2016 was caused by the lawyers' and teachers' strike--assess the validity of this statement."

On October 24, unidentified armed men killed seven children and wounded at least 13 others during an attack on Mother Francisca International Bilingual Academy, a school in the town of Kumba, Southwest Region. In a press release also released on October 24, Minister of Communication Rene Emmanuel Sadi attributed the attack to separatists. He said 10 heavily armed men on three motorbikes entered the school and opened fire on students inside classrooms. Reports indicated attackers also used machetes. He reported that five girls and one boy died during the attack and described the conditions of several of the wounded as critical, noting that they were taken to hospitals in Kumba and in other nearby towns.

## b. Freedoms of Peaceful Assembly and Association

The government limited and restricted freedoms of peaceful assembly and association.

### Freedom of Peaceful Assembly

Although the law provides for freedom of peaceful assembly, the government often restricted this right. The law requires organizers of public meetings, demonstrations, and processions to notify officials in advance but does not require prior government approval for public assemblies, nor does it authorize the government to suppress public assemblies that it did not approve in advance. Nevertheless, officials routinely asserted the law implicitly authorizes the government to grant or deny permission for public assemblies. The government often refused to grant permits for gatherings and used force to suppress assemblies for which it had not issued permits. Authorities typically cited security concerns as the basis for deciding to block assemblies. Progovernment groups, however, were generally authorized to organize public demonstrations.

On August 13, the divisional officer of Yaounde II, Mamadi Mahamat, banned the civil marriage ceremony of MRC leader Maurice Kamto's spokesperson, Olivier Bibou Nissack, which was scheduled to take place at Massao Hotel in Yaounde. Mamadi stated that the organizers of the marriage did not seek authorization for the public event. He also called into question the credentials of Civil Status Secretary Valentin Lewoua, who was to help officiate the marriage. He further stated the

chief officiating officer, traditional leader and Maurice Kamto associate Biloa Effa, had been removed by the minister of territorial administration in December 2019.

On August 15, the divisional officer of Nkongsamba in the Littoral Region banned a meeting of the MRC scheduled to take place at the party's headquarters. Following the ban, some MRC members met at the residence of a colleague, Fabrice Tchoumen, for a private discussion. On August 19, the chief commissioner in Nkongsamba, Joseph Hamadjam, summoned Tchoumen for questioning on August 24, saying that he organized a meeting at his residence without authorization. As of September, the MRC had not reported any ongoing legal proceedings following the questioning.

In September authorities took a series of administrative decisions banning public demonstrations after the MRC called for peaceful protests on September 22 over the government's decision to organize regional elections before resolving the crisis in the two Anglophone regions and advancing electoral reforms. On September 11, the governors of the Littoral and Center Regions banned public meetings and demonstrations indefinitely. Three days later, Territorial Administration Minister Atanga Nji, in a letter to the two governors and the governor of the West Region, urged them to arrest anyone organizing or leading demonstrations. On September 15, Minister of Communication Rene Emmanuel Sadi warned political parties that protests could be considered "insurrection" and that illegal demonstrations across the country would be punished under the antiterror law. The communications minister also threatened to ban the MRC.

On September 19, the headquarters of the opposition CPP in Yaounde was surrounded by more than 30 police officers and gendarmes. The Yaounde district officer stated that the CPP was holding a public meeting without approval, but CPP president Edith Kahbang Walla said in a statement published the same day that they were holding a regularly scheduled meeting for their members.

According to MRC leaders, an estimated 593 party members were detained throughout the country after they attempted to hold peaceful marches on September 22. Several persons in the Yaounde protest sustained minor injuries. They were reportedly arrested due to concerns they were participating in an insurrection. Videos of the protest showed security officers dispersing crowds

with water cannons and tear gas and police firing rubber bullets at protestors. The MRC reported that security forces seriously wounded one individual at the residence of its leader, Maurice Kamto, during the night of September 21.

**Freedom of Association**

The constitution and law provide for the freedom of association, but the law also limits this right. On the recommendation of the prefect, the Ministry of Territorial Administration may suspend the activities of an association for three months on grounds that the association is disrupting public order. The minister may also dissolve an association if it is deemed a threat to state security. National associations may acquire legal status by declaring themselves in writing to the ministry, but the ministry must explicitly register foreign associations, and the president must accredit religious groups upon the recommendation of the Minister of Territorial Administration. The law imposes heavy fines for individuals who form and operate any such association without ministry approval. The law prohibits organizations that advocate a goal contrary to the constitution, laws, and morality, as well as those that aim to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

Conditions for recognition of political parties, NGOs, and associations were complicated, involved long delays, and were unevenly enforced. This resulted in associations operating in legal uncertainty with their activities tolerated but not formally approved.

During the year the government did not officially ban any organizations, but it restricted the MRC's activities, and virtually prohibited all events planned by the party. In a September 7 press briefing following the announcement of regional elections, Minister Atanga Nji suggested that the MRC could be officially banned. The Ministry of Territorial Administration regularly used threats of suspension against political parties, NGOs, and media outlets.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement

Although the constitution and law provide for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government restricted these rights. Growing concerns over the entry of armed groups into Cameroon from the Central African Republic, the conflict with Boko Haram and ISIS-WA in the Far North Region, and the armed conflict in the two Anglophone regions appeared to have prompted the government to adopt a more restrictive approach to refugee movements. The government made it more difficult for refugees, asylum seekers, and stateless persons to move freely in the country.

**In-country Movement:** Using minor infractions as a pretext, police and gendarmes often extorted bribes and harassed travelers at roadblocks and checkpoints in cities and on most highways. Police frequently stopped travelers to check identification documents, including national identity cards, passports, residence permits, vehicle registrations, and tax receipts as security and immigration control measures. Just as in the previous year, humanitarian organizations cited difficulty in accessing certain areas and in some instances were harassed and denied passage by government authorities. Unaccompanied women were frequently harassed when traveling alone. Authorities restricted movements of persons and goods, including motorbikes, especially in the Northwest and Southwest Regions, citing security concerns. Armed Anglophone separatists also restricted the movements of persons and goods in the two Anglophone regions, sometimes in a deliberate attempt to harass and intimidate the local population. Separatist warlords "taxed" cocoa trucks passing through rural areas of the Southwest region. They often used weekly lockdowns referred to as ghost towns to enforce restrictions on movement, in which the armed separatists demanded all businesses close and residents stay home.

On March 13, Northwest Region Governor Adolphe Lele Lafrique signed an order prohibiting the circulation of motorbikes. The order was enforceable daily in the divisions of Bui, Mezam, Momo, Menchum, Ngohketunjia, and Boyo from 6:00 p.m. to 5:00 a.m. For the same reasons, on September 4, the mayor of Bamenda, Paul Tembeng Achobong, announced a ban on commercial and private motorbikes within most of the city, scheduled to begin on September 7, with the goal of limiting separatist activity in the city. In a press release later that day, Northwest

Region Governor Lafrique endorsed the ban and accused separatists of perpetrating attacks on motorbikes. Hours later, the leader of the Southern Cameroons Civil Society Consortium separatist group, John Mbah Akuroh, stated in a video on social media that the prohibition would impoverish thousands of commercial motorbike riders and their families and urged car owners in Bamenda to ground their vehicles until the government lifted the ban.

**Foreign Travel:** Citizens have the right to leave the country without arbitrary restrictions. The movement of some political opponents and debtors, however, were monitored, and their travel documents were often confiscated to confine them to the country. To obtain exit permits, citizens need a valid passport and visa for their country of destination. With the development of human trafficking operations and networks, children and young women were often subjected to more stringent controls at border locations, including airports.

## e. Status of Treatment of Internally Displaced Persons

According to UN High Commission for Refugees (UNHCR) estimates, there were 1,755,787 persons of concern as of July, including one million IDPs, of whom 297,321 were in the Far North Region and 679,000 in the Northwest and Southwest Regions. In addition, the country had an estimated 354,360 returnees in the Far North, Northwest, and Southwest Regions. The population of concern increased by more than 58 percent since 2018. Mass displacements in the Northwest and Southwest Regions of the country, largely after lawyers' protests and a teachers' strike in 2016 morphed into armed conflict, were the primary drivers of this increase. Humanitarian access remained very limited, since military officials maintained tight control over access in the area. Additional factors driving displacements included the desire to flee Boko Haram violence.

The government put in place disarmament, demobilization, and reintegration centers to promote the safe, voluntary return, resettlement, or local integration of IDPs in the Far North, Northwest, and Southwest Regions. Reports suggested the government's DDR centers were inadequately resourced, and many of the returnees left them. Provision of basic social services to IDPs and assistance to returnees were carried out by relief actors with minimal support from the government. In the Northwest and Southwest Regions, the government did not

facilitate efforts to ensure unfettered access for humanitarian actors to deliver aid to persons in need. It made some efforts, however, to provide urgently needed in-kind assistance to crisis-affected IDPs in the Northwest and Southwest Regions based on its *Humanitarian Assistance Response Plan*. This assistance was distributed to populations without an assessment of their needs and only to persons in accessible areas, especially in regional capital cities.

## f. Protection of Refugees

The government at times cooperated with UNHCR and other humanitarian organizations regarding treatment of IDPs, refugees, asylum seekers, and other persons of concern. The country operated an open door policy. This policy, however, was not translated into a progressive legal framework allowing refugees their rights as stated in various legal instruments.

**Refoulement:** Unlike in 2019, there were no reported cases of forced returns.

**Access to Asylum:** The laws provide for granting asylum or refugee status, and the government has established a system of providing protection to refugees, but the implementation of this system was weak. UNHCR continued to provide documentation and assistance to the refugee population, although local authorities did not always recognize the documents as official, which prevented refugees from travelling and engaging in business activities. UNHCR and the government continued to conduct biometric verification and registration of refugees in the Far North Region, including those not living in refugee camps.

**Freedom of Movement:** The government often cited security concerns and suspected criminal activity to restrict the movement of refugees and asylum seekers.

**Access to Basic Services:** Refugees had limited access to health care, education, and employment opportunities. Their rural host communities faced similar problems, but the situation was somewhat worse for refugees. Access to these services varied according to the location of the refugees, with those in camps receiving support through humanitarian assistance, while refugees living in host communities faced difficulty receiving services.

**Durable Solutions:** In October 2019 the United Nations and the governments of Cameroon and the Central African Republic (CAR) initiated the voluntary repatriation of some 4,000 CAR refugees from Cameroon. Some 500 refugees reportedly signed up in the first phase of the program. By the end of December 2019, UNHCR had repatriated more than 3,500 CAR refugees out of those who expressed the desire to return. The repatriation followed a June 2019 tripartite agreement between Cameroon, CAR, and UNHCR to provide for a safe and dignified repatriation of 285,000 CAR refugees to their home country. Repatriation of CAR refugees stopped in the first part of the year due to funding shortfalls and COVID-19 restrictions.

**Temporary Protection:** The government continued to provide temporary and unofficial protection to individuals who may not qualify as refugees, extending this protection to hundreds of individuals, including third-country nationals who had fled violence in the CAR. Due to their unofficial status and inability to access services or support, many of these individuals were subject to harassment and other abuses.

## g. Stateless Persons

Not applicable.

# Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. Elections, however, were often marked by irregularities.

## Elections and Political Participation

**Recent Elections:** On February 9, the country held simultaneous legislative and municipal elections. An estimated 32 political parties participated in the legislative election and 43 participated in the municipal election. Security concerns constrained voter participation in the two Anglophone regions. The courts annulled the legislative elections in 11 constituencies of the Anglophone Northwest and Southwest Regions because voter turnout was below 10 percent; elections were rerun in 11 constituencies of the two Anglophone regions on March

# CAMEROON

22. The ruling Cameroon People's Democratic Movement (CPDM) won 152 of the 180 National Assembly seats and won control of 316 of 360 local councils. Opposing political parties lost significantly when compared with previous elections. Irregularities, including lack of equal access to media and campaign spaces, restrictions on the ability of opposition candidates to register for the election, ballot stuffing, lack of ballot secrecy, voter intimidation, inconsistent use of identification cards, and lack of expertise among local polling officials prompted the Constitutional Council and Regional Administrative Courts to annul some legislative elections.

As of September the Supreme Court, which has final jurisdiction over challenges to the municipal election, had not issued a final ruling. Overall, eight opposition political parties gained access to the National Assembly, and nine won control of local councils. Estimates of voter turnout showed an unprecedented low rate of participation of 43 percent for the legislative and municipal elections. The results could partially be attributed to the call for a boycott of the elections by the MRC and other opposition parties. On December 6, the first-ever election of regional councilors was held, 24 years after they were provided for in the 1996 Constitution. Due to the gains achieved in the municipal councils that made up the electoral college in February elections, the ruling CPDM won in nine of the 10 regions. The government cited the regional elections as a sign of progress on decentralization, although some opposition and civil society groups criticized the elections as not signifying meaningful decentralization of power.

In October 2018, Paul Biya was re-elected president in an election marked by irregularities and against the backdrop of protracted sociopolitical unrest in the two Anglophone Northwest and Southwest Regions.

**Political Parties and Political Participation:** As of December, the country had 307 registered political parties. The CPDM remained dominant at every level of government due to restrictions on opposition political parties, gerrymandering, unbalanced media coverage, the use of government resources for CPDM campaigning, interference with the right of opposition parties to register as candidates and to organize during electoral campaigns, and the influence of traditional rulers, who were largely coopted by the CPDM. Traditional rulers, who receive salaries from the government, openly declared their support for President

Biya prior to the presidential election, and some reportedly compelled residents of their constituencies to prove they did not vote for an opposition candidate by presenting unused ballots.  Traditional rulers who refused to associate with the government were either removed or threatened with destitution.  Membership in the ruling political party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service.

Human rights organizations and opposition political actors considered the drawing of voter districts and distribution of parliamentary or municipal councilors' seats unfair.  They complained that smaller districts considered CPDM strongholds were allocated a disproportionate number of seats compared with more populous districts where the opposition was expected to poll strongly.  Managers of state-owned companies and other high-level government officials used corporate resources to campaign for candidates sponsored by the ruling party.

**Participation of Women and Minorities:**  No laws limit participation of women or members of minorities in the political process and they did participate, although women remained underrepresented at all levels of government.  In parliament, women occupied 87 of 280 seats--61 in the National Assembly and 26 in the Senate.  Women held 11 of 66 cabinet positions.  Similar disparities existed in other senior-level offices, including territorial command and security and defense positions.

The law stipulates that a person can vote at 20 years of age.

The minority Baka, a nomadic Pygmy people, were not represented in the Senate, National Assembly, or higher offices of government.

On June 16, the Administrative Court for the Center Region in Yaounde reinstated Edith Kah Walla as the leader of the CPP.  In 2018, Minister of Territorial Administration Atanga Nji issued a decision naming Samuel Fon as head of the party, replacing Edith Kah Walla who was elected in 2011 as party leader.  The June 16 Administrative Court decision nullified Atanga Nji's decision.

# Section 4. Corruption and Lack of Transparency in Government

# CAMEROON

The law provides criminal penalties for corruption by officials, but the government did not implement the law effectively. There were numerous reports of government corruption. Officials sometimes engaged in corrupt practices with impunity. The law identifies different offenses as corruption, including influence peddling, involvement in a prohibited employment, and nondeclaration of conflict of interest. Reporting corruption was encouraged through exempting whistleblowers from criminal proceedings. Corruption in official examinations is punishable by up to five years' imprisonment, a substantial monetary fine, or both. In addition to the laws, the National Anticorruption Agency (CONAC), the Special Criminal Court, the National Financial Investigation Agency, the Ministry in Charge of Supreme State Audit, and the Audit Bench of the Supreme Court also contributed to fighting corruption in the country. CONAC, the most prominent of the anticorruption agencies, was constrained by the absence of a law empowering it to combat corruption. There were reports that senior officials sentenced to prison were not always required to forfeit ill-gotten gains.

In a prelude to World Anticorruption Day, CONAC on July 10 released a report, *2010-2020, A decade of fighting corruption in Cameroon: Achievements*, that listed the most corrupt sectors in the country, including public procurement, finance, justice, and the security forces. CONAC further stated that with assistance from the Special Criminal Tribunal and the Supreme Court, it was able to help recover CFA 1.7 billion ($2.9 million) of government funds.

**Corruption:** There were consistent allegations of mismanagement of resources with respect to the funds raised to counter COVID-19. Social Democratic Front member of parliament Jean Michel Nintcheu raised the issue several times, challenging the health minister to prove the contrary. He expressed concerns that the money contributed by the public through a national solidarity fund was subject to corruption. He cited overbilling and conflicts of interests within the Ministry of Health.

In a June 12 release, Human Rights Watch urged the government to publish immediately information on the revenues, disbursements, and management of its Health Solidarity Fund, adding that health-care facilities had made mandatory contributions to the emergency fund for more than 25 years. Medical staff told Human Rights Watch that they believed the government had never disbursed any

money from the fund, including in response to COVID-19, even though health-care facilities continued to contribute 10 percent of their revenues. Human Rights Watch announced that on May 11, it wrote to the health minister, inquiring about the rules governing the fund and its activities but had not yet received a response.

In September, after 18 months of investigation, the investigating judge at the Special Criminal Court accused former defense minister Edgar Alain Mebe Ngo of embezzling CFA 236 billion ($4.1 million) as part of the purchase of military equipment for the army. Mebe Ngo and his wife have been awaiting trial at the Kondengui Central Prison since their arrest.

The government continued Operation Sparrow Hawk that was launched in 2006 to fight embezzlement of public funds. As in the previous year, the Special Criminal Court opened new corruption cases and issued verdicts on some pending cases. The National Gendarmerie maintained a toll-free telephone line to allow citizens to report acts of corruption in the Gendarmerie.

**Financial Disclosure:** The constitution requires senior government officials, including members of the cabinet, to declare their assets prior to and after leaving office, but the government did not implement the law.

# Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A number of domestic and international human rights groups investigated and published findings on human rights cases. Government officials, however, impeded many local human rights NGOs by harassing their members, limiting access to prisoners, refusing to share information, and threatening violence against NGO personnel. Human rights defenders and activists received anonymous threats by telephone, text message, and email. The government took no action to investigate or prevent such occurrences. The government criticized reports from international human rights organizations, including Amnesty International, Human Rights Watch, and the International Crisis Group, accusing them of publishing baseless accusations.

# CAMEROON

When Human Rights Watch released its February 25 report, *Civilians Massacred in Separatist Area*, Minister of Communication Rene Emmanuel Sadi accused it and other organizations of being tirelessly determined to undermine the image of the country and the stability of its institutions. Minister Sadi stated the government was in possession of irrefutable evidence establishing links between the author of the Human Rights Watch report and terrorists.

As in the previous year, there were several reports of intimidation, threats, and attacks aimed at human rights activists. On January 26, the Central Africa Human Rights Defenders Network's head office was the victim of arson, which destroyed the organization's archives and part of the executive director's office.

During the *Droit de Reponse* ("*Right to Respond*") program on Equinoxe Television on August 30, Jacqueline Nkoyock, a member of the CPDM central committee, alleged that Phillipe Nanga, the coordinator of NGO Un Monde Avenir, embezzled CFA 280 million ($486,000) provided for a capacity-building project on youth political participation. Nkoyock made the accusation after Nanga remarked that addressing the issue of citizen participation was a prerequisite for free and fair regional elections.

**Government Human Rights Bodies:** In June 2019 the government passed a law establishing the Cameroon Human Rights Commission (CHRC), as a replacement for the existing NCHRF. Like the NCHRF, the CHRC is a nominally independent but government-funded institution. The law establishing the CHRC extended its mandate to protect human rights. The CHRC was not operational during the year because the president had not yet designated its members.

The NCHRF continued to operate in place of the CHRC. While the NCHRF coordinated actions with NGOs and participated in some inquiry commissions, it remained poorly funded and ceased some of its traditional activities, including conducting prison and detention sites visits. NGOs, civil society groups, and the general population considered the NCHRF dedicated and effective but inadequately resourced and with insufficient ability to hold human rights abusers to account effectively. Several observers questioned the decision to establish a new institution and expressed concerns regarding its ability to confront the government that funds it. After MRC leader Maurice Kamto called for peaceful protests on

September 22, interim NCHRF president James Mouangue Kobila issued a statement on behalf of the National Commission on Human Rights and Freedoms on September 16, condemning the proposed protests. After commission member Christophe Bobiokono published a post on Facebook distancing himself from the statement published on behalf of the NCHRF had Kobila as the sole signatory. On September 29, interim NCHRF President James Mouangue Kobila sent a letter to the webmaster of the NCHRF, ordered that Bobiokono be immediately excluded from all NCHRF WhatsApp platforms.

# Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

## Women

**Rape and Domestic Violence:** The law criminalizes rape and provides penalties of between five and 10 years of imprisonment for convicted rapists. Police and courts rarely investigated or prosecuted rape cases, especially since victims often did not report them. The law does not address spousal rape (see also section 1.g.).

The law does not specifically prohibit domestic violence, although assault is prohibited and punishable by imprisonment and fines.

**Female Genital Mutilation/Cutting (FGM/C):** The law protects the bodily integrity of persons and prohibits genital mutilation. Perpetrators are subject to a prison sentence of 10 to 20 years or imprisonment for life if the offender habitually carries out this practice for commercial purposes or the practice causes death. FGM/C remained a problem, but its prevalence was low. As in the previous year, children were reportedly subjected to FGM/C in isolated areas of the Far North, East, and Southwest Regions and among the Choa and Ejagham ethnic groups.

**Other Harmful Traditional Practices:** Widows were sometimes forcibly married to one of their deceased husband's relatives to secure continued use of property left by the husband, including the marital home. To better protect women, including widows, the government included provisions in the law outlawing the eviction of a spouse from the marital home by any person other than the other spouse. The practice of widow rites, by which widows forgo certain

activities such as bathing or freedom of movement, was also prevalent in some parts of the country, including in some rural communities of the West Region.

**Sexual Harassment:** The law prohibits sexual harassment. Offenders can be subject to imprisonment for periods of six months to one year and a monetary fine. If the victim is a minor, the penalty can be one to three years in prison. If the offender is the victim's teacher, the penalty can increase to three to five years in prison. Despite these legal provisions, sexual harassment was widespread and there were no reports that anyone was fined or imprisoned for sexual harassment, in part due to sexual harassment victims' reluctance to file official complaints for fear of reprisal and or stigmatization.

**Reproductive Rights:** Couples and individuals have the right to decide the number and timing of their children. The Ministry of Public Health offered counseling services to women during prenatal visits, promoting the concept of responsible parenthood and encouraging couples to use contraception to space the timing of their children. Many women, however, lacked the means to manage their reproductive health, and societal pressures continued to reinforce taboos on discussing reproductive health within certain communities. Women's dependence on receiving their husbands' consent continued to be a barrier in contraceptive decisions. The government provides support to survivors of gender-based violence or sexual violence through: (1) the development of policies to protect survivors of gender-based violence; (2) legal support to survivors via the judiciary network; (3) general clinical care offered in health facilities; and (4) collection of data through the District Health Information System and provision of situational analysis. Many of the prevention and basic support programs for survivors of gender-based and sexual violence are implemented by community-based organizations.

The UN Population Fund (UNFPA) indicated that, as of October, 48 percent of married or in-union women ages 15 to 49 made their own informed decisions regarding their reproductive health care.

On December 15, the National Committee to Combat Maternal, Neonatal, and Infant/Child Mortality indicated the ratio of maternal deaths dropped by more than 40 percent between 2011 and 2018, from 782 to 406 deaths per 100,000 live births. The high mortality rate was attributed to inadequate access to medical care; lack of

trained medical personnel; and the high cost of prenatal care, hospital delivery, and postpartum care. Prenatal care, skilled attendants during childbirth, emergency obstetrics, neonatal, and postpartum care remained inadequate, particularly in rural areas. The 2018 *Cameroon Demographic and Health Survey* indicated that, in the five years before the survey, almost 90 percent of women ages 15 to 49 who had a live birth received antenatal care from a skilled provider, and 70 percent of births were assisted by a skilled provider, most commonly a nurse, midwife, or auxiliary midwife.

**Coercion in Population Control:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

**Discrimination:** The constitution provides women and men the same legal status and rights. The government, however, often did not enforce the law. In practice, women did not enjoy the same rights and privileges as men. Although local government officials claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions. The government did not implement any official discriminatory policy against women in such areas as divorce, child custody, employment, credit, pay, owning or managing business or property, education, the judicial process, or housing. There were legal restrictions to women's employment in some occupations and industries (see section 7.d.). Within the private sector, fewer women occupied positions of responsibility.

# Children

**Birth Registration:** Children derive citizenship through their parents, but not through birth in the country's territory; the responsibility to register a child's birth falls upon parents. Birth registration was not provided on a discriminatory basis, but many births went unregistered because children were not always born in health facilities. Also, many parents faced challenges in reaching local government offices. While failure to register births did not have immediate consequences for children, in the long run children without birth certificates found it difficult to register for official examinations or secure identification documents.

# CAMEROON

On February 18, the National Civil Status Bureau and the Ministry of Health signed a memorandum of understanding, as part of a universal birth registration project, implemented by the civil status bureau with donor financial support. The partnership is expected to allow the various actors to improve birth declarations and registrations.

**Education:** The law provides for tuition-free compulsory primary education up to the age of 12. The law punishes any parent with sufficient means who refuses to send his or her child to school with a fine. The punishment is imprisonment from one to two years for repeat offenders. Children were generally expected to complete primary education at 12. Secondary school students must pay tuition and other fees in addition to buying uniforms and books. This rendered secondary education unaffordable for many children.

A 2019 UN Women report highlighted gender disparity in education, particularly in secondary education. According to the report, the literacy rate in 2019 was lower for women and girls (86 percent) than for men and boys (97 percent).

During the year separatist attacks on schools in the Southwest and Northwest Regions continued to disrupt the normal operation of schools (see section 1.g.). During the year research by Human Rights Watch showed that school closures caused by the COVID-19 pandemic exacerbated previously existing inequalities and that children who were already most at risk of being excluded from a quality education had been most affected.

**Child Abuse:** The law prohibits various forms of child abuse, including but not limited to assault, indecency, kidnapping, forced labor, rape, sexual harassment, and situations where one parent refuses to disclose the identity of the other parent to the child. Penalties for offenses range from a token fine for forced labor to imprisonment for life in the case of assault leading to death or serious harm. Despite these legal provisions, child abuse remained a problem. Children continued to suffer corporal punishment, both within families and at school. Boko Haram continued to abduct children for use as child soldiers or as suicide bombers (see section 1.g.).

# CAMEROON

On June 29, the daily newspaper *La Nouvelle Expression* published an article by Herve Villard Njiete, who reported that a man named Mahop forced his own daughter to become his sexual partner from the age of nine to 15. Mahop was arrested after his neighbors reported him to police. According to the newspaper, the young girl, who lived in the PK 11 neighborhood in Douala V, tested positive for HIV.

**Child, Early, and Forced Marriage:** The minimum legal age for marriage is 18. Despite the law, according to UNICEF's 2018 child marriage data, 31 percent of women between the ages of 20 and 24 were married before they turned 18 and, of these, 10 percent were married before they turned 15. Childhood marriages were more prevalent in the northern part of the country. The law punishes anyone who compels an individual into marriage with imprisonment of from five to 10 years and fines.

**Sexual Exploitation of Children:** The law prohibits the commercial sexual exploitation and the sale, offering, or procuring for prostitution of children, and practices related to child pornography. A conviction requires proof of a threat, fraud, deception, force, or other forms of coercion. Penalties include imprisonment of between 10 and 20 years and a substantial fine. The law does not set a minimum age for consensual sex. According to anecdotal reports, children younger than 18 were exploited in commercial sex, especially by restaurant and bar promoters, although no statistics were available. Anecdotal reports suggested the ongoing crisis in the two Anglophone regions had contributed to a dramatic increase in the prostitution of underage girls and number of early pregnancies, especially in areas with IDPs.

**Displaced Children:** Many displaced children continued to live on the streets of urban centers, although the number was in decline as a result of stringent security measures and a law that criminalizes vagrancy. According to estimates by the International Organization for Migration, there were approximately 2,570 unaccompanied children in the Far North Region as of April 2019, including IDPs, returnees, out-of-camp refugees, and other migrants (see also sections 2.e. and 2.f.). These children faced many challenges, including limited access to school, health, and protection. Thousands of children were harmed by the humanitarian crisis in the Northwest and Southwest. These children faced significant abuses of

their rights by armed forces and nonstate armed actors alike. The government had not established structures to ensure that internally displaced children were protected from recruitment by nonstate armed groups and terrorist organizations.

In April the Ministry of Social Affairs started an operation to remove thousands of homeless children from the streets. Henri Nyambi Dikosso, the director of national solidarity at the ministry, led a group of social workers and hospital staff who removed up to 160 children from the street by April 1. The spread of COVID-19 forced authorities to begin the project earlier than planned.

**International Child Abductions:** The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The Jewish population was very small, and there were no known reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

The constitution protects the rights of all persons, including persons with disabilities. A 2010 law provides additional protection to persons with physical, sensory, intellectual, or mental disabilities. The protections under the law cover access to education and vocational training, employment, health services, information and cultural activities, communications, buildings, sports and leisure, transportation, housing, and other state services. Some infrastructure projects were made accessible to persons with mobility issues. Public education is free for persons with disabilities and children born of parents with disabilities. Initial vocational training, medical treatment, and employment must be provided "when

possible," and public assistance "when needed."  The government did not enforce these provisions effectively.

There were no reports of police or other government officials inciting, perpetrating, or condoning violence against persons with disabilities during the year.

The majority of children with disabilities attended school with peers without disabilities.  The government introduced inclusive education in many schools and reviewed the curriculum of teacher training colleges to include training in inclusive education skills.  Other children with disabilities continued to attend separate schools, such as the Bulu Blind Center in Buea and the Yaounde Special School for Hearing-impaired Children.  Human Rights Watch expressed concern that all factors affecting children's education during the COVID-19 pandemic significantly affected children with disabilities.

Persons with disabilities did not receive adequate protection in conflict zones.

## Members of National/Racial/Ethnic Minority Groups

The population consists of more than 275 ethnic groups.  Members of President Biya's Beti/Bulu ethnic group from the South Region continued to hold many key positions and were disproportionately represented in the government, state-owned businesses, and security forces.

## Indigenous People

An estimated 50,000 to 100,000 Baka, including Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East Regions.  The government did not effectively protect the civil or political rights of either group.  Logging companies continued to destroy indigenous peoples' naturally forested land without compensation.  Other ethnic groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices.  The government continued long-standing efforts to provide birth certificates and national identity cards to Baka.  Most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in reaching homes deep in the forest.

There were credible reports from NGOs that the Mbororo, nomadic pastoralists living mostly in the North, East, Adamawa, and Northwest Regions, continued to be subject to harassment, sometimes with the complicity of administrative or judicial authorities. In a letter dated August 17, a group of eight persons writing on behalf of the Fulani-Mbororo community and associated with the CPDM, denounced what they described as the demeaning stigmatization of the Fulani-Mbororo as an indigenous and minority people in the country. They stated that the Fulani-Mbororo are not indigenous in the same way as the Baka and are not a minority.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

Consensual same-sex sexual activity between adults is illegal and punishable by a prison sentence lasting between six months and five years and a token fine.

Lesbian, gay, bisexual, transgender, and intersex (LGBTI) rights organizations such as the Cameroonian Foundation for AIDS, Humanity First Cameroon, Alternatives Cameroon, the National Observatory of the Rights of LGBTI Persons and Their Defenders, and others, continued to report arbitrary arrests of LGBTI persons. Data collected through the UNITY platform, a group of 34 local organizations dedicated to the LGBTI population, indicated an increase in arbitrary arrests of LGBTI individuals in the first half of the year. Many of the arrests occurred in Bafoussam on May 17 when police arrested--and later released--53 LGBTI individuals celebrating the International Day against Homophobia, Transphobia, and Biphobia at a time when COVID-19-related restrictions prohibited large gatherings. LGBTI individuals also continued to face significant stigma, violence, and discrimination from their families, communities, and the government.

The constitution provides for equal rights for all citizens, but the law does not explicitly prohibit discrimination against LGBTI persons in housing, employment, nationality, and access to government services such as health care. Security forces sometimes harassed persons on the basis of their real or perceived sexual orientation or gender identity, including individuals found with condoms and lubricants. Fear of exposure affected individuals' willingness to access HIV/AIDS

services, and a number of HIV-positive men who had sex with men reported also partnering with women, in part to conceal their sexual orientation.  Anecdotal reports suggested some discrimination occurred in places of employment with respect to sexual orientation.

In an online article, a human rights activist with the pseudonym John Enama reported that on July 28 the Court of First Instance of Bafang in the West Region imposed fines on four men who were arrested due to what was described as their LGBTI conduct on June 9 in Kekem.  The four men pleaded guilty but their lawyer highlighted extenuating circumstances, alleging that their confessions were given under threats and torture.  The court accepted the guilty pleas; one man was sentenced to a month in prison and a token fine; the other three were fined. Because the families of the defendants were unwilling to pay the fines, two local NGOs paid them, and they were released.

LGBTI organizations could not officially register as such and so sought registration either as general human rights organizations or as health-focused organizations.  Many LGBTI organizations found that operating health programs, particularly HIV programs, shielded them from potential harassment or shutdown rather than promoting advocacy for LGBTI persons as their primary mission.

## HIV and AIDS Social Stigma

Persons with HIV often suffered social discrimination and were isolated from their families and society, in part also due to a lack of education on the disease.  As in the previous year, while no specific cases of discrimination in employment were made public, anecdotal reports indicated some discrimination occurred with respect to HIV status, especially in the private sector.

## Other Societal Violence or Discrimination

Several cases of vigilante action and arson attacks were reported involving arbitrary killings and destruction of both public and private property.  In March an organization known as Friends of the Press Network, based in Kumba in the Southwest Region, reported that Southern Cameroon Defense Forces fighters summarily executed Cecilia Bemo, Itoe Ajasco, and Ferdinand Bajaraka Okon,

whom they suspected of witchcraft. The killings happened in Ediki Mbonge in the Southwest Region. The victims were reportedly tortured by their executioners, who forced them to confess and summarily shot them.

## Promotion of Acts of Discrimination

During the year there was a pattern of discrimination and repeated threats between members of the Bamileke and Beti/Ekan tribes. The animosity started when Maurice Kamto, a Bamileke, challenged the results of the 2018 presidential election and gained momentum when Kamto boycotted the municipal and legislative elections in February. Various government and political figures issued messages via social and traditional media that inflamed intergroup tensions, despite legal provisions against hate speech.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the rights of workers to form and join independent unions, bargain collectively, and conduct strikes, albeit with significant restrictions. The right does not apply to defined groups of workers, including defense and national security personnel, prison administration civil servants, and judicial and legal personnel. The law also prohibits antiunion discrimination and requires the reinstatement of workers fired for union activity. Statutory limitations and other practices substantially restricted these rights. The law does not permit the creation of a union that includes both public and private sector workers or the creation of a union that includes different, even if closely related, sectors. The law requires that unions register with the government, have a minimum of 20 members, and formalize the union by submitting a constitution and bylaws. Founding members must also have clean police records. Those who form a union and carry out union activities without registration can be fined under the law. More than 100 trade unions and 12 trade union confederations were in operation, including one public sector confederation. Trade unions or associations of public servants may not join a foreign occupational or labor organization without prior authorization from the minister of territorial administration, who is responsible for "supervising public freedoms."

# CAMEROON

The constitution and law provide for collective bargaining between workers and management as well as between labor federations and business associations in each sector of the economy. The law does not apply to the agricultural or informal sectors, which included most of the workforce.

Legal strikes or lockouts may be called only after conciliation and arbitration procedures have been exhausted. Workers who ignore procedures to conduct a strike may be dismissed or fined. Free industrial zones are subject to some labor laws, but there are several exceptions. The employers have the right to determine salaries according to productivity, the free negotiation of work contracts, and the automatic issuance of work permits for foreign workers. Some laws intended to target terrorists can impose harsh legal penalties on legitimate trade union activity.

The government and employers do not effectively enforce the applicable laws on freedom of association and the right to collective bargaining. Penalties for violations were rarely enforced and were not commensurate with those for comparable violations. Administrative judicial procedures were infrequent and subject to lengthy delays and appeals.

Collective agreements are binding until three months after a party has given notice to terminate. As in the previous year, there were no reported allegations that the minister of labor and social security negotiated collective agreements with trade unionists who had nothing to do with the sectors concerned and did not involve trade union confederations that prepared the draft agreements.

Many employers continued to use subcontractors to avoid hiring workers with bargaining rights. Major companies, including parastatal companies, reportedly engaged in the practice according to workers from Energy of Cameroon, the water company Camerounaise des Eaux, cement manufacturer Cimencam, Guinness, Aluminum Smelter, COTCO, Ecobank, and many others. Subcontracting reportedly involved all categories of personnel, from the lowest to senior levels. As a result, workers with equal expertise and experience did not always enjoy similar protections when working for the same business, and subcontracted personnel typically lacked a legal basis to file complaints.

# CAMEROON

Workers' representatives said many workers were granted technical leave because of COVID-19, which took a heavy toll on most businesses.

Several strikes were announced. Some were called off after successful negotiations and some were carried out peacefully, while others faced some degree of repression.

In May the union of information and communications technology workers, Syntic, issued a notice to strike from May 22 to June 7 at Nexttel, the Cameroonian subsidiary of the Vietnamese company Viettel. According to Syntic, the strike was due to successive violations of the labor code and unilateral salary deductions. A March 25 decision from the minister of labor suspended the unilateral decision of Nexttel's management to revise the conditions of employee remuneration. The company's top management decided to punish the 31 dissenting workers by firing them. Syntic asked Nexttel to launch a tripartite dialogue, but Nexttel's management had not yet answered the notice.

On May 7, 10 workers' representatives to the Douala City Council were reinstated after spending 36 months without pay. The former government delegate to the city council, Fritz Ntone, suspended the 10 in 2017 after they organized a strike seeking improved working conditions, including health insurance. In 2017 the Littoral Court of Appeal's Labor Arbitration Council issued a decision requesting the delegate to reinstate the workers' representatives, but the delegate instead opposed the court decision and referred the issue back to the labor inspector. The case was once again referred to the region's court of appeals. After multiple postponements, in October 2019 the court confirmed the initial decision to reinstate the workers' representatives and pay their salaries and outstanding arrears, but the delegate did not comply. The May 7 reinstatement of the workers' representatives was the result of several rounds of negotiations with the council executive, under the leadership of the new Douala mayor, Roger Mbassa Ndine. The negotiations resulted in the signing of a memorandum of understanding between the workers' representatives and the council executive. Some of the former workers' representatives believed the memorandum was not carried out in good faith in accordance with the court decision because the mayor refused to fulfill all commitments under the memorandum.

International labor and trade union organizations report a pattern of firing labor representatives.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit all forms of forced and compulsory labor.  The law prohibits slavery, exploitation, and debt bondage and voids any agreement in which violence was used to obtain consent.  Penalties for violations were commensurate with those for comparable crimes.  The law also extends culpability for all crimes to accomplices and corporate entities.  Although the statutory penalties are severe, the government did not enforce the law effectively, in part due to a lack of capacity to investigate trafficking and limited labor inspection and remediation resources.  In addition, due to the length and expense of criminal trials and the lack of protection available to victims participating in investigations, many victims of forced or compulsory labor resorted to accepting out-of-court settlements (see also section 1.g., Child Soldiers).

Anecdotal reports of hereditary servitude imposed on former slaves in some chiefdoms in the North Region continued.  Many members of the Kirdi--a predominately Christian and animist ethnic group enslaved by the Muslim Fulani in the 1800s--continued to work for traditional Fulani rulers for compensation in room and board and generally low and unregulated wages, while their children were free to pursue schooling and work of their choosing.  Kirdi were also required to pay local chiefdom taxes to the Fulani, as were all other subjects.  The combination of low wages and high taxes (although legal) effectively constituted forced labor.  While technically free to leave, many Kirdi remained in the hierarchical and authoritarian system because of a lack of viable alternative options.

Anecdotal reports suggested that in the South and East Regions, some Baka, including children, continued to be subjected to unfair labor practices by Bantu farmers, who hired the Baka at exploitative wages to work on their farms during the harvest seasons.

Child forced labor was reported in domestic labor, gold mining, quarrying, begging, street vending, agriculture, fishing, and spare parts shops.  Forced child

# CAMEROON

labor was also committed by extremist groups, which forced children to work as scouts, porters, and cooks.

Also see the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits most of the worst forms of child labor and sets 14 as the minimum age of employment. The law prohibits children from working at night or longer than eight hours per day. It also outlines tasks children younger than 18 cannot legally perform, including moving heavy objects, undertaking dangerous and unhealthy tasks, working in confined areas, and prostitution. Employers are required to provide skills training to children between the ages of 14 and 18. Because compulsory education ends at the age of 12, children who were not in school and not yet 14 were particularly vulnerable to child labor. Laws relating to hazardous work for children younger than 18 are not comprehensive, since they do not include prohibitions on work underwater or at dangerous heights. Children engaged in hazardous agricultural work, including cocoa production. The law provides penalties ranging from fines to imprisonment for those who violate child labor laws. These penalties were commensurate with those for comparable crimes, such as kidnapping.

Children younger than the minimum age of employment tended to be involved in agriculture, fishing and livestock, the service industry, sex work, and artisanal gold mining. There were reports of underage children associated with nonstate armed groups in the Far North, Southwest, and Northwest Regions. In agriculture, children were exposed to hazardous conditions, including climbing trees, handling heavy loads, using machetes, and handling agricultural chemicals. Children in artisanal gold mines and gravel quarries spent long hours filling and transporting wheelbarrows of sand or gravel, breaking stones without eye protection, and digging and washing the soil or mud, sometimes in stagnant water, to extract minerals. These activities left children vulnerable to physical injuries, waterborne diseases, and exposure to mercury. Children worked as street vendors; in fishing, where they were exposed to hazardous conditions; and largely alongside families

and rather than for formal employers. Children were subjected to forced begging as *talibes* in Koranic schools.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

# d. Discrimination with Respect to Employment and Occupation

The law contains no specific provisions against or penalties for discrimination, but the constitution in its preamble provides that all persons shall have equal rights and obligations and that every person shall have the right and the obligation to work.

Discrimination in employment and occupation allegedly occurred with respect to ethnicity, HIV status, disability, gender, and sexual orientation, especially in the private sector. There were legal restrictions on women's employment in occupations deemed arduous or "morally inappropriate" and in industries including mining, construction, factories, and energy. Members of ethnic groups often gave preferential treatment to other members of their group in business. Persons with disabilities reportedly found it difficult to secure and access employment. There were no reliable reports of discrimination against internal migrant or foreign migrant workers, although anecdotal reports suggested such workers were vulnerable to unfair working conditions. The government took no action to eliminate or prevent discrimination and kept no records of incidents of discrimination.

# e. Acceptable Conditions of Work

The minimum wage in all sectors was greater than the World Bank's poverty line. Premium pay for overtime ranged from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it was weekend or late-night overtime. Despite the minimum wage law, employers often negotiated lower wages with workers, in part due to the extremely high rate of underemployment in the country. Salaries lower than the minimum wage remained prevalent in the public works sector, where many positions required unskilled labor, as well as in domestic work, where female refugees were particularly vulnerable to unfair labor practices.

# CAMEROON

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities.  There are exceptions for guards and firefighters (56 hours per week), service-sector staff (45 hours per week), and household and restaurant staff (54 hours per week).  The law mandates at least 24 consecutive hours of rest weekly.

The government sets health and safety standards in the workplace.  The minister in charge of labor matters establishes the list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety.  The regulations were not enforced in the informal sector.  The labor code also mandates that every enterprise and establishment of any kind provide medical and health services for its employees.  This stipulation was not enforced.

The Ministry of Labor and Social Security is responsible for enforcement of the minimum wage and workhour standards, but did not enforce the law.  Penalties for violations of the law were not commensurate with those for comparable crimes, such as negligence.  Ministry inspectors and occupational health physicians are responsible for monitoring health and safety standards, but the ministry lacked the resources for a comprehensive inspection program.  The government more than doubled the total number of labor inspectors, but the number was still insufficient. Moreover, the government did not provide inspectors adequate access to vehicles or computers.

# CAMEROON 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cameroon is a republic dominated by a strong presidency.  The president retains power over the legislative and judicial branches of government.  The ruling political party, the Cameroon People's Democratic Movement, has remained in power since its creation in 1985.  The country held legislative elections in February 2020 that were marked by irregularities.  The ruling party won 152 of 180 National Assembly seats.  Paul Biya has served as president since 1982.  He was last reelected in 2018 in an election marked by irregularities.

The national police and the national gendarmerie are responsible for internal security.  The former reports to the General Delegation of National Security and the latter to the Secretariat of State for Defense in charge of the Gendarmerie.  The army shares some domestic security responsibilities; it reports to the minister delegate at the presidency in charge of defense.  The Rapid Intervention Battalion reports directly to the president.  Civilian and military authorities did not maintain effective control over the security forces.  There were credible reports that members of the security forces committed numerous abuses.

Casualties rose in the Anglophone crisis in the Northwest and Southwest Regions.  Anglophone separatists used improvised explosive devices with greater success.  ISIS-West Africa increased attacks in the Far North Region.  The government continued to crack down on the opposition Cameroon Renaissance Movement, and in December several of its members were sentenced to prison for terms ranging from one to seven years following protests in 2020.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings, including extrajudicial killings by the government and nonstate armed groups; forced disappearances by the government; torture and cases of cruel, inhuman, or degrading treatment or punishment by the government and nonstate armed groups; harsh and life-threatening prison conditions; arbitrary arrests or detention; political prisoners or detainees; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of

Country Reports on Human Rights Practices for 2021
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 181 of 352

family members for offenses allegedly committed by an individual; serious abuses in a conflict, including abductions and unlawful recruitment and use of child soldiers by nonstate armed groups; serious restrictions on freedom of expression and media, including violence, threats of violence, or unjustified arrests or prosecutions against journalists, censorship, and criminal libel laws; substantial interference with the right of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; serious restrictions on freedom of movement; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; lack of investigations and accountability for gender-based violence; trafficking in persons; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and the existence or use of laws criminalizing same-sex sexual conduct between adults.

Although the government took some steps to identify, investigate, prosecute, and punish officials who committed human rights abuses or corruption, it did not do so systematically and rarely held public proceedings. Impunity remained a serious problem.

Armed separatists, Boko Haram and ISIS-West Africa, and criminal gangs also committed human rights abuses, some of which were investigated by the government.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that the government or its agents committed arbitrary and unlawful killings through excessive use of force in the execution of their official duties. As in the previous year, most of the killings were associated with the crisis in the Northwest and Southwest Regions (see also section 1.g., Abuses in Internal Conflict).

The Ministry of Defense, through the Secretariat of State in charge of the National Gendarmerie (SED), is responsible for investigating whether killings attributed to the security forces, including police perpetrated killings, are justifiable. Prosecutions related to these matters are conducted through the Military Tribunal. In some high-profile cases, preliminary investigations are entrusted to a mixed commission of inquiry, including civilian members with relevant professional backgrounds.

On January 10, according to multiple credible sources, including Reuters, the Center for Human Rights and Democracy in Africa, Buea-based nongovernmental organization (NGO) Reach Out Cameroon, and Cameroon News Agency, soldiers carried out an offensive raid in Mautu, a village in the Muyuka subdivision of the Southwest Region, killing at least nine civilians, including a child and an elderly woman, neither of whom was an affiliate of any separatist organization. Three witnesses reportedly told Reuters that soldiers raided homes and shot civilians as they ran for cover. The Southwest Region-based NGO Reach Out Cameroon identified the deceased as Takang Anyi Roger, age 20; Tambe Daniel; Shey Keisa, age six; Obenegwa David, age 30; Egoshi Lucas, age 25; Takang Bruno, age 22; Ndakam Pascal, age 22; Tambe Ann, age 50; and Ngoto Valentine Akama, age 32. Defense Ministry spokesperson Cyrille Serge Atonfack Guemo acknowledged in a January 11 press release soldiers from the 21st Motorized Infantry Battalion conducted a preventive operation against terrorist positions in the Mautu but did not admit that troops killed civilians. Atonfack Guemo said troops came under heavy gunfire and "adequately responded," which resulted in the neutralization of some terrorists.

Multiple media outlets reported that on January 23, security officers killed four unarmed teenagers in the Meta Quarter neighborhood in Bamenda, Northwest Region. The victims included Sale Saddam and Aloysius Ngalim each age 16, and Blaise Fon and Nelly Mbah, both age 17. In a January 27 press release, Defense Ministry spokesperson Atonfack Guemo said soldiers of the Fifth Gendarmerie Region raided Meta Quarter to apprehend separatists who were planning an assault on a nearby police post from an abandoned building. He said the separatists opened fire on the soldiers approaching their vehicles and during the ensuing confrontation, security officers killed four separatists, wounded several others who

escaped, and recovered large quantities of weapons. On January 25, the *Guardian Post* newspaper reported that local residents identified two of the boys as students at Government Bilingual High School downtown and categorically stated that the teenagers were not armed and had "nothing to do with the ongoing conflict in the Anglophone regions."

In an August 2 report, HRW denounced abuses committed by the army and separatists in Northwest and Southwest Regions. HRW wrote that on June 8 and 9, members of the security forces killed two civilians and raped a 53-year-old woman in the Northwest Region. Survivors and witnesses reportedly told HRW that in the early hours of June 9, approximately 150 security force members from both the regular army and Rapid Intervention Battalion (French acronym: BIR) conducted an operation in and around Mbuluf village. Survivors reportedly told HRW that security forces stopped their group of six including a husband and wife, their two children, another man, and another woman in the vicinity of the village for questioning. In Mbah they released everyone except the husband of the woman who was reportedly raped. His body was reportedly found with multiple gunshot wounds on June 11 in Tatum village, approximately 18 miles from Mbah.

On June 8, at approximately 7 p.m. in Gom village in the Northwest Region, two plainclothes soldiers, whom a witness recognized as regular army members from the Gom military base, broke into the local traditional ruler's home, known as the fon's home, and beat a 72-year-old man. At approximately 7:30 p.m., they questioned and shot Lydia Nwang, a 60-year-old woman, in the right leg after she failed to provide information regarding a separatist fighter. The soldiers then forced the man age 72 and his wife to carry Nwang towards the Gom military base for questioning. Nwang was carried as far as a bridge approximately one mile from her house, when the soldiers shot and killed her. Nwang's relatives recovered her body from the bridge the following morning. HRW claimed that on July 15, it emailed its findings to Defense Ministry spokesperson Atonfack Guemo requesting responses to specific questions but received no response by the time it released its findings. In an August 5 statement, Atonfack Guemo qualified the information contained in HRW's report as false and baseless.

According to NGO Un Monde Avenir, Juste Magloire Tang Ndjock died sometime overnight between July 20 to 21, in the premises of the Gendarmerie Brigade in

Pouma after authorities severely beat him. He had been summoned to the Pouma gendarmerie brigade following a complaint. After failing to appear, gendarme Marshal Okala ordered the arrest of Tang Ndjock. As of the end of the December, his remains and findings of the autopsy report had not been released to the family of the deceased.

On the night of February 13, according to multiple credible sources, a group of armed separatists carried out an attack on the Essoh Atah village in Lebialem division of the Southwest Region, killing four civilians, including the following three traditional rulers: Chief Benedict Fomin, Chief Simon Forzizong, and Chief Fualeasuoh. According to the minister delegate in charge of planning at the Ministry of the Economy, Planning, and Regional Development, Paul Tasong, the group led by Oliver Lekeaka, also known as "Field Marshal," stormed Essoh Atah village, pulled the chiefs from their houses, and shot and killed them at the market square before dumping their bodies near a river. Minister Tasong added that the separatists accused the chiefs of refusing to hand over proceeds from the sale of cocoa for the 2020-21 season and organizing schools in the community. Other reports suggested the separatists also accused their victims of participating in the December 2020 regional election. On July 8, the fon of Baforkum in the Northwest Region was abducted from his palace for the second time in less than 60 days sometime between July 6 and July 7 by suspected separatist fighters; on July 8, residents discovered his body dumped nearby a stream.

On June 15, separatists abducted six divisional delegates in Ekondo-Titi subdivision of the Southwest Region. On June 18, local residents discovered the body of Johnson Mabia Modika, the divisional delegate for the Ministry of Economy, Planning, and Regional Development. HRW indicated on July 1, at approximately 7:30 p.m., two suspected separatist fighters killed Fuh Max Dang, a physics teacher at the Government Bilingual High School in Kumba, Southwest Region, after they broke into his home. A relative of the deceased reportedly told HRW that separatist fighters had previously threatened the teacher, warning him that he would face consequences if he continued teaching. As of the end of December, the status of the remaining five delegates remained unknown.

On July 14, separatists dressed in army uniforms and riding motorbikes killed two security officers at a security post in Babadjou, West Region. On July 18,

according to multiple reports, separatists killed five police officers in Bali, Mezam division of the Northwest Region. The attack took place at a security checkpoint where separatists detonated an improvised explosive device near a police vehicle, after which the separatists opened fire on the occupants. In a video a group of armed men claimed responsibility for the attack and identified themselves as the "Bali Buffaloes." On July 19, less than 24 hours after the Bali attack, a video found on social media showed separatists dismembering a security officer, Patrick Mabenga.

Boko Haram and ISIS-West Africa (ISIS-WA) continued killing civilians, including members of vigilance committees, which are organized groups of local residents cooperating with government forces in the Far North Region. On April 5, HRW reported that Boko Haram had increased attacks on civilians in towns and villages in the Far North Region since December 2020, killing at least 80 civilians. HRW documented that Boko Haram suicide bombers blew up fleeing civilians, adding that dozens of local fishermen were killed with machetes and knives, and an elderly village chief was killed in front of his family. HRW indicated that the actual number of casualties was much higher, in view of the difficulty of confirming details remotely, underscoring that some attacks often went unreported. In late July ISIS-WA carried out two attacks against the army in the Logone-et-Chari division. The first attack took place on July 24 in the locality of Sagme, in Fotokol subdivision. According to multiple accounts, eight soldiers died during the attack and 13 others were wounded. According to the NGO Stand Up for Cameroon, suspected Boko Haram affiliates killed at least 27 persons in the months of November and December.

Although the government repeatedly promised to investigate abuses committed by security forces, it did not do so transparently or systematically. Following the April 2020 release of a summary of the findings of an investigation into the February 2020 killing by security forces of an estimated 23 civilians in the village of Ngarbuh, legal proceedings against three security force members, 17 members of a vigilance committee, and one former separatist fighter, indicted on murder charges, opened at the Yaounde Military Tribunal in June, after multiple adjournments. As of the end of December, only three of the accused had appeared before the court.

## b. Disappearance

As in the previous year, government security forces were believed to be responsible for enforced disappearances of suspected separatists or their supporters.  Human rights lawyers documented the cases of Onyori Mukube Onyori and Ernest Mofa Ngo, whose abductions they believed were orchestrated at the behest of authorities.  Following an attack on the Mother Theresa International Bilingual Academy in Kumba, Southwest Region, in November 2020 two men who were playing cards in the hallway of their house, were abducted and taken to an undisclosed location.  After months of investigations, lawyers discovered in late April that they were being detained at the General Directorate for External Research (DGRE), an intelligence agency, in Yaounde.  The lawyers reported Mofa Ngo was subsequently released under unclear circumstances, but Mukube remained in detention as of December.

As of December there were no developments reported on the high-profile investigation into the death of broadcast journalist Samuel Abue Adjiekha, popularly known as Samuel "Wazizi."  Wazizi was detained in August 2019 after authorities accused him of having connections with armed separatists.  He was transferred to a military-run facility in Buea in August 2019 and never appeared in court, despite several scheduled hearings.  According to the Ministry of Defense, Wazizi died in police custody 10 days after his arrest in 2019 from severe sepsis.  Although Wazizi was officially pronounced dead in June 2020, his family had yet to see or recover his remains more than one year after the official death announcement.

There were no reported developments concerning the alleged disappearance of human rights activist Franklin Mowha, the president of NGO Frontline Fighters for Citizen Interests, who disappeared after leaving his hotel room in 2018, while on a mission to monitor human rights abuses in Kumba, Southwest Region.  Despite multiple calls by human rights organizations for an investigation into the disappearance, the government had not taken action more than three years later.  Mowha highlighted and denounced the abuses perpetrated by persons associated with the government, and authorities had previously detained him on several occasions.

On October 13, barrister Amungwa Nde Ntso Nico, one of the lawyers for separatist leader Sisuku Julius Ayuk Tabe and 47 others arrested in connection to the Anglophone crisis in 2017, told the international community that members of government security forces had removed three of his clients, Tebid Tita, Hamlet Acheshit, and John Fongue, from Yaounde Kondengui Central Prison without official authorization and were holding them incommunicado in the Central Service for Judicial Enquiries (SCRJ) bunker. On October 15, barrister Amungwa and members of the defense team announced to the public that he had a meeting with the state prosecutor at the Yaounde Military Tribunal, who told him the detainees had been transferred to the SCRJ at the SED. Following the meeting, he said he went to the SCRJ, but the clients were not on the prisoner manifest. Amungwa later reported he had been able to visit the three, who were very ill and said they had been mistreated and forced to sign a document in the absence of their lawyer. Tita, Acheshit, and Fongue, in detention since 2017, had yet to be officially sentenced, despite multiple appearances before the Military Tribunal.

On June 15, separatists abducted six divisional delegates in Ekondo-Titi subdivision of the Southwest Region. One of the delegates was eventually killed (see also section 1.a.), and the five others remained unaccounted for as of the end of December.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, there were reports that security force members tortured or otherwise abused citizens, including separatist fighters, their alleged supporters, and political opponents. Human rights organizations documented several cases in which security forces severely mistreated separatist fighters and others in which armed separatists mistreated civilians and members of defense forces. Public officials, or persons acting at their behest, reportedly carried out acts that resulted in severe physical, mental, and emotional trauma.

On February 13, a video emerged on social media and television news programs showing a mixed unit of government defense forces abusing a civilian. They interrogated the man in French and pidgin English, poured water on him, beat him

with a machete until he fell unconscious. According to the video, authorities demanded that the man reveal the location of his brother whom they believed to be a separatist fighter. In a February 15 press release, MOD spokesperson Atonfack Guemo acknowledged that the incident took place in the afternoon of February 11 in the locality of Ndu, Donga and Mantung division of the Northwest Region. Atonfack Guemo said the victim was identified upon preliminary investigations as Jean Fai Fungong, a suspected criminal and separatist. He indicated that the minister delegate for defense, Joseph Beti Assomo, ordered the immediate arrest of two soldiers, two gendarme officers, and four police officers believed to be responsible for the abuse and placed them in detention at the Ndu Territorial Gendarmerie Brigade pending the outcome of a full investigation. As of the end of December, authorities had not released information concerning the outcome of the investigation, and there was no indication that the case had been fully investigated (see also section 1.a.).

On September 21, multiple videos depicting a civilian being beaten by gendarme officers with machetes circulated on social media. The MOD issued a press release and stated there would be a full investigation into the matter. The communique added that the perpetrators of the abuse, which took place on the overnight on September 16 at a gendarme facility in Yaounde, had been identified and would be subject to disciplinary and judicial sanctions. As of late November, the MOD had not provided an update on this case.

According to NGO Un Monde Avenir, shopkeeper Sieur Nzimou Bertin died in gendarme custody on the morning of November 18, a few hours after he was released from police custody, following a summons after a dispute with his neighbor. His death was said to be the consequence of the severe assault and degrading treatment he suffered while in detention on the evening of November 17 at the 9th quarter police station in the Littoral Region.

According to the Conduct in UN Field Missions online portal, three allegations were submitted during the year of sexual exploitation and abuse by the country's peacekeepers deployed to the UN Multidimensional Integrated Stabilization Mission in the Central African Republic (MINUSCA). This followed six allegations against the country's peacekeepers deployed to MINUSCA in 2020. As of the end of December, investigations by the United Nation's Office of

Internal Oversight Services into all allegations from during the year remaining pending. There were also 26 other open allegations dating from previous years of sexual exploitation and abuse by the country's peacekeepers deployed to UN peacekeeping missions dating back to 2017. Of the open cases, eight allegedly involved rape of a child. One case allegedly involved multiple allegations: four instances of rape of a child and two instances of exploitative relationships with an adult. Another open case allegedly involved rape by two peacekeepers of two children and an exploitative relationship with an adult.

Reports from credible organizations and anecdotal evidence suggested there were cases of rape and sexual assaults perpetrated by persons associated with the government in the Northwest and Southwest Regions, as well as in other parts of the country. NGOs also indicated armed separatists sexually assaulted survivors in the two regions (see also section 1.g., Physical Abuse, Punishment, and Torture). On February 13, the NGO Mandela Center International issued a press release denouncing the December 2020 gang rape of a 16-year-old girl by police inspector Remy Gaetan Eba'a Ngomo and his colleagues. Police inspector Eba'a Ngomo, who was on duty at the Ntui public security police station, forced the girl and a male colleague to follow him, according to the survivors and the civil society organizations reporting on the issue. Once at the police station, the police inspector forced the two to have sex outdoors. Afterwards, Eba'a Ngomo invited his colleagues, including a person he referred to as his boss, to rape the female survivor, after chasing away the male survivor. Eba'a Ngomo gave the female survivor 1,000 CFA francs ($2) and threatened to kill her if she revealed what had happened. The father of the female survivor unsuccessfully initiated a series of complaints starting with the head of public security police in Ntui, followed by the public prosecutor in Ntui. The father of the female survivor filed another complaint with the regional division of judicial police in Yaounde. As of early October, the case was pending before the prosecutor, while police inspector Eba'a Ngomo was reportedly in detention; however, his presence in detention was not independently confirmed as of December.

In May Reach Out Cameroon released its human rights situation and incident report for the period extending from January to March 31. In the report, Reach Out indicated that on January 21, separatist fighters attacked, robbed, and gang-raped a

young woman at Nkewen, in the Bamenda III municipality in the Northwest Region. The survivor reportedly told Reach Out that she was on her way back from a party with her aunt when armed men attacked her at the entrance to her neighborhood, pulled her into a nearby bush, and raped her.

While some investigations and prosecutions were conducted and a few sanctions meted out, impunity remained a problem. Few of the reports of trials involved those in command. The General Delegation of National Security and the Secretariat of State for Defense in charge of the National Gendarmerie investigated some abuses. The government levied punitive action against convicted low-level offenders, and other investigations continued as of year's end. The trial for the four soldiers and 17 members of vigilance committees accused of assisting regular defense forces in perpetrating the February 2020 massacre in Ngarbuh continued at the Yaounde Military Tribunal, but as of December, only three of the accused, all of them members of defense and security forces, had been seen in court.

**Prison and Detention Center Conditions**

Prison conditions were harsh and life threatening due to food shortages, poor-quality food, gross overcrowding, physical abuse, as well as inadequate sanitary conditions and medical care.

**Physical Conditions:** Overcrowding remained a significant problem in most prisons, especially in major urban centers.

Officials held prisoners in dilapidated, colonial-era prisons. Authorities often held pretrial detainees and convicted prisoners in the same cells. In some cases female detainees had better conditions, including improved toilet facilities and less-crowded living quarters. Prisons generally had separate wards for men, women, and children. Authorities reported that the sick were held separately from the general prison population, but this was often not the case.

The conditions in detention cells located at gendarmerie and police units were worse. The cells were generally very narrow, and most of them lacked toilets and windows. Virtually all lacked beds. Unlike prisons that had separate wards for men, women, and children, separation of detainees by age and sex was not systematic in gendarmerie and police unit cells. Conservative estimates by the

Human Rights Commission of the Cameroon Bar Association indicated the country's prisons had the capacity to accommodate 17,915 inmates. As of September, the total prison population was 31,815, representing an occupancy rate of 177 percent above the maximum inmate capacity. Prisons in the Littoral Region that had a maximum intake capacity of 1,550 had a total population of 4,639 inmates, representing an occupancy rate of 299 percent above the maximum inmate capacity as of October.

Access to food, water, sanitation, heating and ventilation, lighting, and medical care was inadequate. Consequently, malnutrition, tuberculosis, bronchitis, malaria, hepatitis, scabies, and numerous other treatable conditions, including infections, were rampant. Failure to observe minimum detention rules resulted in at least two deaths during the year. According to credible reports, including by the Mandela Center, Andre Youmbi died on April 25 at the Bafoussam Central Prison in the West Region, after 43 months of detention. Youmbi was ill and had requested treatment in an adequate health facility. The magistrates handling his case considered the nature of the offenses of which he was the alleged perpetrator advocated against his provisional release. The West Region Court of Appeal president reportedly denied the request for provisional release on April 23. Youmbi returned to prison the same day and died two days later.

Multiple organizations reported that on May 3, Jean Louis Tiotso, who was in poor health and had been awaiting trial for illicit sale of medicines, died at the Foumbot prison in the West Region. Ombouda, the prosecutor in his case, allegedly refused to release him to seek appropriate treatment as was his right under the law. Anecdotal reports suggested that Tiotso unsuccessfully attempted multiple times to appeal to the courts for treatment but failed each time. The prison administration also reportedly supported his request to no avail. Tiotso's death triggered a riot that led to the burning of the Foumbot Court House and at least one additional death on May 3, according to reports.

Physical abuse by prison guards and prisoner-on-prisoner violence occurred during the year. Violence among inmates was reported in virtually all prisons. In an August 30 Facebook posting, the content of which was confirmed by Cameroon Renaissance Movement (MRC) lawyers, a whistleblower shared the complaint of an unidentified MRC detainee. The detainee claimed that MRC detainees were

assaulted in their Yaounde central prison cell by inmates at the behest of prison authorities on August 27 after the lights went off. According to the account, Henry Etchome Misse, head of the prison's disciplinary office, led a group of unidentified inmates and assaulted the MRC detainees. Misse and his men allegedly participated in the assault of MRC detainees, some of whom had their money stolen along with other valuables.

**Administration:** Authorities allegedly did not address all credible allegations of mistreatment. MRC detainees, for instance, claimed they had been assaulted on multiple occasions in their prison cells by other prisoners, but they reported that prison officials were indifferent, giving them no opportunity to express their complaints. Visitors needed formal authorization from the state counsel to communicate with inmates; without authorization, visitors had to bribe prison staff to communicate with inmates. While overall prison visits continued to be limited in compliance with COVID-19-pandemic-related restrictions, political detainees reportedly suffered tougher restrictions.

**Independent Monitoring:** Independent monitoring of prisons was constrained by COVID-19-pandemic-related restrictions. Diplomatic missions were granted access to visit their nationals; the government denied human rights groups the ability to review prison conditions. Buea-based Human Is Right reported a few prison visits in the Southwest Region. The International Federation of Actions by Christians Littoral also conducted prison visits mostly in Edea and Mbanga, in the Littoral Region. Other NGOs, including Nouveaux Droits de l'Homme, the Network for Human Rights Defenders in Central Africa (REDHAC), and the Justice and Peace Commissions of Catholic Archdiocese also conducted prison visits, but with reduced access.

**Improvements:** The new Douala-Ngoma Central Prison, reported completed in 2020, was still not functional as of December. The facility was expected to help address prison overcrowding and improve the living conditions of inmates at the Douala-New Bell Central Prison. As of the end of December, the new facility was reportedly still missing equipment and required additional construction before it could begin receiving inmates.

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide for the right of any person to challenge the lawfulness in court of an arrest or detention. The law states that except in the case of an individual discovered in the act of committing a felony or misdemeanor, the officials making the arrest must disclose their identity and inform the detainee of the reason for his or her arrest. Any person illegally detained by police, the state counsel, or the examining magistrate may receive compensation. The government did not always respect these provisions.

### Arrest Procedures and Treatment of Detainees

The law requires police to obtain a warrant from a judge or prosecutor before making an arrest, except when a person is caught in the act of committing a crime, but police often did not respect this requirement. The law provides that suspects be brought promptly before a judge or prosecutor, although this often did not occur, and citizens were detained without judicial authorization. Police may legally detain a person in connection with a common crime for up to 48 hours, renewable once. This period may, with the written approval of the state counsel, be exceptionally extended twice before charges are brought. Nevertheless, police and gendarmes reportedly often exceeded these detention periods. The law also permits detention without charge for renewable periods of 15 days by administrative authorities, such as governors and civilian government officials serving in territorial command. The law also provides that individuals arrested on suspicion of terrorism and certain other crimes may be detained for investigation for periods of 15 days, renewable without limitation with authorization of the prosecutor. The law allows access to legal counsel and family members, although police frequently denied detainees access to both. The law prohibits incommunicado detention, but such cases occurred, especially in connection with the crisis in the Northwest and Southwest Regions. The law permits bail, allows citizens the right to appeal to recuse judges and provides the right to sue for unlawful arrest, but these rights were seldom respected. Bail was approved only on a selective basis, and applications to recuse judges with conflicts of interest rarely succeeded, especially in politically sensitive cases.

**Arbitrary Arrest:** Police, gendarmes, the BIR, and other government authorities reportedly continued to arrest and detain persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado. "Friday arrests," a practice whereby individuals arrested on a Friday typically remained in detention until at least Monday unless the detainee paid a bribe, continued, although on a limited scale.

On May 31, gendarmes arrested Nicodemus Nde Ntso Amungwa, a lawyer, while he was assisting a client during his interrogation at the gendarmerie facility in Yaounde. Minlo, a warrant officer, allegedly seized Amungwa's cell phone without a warrant, claiming Amungwa had taken photographs of the facility. While searching for the alleged photographs, the gendarme found other photographs that recorded alleged military abuses in Cameroon's Northwest and Southwest Regions and arrested Amungwa. Amungwa was taken to the SED, where he was detained for 10 days at the SCRJ. Amungwa was first presented to the government commissioner at the Yaounde Military Tribunal on June 3, but the government commissioner returned the case file to the investigating unit. Upon his release, authorities dropped the charges against Amungwa (see also section 6, Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity, including case of "Shakiro" and "Patricia").

Government authorities arrested four members of the NGO consortium Stand Up for Cameroon in September 2020 in Douala after a "Friday in Black" meeting held at the Cameroon People's Party headquarters. After 15 months of pretrial detention, on December 31, the military tribunal in Douala sentenced them to 16 months in prison, including time served, after declaring them guilty of insurrection. The four, Moussa Bello, Etienne Ntsama, Mira Angoung, and Tehle Membou, were reportedly subjected to brutal treatment and interrogated without legal counsel. At least 124 of the more than 500 citizens arrested in September 2020 in connection with the planned MRC protest remained in detention as of December 31, according to their lawyers. A few of the 500 who were detained were released at police stations, while others were prosecuted in civilian jurisdictions and received varying sentences. On December 27 and 28, the military tribunal in Yaounde sentenced 48 of the remaining detainees to prison terms ranging from one to seven years. Accused among other things of rebellion, rioting, and insurrection,

they were sentenced in the absence of their lawyers, who in September withdrew from all pending proceedings to denounce what they referred to as a "lack of independence" of the judges. In many of the cases, lawyers initiated habeas corpus proceedings or asked the judges to recuse themselves from the hearing due to conflicts of interest or perceived judicial bias.

**Pretrial Detention:** The code of criminal procedure provides for a maximum of 18 months' detention before trial, but many detainees waited years to appear in court. The 2014 antiterrorism law provides that a suspect may be held indefinitely in investigative detention with the authorization of the prosecutor. According to estimates by the Human Rights Commission of the Cameroon Bar Association, there were 18,437 pretrial detainees in a total of 31,815 inmates as of September. Some of the detainees had been awaiting trial for more than five years. In some cases the length of pretrial detention equaled, and in other cases exceeded, the maximum sentence for the alleged crime. Factors contributing to lengthy pretrial detentions included, but were not limited to, insufficient staff, mismanagement of case files, inability to pay court fees, and the politicization of some legal proceedings that required direction from authorities in the central government. Lawyers reported a prolonged pretrial detention in what they referred to as the Calabar 37. The case involved 37 persons from the Northwest and Southwest Regions who were repatriated from Calabar, Nigeria, the same day as separatist leader Sisiku Ayuk Tabe in 2019. According to their defense lawyers, while the Military Tribunal in Yaounde prosecuted Sisiku and nine of his followers and sentenced them to life imprisonment in August 2019, the 37 other detainees who began appearing in court in October 2019 had their case adjourned without the court providing a cause.

Freelance journalist Kingsley Fumunyuy Njoka, whom plainclothes security agents arrested in Douala in May 2020, remained in pretrial detention. He was allegedly interrogated regarding his reporting in relation to the Anglophone crisis, and he was placed in a six-month pretrial detention at the Kondengui Central Prison in Yaounde. During the March parliamentary session, a parliamentarian questioned the Minister Delegate for Defense Assomo regarding the status of this case, to which Assomo replied that the trial would soon begin, without providing any further details. In June 2020 Njoka made his first appearance in court, but the case

was adjourned. Reporters Without Borders denounced his arrest and provisional detention and said the charges against him were not yet substantiated. As of October, according to one of Njoka's lawyers, the matter was still before the government commissioner at the Military Tribunal, and Njoka's six-month preventive custody had been extended.

Amadou Vamoulke, a former general manager of state-owned Cameroon Radio Television (CRTV) who was arrested and detained in 2016 on embezzlement charges, continued to await trial at the Kondengui Central Prison. After at least 50 hearings as of September 26, the Special Criminal Court had not reached a decision on his case as of the end of December.

## e. Denial of Fair Public Trial

The constitution and law provide for an independent judiciary, but this was not always the case. In some instances the outcomes of trials appeared influenced by the government, especially in politically sensitive cases. Despite the judiciary's partial independence from the executive and legislative branches, the president of the republic appoints all members of the bench and legal department of the judicial branch, including the president of the Supreme Court, as well as the president and members of the Constitutional Council, and he may dismiss them at will.

Military courts may exercise jurisdiction over civilians in a broad number of offenses including civil unrest. Military courts increasingly exercised jurisdiction over peaceful demonstrations, which the government had not previously authorized.

**Trial Procedures**

The constitution and law provide for the right to a fair and public trial without undue delay, and the defendant is presumed innocent. Authorities did not always respect the law, applying the presumption of innocence in a selective manner. Criminal defendants have the right to be informed promptly and in detail of the charges, with free assistance of an interpreter. Defendants have the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, restricting access to lawyers, particularly in cases of individuals suspected of complicity with separatists, or political

opponents.  When defendants cannot pay for their own legal defense, the court may appoint trial counsel at public expense, but the process was often burdensome and lengthy, and the quality of legal assistance was poor.  Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf but did not compel witnesses to testify in the Ngarbuh trial.  In some cases related to the crisis in the Northwest and Southwest regions, defendants reported that the state did not share evidence during discovery and that they were not provided the opportunity to cross-examine witnesses.  Defendants have the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt, but authorities often violated this right.  Hearsay and anonymous testimony were sometimes permitted, especially in terrorism cases.  Examining magistrates sometimes attempted to induce political opponents and suspected separatists to incriminate themselves.  Defendants may appeal convictions up to the Supreme Court and may subsequently petition the president for pardon.

Courts often limited procedural rights in politically sensitive cases.  During a press briefing on September 9, the collective of the 60 lawyers defending MRC detainees announced its decision to withdraw from proceedings concerning the remaining 124 inmates, who were held in Bafoussam, Douala, Mfou, and Yaounde, and those whose appeals were awaiting review.  Justifying their decision, the lawyers said they could not continue to provide professional services under conditions contrary to their oath as lawyers and did not want to be associated with arbitrariness and illegality.  They said all civil, administrative, and military judges handling the cases lacked independence and fairness.  According to the lawyers, the judges violated their oath as magistrates by systematically refusing to apply the law, which is contrary to judicial ethics and the principles of justice in conformity with human rights.  Addressing journalists on the occasion, barrister Meli, the lead lawyer, remarked that all steps taken before judicial police officers as well as before civil and military courts for a statutory release, a release on bail or under guarantor, remained unaddressed for the most part or had simply been rejected.  Meli said the same applied to all habeas corpus requests initiated from October 2020 to establish the illegal, unlawful, and arbitrary character of the arrests.  Overall the lawyers said they carried out 279 procedures, all of which were unsuccessful.

**Political Prisoners and Detainees**

There were no reports of newly identified political detainees as of December. At least 124 of those associated with the September 2020 protests called for by the MRC opposition party, however, remained in detention. Prominent among the remaining detainees were MRC treasurer Alain Fogue and MRC leader Maurice Kamto's spokesperson Olivier Bibou Nissack. As in the previous year, political prisoners were detained under heightened security, often in SED facilities, at the Kondengui Principal Prison and the Kondengui Central Prison in Yaounde, the New Bell Central Prison in Douala, and the Mfou Principal Prison in the Center Region. Some were allegedly held at DGRE facilities. Political detainees often did not enjoy the same protections as other detainees, and the government at times restricted access to them by human rights organizations. There were credible allegations that the government falsely charged peaceful dissidents with violence.

REDHAC in an April 7 press release expressed concern regarding the judicial harassment against MRC detainees in Douala, including Ndljole Annis Wilfried, Kouamou Kouam Adolphe Romuuald, Tatcheumou Noutebel Constant Rofel, Kamou Staphane, Kue Francois, Kontchouo Thomas, Feugou Ludovic, Tanakeng Lezigning Mecxhideng, Nsa Ngako Guesie Pene, Pouakou Jiabvo Andre Gislain, Kue Bogne Colline, Nguegang Simplice Romeo, and Maptouhe Antoine Roger. According to the press release, the investigating judge No.3 at the Douala Military Court, Nyango Eko Linda Epse Afane Fongo, on April 1, referred the case to the military court ruling on criminal matters. The MRC members were indicted for offenses including "revolution, insurrection, public meeting demonstrations, and gatherings."

The 10 separatist leaders, including Julius Sisiku Ayuk Tabe, whom the Yaounde Military Tribunal sentenced to life imprisonment in 2019, remained in prison, since the Court of Appeals in September confirmed the sentence. Former minister of state for territorial administration Marafa Hamidou Yaya, who was convicted in 2012 on corruption charges and sentenced to 25 years' imprisonment, remained in prison.

**Politically Motivated Reprisal against Individuals Located Outside the**

**Country**

Unlike in previous years, there were no credible reports during the year of politically motivated reprisal against individuals located outside the country.

**Civil Judicial Procedures and Remedies**

Citizens and organizations have the right to seek civil remedies for human rights abuses through administrative procedures or the legal system; both options involved lengthy delays. Individuals and organizations may appeal adverse decisions domestically or to regional human rights bodies, but the decisions of regional human rights bodies are not binding.

**Property Seizure and Restitution**

On January 9, administrative authorities forcibly evicted more than 100 families from New-Town Aeroport, a township located near the Douala International Airport. Houses were bulldozed and protesters were teargassed. Officially, the operation was to "ensure the rights of way" for Douala Airport. A group of young persons protested the demolition of their homes and a mosque. Some of the persons evicted claimed they had been living in the area for more than 30 years. Authorities claimed no responsibility for resettling persons, and many were left homeless. One member of parliament Cameroonian Party for National Reconciliation President Cabral Libii denounced the evictions and insisted that the persons whose rights had been violated should be compensated.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the constitution and law prohibit arbitrary interference with privacy, family, home, or correspondence, these rights were subject to restriction in the interests of the state, and there were credible reports police and gendarmes abused their positions by harassing citizens and conducting searches without warrants. The law permits a police officer to enter a private home during daylight hours without a warrant only if pursuing a person suspected of or seen committing a crime. Police and gendarmes often did not comply with this provision and entered private homes without a warrant. An administrative authority, including a

governor or senior divisional officer, may authorize police to conduct neighborhood sweeps without warrants, and this practice occurred.

The Buea-based NGO Human Is Right reported in August that it documented several cases of arbitrary arrests and detentions by defense and security forces in Mutengene, Muea, Mile 16, Mile 14, and Molyko, in the Southwest Region, from August 18 to August 30. According to Human Is Right, security forces patrolling neighborhoods arrested persons, especially young men, and searched their homes without warrants. An anonymous witness reportedly told Human Is Right how his 24-year-old son was arrested in Molyko, despite having his national identification card, and subsequently was asked to pay 50,000 CFA francs ($91) to secure his release.

Reports suggest authorities punished family members for offenses allegedly committed by their relatives. In an audio recording circulated on social media platforms early on August 3, the separatist fighter alias "General No Pity," who controlled a separatist base known as Marine Forces located in Ndop, Northwest Region, claimed that soldiers stormed his compound and arrested his "uncles, aunts, younger brothers, and sisters." He gave authorities 48 hours to release the family members, threatening to wreak havoc if anything bad happened to them. The NGO The Center for Research and Resources Distribution to Rural and Underprivileged People (CEREDRUP) confirmed his claims in a September 4 report. According to CEREDRUP, No Pity's brother and cousin were released on August 5, but his mother and uncle remained in government custody. In order to pressure for their release, No Pity and his fighters took up positions along the Bamenda Kumbo Highway in Ndop and Sabga Hill, completely blocking the road for weeks. As of late December, there was no official statement from the government concerning the arrests.

## g. Conflict-related Abuses

**Killings:** There were credible reports that members of government forces and separatist fighters deliberately killed civilians. On July 4, according to multiple credible sources, soldiers at a security checkpoint shot and killed local resident Djibring Dubila Ngoran. A July 6 government press release described the victim as a fugitive from justice and accused him of acting in complicity with separatists

abroad.  Local residents rejected this narrative, and hundreds of civilians protested on the streets of Bamenda.

On July 18, separatists beheaded Esomba Nlend at Ekondo Titi Beach, accusing him of being a traitor.  On July 23, in Ekondo Titi, Ndian division of the Southwest Region, separatists killed former fighter John Eyallo, who had laid down his arms and joined the Deradicalization, Demobilization, and Rehabilitation center in Buea.

**Abductions:**  Armed separatists allegedly kidnapped several persons for not respecting the separatist-imposed lockdown measures.  The separatists held persons as hostages, including public officials, political leaders, teachers, schoolchildren, and traditional leaders.  There were credible allegations that separatists physically brutalized their victims.

On January 13, armed separatists attacked a transport truck at Bamessing in the Ndop subdivision in the Northwest Region and abducted the driver and his assistant.  Two days later, on January 15, two civilians were abducted by alleged separatists from their farm in Mbelewa, in the Bamenda III municipality.  According to the NGO Reach Out, separatists abducted three civilians from a construction site on January 21 at Mile 6 Nkwen, in the Bamenda III municipality of the Northwest Region, for failing to receive a permit from the local commander of separatist forces before beginning construction.

On February 3, armed men believed to be separatists abducted three officers of the Bamenda II council, while council members were in the process of sealing shops.  In a video found on social media, officers could be seen shirtless, sitting on the ground, and being threatened by their abductors, who accused them of violating the laws of "Ambazonia."

On March 12, HRW reported that armed separatists kidnapped a medical doctor in the Northwest Region on February 27 and took him to their camp.  The separatists accused the victim of "not contributing to the struggle" and threatened to kill him.  The doctor was released six hours later, after a 300,000 CFA francs ($545) ransom payment.

Several media outlets reported that on March 13, gunmen presumed to be separatists abducted Ayiseh Bonyui Fame, a journalist assigned to the CRTV

station in Buea, the Southwest Region.  A video that was widely circulated on social media featured Ayiseh pleading for her life while in captivity at knifepoint at an unknown location.  Ayiseh was eventually released on the night of March 14 after her family paid part of the ransom amount requested.

Reach Out reported in May that on January 12, security forces raided Bawum in the Northwest Region and burned down the Bafut ecovillage, which was also a UNESCO world cultural heritage site.  On January 22, security forces attacked the village of Bafia in Muyuka subdivision of the Southwest Region and set houses on fire.  A similar incident happened on February 16 in Tad, a village in Batibo subdivision of the Northwest Region.  On March 1, security forces also set fire to a guest house and laboratory of the Baptist hospital in Bamkikai, Kumbo subdivision, according to multiple sources.  In its August report, HRW indicated that security forces destroyed and looted at least 33 homes, shops, as well as a traditional leader's palace in the Northwest Region on June 8 and 9.  On June 25, according to credible sources, including OCHA, separatists in the Northwest Region kidnapped four humanitarian workers and held them overnight.

**Physical Abuse, Punishment, and Torture:**  According to anecdotal reports, members of government forces physically abused civilians and prisoners in their custody.  Reports suggested that both government forces and separatists mistreated persons, including through sexual and gender-based violence (see also section 1.a.).

**Child Soldiers:**  The government did not recruit or use child soldiers.  Unlike in the previous year, there were no reported allegations that some members of defense and security forces used children for intelligence gathering.  Some community neighborhood watch groups, known as vigilance committees, may have used and recruited children as young as 12 in operations against Boko Haram and ISIS-WA.  Authorities increasingly encouraged the creation of vigilance committees.  On July 29, for example, the senior divisional officer for Bamboutos, Francois Franklin Etapa, issued a decision to reorganize local self-defense committees in his command zone.

Boko Haram continued to recruit and use child soldiers, including girls, in its attacks on civilian and military targets.

**Other Conflict-related Abuse:**  As in the previous year, there were reports of violence directed against health workers and institutions and the use of firearms around health facilities by members of security forces and armed separatists.

From January to June, according to the UN Office for the Coordination of Humanitarian Affairs, 29 attacks were reported in seven health districts in the Northwest Region and seven health districts in the Southwest Region.  Health districts also reported attacks on health-care facilities.  The types of attacks included removal of patients and health workers; criminalization of health care; psychological violence, abduction, arrest, and detention of health personnel or patients; and setting of fires.  These attacks resulted in the death of one patient and the complete destruction of one district health service structure and equipment.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, but the government often restricted this right, explicitly or implicitly.  Government failure to investigate or prosecute attacks on human rights defenders and peaceful protesters led to de facto restrictions on the freedom of expression.

**Freedom of Expression:**  Government officials penalized individuals or organizations that criticized or expressed views at odds with government policy.  Individuals who criticized the government publicly or privately frequently faced reprisals.  On several occasions the government invoked laws requiring permits or government notification of public protests to stifle discourse.

On January 20, during a meeting held at the governor's office with traditional rulers of the West Region in Bafoussam, Minister of Territorial Administration Paul Atanga Nji criticized the traditional rulers because of a statement some of them issued in November 2020 concerning the sociopolitical situation in the country.  In the statement the traditional rulers remarked that the military option to curb the Anglophone crisis had shown its limitations and suggested that a different

avenue for peace was needed. Relaying the minister's message, state-funded CRTV declared that "traditional rulers must not engage or allow their people to engage in the political struggle but should rather stimulate development through the decentralization process."

**Freedom of Expression for Members of the Press and Media, including Online Media:** Private media were active and expressed a wide spectrum of viewpoints. The media landscape faced constraints on editorial independence, in part due to fear of reprisal from state and nonstate armed actors, including separatists connected to the crisis in the Northwest and Southwest Regions. Journalists reported practicing self-censorship to avoid repercussions, including extortion for criticizing or contradicting the government.

**Violence and Harassment:** Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists. The state's failure to investigate or prosecute attacks on journalists created de facto restrictions.

The private daily newspaper *Le Jour* reported that on April 29, Yaounde V municipal police members assaulted two reporters of Canal 2 International while they were covering a protest by commercial bike riders. According to media reports, the Yaounde V police severely beat Canal 2 cameraman Bertrand Tchasse, seized and destroyed his working equipment, and threatened to kill him. Other team members, including a driver and a reporter, were threatened. A government spokesperson said Tchasse's work equipment was seized because the journalists were encouraging motorbike riders to be disorderly in order to record additional footage for their report.

On April 14, the Committee to Protect Journalists (CPJ) reported that six armed men in plainclothes arrested Mbombog Mbog Matip, director of the privately owned *Climat Social* newspaper, who also posts political commentary on social media, in August 2020. CPJ's release indicated that Mbombog Mbog was held at the SED until September 2020, when a military court judge charged him with "propagation of false news," and placed him on pretrial detention until March 7. Following the court hearing, the journalist was transferred to Kondengui Central Prison in Yaounde. CPJ stated that Mbombog Mbog remained in custody until

March 7 without receiving any update regarding his case. CPJ reported that in the months before he was arrested, Mbombog Mbog was investigating an alleged coup attempt involving Colonel Joel Emile Bamkoui, the commander of the Department of Military Security. While Mbombog Mbog was detained at SED, Bamkoui reportedly beat and threatened him, according to *CamerounWeb*. CPJ further reported that the country had eight journalists in prison as of April, many of whom were arrested for being perceived as antigovernment.

On April 19, progovernment private television channel Vision 4 produced a report on J. Remy Ngono, a Cameroonian journalist who lived in France and participated in the *Radio Foot International* program on Radio France International. In the report Raoul Christophe Bia questioned Remy Ngono's sexual orientation. Using photoshopped pictures as evidence, Christophe Bia explicitly compared Ngono to an animal. On September 16, Vision 4 television channel again featured the derogatory imagery in another report. Some observers believed the questioning of Ngono's sexual orientation and the photoshopped images were in response to Ngono's criticism of the government.

**Censorship or Content Restrictions:** By law the Ministry of Communication requires editors to submit two signed copies of their newspapers within two hours after publication. Journalists and media outlets reported practicing self-censorship, especially if the National Communication Council had suspended them previously.

**Libel/Slander Laws:** Libel, slander, defamation, and blasphemy are treated as criminal offenses. The law authorizes the government to initiate a criminal suit when the president or other senior government officials are the alleged victims. These laws place the burden of proof on the defendant, and crimes are punishable by prison terms and substantial fines. While the government may initiate criminal suits when the president or other senior government official are alleged victims, ordinary citizens may also file libel or slander suits, but the law is often applied selectively and privileges senior government officials and well connected individuals.

On June 17, the Court of First Instance in Mbanga, Littoral Region, sentenced Clement Ytembe Bonda, Andre Boris Wameni, and Flavy Kamou Wouwe to one year of imprisonment and a fine after declaring them guilty of joint contempt of the

president of the republic, contempt of the civil authorities, and propagating fake news on social media. The three individuals were workers at the Plantations de Haut Penja (PHP) agricultural complex. They were arrested on June 11 after a video that was widely circulated on social network showed them lambasting the poor working conditions at PHP. In the video Bonda, the main speaker, used critical language to describe President Paul Biya and his government. He could be heard saying that they worked at the banana plantation from 6 a.m. to 6 p.m., under the rain and sun for a monthly salary of approximately 30,000 CFA francs ($55) while government ministers in Yaounde loitered and stole hundreds of billions from public coffers.

After more than two years in pretrial detention as the result of a defamation complaint filed by French Cameroonian writer Calixthe Beyala, Paul Chouta, who worked as a reporter for the privately owned *Cameroon Web news* website, was released on May 20, two days after his sentencing by the Mfoundi Court of First Instance to 23 months' imprisonment. The court issued a post facto sentence to cover the time he was imprisoned without charge.

At a meeting in Yaounde on July 5 for its 28th Extraordinary Session, the National Communication Council sanctioned three journalists for what they deemed to be unprofessional conduct. The sanctions ranged from suspensions for one to six months and a warning. Stive Jocelyn Ngo, a DBS TV journalist, received a 30-day suspension for publishing unsubstantiated and "offensive" information concerning the president of France on April 21 during the program *DBS Martin*. Sismondi Barkev Bidjocka, publisher of Ris Radio, received a one-month suspension for "insufficient investigation" leading to the broadcast of unsubstantiated and "offensive" information against parliamentarian Cabral Libii. The publisher insinuated that Cabral was engaged in some malfeasance involving the procurement of public contracts for private gain related to the fight against the COVID-19 pandemic. Nynanssi Nkouya, publisher of *Confidence Magazine,* received a six-month suspension for publishing a flyer containing "offensive" information concerning Senator Sylvester Nghouchinghe.

**National Security:** Authorities often cited laws against terrorism or protecting national security to threaten critics of the government.

**Nongovernmental Impact:** There were no reported cases of armed separatist groups in the Southwest and Northwest Regions explicitly inhibiting freedom of expression, including for the press. Restrictions on movements by armed separatists, however, contributed to limiting freedom of the press. Also, some political and opinion leaders sought to inhibit freedom of expression by criticizing those who expressed views that were at odds with government policies.

**Internet Freedom**

Anecdotal reports indicated that the government monitored private online communications without appropriate legal authority.

**Academic Freedom and Cultural Events**

Although there were no legal restrictions on academic freedom or cultural events, some school authorities reportedly sanctioned academic personnel for teaching politically sensitive topics, and administrative officials often deterred teachers from criticizing the government.

Anecdotal reporting suggested scientists and academics were subjected to threats, intimidation, and restriction on freedom of expression. In its March report on human rights, the NGO consortium Stand Up for Cameroon reported professor Pascal Charlemagne Messanga Nyamding, a former lecturer at the Institute of International Relations of Cameroon, feared for his life after a March 9 interrogation at SED.

Governor of the East Region Gregoire Mvondo ordered the inclusion of exam questions on the content of President Biya's February 10 message to the youth.

## b. Freedoms of Peaceful Assembly and Association

The government limited and restricted freedoms of peaceful assembly and association. Government failure to investigate or prosecute attacks on human rights defenders and peaceful protesters led to de facto restrictions on the freedom of assembly and association.

**Freedom of Peaceful Assembly**

Although the law provides for freedom of peaceful assembly, the government often restricted this right. The law requires organizers of public meetings, demonstrations, and processions to notify officials in advance but does not require prior government approval for public assemblies, nor does it authorize the government to suppress public assemblies that it did not approve in advance. Nevertheless, officials routinely asserted the law implicitly authorizes the government to grant or deny permission for public assemblies. The government often granted permits for gatherings on a selective basis and used force to suppress assemblies for which it had not issued permits. On December 1, Maurice Kamto intended to organize a book launch at Restaurant La Chaumiere in the Bonapriso neighborhood of Douala, but authorities deployed security forces to prevent the event. Early in the morning, security forces took positions on strategic areas, disrupted traffic, and blocked access to the proposed venue of the book launch. Also, police blocked access to hotel Vallee des Princes where Kamto had secured accommodation. After a day of tension, police escorted Kamto out of Douala.

Authorities typically cited security and health-related concerns as the basis for deciding to block assemblies. Progovernment groups, however, were generally authorized to organize public demonstrations.

On July 16, Roger Justin Noah, deputy secretary general of the opposition MRC, petitioned the divisional officer of Yaounde I for a public protest. The purpose of the event, according to the MRC, was to promote peace in the Northwest and Southwest Regions, call for solidarity with the populations of the Far North Region victimized by Boko Haram, denounce ethnocentrism and hate speech, and call on the government to respect the political rights of all citizens, including political prisoners. The event was scheduled to take place on July 25; however, on July 22, the divisional officer banned the demonstration, citing the risk of "disturbing public order" and "spreading COVID-19." The government, however, approved demonstrations in support of President Biya in Mokolo, Far North Region, on July 21, and on July 25 in Bertoua, East Region. Overall, these rallies, which took place respectively a day before and three days after the ban on the MRC planned demonstration, were perceived by observers as part of reactions against protest messages by activists in the diaspora referred to as "Brigade antisardinards," who

disrupted President Biya's stay at the Intercontinental Hotel in Geneva, Switzerland, on July 17 through the duration of his stay.

On December 15, the divisional officer of Yaounde 2 also banned a subregional consultation that the Network of Human Rights Defenders in Central Africa previously planned to hold on December 16 at the Yaounde Conference Center. The stated purpose of the event was to seek solutions to the crisis in the Northwest and Southwest Regions. The divisional officer cited security and COVID-19-pandemic-related concerns as reasons to justify his decision.

**Freedom of Association**

The constitution and law provide for the freedom of association, but the law also limits this right. On the recommendation of the senior divisional officer, the Ministry of Territorial Administration may suspend the activities of an association for three months on grounds that the association is disrupting public order. The minister may also dissolve an association if it is deemed a threat to state security. National associations may acquire legal status by declaring themselves in writing to the ministry, but the ministry must explicitly register foreign associations, and the president must accredit religious groups upon the recommendation of the minister of territorial administration. The law imposes substantial fines for individuals who form and operate any such association without ministry approval. The law prohibits organizations that advocate a goal contrary to the constitution, laws, and morality, as well as those that aim to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

Conditions for recognition of political parties, NGOs, and associations were complicated, involved long delays, and were unevenly enforced (see also section 3, Political Parties and Political Participation). This resulted in associations operating in legal uncertainty with their activities tolerated but not formally approved.

Although the government did not officially ban any organizations, it continued to restrict the activities of some NGOs and political parties, including Doctors without Borders, Un Monde Avenir, and the MRC. In an August 2 press release, Doctors Without Borders indicated that it was forced to withdraw teams from the Northwest Region, after nearly eight months of suspension by authorities.

Authorities accused the humanitarian group of providing material assistance to separatists, a charge Doctors Without Borders consistently denied. In an August 26 release, Minister of Territorial Administration Paul Atanga Nji ordered promoters of foreign organizations operating in Cameroon to update their status by submitting specific documentation within a month. Although the NGO Un Monde Avenir, which regularly denounces government abuses submitted the required file, the organization's leadership claimed their accreditation had not been renewed at year's end. Philip Nanga, the coordinator, reportedly learned from his banker that he could not open an account for the organization because its accreditation had been suspended.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Although the constitution and law provide for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government restricted these rights.

**In-country Movement:** Using minor infractions as a pretext, police, gendarmes, and custom officers often extorted bribes and harassed travelers at roadblocks and checkpoints in cities and on most highways. Police frequently stopped travelers to check identification documents, including national identity cards, passports, residence permits, vehicle registrations, and tax receipts as security and immigration control measures. As in the previous year, humanitarian organizations cited difficulty in accessing certain areas and in some instances were harassed and denied passage by government authorities. Unaccompanied women were frequently harassed when traveling alone. Authorities restricted movements of persons and goods, including motorbikes, especially in the Northwest and Southwest Regions, citing security concerns. Armed separatists also restricted the movements of persons and goods in the Northwest and Southwest Regions, sometimes in a deliberate attempt to harass and intimidate the local population. They often used weekly lockdowns referred to as "ghost towns" to enforce

restrictions on movement, in which the armed separatists demanded all businesses close and residents stay home. Violent crime, including kidnapping by terrorists, kidnapping for ransom, armed robbery, assault, and carjacking, were major impediments to in-country movement in the three northern regions and part of the East Region.

On July 20, Simon Emile Mooh, the senior divisional officer for Mezam in the Northwest Region, banned the operation of motorbikes in Bali subdivision. The officer indicated that the ban would last for three months and could be extended. The decision followed the killing of five police officers by suspected separatists riding motorbikes in Bali on July 18. On September 11, separatists aligned with a faction of the *Interim Government of Ambazonia*, signed a resolution instituting a lockdown of the Northwest and Southwest Regions beginning on September 15 and ending on October 1. During the lockdown period, all vehicles were banned from the roads in these regions. Separatists warned that any person or group of persons contravening the ban would be punished. According to media reports, streets and markets in Buea, Kumba, and Bamenda remained empty, and schools closed on September 16 following the declaration.

**Foreign Travel:** Citizens have the right to leave the country without arbitrary restrictions. The movement of some political opponents and debtors, however, was monitored, and their travel documents were often confiscated to confine them to the country. To obtain exit permits, citizens need a valid passport and visa for their country of destination.

# e. Status and Treatment of Internally Displaced Persons

According to estimates by the Office of the UN High Commissioner for Refugees (UNHCR), there were more than two million persons of concern as of December 31, and there were more than one million internally displaced persons (IDPs), of whom 358,000 were in the Far North Region and 711,000 in the Northwest and Southwest Regions. In addition the country had an estimated 477,500 formerly displaced persons who had returned to their place of origin. Humanitarian access remained very limited, since military officials maintained tight control over access. Insecurity due to armed groups in the Northwest and Southwest Regions also limited humanitarian access in some areas. UN Humanitarian Air Service flights

to the Northwest Region were suspended due to security concerns. Additional factors driving displacements included the desire to flee from Boko Haram.

The government put in place Deradicalization, Demobilization, and Reintegration (DDR) centers to promote the safe, voluntary return, resettlement, or local integration of former combatants in the Far North, Northwest, and Southwest Regions. Reports suggested the government's DDR centers were inadequately resourced, and some of the former combatants left. During the year, however, many former Boko Haram fighters reportedly joined the DDR centers in the Far North Region after their leader Abubakar Shekau died. As of the end of August, more than 1,102 former fighters had joined the DDR centers since January, according to official estimates. Provision of basic social services to IDPs and assistance to returnees were carried out by relief actors with minimal support from the government. Humanitarian actors mentioned on several occasions that the humanitarian community could not effectively implement its DDR programming without having a legal framework in place, which the government had thus far not implemented. In the Northwest and Southwest Regions, humanitarian actors mostly had access to urban centers. The government made some efforts to provide urgently needed in-kind assistance to crisis-affected IDPs in the Northwest and Southwest Regions based on its humanitarian assistance response plan. This assistance was reportedly distributed to populations without an assessment of their needs and only to persons in accessible urban areas.

## f. Protection of Refugees

The government generally cooperated with UNHCR and other humanitarian organizations in providing protection and assistance to refugees or asylum seekers, as well as other persons of concern. The country operated an open-door policy. This policy, however, was not translated into a progressive legal framework allowing refugees their rights as stated in various legal instruments.

**Access to Asylum:** The law provides for granting asylum or refugee status, and the government has established a system of providing protection to refugees, but the implementation of this system was weak. UNHCR continued to provide documentation and assistance to the refugee population, although local authorities did not always recognize the documents as official, which prevented refugees from

travelling and engaging in business activities. UNHCR and the government continued to conduct biometric verification and registration of refugees in the Far North Region, including those not living in refugee camps.

**Freedom of Movement:** The government did not provide documents in a timely manner to refugees and other persons in need of primary documentation, which restricted movement.

**Access to Basic Services:** Refugees had limited access to health care, education, and employment opportunities. Their rural host communities faced similar problems, but the situation was somewhat worse for refugees. Access to these services varied according to the location of the refugees, with those in camps receiving more support through humanitarian assistance, while refugees living in host communities faced more difficulty receiving services. On May 25, the Ministry of Public Health and UNHCR signed a memorandum of understanding providing for the treatment of refugees in public health facilities. A strategic integration plan covers refugees from the Central African Republic (CAR) and Nigeria, and those displaced because of the crisis in the Northwest and Southwest Regions of the country. The agreement was intended to afford refugee and host population equitable access to quality primary health-care services and a referral system for secondary and tertiary care.

**Durable Solutions:** There was no evidence that the government accepted refugees for resettlement or offered naturalization to refugees residing on its territory. The government, however, assisted in the voluntary return of persons from CAR and Nigeria.

On February 10, the governments of Nigeria and Cameroon and UNHCR announced the planned voluntary return of 5,000 Nigerian refugees from the Minawao refugee camp in the Far North Region. On March 8, Minister of Territorial Administration Paul Atanga Nji donated relief packages from President Biya to the first contingent of more than 400 Nigerian refugees who voluntarily opted to return home. After 3,880 Nigerian refugees were voluntarily returned to Banki and Bama towns in Nigeria's Borno State, returns were halted due to the COVID-19 pandemic, insecurity, and movement difficulties due to the rainy season. The private daily *Le Jour* indicated that the returns took place between

January and March, within the framework of the regional strategy for stabilization, recovery, and resilience of the Lake Chad basin areas affected by the Boko Haram crisis. In October UNHCR reported that after meetings with Nigerian and Cameroonian officials, 7,000 Nigerians were scheduled to return home in 14 convoys of 500 persons during the rest of the year and in 2022.

**Temporary Protection:** The government continued to provide temporary and unofficial protection to individuals who might not qualify as refugees, extending this protection to hundreds of individuals, including third-country nationals who had fled violence in CAR. Due to their unofficial status and inability to access services or support, many of these individuals were subject to harassment and other abuses.

# Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. Elections, however, were often marked by irregularities, although no elections were conducted during the year.

## Elections and Political Participation

**Recent Elections:** In February 2020 the country held simultaneous legislative and municipal elections. An estimated 32 political parties participated in the legislative elections and 43 participated in the municipal elections. Security concerns constrained voter participation in the Northwest and Southwest Regions. The courts annulled the legislative elections in 11 constituencies of the Northwest and Southwest Regions due to voter turnout of less than 10 percent. Legislative reruns occurred in the 11 constituencies in March 2020. The ruling Cameroon People's Democratic Movement (CPDM) won 152 of the 180 National Assembly seats and 316 of 360 local councils. Opposing political parties lost significant numbers of seats when compared with previous elections. Overall, eight opposition political parties won seats in the National Assembly, and nine won control of local councils. Additionally, irregularities including lack of equal access to media and campaign space, restrictions on the ability of opposition candidates to register for the election, ballot stuffing, lack of ballot secrecy, voter intimidation, inconsistent use

of identification cards, and lack of expertise among local polling officials prompted the Constitutional Council and regional administrative courts to annul some legislative elections.

Estimates of voter turnout showed an unprecedented low rate of participation of 43 percent for the legislative and municipal elections in 2020. The lower turnout could partially be attributed to the call for a boycott of the elections by the MRC and other opposition parties. In December 2020 the first-ever election of regional councilors was held, 24 years after provisions for regional elections in the 1996 constitution. Due to the gains achieved in the municipal councils that made up the electoral college in the February 2020 elections, the ruling CPDM won in nine of the 10 regions. The government cited the regional elections as a sign of progress on decentralization, although political opposition and civil society groups criticized the elections for failing to meaningfully decentralize power.

In 2018 Paul Biya was re-elected president in an election marred by irregularities and against the backdrop of protracted sociopolitical unrest in the Northwest and Southwest Regions.

**Political Parties and Political Participation:** As of the end of December, the country had approximately 330 registered political parties. During the year the government accredited 11 new political parties "to enrich the political debate and encourage the expression of freedoms." The CPDM remained dominant at every level of government due to restrictions on opposition political parties, gerrymandering, unbalanced media coverage, the use of state funds to promote party campaigns, interference with the right of opposition parties to register as candidates and to organize during electoral campaigns, and undue influence of traditional rulers, who were largely coopted by the CPDM. Traditional rulers, who received salaries from the government, openly declared their support for President Biya prior to the 2018 presidential election, and some reportedly compelled residents of their constituencies to prove they did not vote for an opposition candidate by presenting unused ballots. Traditional rulers who refused to associate with the government were either removed or threatened with destitution. Membership in the ruling political party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service. Conversely, membership in some opposition political parties, especially the MRC,

was often associated with threats and intimidation from the government.

Human rights organizations and opposition political actors considered the drawing of voter districts and distribution of parliamentary or municipal councilors' seats unfair. They complained that smaller districts considered CPDM strongholds were allocated a disproportionate number of seats compared with more populous districts where the opposition was expected to poll strongly. Managers of state-owned companies and other high-level government officials used corporate resources to campaign for candidates sponsored by the ruling party.

**Participation of Women and Members of Minority Groups:** No laws limit participation of women or members of minorities, or persons with disabilities in the political process and they did participate, although women remained underrepresented at all levels of government. There were no official laws limiting the participation of lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons; however, observers noted social stigma and criminalization of same-sex conduct may have deterred LGBTQI+ persons from openly participating in the political process. In parliament women occupied 87 of 280 seats, 61 in the National Assembly and 26 in the Senate. Women held 11 of 66 cabinet positions. Similar disparities existed in other senior-level offices, including territorial command and security and defense positions. The minority Baka, a nomadic indigenous group, were not represented in the Senate, National Assembly, or higher offices of government, although there were no laws limiting their participation.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, but the government did not implement the law effectively. There were numerous reports of government corruption. Officials sometimes engaged in corrupt practices with impunity. The law identifies different offenses as corruption, including influence peddling, involvement in a prohibited employment, and failure to declare a known conflict of interest. Reporting corruption was encouraged through exempting whistleblowers from criminal proceedings. In addition to the laws, the National

Anticorruption Agency (CONAC), Special Criminal Court, National Financial Investigation Agency, Ministry in Charge of Supreme State Audit, and Audit Bench of the Supreme Court also contributed to fighting corruption in the country. CONAC, the most prominent of the anticorruption agencies, was constrained by the absence of any legislative or presidential mandate that could empower it to combat corruption. There were reports that senior officials sentenced to prison were not always required to forfeit their ill-gotten gains.

**Corruption:** As in 2020, allegations of mismanagement of resources continued, especially in respect to the special COVID-19-pandemic fund, which some referred to as "Covidgate." The presidency in March ordered an audit of the management of COVID-19-pandemic spending to include an audit of the Special National Solidarity Fund established in 2020 to fight against the pandemic and its socioeconomic consequences. Endowed with a budget of 180 billion CFA francs ($3.27 million), the Special Solidarity Fund was expected to be used, among other things, for the purchase of protective equipment, tests, ambulances, and medicines, and to manage the quarantine of travelers.

According to its interim report, the Audit Bench of the Supreme Court specifically targeted two ministries that played a central role in the official COVID-19-pandemic response, namely the Ministry of Public Health and the Ministry of Scientific Research and Innovation. The report highlighted shortcomings including the degree of opacity in the awarding of contracts, overruns of allocated budgets, embezzlement, and blatant overbilling. According to the Audit Bench, Mediline Medical Cameroon (MMC) and Moda Holding Hong Kong (a shareholder of MMC) won 90 percent of the COVID-19 rapid tests purchased and received 95 percent of the available credit to finance purchase orders to the detriment of two other local providers with experience in the same field. Moda Holding Hong Kong billed the Ministry of Health for transportation-related expenses, but the incurred expenses were not proportional to the quantity of tests delivered. Auditors noted that a COVID-19 test purchased from MMC cost 17,500 CFA francs ($32) per unit, 10,415 CFA francs ($19) more than the price proposed by SD Biosensor. The overpayment cost the state an additional 14.5 billion CFA francs ($26.36 million).

A dozen officials reportedly appeared before the commission during the

investigation. Members of the political opposition and human rights activists urged the government to publish the full report, especially since all relevant agencies were not assessed in the interim report. On April 6, the presidency sent the Ministry of Justice a copy of the report on COVID-19-pandemic spending and instructed the minister to open a "judicial inquiry" into the misappropriation of funds. On May 28, Minister of Communication Rene Emmanuel Sadi reported that President Biya called for judicial proceedings to take place at the Special Criminal Court. In December the full report was released; however, no criminal proceedings had taken place by year's end.

The trial of the former defense minister Edgar Alain Mebe Ngo opened at the Special Criminal Court in September 2020 after multiple adjournments. He stood accused of embezzling 236 billion CFA francs ($429 million) as part of the purchase of military equipment for the army. Mebe Ngo and his wife had been awaiting trial at the Kondengui Central Prison in Yaounde since their arrest in 2019. As of the end of December, the court had not reached a decision.

The government continued Operation Sparrow Hawk that was launched in 2006 to fight embezzlement of public funds. As in the previous year, the Special Criminal Court opened new corruption cases during the year. The National Gendarmerie maintained a toll-free telephone line to allow citizens to report acts of corruption in the gendarmerie.

In a September 23 anticorruption report, CONAC reported the country lost close to 18 billion CFA francs ($32.7 million) to corruption in 2020. The report on the state of the fight against corruption in 2020 showed that corruption remained prevalent in the country. The report identified the transportation sector, land tenure, and the police force as the three most corrupt sectors in the country, adding corrupt practices were rampant in the Center and Littoral Regions.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A number of domestic and international human rights groups investigated and published findings on human rights cases. Government officials rarely were

cooperative and responsive to their views. Government officials impeded many local human rights NGOs by harassing their members, limiting access to prisoners, refusing to share information, and threatening violence against NGO personnel. The government took no action to investigate or prevent such occurrences. The government criticized reports from international human rights organizations by accusing them of publishing baseless accusations.

On August 2, Human Rights Watch (HRW) released a report entitled *Cameroon: New Abuses by Both Sides*, which accused government forces of destruction of property, rape, killings, execution of civilians, and looting in the Northwest and Southwest Regions. In response military spokesman Cyrille Atonfack Guemo firmly rejected what he referred to as an "outrageous and provocative" report. In an August 5 statement, he declared, "Everything appeared to clearly indicate that the multiple positions taken by HRW are intended only to discredit the defense and security forces."

In an August 26 press release, Minister of Territorial Administration Paul Atanga Nji announced an inquiry into the registration of all foreign NGOs operating in Cameroon. In the release Atanga Nji ordered them to deposit all required original documentation at his ministry by the end of September.

The order specifically asked for a dossier comprising an original copy of the document authorizing the organization in Cameron; two copies of the organization's constitution; the instrument appointing the organization's representative; a legalized photocopy of the national identity card or the representative's passport that is less than three months old; a map indicating the location of the organization's headquarters, or of its legal representative's office and permanent telephone address; a complete list of nonnational staff working for the organization; their curricula vitae and certified copies of their passports; a complete list of local personnel including their work contracts; and the organization's annual activity program. Minister Atanga Nji added that foreign organizations that did not submit the documents prior to the required deadline would be suspended (see also section 2.b, Freedom of association). As of October the Ministry of Territorial Administration had relaxed some of the requirements after strong pushback from civil society organizations and international NGOs.

Observers saw the minister's decision as a strategy to intimidate human rights organizations and possibly ban those that highlighted government abuses. As in the previous year, human rights defenders and activists received anonymous threats from persons suspected to be affiliated with the government by telephone, text message, and email. In particular this was the case for the Central Africa Human Rights Defenders Network was a consistent target of the government.

On July 21, Chief Warrant Officer Bako Jean Oscar, commander of research Brigade I in Bonanjo, Douala, summoned Maximilienne Chantal Ngo Mbe, executive director of Network for Human Rights Defenders in Central Africa, to appear before him on August 9. The summons did not contain further information on the case in question, and authorities refused to specify what charges, if any, they were investigating. Ngo Mbe received an additional summons on August 13 from the Legion Gendarmerie to appear on August 16 again without any specified reason; however, the date in question fell on a holiday so she was not required to appear. Ngo Mbe received a subsequent summons to appear before the Yaounde Scientific and Judicial police in November, ordering her to appear on December 28; however, her lawyers petitioned to have the date postponed until February 2022.

**Government Human Rights Bodies:** In 2019 the government passed a law establishing the Cameroon Human Rights Commission (CHRC), as a replacement for the existing National Commission on Human Rights and Freedoms (NCHRF). During the year the president appointed 15 members to the CHRC, including James Mouangue Kobila, formerly acting chairperson of the NCHRF, as chairperson, and Galega Gana Raphael as the deputy chairperson. The CHRC became operational on April 29 after the team took the oath of office. Like the NCHRF, the CHRC is a nominally independent, government-funded institution. The law establishing the CHRC extended its mandate to protect human rights. While the CHRC coordinated actions with NGOs and participated in some inquiry commissions, it remained poorly funded.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalizes rape and provides penalties of between five and 10 years of imprisonment for convicted rapists. Police and courts rarely investigated or prosecuted rape cases, especially since survivors often did not report them. The law does not address spousal rape, nor does it specifically prohibit domestic violence, although assault is prohibited and punishable by imprisonment and fines.

During the year there were allegations that persons associated with the government raped women and children. Authorities investigated the allegations in some cases but denied the reports in other cases. On August 2, HRW reported that on June 8-9, members of the security forces raped a 53-year-old woman in the Northwest Region. Authorities did not order any investigation into the allegations (see also sections 1.a, 1.c., and 1.g.).

On April 29, Yaya Hamza Bamanga, an examining magistrate at the Koung-Khi High Court in Bandjoun, charged senior police inspector Asso'o Simon Jean with aggravated rape of a student (see also section 1.c.).

**Female Genital Mutilation/Cutting (FGM/C):** The law protects the bodily integrity of persons and prohibits genital mutilation for all women, including women ages 18 and older and girls younger than 18. Perpetrators are subject to a prison sentence of 10 to 20 years or imprisonment for life if the offender habitually carries out this practice for commercial purposes, or if the practice causes death. According to estimates by the UN Population Fund (UNFPA), FGM/C prevalence among girls ages 15 to 19 between 2004 and 2018 was zero percent. On February 6, the International Day of Zero Tolerance to Female Genital Mutilation, Minister of Women's Empowerment and the Family Marie Therese Obama met the Muslim community at the Yaounde Briquetterie neighborhood to raise awareness concerning FGM/C. Although the practice was gradually dying out as indicated by statistical data collected during the previous 10 years, the minister said she believed it continued in some areas. As in the previous year, anecdotal reports suggested children were subjected to FGM/C in isolated areas of the Far North,

East, and Southwest Regions and among the Choa and Ejagham ethnic groups.

**Other Harmful Traditional Practices:**  Widows were sometimes forcibly married to one of their deceased husband's relatives to secure continued use of property left by the deceased husband, including the marital home.  The government included provisions in the law outlawing the eviction of a spouse from the marital home by any person other than the other spouse.  The practice of widow rites, by which widows were subject to certain trials such as bathing in public or movement restrictions, was also prevalent in some parts of the country, including in some rural communities of the West Region.

**Sexual Harassment:**  The law prohibits sexual harassment.  Offenders may be subject to imprisonment for periods of six months to one year and a fine.  If the survivor is a minor, the penalty may be one to three years in prison.  If the offender is the survivor's teacher, the penalty may increase to three to five years in prison.  Despite these legal provisions, sexual harassment was widespread and there were no reports during the year that anyone was fined or imprisoned for sexual harassment, in part due to sexual harassment survivors' reluctance to file official complaints for fear of reprisal and or stigmatization.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The Ministry of Public Health offered counseling services to women during prenatal visits, promoting the concept of responsible parenthood and encouraging couples to use contraception to space the timing of their children.  Many women, however, lacked the means to manage their reproductive health, and societal pressures continued to reinforce taboos on discussing reproductive health within certain communities.  Women's dependence on receiving their husbands' consent continued to be a barrier in contraceptive decisions.

The government provided support to survivors of sexual violence and other forms of gender-based violence through the development of policies to protect survivors of gender-based violence, legal support to survivors via the judiciary network, general clinical care offered in health facilities, and collection of data through the District Health Information System and provision of situational analysis.  Many of

the prevention and basic support programs for survivors of gender-based violence were implemented by community-based organizations.

The Ministry of Health did not provide emergency contraception for survivors of gender-based violence. UNFPA provided a kit with emergency contraception as part of post-gender-based violence clinical care. These kits were offered in a few clinical sites that provided services to gender-based violence survivors.

UNFPA indicated that as of mid-September the contraceptive prevalence rate among all women ages 15 to 49 using any method was 27 percent, and 23 percent among married or in-union women ages 15 to 49. The information also indicated that contraceptive prevalence rate among all women ages 15 to 49 using a modern method was 22 percent and 17 percent among married or in-union women. Unmet need for family planning among all women ages 15 to 49 was 16 percent, while it was 23 percent of married or in-union women. Access to and availability of basic social services, including sexual and reproductive health care, however, were severely limited in conflict-affected regions, and many pregnant women did not have access to adequate maternal health care.

The 36 billion CFA francs ($65.5 million) Health Check project launched in 2015 in the Adamawa, North and Far North Regions to contribute to the reduction of maternal and child mortality came under review on March 4. Maternal and neonatal mortality decreased to 467 maternal deaths per 100,000 live births, and 28 neonatal deaths per 100,000 infants. Health checks were sold to women at a cost of 6,000 CFA francs ($11), which granted women access to four prenatal consultations, echography, delivery including cesarian and postnatal consultations, and a 42-day stay after delivery in a health-care facility.

**Discrimination:** The constitution provides women and men the same legal status and rights. The government, however, often did not enforce the law. In practice, women did not enjoy the same rights and privileges as men. Although local government officials claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions. The government did not implement any official discriminatory policy against women in such areas as divorce, child custody, employment, credit, pay, owning or managing business or

property, education, the judicial process, or housing.  There were legal restrictions to women's employment in some occupations and industries.  Within the private sector, fewer women occupied positions of responsibility.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution states in its preamble that the State shall protect "minorities and preserve the rights of indigenous populations in accordance with the law," but it does not mention specific categories that qualify as minorities or indigenous populations.  The laws and regulations on decentralization and elections also protect the rights of minorities by requiring that lists of candidates reflect the sociological landscape of constituencies, or that the office of president of a regional council or city mayor be held by a native of the constituency.  The government made efforts to enforce these provisions, but some forms of discrimination and violence persisted.

While there were no reliable reports of governmental or societal violence or discrimination against members of racial, ethnic, or national minorities, there were reports of violence along ethnic lines during the year, although it was not always clear whether ethnicity was the primary reason for the violence.

On September 8, in Tonga, Nde division of the West Region, four persons were killed and several others injured in clashes between IDPs from the Northwest and Southwest Regions and local Bamileke communities.  The conflict reportedly started when an Anglophone IDP killed a young Bamileke who was accused of theft.  The local gendarmerie legionnaire station was reportedly burned down during the clashes between the communities.

On December 5, clashes between the Mousgoum and Arab Choa ethnic groups regarding control of water resources broke out in the Logone and Chari division of the Far North Region, leaving 22 persons dead, approximately 30 injured, and tens of thousands displaced in Chad, according to UNHCR.  Thousands of persons fled to neighboring Chad for safety.  Approximately 30 other persons died in similar clashes earlier in August.

## Indigenous Peoples

Taking as basis the criteria for identifying indigenous populations contained in the International Labor Organization Convention 169 and the *Report of the African Commission's Working Group on Indigenous Populations/Communities*, the groups that may be considered indigenous in Cameroon are the Mbororo and the Baka. An estimated 50,000 to 100,000 Baka, including Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East Regions. The government did not effectively protect the civil or political rights of either group. Logging companies continued to destroy indigenous persons' naturally forested land without compensation. Other ethnic groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices. The government continued long-standing efforts to provide birth certificates and national identity cards to Baka. Nonetheless, most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in reaching homes deep in the forest.

There were credible reports from NGOs that the Mbororo, nomadic pastoralists living mostly in the North, East, Adamawa, and Northwest Regions, continued to be subject to harassment, sometimes with the complicity of administrative or judicial authorities. The Mbororo Social and Cultural Development Association indicated that the Anglophone crisis negatively affected the Mbororo community. According to the association program coordinator, between January and September 14, separatists were responsible for the killing of 10 Mbororos in the Northwest Region. Separatists reportedly burglarized 63 homes, burned down one house, and kidnapped 11 persons for ransom for a total of 7.61 million CFA ($13,800) during the same period.

## Children

**Birth Registration:** Children derive citizenship through their parents, but not through birth in the country's territory; the responsibility to register a child's birth falls upon parents. Birth registration was provided on a nondiscriminatory basis, but many births went unregistered because children were not always born in health facilities. Also, many parents faced problems in reaching local government offices. A diagnostic study and the complementary evaluation of the civil status

system conducted in 2016 revealed that the low level of birth registration was due to a multitude of factors, including administrative obstacles linked, among other things, to the nonfunctioning of civil status centers or their remoteness from the populations. In addition existing regulations that established the free declaration and registration of births were not respected in health facilities and in civil registration centers. Ignorance of laws and regulations and the neglect of the populations also contributed to inadequate birth registration. Children without birth certificates were unable to register for official examinations to enter secondary school or secure legally required identity documents.

Offices of Civil Affairs were located within municipal councils in each subdivision, and in many rural or remote areas, they were in civil status centers. In some jurisdictions parents would need to travel more than 15 miles to find an operational civil administrative office. Parents have until 90 days after a child is born to register the birth. After that time, a birth may only be registered by appealing to the local district prosecutor. To adjudicate and notarize official birth documents, a family would be expected to pay 15,000 to 25,000 CFA francs ($27-$46) and face bureaucratic obstacles, which most families from rural communities would struggle to afford, forcing many parents to abandon the process early. The president of the court sets the price to execute summary judgements, and the price for the execution varied by division and region.

According to a Ministry of Basic Education report released in March, an estimated 36 percent of the nearly five million primary students registered for the 2020-21 academic year did not have birth certificates. On March 8, Far North Region Governor Midjiyawa Barkary issued a report in which he said 40.6 percent of primary school students in the Far North Region did not have birth certificates.

**Education:** The law provides for tuition-free compulsory primary education up to the age of 12. The law punishes parents with sufficient means who refuses to send their child to school with a fine. Children were generally expected to complete primary education at 12 years of age. Secondary school students had to pay tuition and other fees in addition to buying uniforms and books. This rendered secondary education unaffordable for many children.

A 2019 UN Women report highlighted gender disparity in education, particularly

in secondary education. According to the report, the literacy rate in 2019 was lower for women and girls (86 percent) than for men and boys (97 percent).

During the year separatists ordered boycotts and attacked schools in the Southwest and Northwest Regions that continued to disrupt the normal school operations. According to the United Nations, two of three schools in the two regions were closed. Several teachers were killed or kidnapped during the year. On November 24, suspected separatist gunmen killed four students and one teacher in the Government Bilingual High School in Ekondi-Titi in the Southwest Region. At the beginning of the school year, school attendance in rural communities remained notably lower than school attendance in urban areas.

On January 9, according to credible accounts, separatists shot and killed a school principal in Ossing, a village in Mamfe subdivision of the Southwest Region. Local reports suggest the principal was attacked and shot in his neighborhood after returning from school that day. On February 2, armed separatists stormed Bamessing in Ngoketunjia division of the Northwest Region, killed two civilians for allegedly being traitors. On March 8, separatist fighters attacked a bus transporting passengers out of the Northwest Region at Akum, killing four civilians and wounding several others.

UNICEF reported that on June 6, members of an armed group attacked a religious center in Mamfe, Southwest Region, killing a 12-year-old boy and wounding a 16-year-old boy.

**Child Abuse:** The law prohibits various forms of child abuse, including but not limited to assault, indecency, kidnapping, forced labor, rape, sexual harassment, and situations where one parent refuses to disclose the identity of the other parent to the child. Despite these legal provisions, child abuse remained a problem. Children continued to suffer corporal punishment, both within families and at school. Boko Haram continued to abduct children for use as child soldiers or as suicide bombers (see section 1.g.), and adults, including persons associated with the government sexually assaulted children.

According to an article published in the daily newspaper *La Nouvelle Expression* on June 21, approximately 30 cases of rape of minors were recorded in 17 months

in the country. The article followed a survey conducted by Griote TV on the Day of the African Child. The authors claimed that between January and May, they identified at least 30 cases of child sexual abuse, with the survivors between three and 13 years of age, and that after investigation and discussions with families, it was clear that most of the sexual assaults involved members of the government security forces.

As of July 2, the West Region-based Association pour le developpement economique et la gouvernante locale (ADEGEL) claimed it documented 76 cases of physical violence perpetrated by men against young girls ages 12 to 14 in the Noum division, including 34 cases in Foumbot and 42 in Koptamou. ADEGEL highlighted the case of a 13-year-old girl who was gang-raped in mid-April by five men. Due to injuries suffered in the abuse, the survivor underwent restorative surgery with assistance from ADEGEL. The organization was in the process of compiling a file to share with the prosecutor's office, but as of October ADEGEL members had been unable to identify the assailants.

**Child, Early, and Forced Marriage:** The minimum legal age for marriage is 18. Despite the law, according to UNICEF's 2018 child marriage data, 31 percent of women between ages 20 to 24 were married before age 18 and 11 percent were married before age 15. Early and forced marriages, as well as abusive "temporal marriages," were more prevalent in the northern part of the country and some parts of the West Region, especially in the Noun division. As of July 2, ADEGEL stated it had documented 12 cases of forced marriage in Foumbot and petitioned the Court of First Instance to nullify the marriages. In March, however, the case files were completely destroyed after the court was set on fire following the death of an inmate.

Servitas Cameroon, a nonprofit organization which aims to support and empower women and young girls, documented the case of a 13-year-old girl forcefully married to a man who was more than four times her age at the time. She endured eight years of violence and isolation, which resulted in the birth of three children before she reached the age of 18, when a marriage certificate was issued. A consortium of civil society organizations, including Servitas and Women's Counseling and Information Center, assisted the survivor. The NGO consortium reported that they were pursuing legal action to nullify the marriage, and that the

case was pending before the Wouri High Court in Douala.

**Sexual Exploitation of Children:** The law prohibits the commercial sexual exploitation and the sale, offering, or procuring for child sex trafficking and practices related to child pornography. The country's legal framework requires a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore does not criminalize all forms of child sex trafficking. The law does not set a minimum age for consensual sex. According to anecdotal reports, traffickers exploited children younger than 18 in sex trafficking, although no statistics were available. Anecdotal reports suggested the crisis in the Northwest and Southwest Regions had contributed to a dramatic increase in child sex trafficking and number of early pregnancies, especially in areas with IDPs. Reports suggested the Bonaberi neighborhood in Douala was a hub for the sexual exploitation of underage IDP girls.

**Displaced Children:** Many displaced children continued to live on the streets of urban centers, although the number was in decline because of stringent security measures and a law that criminalizes vagrancy. According to estimates of the International Organization for Migration (IOM), there were 2,170 separated children and 1,790 unaccompanied children in the Far North Region as of 2020 (Multi-Sectoral Needs Assessment (MSNA), December 2020, IOM), including IDPs, returnees, out-of-camp refugees, and other migrants (see also sections 2.e. and 2.f.). During the year, among 3,369 households interviewed, 5 percent of 18,000 children were either unaccompanied or separated (*Return Intention Survey*, November 2021, IOM). These children faced many obstacles including limited access to school, health, and protection.

Thousands of children were affected by the humanitarian crisis in the Northwest and Southwest Regions. These children faced significant abuses of their rights by armed forces and nonstate armed actors alike. According to the August MSNA, there were approximately 769 unaccompanied and 8,320 separated children in the Northwest and Southwest Regions among the displaced population. These children faced many problems, including limited access to school, health care, protection, and risk of being recruited into armed groups. The government had not established structures to ensure that internally displaced children were protected from recruitment by nonstate armed groups and terrorist organizations.

**International Child Abductions:** The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The Jewish population was very small, and here were no known reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

Persons with disabilities could not access education, health services, public buildings, and transportation on an equal basis with others. A 2010 law provides additional protection to persons with physical, sensory, intellectual, or mental disabilities. The protections under the law cover access to education and vocational training, employment, health services, information and cultural activities, communications, buildings, sports and leisure, transportation, housing, and other state services. Some infrastructure projects were made accessible to persons with mobility challenges. Public education is free for persons with disabilities and children born of parents with disabilities. Initial vocational training, medical treatment, and employment must be provided "when possible," and public assistance "when needed." The government did not enforce these provisions effectively.

The government did not provide government information and communication in accessible formats.

The constitution protects the rights of all persons, including persons with disabilities. There were no reports of police or other government officials inciting, perpetrating, or condoning violence against persons with disabilities during the

year.

Many children with disabilities attended school with peers without disabilities. The government introduced inclusive education in many schools and reviewed the curriculum of teacher training colleges to include training in inclusive education skills. Other children with disabilities continued to attend separate schools, such as the Bulu Blind Center in Buea and the Yaounde Special School for Hearing-impaired Children.

Persons with disabilities did not receive adequate protection in conflict zones.

## HIV and AIDS Social Stigma

Persons with HIV often suffered social discrimination and were isolated from their families and society, in part also due to a lack of education on the disease. As in the previous year, while no specific cases of discrimination in employment were made public, anecdotal reports indicated some discrimination occurred with respect to HIV status, especially in the private sector.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

On February 12, a representative from Working for Our Wellbeing (WFW), an organization based in Douala working on lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) matters reported that authorities had arrested six LGBTQI+ persons, including four transgender women, between November 2020 and February 8. Mildred Loic Njeuken, known as "Shakiro," and Roland Moute, who is also known as "Patricia," were arrested together on February 8. The WFW report added that every detainee experienced varying degrees of physical abuse, harassment, and threats of sexual violence from inmates and guards while inside New Bell Prison in Douala. While the charges against all but Shakiro and Patricia were dropped, the latter two were convicted in May on charges of attempted homosexuality and failure to display a national identity card, and they were sentenced to five years in prison. They were released on bail in July, and as of December the case was before the Court of Appeal in Bonanjo. On August 7, a group of young men violently assaulted "Shakiro" and "Patricia" after they had

been released on bail pending an appeal in mid-July. Images and video footage found circulating on social media showed a group of young men violently attacking and disrobing the two survivors on the street. Police reportedly did not officially document the attack in an official report after arriving on the scene, although they escorted the two to the hospital.

In a July 1 report on gender-based violence, Alternative-Cameroon documented the case of a 33-year-old man who was illegally detained at the Douala New Bell Central Prison. On January 24, according to the report, residents in the Douala neighborhood accused the man of being gay, beat him, and called the Douala 10th police district. Police came and arrested the man whom the individuals accused of being homosexual and remanded him for less than 24 hours before referring him to New Bell Central prison, where he spent three months without appearing in court. The survivor lost his job and was evicted from his home.

Consensual same-sex sexual activity between adults is illegal and punishable with imprisonment lasting anywhere between six months and five years plus a fine.

LGBTQI+ human rights organizations such as the Cameroonian Foundation for AIDS, Humanity First Cameroon, Alternatives-Cameroon, the National Observatory of the Rights of LGBTQI+ Persons and Their Defenders, Colibri, Working for Our Wellbeing, and others continued to report arbitrary arrests of LGBTQI+ persons. LGBTQI+ individuals continued to face significant stigma, violence, and discrimination from their families, communities, and the government.

In one instance on February 24, highlighted in the April HRW report, police officers raided the office of Colibri, a health and human rights organization that provides HIV prevention and treatment services in Bafoussam, West Region. Authorities arrested 13 persons on attempted homosexuality charges, including seven from the Colibri staff. Police released all 13 between February 26 and 27. Three of those who were arrested said police beat at least three Colibri staff members at the police station and threatened everyone who had been arrested. They added that police interrogated them without the presence of a lawyer and forced them to sign statements, which they were not allowed to read. One of them, a 22-year-old transgender woman, said, "Police told us we are devils, not humans,

not normal.  They beat up a transwoman in front of me."  Police also forced one of the 13 arrested, a 26-year-old transgender woman, to undergo an HIV test and a forced anal exam at a health center in Bafoussam on February 25.  She reportedly told HRW that "the doctor was uncomfortable with performing the procedure but said he had to do the examination because the prosecutor's office asked for it."

On April 14, HRW reported that security forces since February had arbitrarily arrested, beat, or threatened at least 24 persons, including a 17-year-old boy, for alleged consensual same-sex conduct or gender nonconformity.  Between February 17 and April 8, HRW said it interviewed 18 persons, including five who had been detained, three lawyers, and 10 members of LGBTQI+ NGOs in relation to the aforementioned case.

The constitution prescribes equal rights for all citizens; however, the law does not explicitly prohibit discrimination against LGBTQI+ persons in housing, employment, nationality, and access to government services such as health care.  Security forces sometimes harassed persons based on their perceived sexual orientation or gender identity, including individuals found with condoms and lubricants.  Fear of exposure affected individuals' willingness to access HIV and AIDS services, and several HIV positive men who had sex with men reportedly were partnered with women, in part to conceal their sexual orientation.  Anecdotal reports suggested some discrimination occurred in places of employment with respect to sexual orientation.

LGBTQI+ organizations could not officially register as such and thus sought registration either as general human rights organizations or as health-focused organizations.  Many LGBTQI+ organizations found that operating health programs, particularly HIV programs, shielded them from potential harassment or shutdown rather than promoting advocacy for LGBTQI+ persons as their primary mission.

According to multiple reports, on November 15, an intersex person was sexually assaulted, beaten, and threatened by a violent mob in Yaounde.  The attack, which lasted for several hours, was filmed and later posted on social media.  In a press statement issued on November 26, the minister of communication condemned the publication of explicit videos, adding that while homosexuality was against the

law, violence against those suspected of homosexuality was also illegal.  A man allegedly connected to the attack was arrested and released 48 hours later.  A complaint was filed with the police on behalf of the survivor.

## Other Societal Violence or Discrimination

Several cases of vigilante action and arson attacks were reported involving arbitrary killings and destruction of both public and private property.  According to multiple media reports, the mutilated body of Fouodji Flaubert, a person with albinism who went missing days earlier, was found dead on August 29 in the Bafoussam neighborhood of Djeleng 2, West Region.  According to Bafoussam I police district officials, as reported by *La Nouvelle Expression* on September 1, Fouodji's body was missing certain organs.  Waffo Marie Madeleine, the president of the Association of Albino Women of Cameroon, said in April and May that she had received information from unidentified individuals who were planning to abduct persons with albinism in Bafoussam.  She reportedly passed the information on to the minister of social affairs, who promised to take some precautions at the level of the ministry to safeguard its citizens.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the rights of workers to form and join independent unions, bargain collectively, and conduct strikes, albeit with significant restrictions.  The right does not apply to defined groups of workers, including defense and national security personnel, prison administration civil servants, and judicial and legal personnel.  The law also prohibits antiunion discrimination and requires the reinstatement of workers fired for union activity.  Statutory limitations and other practices substantially restricted these rights.  The law does not permit the creation of a union that includes both public- and private-sector workers or the creation of a union that includes different, even if closely related, sectors.  The law requires that unions register with the government, have a minimum of 20 members, and formalize the union by submitting a constitution and bylaws.  Founding members must also have clean police records.  Those who form a union and carry out union activities without registration may be fined.  More than 100 trade unions and 12

trade union confederations were in operation, including one public sector confederation. Trade unions or associations of public servants may not join a foreign occupational or labor organization without prior authorization from the minister of territorial administration, who is responsible for "supervising public freedoms."

The constitution and law provide for collective bargaining between workers and management as well as between labor federations and business associations in each sector of the economy. The law does not apply to the agricultural or informal sectors, which included most of the workforce.

Legal strikes or lockouts may be called only after conciliation and arbitration procedures are exhausted. Workers who ignore procedures to conduct a strike may be dismissed or fined. Free industrial zones are subject to some labor laws, but there are several exceptions. The employers have the right to determine salaries according to productivity, the free negotiation of work contracts, and the automatic issuance of work permits for foreign workers. Some laws intended to target terrorists may impose harsh legal penalties on legitimate trade union activity.

The government and employers did not effectively enforce the applicable laws on freedom of association and the right to collective bargaining. Penalties for violations were rarely enforced and were not commensurate with those for comparable violations. Administrative judicial procedures were infrequent and subject to lengthy delays and appeals.

Collective agreements are binding until three months after a party has given notice to terminate. As in the previous year, there were no reported allegations that the minister of labor and social security negotiated collective agreements with trade unionists who had nothing to do with the sectors concerned and did not involve trade union confederations that prepared the draft agreements.

Many employers continued to use subcontractors to avoid hiring workers with collective bargaining rights. Major companies, including quasi-state-run and or - operated companies, reportedly engaged in the practice, according to workers from Energy of Cameroon, the water company Camerounaise des Eaux, cement manufacturer Cimencam, Guinness, Aluminum Smelter, Cameroon Oil

Transportation Company, Ecobank, and many others. Subcontracting reportedly involved all categories of personnel, from the lowest to senior levels. As a result workers with equal expertise and experience did not always enjoy similar protections when working for the same business, and subcontracted personnel typically lacked a legal basis to file complaints.

As in 2020, workers' representatives said some workers were granted technical leave because of the COVID-19 pandemic, which took a heavy toll on most businesses. Several strikes were announced. Some were called off after successful negotiations, others were carried out peacefully, while others faced some degree of repression.

The National Union of Higher Education Teachers (SYNES) called on its members to suspend lectures from January 25 to 30. University teachers were protesting the nonpayment of the quarterly modernization and research bonuses, an incentive they had been receiving since 2009. They also protested the new method of evaluating undergraduate students, in particular the introduction of multiple-choice questions, which they deemed to be inappropriate. In an interview posted on YouTube, Jeannette Wagging, SYNES' communications secretary, acknowledged that authorities had begun making payments, but she said the union would continue to make sure all teachers received bonuses.

On June 10, the leaders of the country's national public transport unions issued a notice to strike beginning on July 12. According to the union leaders, commercial motorbike riders lacked sufficient insurance coverage to compensate vehicles damaged during accidents. Also, unions protested the increase in the cost of insurance for cab drivers from 40,000 CFA francs ($73) to 60,000 CFA francs ($109). Trade unions denounced the fact that urban buses were paying the same taxes as interurban buses. After a series of consultations at the Ministry of Labor and Social Security, the union leaders suspended the strike to give the government more time to address the problems.

The General Union of Transporters of Cameroon also announced a strike on the transport of goods in the commercial trucking sector beginning on September 6. The truckers were protesting what they characterized as illegal surcharges.

On September 22, during the 28th and 29th sessions of the Consultation and Monitoring Committee of the Social Dialogue, the minister of labor and social security announced that 102,000 workers had lost their jobs because of the COVID-19 pandemic. The minister invited the social partners to make proposals to him for the use of COVID-19 pandemic funds to limit the effects of the coronavirus in the world of work.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit all forms of forced and compulsory labor. The law prohibits slavery, exploitation, and debt bondage and voids any agreement in which violence was used to obtain consent. Penalties for violations were commensurate with those for other serious crimes. The law also extends culpability for all crimes to accomplices and corporate entities. Although the statutory penalties are severe, the government did not enforce the law effectively, in part due to a lack of capacity to investigate trafficking, limited labor inspection and remediation resources, and regular conflation of human trafficking and migrant smuggling. In addition due to the length and expense of criminal trials and the lack of protection available to victims participating in investigations, many victims of forced or compulsory labor resorted to accepting out-of-court settlements. Anecdotal reports of hereditary servitude imposed on former slaves in some chiefdoms in the North Region continued. Many members of the Kirdi, a predominately Christian and animist ethnic group enslaved by the Muslim Fulani in the 1800s, continued to work for traditional Fulani rulers for compensation in room and board and generally low and unregulated wages, while their children were free to pursue schooling and work of their choosing. Kirdi were also required to pay local chiefdom taxes to the Fulani, as were all other subjects. The combination of low wages and high taxes (although legal) effectively constituted forced labor. While technically free to leave, many Kirdi remained in the hierarchical and authoritarian system because of a lack of viable alternative options.

Anecdotal reports suggested that in the South and East Regions, some Baka, including children, continued to be subjected to unfair labor practices by Bantu farmers who hired the Baka at exploitative wages to work on their farms during the harvest seasons.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits most of the worst forms of child labor and sets 14 as the minimum age of employment. The law prohibits children from working at night or longer than eight hours per day. It also outlines tasks children younger than 18 may not legally perform, including moving heavy objects, undertaking dangerous and unhealthy tasks, working in confined areas, and commercial sex. Employers are required to provide skills training to children between the ages of 14 and 18. Because compulsory education ends at the age of 12, children who were not in school and not yet 14 were particularly vulnerable to child labor. Laws relating to hazardous work for children younger than 18 are not comprehensive, since they do not include prohibitions on work underwater or at dangerous heights. Children engaged in hazardous agricultural work, including cocoa production. The law provides penalties ranging from fines to imprisonment for those who violate child labor laws. These penalties were commensurate with those for comparable crimes, such as kidnapping.

Children younger than the minimum age of employment tended to be involved in agriculture, fishing and livestock, the service industry, sex work, and artisanal gold mining. Children in refugee or IDP camps were particularly vulnerable to the worst forms of child labor, including commercial sexual exploitation. Reports also indicated some internally displaced children from the crisis in the Northwest and Southwest Regions were exploited in farm work, and children who escaped child and early marriages often ended up as survivors of sexual exploitation, especially in the Noun division of the West region. There were reports of underage children associated with nonstate armed groups in the Far North, Southwest, and Northwest Regions. In agriculture children were exposed to hazardous conditions, including climbing trees, handling heavy loads, using machetes, and handling agricultural chemicals. Children in artisanal gold mines and gravel quarries spent long hours filling and transporting wheelbarrows of sand or gravel, breaking stones without eye protection, and digging and washing the soil or mud, sometimes in stagnant water, to extract minerals. These activities left children vulnerable to physical injuries, waterborne diseases, and exposure to mercury. Children worked as street

vendors; in fishing, where they were exposed to hazardous conditions; and largely alongside families and rather than for formal employers. Children were subjected to forced begging as *talibes* in Quranic schools.

Traffickers exploited children in domestic service and restaurants, as well as begging or vending on streets and highways. Additionally, criminal elements forced children to work in artisanal gold mining, gravel quarries, fishing, animal breeding, and agriculture (on onion, cotton, tea, and cocoa plantations), as well as in urban transportation assisting bus drivers and in construction to run errands, work, or provide security. Media reports indicated exploitation in the country's fishing sector was widespread. Extremist groups, such as Boko Haram, forced children to work as scouts, porters, and cooks.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

The law contains no specific provisions against or penalties for discrimination, but the constitution in its preamble provides that all persons shall have equal rights and obligations and that every person shall have the right and the obligation to work.

Discrimination in employment and occupation allegedly occurred with respect to ethnicity, HIV status, disability, gender, and sexual orientation, and gender identity especially in the private sector. There were legal restrictions on women's employment in occupations deemed arduous or "morally inappropriate" and in industries including mining, construction, factories, and energy. Members of ethnic groups often gave preferential treatment to other members of their group in business. Persons with disabilities reportedly found it difficult to secure and access employment. There were no reliable reports of discrimination against internal migrant or foreign migrant workers, although anecdotal reports suggested such workers were vulnerable to unfair working conditions. The government took no action to eliminate or prevent discrimination and kept no records of incidents of discrimination.

Credible reports of discrimination against workers with disabilities persisted. For example, Bonfeu Eric Michel, a visually impaired citizen and disability rights

activist, complained to the president that despite his qualifications and antidiscrimination laws, multiple state-owned and private companies refused to hire him due to his visual impairment.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The minimum wage in all sectors was greater than the World Bank's poverty line. Premium pay for overtime ranged from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it was weekend or late-night overtime. Despite the minimum wage law, employers often negotiated lower wages with workers, in part due to the extremely high rate of underemployment in the country. Salaries lower than the minimum wage remained prevalent in the public works sector, where many positions required unskilled labor, as well as in domestic work, where female refugees were particularly vulnerable to unfair labor practices.

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities. There are exceptions for guards and firefighters (56 hours per week), service-sector staff (45 hours per week), and household and restaurant staff (54 hours per week). The law mandates at least 24 consecutive hours of rest weekly.

The Ministry of Labor and Social Security is responsible for enforcement of the minimum wage and workhour standards but did not enforce the law. Penalties for violations of the law were not commensurate with those for comparable crimes, such as negligence. The government more than doubled the total number of labor inspectors, but the number was still insufficient, and the ministry lacked the resources for a comprehensive inspection program.

**Occupational Safety and Health:** The government sets health and safety standards in the workplace. The minister in charge of labor matters establishes the list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety. Ministry inspectors and occupational health physicians are responsible for monitoring health and safety standards.

The regulations were not enforced in the informal sector. The labor code also

mandates that every enterprise and establishment of any kind provide medical and health services for its employees.  This stipulation was not enforced.

**Informal Sector:**  According to International Labor Organization estimates as of December 2020, the employment situation in the country could be characterized by the large size of its informal economy.  The International Labor Organization further indicated that informal workers, who represented 90 percent of all employed, were mostly women.  Sectors where informal employment was most prevalent included artisanal mining, petty trade, hunting and fishing, and handicraft.  The informal economy was mostly unregulated.

# CAMEROON 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cameroon is a republic dominated by a strong presidency. The president retains power over the legislative and judicial branches of government. The ruling political party, the Cameroon People's Democratic Movement, has remained in power since its creation in 1985. The country held legislative elections in February 2020 that were marked by irregularities. The ruling party won 152 of 180 National Assembly seats. Paul Biya has served as president since 1982. He was last reelected in 2018 in an election observers described as marked by irregularities.

The national police and the national gendarmerie are responsible for internal security. The national police report to the General Delegation of National Security and the national gendarmerie reports to the Secretariat of State for Defense in charge of the Gendarmerie. The army shares some domestic security responsibilities; it reports to the minister delegate at the presidency in charge of defense. The Rapid Intervention Battalion reports directly to the president. Civilian and military authorities at times did not maintain effective control over the security forces. There were credible reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearances; torture and other ill-treatment by the government and nonstate armed groups; harsh and life-threatening prison conditions; arbitrary arrests or detention; political prisoners or detainees; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including abductions and physical abuse, by nonstate armed groups; serious restrictions on freedom of expression, including violence, threats of violence, or unjustified detentions of journalists and censorship; substantial interference with the right of peaceful assembly and freedom of association; serious restrictions on freedom of movement; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation;

Country Reports on Human Rights Practices for 2022
United States Department of State • Bureau of Democracy, Human Rights and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 243 of 352

serious government corruption; lack of investigations and accountability for gender-based violence; crimes involving violence or threats of violence targeting members of ethnic groups, including the Massaga and Oliti communities in the Southwest Region and herders and farmers in the Northwest Region; trafficking in persons; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and the existence or use of laws criminalizing same-sex sexual conduct between adults.

Although the government took steps to identify, investigate, prosecute, and punish officials who committed human rights abuses or corruption, it did not do so systematically and rarely made public the outcome of such procedures. Impunity remained a serious problem.

Armed separatists, Boko Haram, the Islamic State of Iraq and Syria-West Africa, and criminal gangs also committed significant human rights abuses, some of which were investigated by the government.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary and unlawful killings through excessive use of force in the course of their official duties. As in the previous year, most of the killings were associated with the crisis in the Northwest and Southwest Regions (see also section 1.g., Abuses in Internal Conflict). No specific racial or ethnic communities were disproportionately targeted among the victims. There were also credible reports that armed groups in the Northwest and Southwest Regions, as well as Boko Haram and the Islamic State of Iraq and Syria-West Africa (ISIS-WA) in the Far North Region, committed unlawful killings.

The Ministry of Defense, through the Secretariat of State in charge of the National Gendarmerie (SED), is responsible for investigating whether killings attributed to defense and security forces are justifiable. Investigations concerning police-perpetrated killings may be conducted by the General Delegation of National

Security through its Special Division for Services Control. In some cases, preliminary investigations are entrusted to a mixed commission of inquiry, including civilian members with relevant professional backgrounds. Prosecutions related to these matters are conducted through the Military Tribunal.

In a May 29 release, Mandela Center International (MCI) reported that four soldiers of the 31st Motorized Infantry Battalion (BIM) of the Cameroonian army based in Tchollire, North Region, shot and killed Souleymanou Bouba, age 22, on April 28. According to MCI, Bouba and two other herders were returning to Cameroon with their animals from the Central African Republic (CAR) when they crossed the border and found the BIM absent from their established checkpoint. When the soldiers returned to their post and found animals and herders had crossed the CAR border into Cameroon without authorization, they pursued Bouba and his companions, located them 30 minutes from the border, and opened fire, reportedly without warning, killing Bouba. As of year's end, the case was ongoing, although the four soldiers had been released.

Northwest Governor Adolphe Lele Lafrique announced that on April 12, an armed secessionist group attacked a vehicle carrying four prison officials in Takija Kikaikelaki, a village near Kumbo in the Northwest Region. The assailants killed the four occupants of the vehicle: Kiga Theodore, the Northwest prison administration delegate; prison administrator Nang Leonel; senior prison guard Afuh Nelson; and Awono Yannick, another prison guard and driver of the vehicle. The separatists who claimed responsibility for the attack posted a video of the killings on social media. In the video, they could be seen beating the four civil servants with sticks and machetes before using their weapons to execute them.

On September 6, in Muyuka subdivision of the Southwest Region, heavily armed individuals believed to be separatists opened fired on a public bus from Douala, killing six occupants of the bus: a woman, Oba Dilonga; and five men identified as Tabi Enow, Achidi Abel, Yancho Fancis Neba, Keneth (no known last name), and the driver.

Boko Haram and ISIS-WA continued killing civilians, including members of vigilance committees, which are organized groups of residents cooperating with government forces in the Far North Region. Throughout the year, Boko Haram

and ISIS-WA attacked civilians 288 times, killing 134 and wounding 39. Boko Haram and ISIS-WA also killed 34 defense and security personnel and wounded 47. On May 19, terrorists attacked the locality of Tourou, killing three soldiers, including the head of the Hitaoua military post, and four civilians, including Wassa Ayouba (age 45), Danagai Guedjere (age 17), Ali Dorondo (age 63), and Zawala Moskota (age 5), according to the private newspaper *Oeil du Sahel*. On the night of May 30, an attack on Hitawa left seven persons dead and several others wounded. During a June 13 attack, terrorists killed three civilians and stole the food supplies of residents. On the night of June 25-26, terrorists killed two members of the joint multilateral force at Boudouwa, Mayo Sava division.

Although the government repeatedly promised to investigate abuses committed by security forces, it did not do so transparently or systematically. Following the April 2020 release of a summary of the findings of an investigation into the February 2020 killing by security forces of an estimated 23 civilians in the village of Ngarbuh, legal proceedings started against three security force members, 17 members of a vigilance committee, and one former separatist fighter, indicted on murder charges, at the Yaoundé Military Tribunal in June 2021, after multiple adjournments. As of the end of December 2021, only the three security force members had appeared before the court, while the members of the vigilance committee and the former separatist fighter were still awaiting their court appearance. At year's end, the court had not issued any final verdict, and the soldiers were not in detention.

## b. Disappearance

As in the previous year, there were reports of individuals held incommunicado by, or on behalf of government authorities, typically for brief periods of time immediately following arrest.

On July 16, for example, according to multiple accounts, members of the army allegedly arrested Dr. Punjom Njefi Yves, the chief medical officer of Bafut district hospital, in the Northwest Region. A military contact reportedly invited Punjom to a Bafut military base. Once at the military base, officials reportedly informed Punjom they suspected him of aiding separatists by providing medical assistance to injured combatants. On his way back from the military base,

unidentified masked men detained Punjom and took him to an undisclosed location. Punjom reportedly discovered six days later that he was at a Rapid Intervention Battalion (BIR) camp in Bamenda, Northwest Region. Barrister Amungwa Nde Ntso Nico claimed Punjom's wife told him that she did not hear from her husband again until July 30 when he informed her that he had been transferred to the SED in Yaoundé. The Cameroon Human Rights Commission (CHRC) confirmed the arrest, although with slightly differing details. According to the Commission, Punjom was arrested on July 8 under suspicion of financing terrorism and was brought before the military tribunal for the first time on August 26. He was transferred to the SED and again transferred to the Yaoundé Kondengui Central prison on September 9. The CHRC relayed that officials from SED and the Yaoundé Military Tribunal stated that Punjom had never been denied the ability to communicate with his family or his lawyer. As of December, the investigation continued, and visits to the detainee were allowed, subject to authorization by the Government Commissioner, according to the CHRC.

On January 13, armed separatists kidnapped 10 workers of the Cameroon Development Corporation Likomba rubber estate plantation in Tiko, Southwest Region, and set their tractor ablaze. In a video that surfaced online on January 15, the voices of some men, who identified themselves as "Ambazonia Restoration Forces," could be heard forcing the workers to apologize for working on the estate. One of the messages from the kidnappers suggested that the workers were kidnapped because they were being guarded by the military. The kidnappers handed guns and grenades to the plantation workers and said they should help them fight the military in Tiko. The workers remained in captivity for weeks.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although the constitution and law prohibit such practices, there were reports that security force members tortured or otherwise abused individuals. Human rights organizations documented several cases in which security forces, and traditional and religious authorities severely mistreated civilians, including children, and others in which armed separatists mistreated civilians and members of defense forces. Prison guards reportedly abused detainees during the year. In its April

*Where Does Torture Take Place Around the World* report, nongovernmental organization (NGO) Freedom from Torture reported that citizens were tortured for their opposition to the state as well as for their perceived sexual orientation.

NGO Human Rights Watch reported that on April 10, when two lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons went to the gendarmes to report being attacked, the gendarmes on duty beat them. The men said the gendarmes held them on the floor threatened to kill them, searched their cell phones, ordered them to remove their shoes and beat the soles of their feet with a machete. They were reportedly released the following day after paying a bribe.

Human Rights Watch reported that on April 24, soldiers from the BIR severely beat and then detained between 30 and 40 motorbike riders outside of Ndop, because the soldiers allegedly suspected them of being separatist fighters. Human Rights Watch spoke to two of the motorbike riders who told them the soldiers forced them to undress and beat them with an iron hammer and their belts and kicked them. One of the motorbike riders estimated the beating lasted more than four hours. (Also see section 1.d., Arbitrary Arrest.)

Sébastien Ebala, who alleged he was previously tortured by security forces, told NGO SOS-Torture Network that Colonel Joel Émile Bamkoui called him on June 22 and threatened to arrest and torture him again as retaliation for Ebala coming forward publicly with his allegations of being tortured.

There were new reports during the year on cases of torture previously not publicly known. In February, Human Rights Watch released a report claiming it documented 14 cases of physical abuse or assault of individuals who had been deported to the country. Human Rights Watch alleged 13 of these cases were abuse or assault by government authorities and one case of physical abuse or assault by armed separatists. Human Rights Watch further reported that government agents raped three women in custody, subjected a man to forced labor, and severely beat individuals returned to the country after deportation. Human Rights Watch assessed several of these cases amounted to torture. In one example, a woman told Human Rights Watch she was tortured and raped by gendarmes or military men during six weeks in detention in Bamenda, Northwest Region. She

said they used ropes, tubes, boots, and belts to hit her over all her body. She said they told her she destroyed the image of the country, so she had to pay for it.

As of September, authorities had not officially released information regarding the outcome of the investigation concerning the two soldiers, two gendarme officers, and four policemen, who in February 2021 were accused of abusing a civilian in the Northwest Region. In August 17 comments, the president of the CHRC remarked that under international human rights law, the government was not required to publish the findings of the investigation. He suggested that authorities did what was essential, including putting an end to the abuses and punishing the perpetrators.

NGOs indicated armed separatists frequently sexually assaulted civilians in the Northwest and Southwest Regions (see also section 1.g., Physical Abuse, Punishment, and Torture).

During the evening of January 31 in Garoua, North Region, Ali Youssef, approximately age 17, died at the palace of his uncle and traditional ruler, the Lamido of Garoua, under suspicious circumstances, and his body was quickly buried. A press release from the Lamido's palace indicated that Youssef was under the influence of drugs and had been taken in at the request of his mother by his uncle. According to the press release, Youssef died of heart failure while he was undergoing detoxification. On February 2, Youssef's body was exhumed following instructions from local administrative authorities. The autopsy revealed signs of harsh treatment, and authorities referred the case to the military court in Garoua. Suspects associated with the case included Lamido Ibrahim El Rachidine; Mairamou, the Lamido's elder sister and mother of the deceased; and two soldiers assigned to the Lamido's palace. As of the end of August, all the suspects except the Lamido had reportedly been interrogated and officially indicted. Referring to the issue, the president of the CHRC indicated on September 16 that his organization could, if need be, intervene as amicus curiae, to make the Lamido appear before the court. As of December, no further action had been reported.

In a news broadcast on May 24, the state-owned Cameroon Radio and Television national station reported that authorities discovered a Quranic school transformed into a traditional prison in the Sabongari neighborhood of Ngaoundere, Adamawa

Region.  Quranic masters reportedly held 70 youths in the prison and subjected them to physical abuse daily.  Their parents had entrusted them to the Quranic instructors and believed the children were at a boarding school.  The children provided testimonies that suggested they spent all their time chained, had nothing to eat, and were denied showers.  Adamawa Governor Kildadi Taguieke Boukar, who visited the location on May 23, ordered the release of the children, the immediate closure of the prison, as well as an investigation.  As of early September, there were no reported developments concerning the investigations.

While investigations and prosecutions were conducted and punishments imposed, the government rarely publicized the outcome of the various investigations, and impunity remained a problem.  Corruption, government reluctance to acknowledge officials' errors or malfeasance, and judicial opacity contributed to impunity.  The General Delegation of National Security and the Secretariat of State for Defense in charge of the National Gendarmerie investigated some abuses.  The government levied punitive action against convicted low-level offenders, and other investigations continued as of year's end.

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening due to food shortages, poor-quality food, gross overcrowding, physical abuse, as well as inadequate sanitary conditions and medical care.

**Abusive Physical Conditions:**  Overcrowding remained a significant problem in most prisons, especially in major urban centers.  The country's prisons have the designed capacity to accommodate 19,415 inmates.  Responding to a question on the implementation of alternative penalties provided for by the code of criminal procedure, Minister of Justice Laurent Esso told parliamentarians on June 27 that the penitentiary administration had 4,351 personnel for a prison population of 32,003 inmates.  Furthermore, in a report released in May, the International Federation of Actions by Christians for the Abolition of Torture (ACAT) Littoral, indicated that the six functional prisons in the Littoral Region, with an intake capacity of 1,550, had a total population of approximately 6,000 inmates.  The Douala New Bell Central Prison alone, according to ACAT, had 4,000 to 4,500 inmates in the facility, which had a designed capacity of 800.

Officials held prisoners in dilapidated, colonial-era prisons. Authorities often held pretrial detainees and convicted prisoners in the same cells. In some cases, women detainees had better conditions, including improved toilet facilities and less-crowded living quarters. Prisons generally had separate wards for men, women, and children. Authorities reported that the sick were held separately from the general prison population, but this was often not the case.

The conditions in detention cells located at gendarmerie and police units were worse. The cells were generally very narrow, and most of them lacked toilets and windows. Virtually all lacked beds. Unlike prisons that had separate wards for men, women, and children, separation of detainees by age and sex was not systematic in gendarmerie and police unit cells. Prison officials made extensive use of shackling as a disciplinary measure.

Access to food, potable water, sanitation, heating, ventilation, lighting, and medical care was inadequate. Inmates in the Littoral Region for example, according to ACAT, received only one meal per day. While the daily prison food appropriation per inmate increased in 2018 to 371 CFA francs (approx. 60 cents), prison officials reportedly complained that once budgeted at the beginning of the year, the food appropriation was seldom adjusted, no matter how much the prison population increased during the year. Inmates were exposed to malnutrition, tuberculosis, bronchitis, malaria, hepatitis, scabies, and numerous other contagious diseases. Cholera broke out in the Douala New Bell Central Prison in February and resurged in August, killing more than a dozen inmates as of September 1, including a member of the Cameroon Renaissance Movement (MRC), according to credible reports. Anecdotal reports suggest that poor prison conditions also promoted the development of illicit practices such as the sale of drugs, enslavement of indigent inmates, as well as male and female prostitution. Prisoner-on-prisoner violence occurred during the year.

**Administration:** Authorities allegedly did not address all credible allegations of mistreatment. Visitors for ordinary inmates needed to comply with regulations, including visiting during approved hours, observing COVID-19 pandemic-related barrier measures, and limiting the number of visitors per inmate at the same time. For politically sensitive cases, however, visitors often had additional requirements, including formal authorization from the state counsel or the government

commissioner, without which they often resorted to bribing prison staff members to communicate with inmates.

**Independent Monitoring:** Independent monitoring of prisons continued to be constrained by COVID-19 pandemic-related restrictions. Diplomatic missions were granted access to visit their nationals. The CHRC regularly conducted visits to review prison conditions as part of its statutory mission. During a May 24-26 training workshop in Yaoundé, the CHRC leadership indicated that they conducted visits in 30 detention facilities in the Far North, Northwest, West, Southwest and Adamawa Regions during the first quarter of the year. The government did not readily allow independent human rights groups access to review prison conditions. Most organizations alleged that access to prisons mostly depended on the relationships between the leaders of the organizations and prison officials.

**Improvements:** The minister of justice appointed the management team of the new Douala-Ngoma Central Prison on January 4, and the team was officially commissioned on February 18. The prison, completed in 2020 with an intake capacity of 1,500 inmates, reportedly received its first inmates on September 4, when 200 prisoners were reportedly transferred to the prison from the Douala New Bell Central Prison.

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention and provide for the right of any person to challenge the lawfulness of their arrest or detention in court. The law states that except in the case of an individual discovered in the act of committing a felony or misdemeanor, the officials making the arrest must disclose their identity and inform the detainee of the reason for their arrest. Under the law, any person illegally detained by police, the state counsel, or the examining magistrate may, when the proceedings end in a no-case ruling or an acquittal which has become final, receive compensation if the defendant proves that they have suffered injury of a particularly serious nature because of such detention. The government did not always respect these provisions.

**Arrest Procedures and Treatment of Detainees**

The law requires police to obtain a warrant from a judge or prosecutor before

making an arrest, except when a person is caught in the act of committing a crime, but police often did not respect this requirement. The law provides that suspects be brought promptly before a judge or prosecutor, although this often did not occur, and citizens were detained without judicial authorization. Police may legally detain a person in connection with a common crime for up to 48 hours, renewable once. This 48-hour period may, with the written approval of the state counsel, be exceptionally extended twice before charges are brought. Nevertheless, police and gendarmes reportedly often exceeded these detention periods. The law also permits detention without charge for renewable periods of 15 days by administrative authorities, such as governors and civilian government officials serving in territorial command.

The law provides that individuals arrested on suspicion of terrorism and certain other crimes may be detained for investigation for periods of 15 days, renewable without limitation with authorization of the prosecutor. The law allows access to legal counsel and family members, although police frequently denied detainees access to both. The law prohibits incommunicado detention, but such cases occurred, especially in connection with the conflicts in the Northwest and Southwest Regions. The law permits bail, allows citizens the right to appeal to recuse judges and provides the right to sue for unlawful arrest, but these rights were seldom respected. Bail was approved only on a selective basis, and applications to recuse judges with conflicts of interest rarely succeeded, especially in politically sensitive cases.

**Arbitrary Arrest:** Police, gendarmes, the BIR, and other government authorities reportedly continued to arrest and detain persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado.

Multiple credible sources, including the Working Group on Human Rights, reported that on April 24, BIR soldiers detained and beat between 30 to 40 motorbike riders who were part of a funeral convoy heading to Oku from Ndop. The soldiers suspected the bike riders of collaborating with separatists and took them to the BIR base in Ndop. HRW indicated that the soldiers then transferred 23 of the bike riders to the BIR base in Bafut, approximately 27 miles from Ndop, where they held them incommunicado for approximately three weeks. On May 21, the 23 detainees were reportedly moved to the central prison in Bamenda. The

group appeared before the Bamenda Military Court at least twice as of June, but they were not yet formally charged as of December.

On May 29, in Bafoussam, West Region, according to credible NGOs and the victim himself, barrister Jean Claude Tella, a lawyer with the Cameroon Bar Association, was on his way to a meeting when three persons in civilian clothes forcibly took him to the local gendarmerie. The officials neither produced a warrant nor disclosed the reason for the arrest. While at the gendarmerie, the lawyer realized that two of the individuals were gendarmes. Tella disclosed his identity and asked to be informed regarding the reasons for his arrest. Tella stated that the gendarmes subjected him to acts of physical abuse and released him the next day after the intervention of his colleagues. Tella said he filed a complaint with the Prosecutor General's Office, and the prosecutor forwarded the file to the gendarmerie legion for investigations. As of mid-October, the gendarmerie had reportedly forwarded the file to the government commissioner at the Bafoussam Military Tribunal without interrogating all suspects.

**Pretrial Detention:** The code of criminal procedure provides for a maximum of 18 months' detention before trial, but many detainees waited years to appear in court. The 2014 antiterrorism law provides that a suspect may be held indefinitely in investigative detention with the authorization of the prosecutor. According to estimates by the Human Rights Commission of the Cameroon Bar Association, there were 18,437 pretrial detainees in a total of 31,815 inmates as of September. Some of the detainees had been awaiting trial for more than five years. In some cases, the length of pretrial detention equaled, and in other cases exceeded, the maximum sentence for the alleged crime. Other factors contributing to lengthy pretrial detentions included, but were not limited to, insufficient staff, mismanagement of case files, the defendant's inability to pay court fees, and the politicization of some legal proceedings that required direction from authorities in the central government. According to estimates by ACAT Littoral, 3,500 out of the 4,000 to 4,500 inmates at the Douala-New Bell Central Prison were pretrial detainees as of January. The bar association estimates from 2021 indicated close to 60 percent of inmates nationwide were pretrial detainees.

On December 20, the Special Criminal Court found Amadou Vamoulké guilty of embezzlement and sentenced him to 12 years' imprisonment, after more than six

years of detention and more than 90 hearings. The court also ordered him to pay a 47 million CFA francs ($76,400) fine. Vamoulké, a former general manager of state-owned Cameroon Radio Television, was arrested and detained in 2016 on embezzlement charges. The UN Working Group on Arbitrary Detention declared in 2020 that "the violations of the right to due process are of such gravity that they confer an arbitrary character on Vamoulké's detention."

## e. Denial of Fair Public Trial

The constitution and law provide for an independent judiciary, but the government did not always respect judicial independence and impartiality. In some instances, the outcomes of trials appeared influenced by the government, especially in politically sensitive cases. In other cases, the government explicitly instructed judicial officials and prosecutors to take specific decisions. Despite the judiciary's partial independence from the executive and legislative branches, the president of the republic appoints all members of the bench and legal department of the judicial branch, including the president of the Supreme Court, and may dismiss them at will. The president of the republic also appoints the president and members of the Constitutional Council for a renewable period of six years.

Military courts may exercise jurisdiction over civilians in a broad number of offenses including civil unrest.

**Trial Procedures**

The constitution and law provide for the right to a fair and public trial without undue delay, and the defendant is presumed innocent. Authorities did not always respect the law, applying the presumption of innocence in a selective manner. Criminal defendants have the right to be informed promptly and in detail of the charges, with free assistance of an interpreter if needed; the quality of interpretation often was poor. Defendants have the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, restricting access to lawyers, often at the preliminary investigation phase, particularly in cases of individuals suspected of complicity with separatists, or political opponents. When defendants cannot pay for their own legal defense, the court may appoint trial counsel at public expense, but the process

was often burdensome and lengthy, and the quality of legal assistance was poor. Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf but did not compel witnesses to testify. Defendants have the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt, but authorities often violated this right. Hearsay and anonymous testimony were sometimes permitted, especially in terrorism cases. Examining magistrates sometimes attempted to induce political opponents and suspected separatists to incriminate themselves. Defendants may appeal convictions up to the Supreme Court and may subsequently petition the president for pardon.

Courts often limited procedural rights in politically sensitive cases. Appeal hearings in the case of 39 MRC detainees in Yaoundé who, in December 2021 and January 2022 were sentenced by military courts to up to seven years in some cases, eventually opened at the Yaoundé Military Tribunal on September 15. The hearings were then postponed to October 20, at the request of MRC lawyers. There had been two previous attempts to start the appeal trials, notably on July 22 and August 17, in the absence of the detainees and their lawyers, who were unaware. According to the lead case lawyer, the appellants and their lawyers only learned about the hearings in August, when the court sent an order requesting the administrator of the Yaoundé Central Prison to produce the appellants for the July 22 hearing. As of August 31, the military tribunal in Douala had not yet forwarded appeal files to the Littoral Court of Appeal for those sentenced in Douala in December 2021.

Former Minister of Water and Energy Basile Atangana Kouna, who was in detention since 2018 in connection to the alleged embezzlement of public resources, was released on July 29, after the Special Criminal Court (TCS) dropped the charges against him. During the hearing, the TCS announced that the public prosecutor of the TCS, at the request of Justice Minister Esso, had requested a stay of proceedings because the accused returned the money to the government Treasury. Minister Esso requested the TCS to drop the charges following a July 25 letter from Secretary General of the Presidency Ferdinand Ngoh Ngoh indicating that President Biya had authorized the end of proceedings against Atangana Kouna.

**Political Prisoners and Detainees**

There were no reports of newly identified political prisoners or detainees as of the end of the year. Ninety-four of those associated with the 2020 protests called for by the MRC opposition party, however, remained in detention, 29 of whom were expected to complete their imprisonment terms on September 30, including eight in Yaoundé and Mfou, Center Region, and 21 in Douala Prominent. Among the remaining detainees were MRC treasurer Alain Fogue and MRC spokesperson Olivier Bibou Nissack. While the charges for which they were convicted related to rebellion, insurrection, and destabilization of democratic institutions, there were credible allegations that the charges were incommensurate with participating or attempting to participate in peaceful protests.

The UN Working Group on Arbitrary Detention found in November that the deprivation of liberty of 15 individuals detained in this case was arbitrary, including the detentions of Maurice Kamto, Albert Dzongang, Alain Fogue Tedom, Michèle Ndoki, Paul Eric Kingue, Gaston Phiippe Abe Abe, Célestin Djamen Ndjamo, Sylvanus Muthaga, Jean Djieukou Mouaffi, Samiratou Matchuendem, Laure Kamegne Noutchang, Jean Bonheur Tchouefa Nouka, Mamadou Yacoubou, Christian Foulefack Tsamo, and Olivier Bibou Nissack. While many of the detainees were released, including Kamto, others remained in detention. The 10 separatist leaders, including Julius Sisiku Ayuk Tabe, whom the Yaoundé Military Tribunal sentenced to life imprisonment in 2019, remained in prison, and in September 2021, the Court of Appeals confirmed the sentence. In November, the UN Working Group on Arbitrary Detention found the deprivation of liberty of these 10 individuals to be arbitrary.

**Civil Judicial Procedures and Remedies**

Citizens and organizations have the right to seek civil remedies for human rights abuses through administrative procedures or the legal system; both options involved lengthy delays. Individuals and organizations may appeal adverse decisions domestically or to regional human rights bodies, but the decisions of regional human rights bodies are not binding.

**Property Seizure and Restitution**

There were reports that the government evicted persons from their places of residence without due process or adequate restitution.  On May 14, for example, administrative authorities forcefully evicted several dozen residents from the area known as Dikolo-Bali in Douala 1 subdivision, Littoral Region, as part of a project to build a five-star hotel.  Government workers and security bulldozed houses and teargassed protestors.  According to the governor of the Littoral Region, some residents had received compensation prior to the eviction.  On May 28, the governor set up a commission to revisit the area and see where the construction went beyond the original land perimeter, and to register the collateral victims.  He also ordered the suspension of all work on the site pending the report of the commission.  The report had not been made public as of the end of the year.

The populations of Kribi 3 subdivision, Ocean division of the South Region, who were evicted because of the construction of the Kribi-Lolabe highway since 2016, had reportedly not yet received full compensation as of mid-June at the time of the highway's completion and inauguration.  According to media reports, the government released approximately one billion CFA francs ($1.63 million) for compensation, but the divisional compensation commission disbursed only part of the compensation.

# f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the constitution and law prohibit arbitrary interference with privacy, family, home, or correspondence, these rights were subject to restriction in the interests of the state, and there were credible reports police and gendarmes abused their positions by harassing citizens and conducting searches without warrants. The law permits a police officer to enter a private home during daylight hours without a warrant only if pursuing a person suspected of or seen committing a crime.  Police and gendarmes often did not comply with this provision and entered private homes without a warrant.

Reports suggested authorities punished family members for offenses allegedly committed by their relatives.  In 2021, the self-styled separatist "General No Pity"

who controlled a separatist base known as Marine Forces located in Ndop, Northwest Region, claimed that soldiers stormed his compound and arrested his "uncles, aunts, younger brothers, and sisters." He gave authorities 48 hours to release the family members, threatening to wreak havoc if anything bad happened to them. While No Pity's brother and cousin were released in August 2021, his mother and uncle remained in government custody. As of mid-September, Antoinette Kongnso, No Pity's former girlfriend arrested in October 2021, was still being held in detention despite a December 2021 decision of the Southwest court of appeals granting her bail.

## g. Conflict-related Abuses

There were credible reports of abuses associated with the ongoing crisis in the Northwest and Southwest Regions, where government forces clashed with separatists. The abuses included killings and abductions by both government forces and armed separatist groups. Furthermore, there were credible reports of abuses, including killings and abductions, committed by Boko Haram and ISIS-WA in the Far North Region.

**Killings:** There were credible reports that members of government forces and separatist fighters deliberately killed civilians. On the night of June 9, government forces killed at least two unarmed civilians during a reconnaissance operation in Belo, Boyo division of the Northwest Region. Eyewitnesses reportedly told Center for Human Rights and Democracy in Africa (CHRDA) that at approximately 3:00 a.m., young men were returning home when soldiers detained them. One of the young men was identified as Gideon Alahfuchi, a former separatist fighter who was previously shot in the waist and was just recovering from his wounds. At some point during the evening, when Gideon Alahfuchi complained that he was tired, the soldiers allegedly slit his throat with a knife and dumped his corpse by the roadside. Witnesses reportedly told the CHRDA that the soldiers left Belo in approximately 10 trucks, and moved to Njinkfuin, heading towards a separatist camp situated in the village of Aboh. While at Njinkfuin, they removed a man in his 50s known as "Bo Luh" from bed and executed him after accusing him of making charms (*odeshi*) for separatist fighters.

On March 2, suspected separatists ambushed and killed Timothee Aboloa,

divisional officer (DO) of Ekondo-Titi in the Southwest Region. The attackers detonated at least four improvised explosive devices (IEDs) as the DO and several others drove toward the neighboring town of Bekora. According to Southwest Region Governor Bernard Okalia Bilai, after the detonation of the IEDs, separatists opened fire on the occupants of the vehicle. At least six other persons died in the attack. On June 14, armed separatists ambushed and decapitated two police officers in Mbuene, a village situated in Njinikom subdivision, Boyo division of the Northwest Region. According to reports, the operation was a counterattack on the defense forces, who previously conducted an operation in the village in search of separatist fighters.

Human Rights Watch reported in June that armed separatists killed at least seven persons, injured six others, raped a girl, and committed other grave human rights abuses across the country's Northwest and Southwest Regions since January.

**Abductions:** Armed separatists kidnapped several persons for not respecting the separatist-imposed lockdown measures. The separatists held persons as hostages, including public officials, political leaders, teachers, schoolchildren, and religious and traditional leaders. There were credible allegations that separatists physically brutalized their victims.

As of late June, according to credible NGOs, separatists had carried out at least 80 abductions since January. In April, armed separatists kidnapped 33 Roman Catholic seminarians for ransom in Bachuo-Ntai, Southwest Region. On April 30, in Bamenda, Northwest Region, separatists kidnapped Senator Regina Mundi, a member of the ruling Cameroonian People's Democratic Movement, along with her driver. The day after her abduction, a video circulated on social media showing Senator Mundi seated on a sofa in front of a "Republic of Ambazonia" poster, reading a prepared statement in which she referred to herself as "an Ambazonian by birth and nationality," and calling for Ambazonian independence. According to reports, different factions of the self-proclaimed Ambazonian Defense Forces claimed responsibility, each making its own demands for the Senator's liberation and at least one group threatening to kill her. Government defense and security forces eventually rescued Senator Mundi on May 30 (see also section 1.b., Disappearance).

As of the end of August, Fon Yakum Kevin Shumitang II, the president of the Northwest House of Chiefs, whom armed separatists abducted in 2021, remained unaccounted for. Separatists kidnapped the traditional ruler in December 2021, from his palace at Bambalang, Ngoketunjia division of the Northwest Region. Also, the whereabouts of five of the six divisional delegates, whom armed separatists abducted in June 2021 in Ndian division of the Southwest Region, remained unknown as of December.

According to bishops of the Roman Catholic Bamenda Provincial Episcopal Conference (BAPEC), on September 16, at least 30 unidentified individuals firing into the air set fire to St. Mary's Roman Catholic Church in Nchang, Mamfe, Southwest Region and abducted nine persons. The abductees included five priests, a nun, one catechist, and two others. The bishops attributed the attack to separatists who regularly accused the Church of not supporting the secession of the Northwest and Southwest Regions. They said since the crisis began in 2016, combatants had increasingly threatened and targeted church leaders and missionaries who were "facing a wave of persecution." During a September 21 media interview, BAPEC leader Archbishop Andrew Nkea said the kidnappers had asked for a 66 million CFA francs ($107,000) ransom, which they later reduced to 33 million CFA francs ($53,700). All nine abductees were eventually released on October 22.

**Physical Abuse, Punishment, and Torture:** According to credible reports, both government agents and separatists physically abused civilians, as well as prisoners in their custody (see also section 1.c.).

Multiple organizations reported that BIR soldier Ewome Eboko John, better known by the pseudonym "Moja Moja," arrested many civilians in the Southwest Region, accused them of being separatists, and administered harsh treatment to secure confessions. According to the organizations, Moja Moja often recorded videos of his victims as he abused them and published the videos on his Facebook page called "Moja Moja Chief." On June 27, one of the videos went viral on social media depicting Ewume beating an unarmed civilian with a metal object and forcing him to confess to being a separatist fighter. On July 12, a group of lawyers including Amungwa Nde Ntso Nico, Tamfu Ngarka Tristel Richard, and Edward Lyonga Ewule addressed a denunciation letter to the government commissioner

(prosecutor) of the Yaoundé Military Tribunal, copying the director of military justice at the Ministry of Defense. While no investigation was reportedly opened by the end of the year, one of the lawyers who signed the denunciation letter said SED officials acknowledged that Moja Moja would be investigated.

According to the *Conduct in UN Field Missions* online portal, there were three allegations during the year of sexual exploitation reported against the country's peacekeepers in the UN Multidimensional Integrated Stabilization Mission in the Central African Republic (MINUSCA). Two allegations concerned police officers and one concerned a military officer, and investigations into all three remained pending at the end of the year. Investigations into two allegations in MINUSCA from 2021, including one concerning alleged child rape, as were three investigations into allegations in MINUSCA from 2020. The country's peacekeepers have been subject to almost 50 sexual exploitation allegations since the UN began tracking sexual exploitation data in 2015. The country, however, took some steps toward greater accountability. On 19 separate occasions since 2019, the government sentenced perpetrators to prison time following substantiation of sexual exploitation allegations. During the year, the government publicly cautioned troops being deployed to the CAR to comply fully with standards of behavior.

**Child Soldiers:** There were no credible allegations that the government recruited or used child soldiers. As in 2021, there were no reported allegations that members of defense and security forces used children for intelligence gathering. Some community neighborhood watch groups, known as vigilance committees, may have used and recruited children as young as 12 in operations against Boko Haram and ISIS-WA, although no specific cases were highlighted, and no statistics were available (also see section 7.c.). Authorities continued to encourage the creation of vigilance committees.

Boko Haram continued to recruit and use child soldiers, including girls, in its attacks on civilian and military targets.

**Other Conflict-related Abuse:** As in the previous year, there were reports of violence directed against health workers and institutions and of the use of firearms around health facilities by members of security forces and armed separatists.

There were also reports of such incidents targeting schools and civilian residential areas.

On April 21, in Konye, Meme division of the Southwest Region, members of government security forces reportedly burned several houses in Matondo II village, popularly known as Number 19, following a pursuit of fleeing armed separatists.

On February 10, according to credible reports, armed separatists burned down the dormitories and administrative blocks of Queen of the Rosary College Okoyong, a girls-only Roman Catholic Church institution in Manfe, Manyu division of the Southwest Region.  In April, armed separatists stormed the University of Bamenda campus in the Northwest Region, shooting in the air, causing panic among students and teachers, and leading to a stampede that injured at least five persons.  Separatists reportedly attacked the university for not observing a separatist-imposed lockdown.  Two months later, on July 8, separatist fighters overtook the building of the faculty of engineering and technology of the University of Buea, where students were taking exams.

On the night of June 8, unidentified men believed to be separatist fighters burned down the Mamfe district hospital, situated in Manyu division of the Southwest Region.  The entire structure was destroyed, including all hospital equipment and materials.  The hospital was the largest health facility in Manyu division, serving a population of more than 80,000 individuals, according to reports.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, but the government often restricted this right, explicitly or implicitly.  Private media were active and expressed a wide spectrum of viewpoints.  The media landscape faced constraints on editorial independence, in part due to fear of reprisal from state and nonstate armed actors, including separatists connected to the crisis in the Northwest and Southwest Regions.

**Freedom of Expression:**  Government officials denied individuals or

organizations the ability to criticize or express views at odds with government policy. Authorities imposed restrictions on symbolic expressions, such as flags and political symbols. Government officials also denied citizens the ability to discuss certain matters of general interest, including expression of views concerning political transition. Individuals who criticized the government publicly or privately often faced reprisals. On several occasions, the government invoked laws requiring permits or government notification of public protests to stifle discourse.

As part of preparations for the May 20 National Day celebration, the Mfoundi senior divisional officer in Yaoundé on May 15 addressed a letter to the vice president of the Social Democratic Front (SDF), spelling out conditions for SDF's participation in the May 20 parade. These conditions included, but were not limited to, not displaying any image other than that of President Biya, not using telephones during the parade, and not displaying slogans, placards, or texts not previously approved by the civil cabinet of the presidency.

**Violence and Harassment:** Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists. The state's failure to investigate or prosecute attacks on journalists created de facto restrictions.

On May 18, Bissong Macdella Bessong, a journalist who works for *Kick442* online media, went to the Molyko stadium in Buea, Southwest Region, to cover a match of the Cameroonian Elite One soccer championship. Bisong produced a scanned copy of her accreditation from her mobile phone, but Njonje Mbua, the director of the stadium, refused her access to the stadium, saying she must produce the physical document. Mbua forced the journalist away, with the assistance of police officers. In the process, two of the policemen reportedly exerted physical violence on Bessong, including punching her and dragging her to the ground. *Kick442* online media reportedly filed a complaint which was pending before the court in Buea; there was no reported update on the case as of December.

**Censorship or Content Restrictions for Members of the Press and Other Media, including Online Media:** By law the Ministry of Communication requires editors to submit two signed copies of their newspapers within two hours

after publication. Journalists and media outlets reported practicing self-censorship, especially if the National Communication Council (NCC) had suspended them previously. The Ministry of Communication has supervisory authority over media and accredits media organizations, while the NCC is the regulatory and consultative body on media matters. Authorities threatened journalists, and the NCC suspended journalists and publishers for programs and views deemed at odds with government policy. In some cases, sanctioned outlets and journalists refused to implement the NCC's decisions, leading the chair of the NCC to reportedly request support from the Ministry of Territorial Administration to implement NCC decisions.

On March 14, Benjamin Mboutou, the senior divisional officer (SDO) for Wouri division, Littoral Region, summoned Cedric Noufele, then editor in chief of Equinoxe TV, to his office. Equinoxe TV promoter Severin Tchounkeu on March 16 represented Noufele at the meeting. Tchounkeu and the SDO reportedly discussed matters including the conduct of *Droit de Réponse*, a program that had Noufele as presenter. The SDO reportedly complained concerning the way Noufele handled the program, stating that he often did not give representatives of the ruling CPDM the same treatment as other panelists. Thereafter, on March 18, Littoral Governor Dieudonne Ivaha Diboua sent a letter to Tchounkeu, accusing Equinox TV of inciting public uprising against republican institutions. Referring to the *Droit de Réponse* program of February 27 on an ongoing teachers' strike, the governor claimed that one of the panelists called on parents and students to join the protest. He threatened to "apply the law" if Equinox did not change its reporting style.

In the footsteps of the governor, the NCC issued a press release drawing "the attention of media professionals to the gravity of the consequences that may arise from the dissemination of compromising information against republican institutions, and firmly reminding their authors that media excesses are a threat to public order." Like the governor, the NCC threatened to sanction what it referred to as unprofessional behavior. On April 1, the NCC suspended Severin Tchounkeu from practicing journalism and the functions of publisher for one month. The NCC also banned Noufele from practicing journalism for the same length of time, accusing him of failing to exert control over panelists during the February 27

program, thus allowing the broadcasting of conflicting comments likely to amplify a "potentially explosive" social demand. The *Droit de Réponse* program received a one-month suspension.

**Libel/Slander Laws:** Libel, slander, defamation, and blasphemy are treated as criminal offenses. The law authorizes the government to initiate a criminal suit when the president or other senior government officials are the alleged victims. These laws place the burden of proof on the defendant, and crimes are punishable by prison terms and substantial fines. Ordinary citizens may also file libel or slander suits, but the law is often applied selectively and gives privileges to senior government officials and well-connected individuals. There were no known reports of cases prosecuted under libel, slander, or blasphemy laws during the year.

**National Security:** Authorities often cited laws against terrorism or protecting national security to threaten critics of the government.

**Nongovernmental Impact:** There were several reported cases of armed separatist groups in the Southwest and Northwest Regions explicitly inhibiting the enjoyment of freedom of expression, including for the press. However, concern for personal security and restrictions on movements imposed by armed separatists contributed to limiting freedom of expression for members of the press.

On February 14, Vision 4, a progovernment television channel, suspended Dieudonne Essomba as a consultant for its *Club d'Elites* weekly program. The decision came after Dieudonne Essomba denounced President Biya's longevity in power and questioned his physical capacity to run the country at age 89. He declared that it was the president's wife, Chantal Biya, who was leading the country. Following the program, Essomba was summoned to the territorial surveillance department on February 16, according to the daily *La Nouvelle Expression* of February 17. Essomba later returned to Vision 4.

Several organizations reported that on May 26, in Bamenda, Northwest Region, at least six heavily armed separatists attempted to kidnap Frederic Takang, the BBC's Cameroon correspondent and one of the few journalists still working in the Northwest and Southwest Regions. The separatists took Takang's belongings, including his vehicle, computer, microphone, money, and mobile phone.

Contacted by NGO Journalists in Africa for Development, Takang said separatist fighters do not allow journalists access to areas under their control. Overall, according to *La Nouvelle Expression,* fewer than 10 journalists continued working from Bamenda.

**Internet Freedom**

Anecdotal reports indicated that the government monitored private online communications without appropriate legal authority. The reports however did not highlight any specific cases.

## b. Freedoms of Peaceful Assembly and Association

The government limited and restricted freedoms of peaceful assembly and association. Government failure to investigate or prosecute attacks on human rights defenders and peaceful protesters undermined the enjoyment of freedoms of peaceful assembly and of association.

**Freedom of Peaceful Assembly**

Although the law provides for freedom of peaceful assembly, the government often restricted this right. The law requires organizers of public meetings, demonstrations, and processions to notify officials in advance but does not require prior government approval for public assemblies, nor does it authorize the government to suppress public assemblies that it did not approve in advance. Nevertheless, officials often asserted the law implicitly authorizes the government to grant or deny permission for public assemblies. The government often granted permits for gatherings on a selective basis and used force to suppress assemblies for which it had not issued permits.

Authorities typically cited security and health-related concerns as the basis for deciding to block assemblies. Progovernment groups, however, were generally authorized to organize public demonstrations.

Multiple organizations reported that on February 16, Daouda Issa, the divisional officer of Douala IV, in the Littoral Region, banned a three-day seminar hosted by Germany's Friedrich Ebert Foundation. The purpose of the seminar was to train

officials of opposition parties, the MRC and Social Democratic Front (SDF), on political communication. Close to 80 members of the MRC and SDF allegedly showed up for the training session when Daouda Issa entered the venue with gendarmes and policemen, told all attendees to step out, and threatened to arrest anyone who chose to remain. While the Friedrich Ebert Foundation was the organizer of the seminar, Daouda Issa reportedly served MRC and SDF officials with an order banning the event. The order stated that the organizers had not previously received approval for the training, which he described as "a public political demonstration likely to degenerate and disturb public order."

On June 29, the divisional officer for Yaoundé 1, Nyandji Mgbatou Harouna, banned a conference scheduled to take place at the Franco Hotel in Yaoundé on June 30. Earlier, on June 28, the divisional officer had issued a receipt to Jean Bosco Talla, the promoter of the conference, acknowledging notification of the event. In his June 29 reversal, the divisional officer cited a risk of disrupting social order. The conference dubbed "La Grande Palabre" was expected to mobilize actors from academia, civil society, media, and politics to discuss political transition. On the day scheduled for the conference, the divisional officer arrived at the conference venue with security forces and ordered participants not to enter.

**Freedom of Association**

The constitution and law provide for the freedom of association, but the law also limits this right. On the recommendation of the senior divisional officer, the Ministry of Territorial Administration may suspend the activities of an association for three months on grounds that the association is disrupting public order. The minister may also dissolve an association if it is deemed a threat to state security. National associations may acquire legal status by declaring themselves in writing to the ministry, but the ministry must explicitly register foreign associations, and the president must accredit religious groups upon the recommendation of the minister of territorial administration. The law imposes substantial fines for individuals who form and operate any such association without ministry approval. The law prohibits organizations that advocate a goal contrary to the constitution, laws, and morality, as well as those that aim to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

Conditions for recognition of political parties, NGOs, and associations were complicated, involved long delays, and were unevenly enforced (see also section 3, Political Parties and Political Participation). This resulted in associations operating in legal uncertainty with their activities tolerated but not formally approved.

Although the government did not officially ban any organizations, it continued to restrict the activities of some NGOs, including Doctors without Borders (MSF) and Un Monde Avenir.

On July 15, Doctors without Borders announced its decision to close project bases in Kumba and Mamfe, in the Southwest Region, beginning on August 1. The decision followed the suspension of MSF activities by authorities three months earlier, prior to which security forces arrested and detained four MSF staff members in December 2021 and January. The MSF indicated that it could not indefinitely maintain teams with no clear visibility of when it may restart activities, nor of the likelihood that its staff could work in conditions where they would not be prosecuted for providing medical assistance to those in need, including to armed separatists.

In an August 2021 release, Minister of Territorial Administration Paul Atanga Nji ordered the leadership of foreign organizations operating in the country to update their status by submitting specific documentation within a month. Although the NGO Un Monde Avenir, which regularly denounces government abuses, submitted the required file, the organization's leadership claimed their accreditation had not been renewed as of December.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Although the constitution and law provide for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government and nonstate armed groups restricted these freedoms.

**In-country Movement:** Using minor infractions as a pretext, police, gendarmes, and custom officers often extorted bribes and harassed travelers at roadblocks and checkpoints in cities and on highways. Police frequently stopped travelers to check identification documents, including national identity cards, passports, residence permits, vehicle registrations, customs status, and tax receipts as security and immigration control measures. As in the previous year, humanitarian organizations cited difficulty in accessing certain areas and in some instances were harassed and denied passage by government authorities. Unaccompanied women were frequently harassed when traveling alone. Authorities restricted movements of persons and goods, including motorbikes, especially in the Northwest and Southwest Regions, citing security concerns.

Armed separatists restricted the movements of persons and goods in the Northwest and Southwest Regions, sometimes in a deliberate attempt to harass and intimidate the local population. Separatists often used weekly lockdowns referred to as "ghost towns" to enforce restrictions on movement, in which the armed separatists demanded all businesses, schools, and places of worship close, and residents stay home. Violent crime, including kidnapping by terrorists, kidnapping for ransom, armed robbery, assault, and carjacking, were major impediments to in-country movement in the three northern regions as well as in part of the East Region.

Separatists continued to enforce a lockdown of the Northwest and Southwest Regions on Mondays, as well as for other extended periods of time. During the lockdown periods, all vehicles were banned from the roads in these regions. Separatists warned that any person or group of persons contravening the ban would be punished.

**Foreign Travel:** Citizens have the right to leave the country without arbitrary restrictions. The movement of some political opponents and debtors, however, was monitored, and their travel documents were often confiscated to confine them to the country. To obtain exit permits, citizens need a valid passport and visa for their country of destination. There were no credible reports of citizenship revocation on an arbitrary or discriminatory basis during the year.

# e. Protection of Refugees

The government generally cooperated with the Office of the United Nations High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees or asylum seekers, as well as other persons of concern. The country operated an open-door policy. This policy, however, was not implemented in a manner that allowed refugees to exercise fully their rights to freedom of movement, employment, and access to government health and educational services, as stated in various legal instruments.

**Access to Asylum:** The law provides for the granting of asylum or refugee status, and the government has established a system of providing protection to refugees, but the implementation of this system was weak. UNHCR continued to provide documentation and assistance to the refugee population, although local authorities did not always recognize the documents as official, which prevented refugees from traveling and engaging in business activities.

**Freedom of Movement:** The government did not provide documents in a timely manner to refugees and other persons in need of primary documentation, which restricted movement. During the year, authorities launched a project to deliver biometric identity cards to refugees from the CAR. UNHCR and the government continued to conduct biometric verification and registration of Nigerian refugees in the Far North Region, including those not living in refugee camps. The pilot phase of the project was launched in the East Region and was expected to secure 6,000 biometrics-based identification documents to CAR refugees living in camps there. The biometrics-based identification documents aimed to facilitate the socioeconomic integration of the refugees, including enabling holders to open and access bank accounts, and to circulate freely within the country.

**Employment:** There were no credible reports that the government imposed restrictions on refugees' ability to work after their status as refugees was official. Refugees without government-recognized documentation, however, experienced significant obstacles to employment.

**Access to Basic Services:** There were no known cases of discrimination in education and health care that occurred once a refugee's status was official. While

refugees had limited access to health care, education, and employment opportunities, their rural host communities faced similar problems. Access to these services varied according to the location of the refugees, with those in camps receiving more support through humanitarian assistance, while refugees living in host communities faced more difficulty receiving services.

**Durable Solutions:** There was no evidence that the government accepted refugees for resettlement or offered naturalization to refugees residing in its territory. The government, however, assisted in the voluntary return of persons to the CAR.

The governments of Cameroon and the CAR successfully repatriated 299 CAR refugees from the East and Adamaoua Regions on June 1. UNHCR supervised their departure from the country. According to the *Cameroon Tribune*, 6,504 refugees benefited from UNHCR support and its partners to travel back home.

In April, the government hosted a ministerial-level conference to seek durable solutions for Central African refugees in countries surrounding the CAR. The conference ended with the signing of the Yaoundé Declaration, a document calling for the creation of a coordinating body for the CAR and its six neighboring countries to work together on durable solutions.

**Temporary Protection:** The government continued to provide temporary and unofficial protection to individuals who might not qualify as refugees, extending this protection to hundreds of individuals, including third-country nationals who had fled violence in the CAR. Due to their unofficial status and inability to access services or support, many of these individuals were subject to harassment and other abuses by employers in the informal sector.

## f. Status and Treatment of Internally Displaced Persons

According to estimates by UNHCR, the country hosted approximately two million persons of concern to UNHCR as of July, including approximately one million internally displaced persons (IDPs). In addition, the country had an estimated 555,668 formerly displaced persons, as of November 30, who had returned to their places of origin. The IDPs were mainly from the Far North, Northwest, and Southwest Regions. They were mostly driven by Boko Haram/ISIS-related insecurity and the crisis in the Northwest and Southwest Regions. Humanitarian

access remained limited because of insecurity and military officials' tight control over access to the affected areas.

# Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. Elections, however, were often marked by irregularities, although no elections were conducted during the year.

## Elections and Political Participation

**Recent Elections:** In 2020, the country held simultaneous legislative and municipal elections. The next Senate elections are scheduled in 2023, while legislative, municipal, and presidential elections are scheduled in 2025.

In 2020, security concerns constrained voter participation in the Northwest and Southwest Regions. The courts annulled the legislative elections in 11 constituencies of the Northwest and Southwest Regions due to voter turnout of less than 10 percent. Legislative reruns occurred in the 11 constituencies. The ruling Cameroon People's Democratic Movement (CPDM) won 152 of the 180 National Assembly seats and 316 of 360 local councils. Opposing political parties lost significant numbers of seats when compared with previous elections. Overall, eight opposition political parties won seats in the National Assembly, and nine won control of local councils. Additionally, the Constitutional Council annulled some legislative elections, citing irregularities including lack of equal access to media and campaign space, restrictions on the ability of opposition candidates to register for the election, ballot stuffing, lack of ballot secrecy, voter intimidation, inconsistent use of identification cards, and lack of expertise among local polling officials.

In 2018, Paul Biya was reelected president in an election marred by irregularities and against the backdrop of protracted sociopolitical unrest in the Northwest and Southwest Regions.

**Political Parties and Political Participation:** As of the end of the year, the country had approximately 330 registered political parties. The CPDM remained

dominant at every level of government due to restrictions on opposition political parties, gerrymandering, unbalanced media coverage, the use of state funds to promote party campaigns, interference with the right of opposition parties to register as candidates and to organize during electoral campaigns, and undue influence of traditional rulers. Traditional rulers, who received salaries from the government, openly declared their support for President Biya prior to the 2018 presidential election, and some reportedly compelled residents of their constituencies to prove they did not vote for an opposition candidate by presenting unused ballots. Traditional rulers who refused to associate with the government were either removed or threatened with the loss of all income. Membership in the ruling political party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service.

Human rights organizations and opposition political actors considered the drawing of voter districts and distribution of parliamentary or municipal councilors' seats unfair. They complained that smaller districts considered CPDM strongholds were allocated a disproportionate number of seats compared with more populous districts where the opposition was expected to poll strongly. Managers of state-owned companies and other high-level government officials used corporate resources to campaign for candidates sponsored by the ruling party.

**Participation of Women and Members of Minority Groups:** No laws limit participation of women or members of minorities, or persons with disabilities, in the political process and members of many of these groups did participate. No laws explicitly limited the participation of LGBTQI+ persons; they did not openly participate in the political process, and observers surmised that social stigma and the criminalization of same-sex conduct deterred LGBTQI+ persons from openly participating.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, but the government did not implement the law effectively. There were numerous reports of government corruption. The law identifies different offenses as corruption,

including influence peddling, involvement in prohibited employment, and failure to declare a known conflict of interest. Reporting corruption was encouraged through exempting whistleblowers from criminal prosecution. In addition to the laws, the National Anti-corruption Agency (CONAC), Special Criminal Court (TCS), National Financial Investigation Agency, Ministry in Charge of Supreme State Audit, and Audit Bench of the Supreme Court also contributed to fighting corruption. CONAC, the most prominent of the anti-corruption agencies, was constrained by the absence of any legislative or presidential mandate. There were reports that senior officials sentenced to prison were not always required to forfeit their ill-gotten gains.

**Corruption:** As in the previous year, there were new allegations of corruption involving public officials. The TCS continued prosecuting corruption cases. While hearings continued in some high-profile cases, the court opened new cases and issued decisions in other ones. It dropped charges in at least one ongoing case.

In May, the UK-Swiss commodity firm Glencore confessed before a London court to paying $28 million in bribes to secure preferential access to oil in five African countries, including Cameroon. Following the guilty plea, members of the political opposition, civil society, independent media, and anti-corruption NGOs, including Transparency International, urged the country's anti-corruption institutions to open an investigation into the issue, which relates to the operations of the National Hydrocarbon Corporation (SNH) and the National Refining Company (SONARA). The leadership of SNH and SONARA denied the allegations. CONAC announced on July 7 that it had opened a corruption investigation into the matter. As of December, there were no reported developments concerning the investigation.

On August 22, the TCS found Niwa Long Othon, a former manager of the National Civil Engineering Equipment Pool-MATGENIE (2009-17), and his administrative and financial director, Simon Crépin Zambo, guilty of the embezzlement of public property in the amount of 1.37 billion CFA francs ($2.23 million). The TCS sentenced them to 20 years' imprisonment each and ordered them to pay back the funds allegedly misappropriated, plus damages.

As of the end of September, there were no reported developments regarding the

outcome of the judicial proceedings that President Biya ordered in 2021 concerning the management of COVID-19 spending. The 2021 investigation into the spending, popularly known as "Covidgate," highlighted shortcomings including opacity in the awarding of contracts, overruns of allocated budgets, embezzlement, and overbilling. A dozen officials reportedly appeared before the commission during the investigation conducted by the Audit Chamber of the Supreme Court. Following the audit report, Minister of Communication Rene Emmanuel Sadi reported in May 2021 that President Biya had ordered judicial proceedings to be conducted by the TCS. Anecdotal reports emerged in late August that the TCS interrogated at least one senior government official in connection with the COVID-19 spending, but as of December, there were no reported developments on the issue.

The trial of the former Defense Minister Edgar Alain Mebe Ngo that opened at the Special Criminal Court in 2020 continued; the court had not issued any decision as of September. Mebe Ngo stood accused of embezzling 236 billion CFA francs ($429 million) as part of the purchase of military equipment for the army.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

Several domestic and international human rights groups investigated and published findings on human rights cases. Government officials rarely were cooperative and responsive to their views. Government officials impeded many local human rights NGOs by harassing their members, limiting access to prisoners, refusing to share information, and threatening violence against NGO personnel. The government took no action to investigate or prevent such occurrences.

**Retribution against Human Rights Defenders (HRDs):** Since Territorial Administration Minister Paul Atanga Nji in August 2021 instructed associations operating in the country to update their status within a one-month deadline or be suspended, some organizations were having difficulties renewing their accreditations. As in the previous year, human rights defenders and activists received anonymous threats from persons suspected to be affiliated with the

government by telephone, text message, and email. On January 15, for example, Philippe Nanga, the coordinator of Un Monde Avenir, received a WhatsApp message that read: "Tell my friend Philippe Nanga that after the African Cup of Nations, Paul Biya will no longer be constrained by speeches on human rights. The state will conduct systematic cleaning."

On March 14, Glede Bruno, the director of judicial police in Yaoundé, summoned NGO Central Africa Human Rights Defenders Network (REDHAC) executive director Maximilienne Ngo Mbe to report to the judicial police on March 23 to discuss the legal status of REDHAC. Glede reminded Ngo Mbe that in the event she failed to report to police as requested, she would be compelled to do so by all legal means. Barrister Alice Nkom and other lawyers represented Ngo Mbe at the judicial police. After referring to the movement of funds in REDHAC's accounts, the police officer questioned barrister Nkom on suspicions of money laundering, embezzlement of resources, and nonenrollment of REDHAC staff members to the National Social Insurance Fund. Police had taken no further action as of October. (Also see section 2.b., Freedom of Association.)

**Government Human Rights Bodies:** The mission of the CHRC, established in 2019, is to promote and protect human rights and prevent torture in detention facilities. The commission operates hotline No. 1523, which serves to denounce human rights abuses, including cases of torture. The CHRC is a government-funded institution. The CHRC may also receive support from national and international partners, as well as donations. The CHRC coordinated actions with NGOs, participated in some inquiry commissions, and issued statements on topical human rights matters.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalizes rape of both women and men and provides penalties of between five and 10 years of imprisonment for convicted rapists. Police and courts rarely investigated or prosecuted rape cases, especially since survivors often did not report them. The law does not address spousal rape, nor does it specifically prohibit domestic violence, although assault is prohibited

and punishable by imprisonment and fines.

Unlike in 2021, there were no known or officially reported allegations that persons associated with the government raped women and children. Reports, however, suggest that domestic violence was a major issue.

On June 26, according to credible sources, a soldier shot and killed his girlfriend, Nchinda Ophilia, also a soldier, following a heated argument. As of early October, there was no publicly available information concerning investigations into the killing.

The government provided support to survivors of sexual violence and other forms of gender-based violence, including legal support to survivors via the judiciary network, general clinical care offered in health facilities, and collection of data through the District Health Information System and provision of situational analysis. Many of the prevention and basic support programs for survivors of gender-based violence were implemented by community-based organizations.

**Female Genital Mutilation/Cutting (FGM/C):** The law protects the bodily integrity of persons and prohibits genital mutilation for all women, including women ages 18 and older and girls younger than 18. Perpetrators are subject to a prison sentence of 10 to 20 years, or imprisonment for life if the offender habitually carries out this practice for commercial purposes or if the practice causes death. According to estimates from UN Women, however, the prevalence of FGM/C among girls and women aged 15 to 49 years was 2 percent.

**Other Forms of Gender-based Violence:** Widows were sometimes forcibly married to one of their deceased husband's relatives, especially in rural communities, to secure continued use of property left by the deceased husband, including the marital home. The government included provisions in the law outlawing the eviction of a spouse from the marital home by any person other than the other spouse. The practice of widow rites, by which widows were subject to certain trials such as bathing in public or movement restrictions, was prevalent in rural communities of the West Region. Anecdotal reports suggested breast ironing, the process of forcibly flatting emerging breasts in pubescent girls, continued to exist in some rural communities, but in very small numbers.

**Sexual Harassment:** The law prohibits sexual harassment. Offenders may be subject to imprisonment for periods of six months to one year and a fine. If the survivor is a child, the penalty may be one to three years in prison. If the offender is the survivor's teacher, the penalty may increase to three to five years in prison. Despite these legal provisions, sexual harassment was widespread but there were no known reports during the year that anyone was fined or imprisoned for sexual harassment, in part due to sexual harassment survivors' reluctance to file official complaints due to fear of reprisal and or stigmatization.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

In most parts of the country, prenatal clinics monitored and assisted women to go safely through pregnancy and childbirth and provided parents with the best chance of having a healthy infant. Women also had access to emergency care, including services for the management of complications arising from abortion regardless of whether abortion was legally permitted.

The Ministry of Public Health offered counseling services to women during prenatal visits, promoting the concept of responsible parenthood and encouraging couples to use contraception to space the timing of their children. Many women, however, lacked the means to manage their reproductive health, and societal pressures continued to reinforce taboos on discussing reproductive health within certain communities. Women's dependence on receiving their husbands' consent continued to be a barrier in contraceptive decisions. Also, women in some rural areas or from poor families received limited skilled health-care attendance at birth, in part due the distance between health facilities.

The government did not readily provide emergency contraception for survivors of sexual violence. In the past, the UN Population Fund provided a kit with emergency contraception to some clinical sites as part of clinical care for gender-based violence survivors.

In July, the government passed a law regulating medically assisted procreation (MAP). The practice had been ongoing for several years in the country but had no legal framework. The law restricts MAP to married couples or those able to prove

a common-law marriage. To benefit from MAP, a person must be at least 21 years old, and not older than 55 for women. The law also affirms the legality of consensual third-party surrogacy in the case of egg or sperm donation, while expressly forbidding the trade or sale of reproductive material. The penalty for such an infraction would range from a nominal fine to imprisonment.

Menstruation and limited access to sanitary products affected girls' access to education. Pregnancy and motherhood often impeded adolescent girls' access to education, but there were no studies assessing the magnitude of the problem. As a measure to encourage pregnant girls to remain in school, Nalova Lyonga, the Minister of Secondary Education, in May issued a release allowing confirmed pregnant students to continue with school activities until the 26th week of pregnancy, after which she may request to be placed on maternity leave.

**Discrimination:** The constitution provides women and men the same legal status and rights. The government, however, often did not enforce the law. Although local government officials claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions. The government did not implement any official discriminatory policy against women in such areas as divorce, child custody, employment, credit, pay, owning or managing business or property, education, the judicial process, or housing. There were legal restrictions to women's employment in some occupations and industries (see section 7.d.). Within the private sector, fewer women occupied positions of responsibility.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution states in its preamble that the state shall protect "minorities and preserve the rights of Indigenous populations in accordance with the law," but it does not mention specific categories that qualify as minorities or Indigenous populations. The laws and regulations on decentralization and elections also protect the rights of minorities by requiring that lists of candidates reflect the sociological landscape of constituencies, or that the office of president of a regional council or city mayor be held by a native of the constituency. The government made efforts to enforce these provisions, but some forms of

discrimination and violence persisted.

While there were no reliable reports of governmental or societal violence or discrimination against members of racial, ethnic, or national minorities, there were reports of violence along ethnic lines during the year, although it was not always clear whether ethnicity was the primary reason for the violence.

During the night of June 25, in the village of Bakinjaw, Manyu division of the Southwest Region, at least 32 persons died in an intercommunal clash between the Oliti and Messaga Ekol communities. It began at the home of a local member of Parliament, Aka Martin, where several persons were gathered for the funeral of his late brother. Unidentified assailants stormed the home and set fire to the house and the coffin containing the remains of the brother. Residents reportedly identified the assailants as members of the Oliti community, accompanied by armed mercenaries. In a June 27 statement, the Moderator of the Presbyterian Church in Cameroon referred to the incident as a further development in an interethnic conflict that began in April as a land dispute between the Oliti and Messaga Ekol communities. The Oliti community, the moderator recalled, attacked and killed members of the Messaga Ekol community on their farms on April 29, and the Messaga Ekol community retaliated. The Oliti community then secured the backup of hired armed men and launched an attack on the Messaga Ekol community, burning several houses and killing more than 30 persons. In a June 8 statement, Ministry of Defense Spokesperson Cyrille Atonfack Guemo suggested that the attack was perpetrated by separatists.

On July 24, armed individuals abducted four members of the Fulani community from their homes in Wum, Mentchum division of the Northwest Region. The next day, residents discovered the corpses of the abductees. As a result, some Fulani men on July 26 reportedly launched an offensive to avenge the deaths, leaving several wounded. While some sources attributed the killings to separatists, others said the incident was a further development in the protracted farmer/herder conflict in this community.

## Indigenous Peoples

Taking as basis the criteria for identifying Indigenous populations contained in the

International Labor Organization Convention 169 and the *Report of the African Commission's Working Group on Indigenous Populations/Communities*, the groups that may be considered Indigenous in the country are the Mbororo and the Baka. An estimated 50,000 to 100,000 Baka, including Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East Regions. The government did not effectively protect the civil or political rights of either group.

Logging companies continued to destroy Indigenous persons' naturally forested land without compensation. Other ethnic groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices. The government continued long-standing efforts to provide birth certificates and national identity cards to Baka. Nonetheless, most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in reaching homes deep in the forest. In December, the National Assembly passed legislation exempting the Baka from the minimum height requirement for military service, a requirement which heretofore prevented Baka from serving in the armed forces.

There were credible reports from NGOs that the Mbororo, nomadic pastoralists living mostly in the North, East, Adamawa, and Northwest Regions, continued to be subject to harassment, sometimes with the complicity of administrative or judicial authorities. The Mbororo Social and Cultural Development Association (BOSCUDA) indicated that the crisis in the Northwest and Southwest Regions negatively affected the Mbororo community. According to the association program coordinator, the Mbororo adopted a neutral position when the crisis started and consequently face regular attacks by separatists for not supporting independence. Farmers reportedly targeted the Mbororo, stealing their cattle, especially in Donga and Mantung division of the Northwest Region. BOSCUDA's program coordinator said that at least 812 Mbororo had been affected by the crisis in one way or the other as of April 20. Among them, 192 had been killed, 127 kidnapped, 266 houses burned, 2,256 cattle seized or killed, and 184.74 million CFA francs ($300,000) spent in ransom payments.

## Children

**Birth Registration:** Children derive citizenship through their parents, but not

through birth in the country's territory. The responsibility to register a child's birth falls upon parents. Birth registration was provided on a nondiscriminatory basis, but many births went unregistered because children were not always born in health facilities. Also, many parents faced problems in reaching local government offices. A diagnostic study and the complementary evaluation of the civil status system conducted in 2016 revealed that the low level of birth registration was due to a multitude of factors, including administrative obstacles linked, among other things, to the nonfunctioning of civil status centers or their remoteness from the populations. In addition, existing regulations that established the free declaration and registration of births were not respected in health facilities and in civil registration centers. Ignorance of laws and regulations and the neglect of the populations also contributed to inadequate birth registration. Children without birth certificates were unable to register for official examinations to enter secondary school or secure other legally required identity documents.

Offices of Civil Affairs were located within municipal councils in each subdivision, and in many rural or remote areas, they were in civil status centers. In some jurisdictions, parents would need to travel more than 15 miles to find an operational civil administrative office. Parents have until 90 days after a child is born to register the birth. After that time, a birth may only be registered by appealing to the local district prosecutor. To adjudicate and notarize official birth documents, a family would be expected to pay 15,000 to 25,000 CFA francs ($24-$41) and face bureaucratic obstacles, which most families from rural communities would struggle to afford, forcing many parents to abandon the process early. The president of the court sets the price to execute summary judgments, and the price for the execution varied by division and region.

On April 12, the government daily *Cameroon Tribune* published an interview with the minister of decentralization and local development, who indicated that approximately four million persons in the country do not have birth certificates. The minister urged stakeholders to support an operation aimed at large-scale issuance of birth certificates. Citing the National Civil Status Office (Bunec) as its source of information, the privately funded *Oeil du Sahel* newspaper reported on August 29 that 400,000 children in the Far North Region missed school during the 2021-22 school year because they did not have birth certificates. The newspaper

further indicated that for the 2022-23 school year, Bunec identified 1,600,000 children attending schools without birth certificates.

**Education:** The law provides for tuition-free compulsory primary education up to the age of 12. The law punishes parents with sufficient means who refuse to send their child to school with a fine. Children were generally expected to complete primary education at 12 years of age. Secondary school students had to pay tuition and other fees in addition to buying uniforms and books. This rendered secondary education unaffordable for many children.

A 2019 UN Women report highlighted gender disparity in education, particularly in secondary education (see also section 6, Women, Reproductive Rights). According to the report, the literacy rate in 2019 was lower for women and girls (86 percent) than for men and boys (97 percent).

During the year, separatists ordered boycotts and attacked schools in the Southwest and Northwest Regions that continued to disrupt normal school operations. Several teachers were killed or kidnapped during the year. On June 17, members of a nonstate armed group abducted Sunjo Nicoline and Nasuru Nsodzeka, two teachers on duty at the Kumbo government high school, Northwest Region. The teachers were encouraging the resumption of classes and providing home-based refresher courses to students in physics and chemistry. In a statement issued on May 13, Virginia Gemba, the Special Representative of the UN Secretary General for Children and Armed Conflict, indicated that more than 700,000 children were out of school because of the crisis in the Northwest and Southwest Regions (see also section 1.g., Other Conflict-related Abuse). The beginning of the 2022-23 school year was constrained by the insecurity in the Northwest and Southwest Regions, where armed separatists imposed a lockdown and perpetrated attacks on civilians who challenged it (also see section 6, Other Societal Violence or Discrimination).

In an article published in *La Nouvelle Expression* on June 22, Joseph Ateba Abena, on behalf of NGO Journalists in Africa for Development, highlighted the case of unschooled Indigenous peoples. According to the article, the schools were abandoned and the teachers, when they existed, were neither trained nor remunerated by the state. The author of the article asserted that apart from the

isolated actions of the Ministry of Social Affairs, there was no clear government policy that encouraged the schooling of Indigenous children. Moreover, the teachers at the schools did not receive any pedagogical training recognized by the country's educational system, and their remuneration came from voluntary contributions and civil society organizations, not formally from the government. According to the coordinator of the Association for the Promotion of Persons with Disabilities, the Elderly and Orphans of Cameroon, a human rights organization based in the Noun division of the West Region, children with special needs had limited access to education compared with other children. More often, he said, parents of children with disabilities did not send the children to school.

**Child Abuse:** The law prohibits various forms of child abuse, including but not limited to assault, indecency, kidnapping, forced labor, rape, sexual harassment, and situations where one parent refuses to disclose the identity of the other parent to the child. Despite these legal provisions, child abuse remained a problem. Children continued to receive corporal punishment both within families and at school. Boko Haram continued to abduct children for use as child soldiers or as suicide bombers (see section 1.g.), and adults sexually assaulted children.

Tomorrow's Children, an NGO based in the Noun division of the West Region, reported that farmers exploited IDP women and children in their plantations, where they abused them sexually. The organization also mentioned the case of a girl who was raped by her classmates at the bilingual government school Koutaba in December 2021. The rapists were reportedly in detention as of April 20.

In its report during the year on monitoring domestic violence, the NGO Nouveaux Droits de l'Homme highlighted several cases of violence against women, sometimes involving children as victims. On March 20, in Douala, for example, a former host of the television show *Jambo* on Canal 2 International reportedly raped his daughter, whose age was estimated at 14. Canal 2 reportedly suspended him from the program; by mid-August, the father had not been charged with a crime.

**Child, Early, and Forced Marriage:** The minimum legal age for marriage is 18. Despite the law, according to UNICEF's 2018 child marriage data, 31 percent of women between ages 20 to 24 were married before age 18 and 11 percent were married before age 15. Early and forced marriages, as well as abusive "temporal

marriages," were more prevalent in the northern part of the country and some parts of the West Region, especially in the Noun division.

**Sexual Exploitation of Children:**  The law prohibits the commercial sexual exploitation and the sale, offering, or procuring for child sex trafficking and practices related to child pornography.  Authorities enforced laws against child pornography.  The country's legal framework requires a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore does not criminalize all forms of child sex trafficking.  The law does not set a minimum age for consensual sex.  According to anecdotal reports, traffickers exploited children younger than 18 in sex trafficking, although no statistics were available.  Anecdotal reports suggested the crisis in the Northwest and Southwest Regions had contributed to a dramatic increase in child sex trafficking and increased number of early pregnancies, especially in areas with IDPs.  Reports suggested the Bonaberi neighborhood in Douala was a hub for the sexual exploitation of underage IDP girls (also see section 7.c.).

**Infanticide, Including Infanticide of Children with Disabilities:**  Although infanticide is illegal, there were isolated reports of attempted infanticides.  The daily *La Nouvelle Expression* reported on April 14 that on the night of April 8, in Banekane, a locality of Nde division, West Region, an IDP named Emmanuella (surname unknown) gave birth to a baby that she immediately buried alive.  Neighbors found the infant alive 48 hours later and rushed it to a clinic in Bagangte for appropriate care.  Emmanuella, already a mother of three children, explained that she lacked the means to care for the newborn.

**Displaced Children:**  Many displaced children continued to live on the streets of urban centers, although the number was in decline because of stringent security measures and a law that criminalizes vagrancy.  According to estimates of the International Organization for Migration (IOM), there were 2,170 separated children and 1,790 unaccompanied children in the Far North Region as of 2020, including IDPs, returnees, out-of-camp refugees, and other migrants (see also sections 2.e. and 2.f.).

Thousands of children were affected by the humanitarian crisis in the Northwest and Southwest Regions.  These children were vulnerable to abuses of their rights

by armed forces and nonstate armed actors alike. In 2021, according to IOM data from August, there were approximately 769 unaccompanied and 8,320 separated children in the Northwest and Southwest Regions among the displaced population. These children faced many problems, including limited access to school, health care, protection, and risk of being recruited into armed groups. The government had not established structures to ensure that internally displaced children were protected from recruitment by nonstate armed groups and terrorist organizations.

## Antisemitism

The Jewish population was very small, and there were no known reports of antisemitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** Consensual same-sex sexual activity between adults is illegal and punishable with imprisonment from six months to five years plus a fine. The government enforced the law. While there is no law criminalizing LGBTQI+ identity, police often detained LGBTQI+ individuals based solely on their perceived sexual orientation, gender identity, or gender expression, including individuals detained who had sought law enforcement assistance after being the victims of violent crimes.

**Violence against LGBTQI+ Persons:** LGBTQI+ human rights organizations such as the Cameroonian Foundation for AIDS, Humanity First Cameroon, Alternatives-Cameroon, the National Observatory of the Rights of LGBTQI+ Persons and Their Defenders, Colibri, Working for Our Wellbeing, and others continued to report arbitrary arrests of LGBTQI+ persons. LGBTQI+ individuals continued to face significant stigma, violence, and discrimination from their

families, communities, and the government, including law enforcement personnel (see also section 1.c.).

In a May press release, Human Rights Watch indicated that since March 9, security forces had arrested at least six persons and detained 11, all of them victims of group attacks, for alleged consensual same-sex conduct and gender nonconformity. The Human Rights Watch (HRW) release stated that on April 10, a crowd of approximately eight men armed with machetes, knives, sticks, and wooden planks, attacked a group of at least 10 LGBTQI + persons attending a party at a private home in Yaoundé. A local official reportedly took two of the victims to the gendarmerie for protection from the mob, but instead the gendarmes beat the victims and only released them after payment of 15,000 CFA francs ($24). The other victims remained in the hands of the violent crowd for at least two hours, which injured and robbed them of their money and mobile phones. A human rights organization advocating for LGBTQI+ persons stated that it had recorded several dozen other cases of violence and abuse against members of the LGBTQI+ community across the country as of August.

During the year, there was a new development in the November 2021 case where a violent mob sexually assaulted, beat, and threatened an intersex person while others filmed the attack in two videos which later circulated on social media. A man allegedly connected to the attack was arrested and released 48 hours later. In November 2021, an organization advocating for LGBTQI+ persons filed a complaint with police on behalf of the survivor. Police opened a fresh investigation into the incident, leading to the arrest of and subsequent prosecution of a suspect. On February 25, the court of first instance at the Yaoundé administrative center found the accused guilty and sentenced him to six-month imprisonment plus a fine of 650,000 CFA francs ($1,060).

**Discrimination:** The constitution prohibits discrimination and prescribes equal rights for all citizens; however, the law does not explicitly prohibit discrimination based on sexual orientation, gender identity or expression, or sex characteristics; the law does not specifically recognize LGBTQI+ individuals, couples, or their families. Security forces sometimes harassed, detained, and assaulted persons based on their perceived sexual orientation or gender identity, including individuals found with condoms and lubricants. Fear of exposure affected

individuals' willingness to access HIV and AIDS health services.

**Availability of Legal Gender Recognition:**  No laws or decrees allow individuals to change their gender identity marker on legal and identifying documents to bring them into alignment with their gender identity.  The option of identifying as "non-binary/intersex/gender non-conforming" is not available.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  The law is silent on such practices.  Anecdotal reports however indicated some members of the LGBTQI+ community were victims of "corrective rape" to have them change their sexual orientation or gender identity.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:**  Although the law does not specifically prohibit their registration, LGBTQI+ organizations were not permitted to officially register as such and thus registered either as general human rights organizations or as health-focused organizations.  Many LGBTQI+ organizations reported that operating health programs, particularly HIV prevention and treatment programs, shielded them from potential harassment or shutdown, rather than promoting advocacy for LGBTQI+ persons as their primary mission.

## Persons with Disabilities

Persons with disabilities could not access education, health services, public buildings, and transportation on an equal basis with others.  A 2010 law provides additional protection to persons with physical, sensory, intellectual, or mental disabilities.  The protections under the law cover access to education and vocational training, employment, health services, information and cultural activities, communications, buildings, sports and leisure, transportation, housing, and other state services.  Some infrastructure projects were made accessible to persons with mobility challenges.  Under the 2010 law, public education is free for persons with disabilities and children born of parents with disabilities.  Initial vocational training, medical treatment, and employment must be provided "when possible," and public assistance "when needed."  The government did not enforce these provisions effectively.  The government did not always provide information

and communication on disability concerns in formats that were accessible to persons with disabilities.

The constitution protects the rights of all persons. There were no reports of police or other government officials inciting, perpetrating, or condoning violence against persons with disabilities during the year. Persons with disabilities faced discrimination in employment and occupation (see section 7.d.).

Many children with disabilities attended school with peers without disabilities. The government introduced inclusive education in many schools and reviewed the curriculum of teacher training colleges to include training in inclusive education skills. Other children with disabilities continued to attend separate schools, such as the Bulu Blind Center in Buea and the Yaoundé Special School for Hearing-Impaired Children. NGOs, including Noun division-based Association for the Promotion of Persons with Disabilities, the Elderly and Orphans of Cameroon, however, indicated that parents of children born with disabilities seldom sent the children to school.

On June 27, at approximately 6 a.m., police arrested more than twenty visually impaired persons while they were peacefully demonstrating in front of the Prime Minister's Office in Yaoundé. Those arrested were detained for several hours at the central police station number 1. While the alleged intention of the demonstration was to denounce poor living conditions and the difficult access to employment for persons with disabilities, authorities stated the demonstration was illegal. A spokesperson for the protesters reportedly told Radio Equinoxe reporters that three visually impaired journalists were selected for the last direct recruitment into the public service, but no one was eventually confirmed after the interviews. He cited the 2010 law on the promotion of persons with disabilities, which stipulates that for equal qualifications, the person with a disability has priority. They said they believed they were also marginalized during recruitment in private companies, even though many of the applicants are university graduates. Persons with disabilities did not receive adequate protection in conflict zones. The government took no action to limit the rights of persons with disabilities to participate in civic life; however, access constraints may have limited participation to certain activities, such as voting in elections.

## Other Societal Violence or Discrimination

Several cases of vigilante action and arson attacks were reported involving arbitrary killings and destruction of both public and private property. At approximately 2:00 a.m. on August 22, unidentified individuals set fire to a dormitory at Presbyterian Secondary School (PSS), Mankon in Bamenda, Northwest Region, days before the August 24 reopening for final-year students. School authorities told media that the arsonists fired several shots in the air before leaving the campus. The incident was the third arson attack on PSS Mankon since the beginning of the crisis in the Northwest and Southwest Regions. The attack followed an August 13 viral communiqué by separatists who announced that classes would only resume on October 4 and threatened reprisals against any schools that attempted to reopen earlier. The separatists expressed their opposition to the resumption of classes in state-owned schools and declared private, denominational, and community-run schools could reopen, provided they did not use school uniforms, sing the national anthem, or teach French. The arson attack on PSS Mankon took place hours after an August 21 call by bishops of the Bamenda Ecclesiastical Province for classes to resume in the Northwest and Southwest Regions without any preconditions (also see section 6, Children, Education).

Persons with HIV often suffered social discrimination and were isolated from their families and society, in part due to a lack of education on the disease. As in the previous year, while no specific cases of discrimination in employment were made public, anecdotal reports indicated some discrimination occurred with respect to HIV status, especially in the private sector.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the rights of workers to form and join independent unions, bargain collectively, and conduct strikes, albeit with significant restrictions. The right does not apply to defined groups of workers, including defense and national security personnel, prison administration civil servants, and judicial and legal personnel. The law also prohibits antiunion discrimination and requires the

reinstatement of workers fired for union activity. Statutory limitations and other practices substantially restricted these rights. The law does not permit the creation of a union that includes both public and private-sector workers or the creation of a union that includes different, even if closely related, sectors. The law requires that unions register with the government, have a minimum of 20 members, and formalize the union by submitting a constitution and bylaws. Founding members must also have clean police records. Those who form a union and carry out union activities without registration may be fined. Unions are prohibited from carrying out any activity that is not related to the study, defense, development, and protection of the interests of workers.

More than 100 trade unions and 12 trade union confederations were in operation, including one public sector confederation. Trade unions or associations of public servants may not join a foreign occupational or labor organization without prior authorization from the minister of territorial administration, who is responsible for "supervising public freedoms."

The constitution and law provide for collective bargaining between workers and management as well as between labor federations and business associations in each sector of the economy. The law does not obligate employers to bargain. The law does not apply to the agricultural or informal sectors, which included most of the workforce.

Legal strikes or lockouts may be called only after conciliation and arbitration procedures are exhausted. Workers who ignore procedures to conduct a strike may be dismissed or fined. Free industrial zones are subject to labor laws, but there are several exceptions limiting worker rights. Within free industrial zones, employers have the rights to determine salaries according to productivity, which could bypass minimum wage requirements, to negotiate work contracts free of some labor law regulations, and to issue work permits for foreign workers without the normally lengthy government oversight process. Some laws intended to target terrorists may impose harsh legal penalties on legitimate trade union activity.

The government and employers did not effectively enforce the applicable laws on freedom of association and the right to collective bargaining. Penalties for violations were rarely applied against violators and were not commensurate with

those for comparable violations.  Administrative and judicial procedures were infrequent and subject to lengthy delays and appeals.

Collective agreements are binding until three months after a party has given notice to terminate.

Many employers continued to use subcontractors to avoid hiring workers with collective bargaining rights.  Major companies, including quasi-state-run and state-operated companies, reportedly engaged in the practice, according to workers from Energy of Cameroon, the water supply company Camerounaise des Eaux, cement manufacturer Cimencam, Guinness, Aluminum Smelter, Cameroon Oil Transportation Company, Ecobank, and many others.  Subcontracting reportedly involved all categories of personnel, from the lowest to senior levels.  As a result, workers with equal expertise and experience did not always enjoy similar protections when working for the same business, and subcontracted personnel typically lacked a legal basis to file complaints.

The International Trade Union Confederation cited the country's Terrorism Suppression Law, as limiting civil liberties in the country, including legitimate trade union activities.  The International Labor Organization (ILO) noted in 2021 that the law's definition of terrorism could apply to acts related to the legitimate exercise of activities by trade unions or employers' representatives.

Several strikes were announced.  Some were called off after successful negotiations, others were carried out peacefully, and others faced some degree of repression.

As an example of a successful negotiation, teachers organized under the collective "On a Trop Supporté" (OTS) launched a nationwide strike on February 21 to demand better working conditions and restitution for unpaid wages and benefits. Representatives of OTS reportedly submitted a strike notice to the Prime Minister's Office in February, demanding payment of their outstanding allowances and bonuses.  In March, the secretary general of the Presidency announced the disbursement of emergency funding to address the outstanding balance reportedly owed to teachers who graded official exams for academic years 2020 and 2021. OTS then called on colleagues to resume duty, saying that the collective would

trust the good faith of the government and temporarily suspended the strike to avert an education crisis.

The government took some actions to repress trade union activity. In June, security forces arrested four leaders of transport sector trade unions and placed them in administrative custody in Yaoundé. They were accused of incitement to rebellion, criminal association, disturbance of public order, and conspiracy against the Republic. These representatives of cab drivers, intercity drivers, and other transporters had planned a sit-in in front of the Prime Minister's Office to denounce the increase in the price of the vehicle inspection. In their strike notice, they also urged their colleagues to demonstrate against illegal transporters who compete with them and against the abuses of agents of the Ministry of Transport on the highways. The four union leaders were released on June 14. Prior to the arrest, on March 23, police occupied the premises of the Labor Exchange (Bourse du Travail), located in the Messa district of Yaoundé, to prevent a planned press conference by the transport sector union leaders.

Government officials also took police action against a planned work stoppage. In a June 29 communiqué, the president of the National Union of Public Sector Researchers urged researchers to suspend, effective June 30, activities such as scientific supervision of students and trainees in research institutes under the Ministry of Scientific Research and Innovation. In response to the strike notice, officials deployed a strong police presence on June 30, effectively taking control of the Ministry of Scientific Research and Innovation to prevent any labor stoppage. The government justified its action by citing the labor code requirement for arbitration to precede any strike action.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit all forms of forced and compulsory labor. The law prohibits slavery, exploitation, and debt bondage and voids any agreement in which violence was used to obtain consent. Penalties for violations were commensurate with those for other serious crimes. The law also extends culpability for all crimes to accomplices and corporate entities. Although the statutory penalties are severe, the government did not enforce the law effectively, in part due to a lack of capacity to investigate trafficking, labor inspection and

remediation, and regular conflation of human trafficking and migrant smuggling. In addition, due to the length and expense of criminal trials and the lack of protection available to victims participating in investigations, many victims of forced or compulsory labor resorted to accepting out-of-court settlements. Anecdotal reports of hereditary servitude in some chiefdoms in the North Region continued.

Many members of the Kirdi, a predominately Christian and animist ethnic group enslaved by the Muslim Fulani in the 1800s, continued to work for traditional Fulani rulers for compensation in room and board and generally low and unregulated wages, while their children were free to pursue schooling and work of their choosing. Kirdi were also required to pay local chiefdom taxes to the Fulani, as were all other subjects. The combination of low wages and high taxes (although legal) effectively constituted forced labor. While technically free to leave, many Kirdi remained in the hierarchical and authoritarian system because of a lack of viable alternative options.

Unconfirmed but credible reports suggested that in the South and East Regions, some Baka, including children, continued to be subjected to unfair labor practices by Bantu farmers who hired the Baka at exploitative wages to work on their farms during the harvest seasons.

The ILO noted in 2021 that under the country's law, compulsory prison labor may be imposed for expressing certain political views or opposing the established political, social, or economic system.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

The law contains no specific provisions against or penalties for discrimination, but

the constitution in its preamble provides that all persons shall have equal rights and obligations and that every person shall have the right and the obligation to work.

Discrimination in employment and occupation allegedly occurred with respect to ethnicity, HIV status, disability, gender, sexual orientation, and gender identity, especially in the private sector, although no statistics were available (see section 6). There were legal restrictions on women's employment in occupations deemed arduous or "morally inappropriate" and in industries including mining, construction, factories, and energy. Women made up 90 percent of the labor force in the informal sector. Members of ethnic groups often gave preferential treatment to other members of their group in business. Persons with disabilities reportedly found it difficult to secure and access employment. Refugees could obtain legal authorization to work in the formal sector; however, formal sector employers rarely hired authorized refugees. There were no confirmed reports of discrimination against internal migrant or foreign migrant workers, although unconfirmed credible reports suggested such workers were vulnerable to unfair working conditions. The government took no action to eliminate or prevent discrimination and kept no records of incidents of discrimination.

In June, a group of visually impaired persons staged a demonstration in front of the Prime Minister's Office in Yaoundé, to denounce what they considered discrimination regarding their access to employment. (See section 6, Persons with Disabilities.)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The minimum wage in all sectors was greater than the World Bank's poverty line. Premium pay for overtime ranged from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it was weekend or late-night overtime. Despite the minimum wage law, employers often negotiated lower wages with workers, in part due to the extremely high rate of underemployment in the country. Salaries lower than the minimum wage remained prevalent in the public works sector, where many positions required unskilled labor, as well as in domestic work, where female refugees were particularly vulnerable to unfair labor practices.

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities. There are exceptions for guards and firefighters (56 hours per week), service-sector staff (45 hours per week), and household and restaurant staff (54 hours per week). The law mandates at least 24 consecutive hours of rest weekly.

**Occupational Safety and Health:** The government sets occupational safety and health (OSH) standards in the workplace. The minister in charge of labor establishes the list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety. Ministry inspectors and occupational health physicians are responsible for monitoring OSH standards.

**Wage, Hour, and OSH Enforcement:** The Ministry of Labor and Social Security is responsible for enforcement of the minimum wage, overtime, and OSH laws. The ministry did not enforce the laws and regulations in the informal sector. In the formal sector, penalties for violations of the law were not commensurate with those for comparable crimes, such as negligence. Penalties were rarely applied against violators. Unconfirmed but credible reports suggest some businesses did not provide health services to their employees, as required by law but rarely enforced. The government more than doubled the total number of labor inspectors, but the number was still insufficient, and the ministry lacked the resources for a comprehensive inspection program.

**Informal Sector:** The International Labor Organization reported that informal workers made up 90 percent of the labor force in the country, and that most were women. Sectors where informal employment was most prevalent included artisanal mining, petty trade, hunting and fishing, and handicraft. The informal economy was mostly unregulated, and consequently was not covered by wage, hour, OSH, and other labor laws and inspections. Although self-employed workers could voluntarily contribute to one type of government old age pension scheme, workers in the informal labor market were largely uncovered or ineligible for social protection schemes like unemployment or workers compensation for injury.

# Cameroon 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Cameroon during the year.

Significant human rights issues included credible reports of: arbitrary or unlawful killings, including extrajudicial killings; torture or cruel, inhuman, or degrading treatment or punishment by the government; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; serious abuses in a conflict, including reportedly unlawful or widespread civilian deaths or harm, enforced disappearances or abductions, torture, and physical abuses; unlawful recruitment or use of children in armed conflict by nonstate groups; serious restrictions on freedom of expression and media freedom, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; substantial interference with the freedom of peaceful assembly and freedom of association; restrictions on freedom of movement within the territory of a state; serious government corruption; serious government restrictions on or harassment of domestic and international human rights organizations; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, child, early and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 298 of 352

forced marriage, and other forms of such violence; crimes involving violence or threats of violence targeting members of ethnic groups and Indigenous peoples; laws criminalizing same-sex sexual conduct between adults, which were enforced; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and systematic restrictions on workers' freedom of association, including violence and threats against labor activists.

The government took limited credible steps to identify and punish officials who may have committed human rights abuses.

Armed separatists, Boko Haram, the Islamic State of Iraq and Syria-West Africa, criminal gangs, and other societal abusers committed significant human rights abuses, some of which were investigated by the government.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that the government or its agents committed arbitrary and unlawful killings, including extrajudicial killings, during the year.

On February 27 in Moussourtouk in Mayo-Kani Department of the Far North

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 299 of 352

Region, an off-duty Rapid Intervention Battalion soldier, Woulkam Baba, stabbed to death Etienne Ayang Kolfounq, a high school teacher from a local government school, after a verbal altercation at a drinking spot. The Ministry of Defense confirmed the killing and announced Woulkam was arrested, as were two other soldiers present during the altercation. According to the governmental Cameroon Human Rights Commission (CHRC), the three soldiers were incarcerated awaiting trial for homicide.

On March 15, University of Buea student Ngule Linus Fonteh died in police custody after he and his roommate, Mboh Jires Akua, were apprehended by nonuniformed members of the Military Security Unit for allegedly supporting armed separatist groups. According to the nongovernmental organization (NGO) Center for Human Rights and Democracy in Africa and a lawyer for the victim's family, Mboh suspected he may have been targeted because of critical statements he made online regarding the security forces and that Ngule was detained arbitrarily because he was Mboh's roommate. Mboh reported he and Ngule were both tortured with machetes after initially refusing to sign prewritten confessions. Mboh stated he was beaten and received several blows with machetes on the soles of his feet during an interrogation. When the morgue released Ngule's remains after four months, his body reportedly showed signs of torture, including scars on his feet. Security forces detained Mboh for nearly four months until, after a CHRC investigation, he was released without charges. There were no known reports of government action against the perpetrators.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 300 of 352

Four soldiers of the 31st Motorized Infantry Battalion based in Tchollire, North Region, shot and killed Souleymanou Bouba in April 2022. According to the CHRC, the four soldiers were detained in June 2022 and subsequently charged with homicide but released on bail. The case remained pending at year's end.

Journalists and NGOs reported numerous arbitrary and unlawful killings of civilians by nonstate armed groups in conflicts that continued in the Northwest, Southwest, and Far North Regions.

Boko Haram and the Islamic State of Iraq and Syria-West Africa (ISIS-WA) reportedly committed unlawful killings of unarmed civilians. On February 3, four persons, including three women, died in an attack attributed to Boko Haram and ISIS-WA in Metchikar Village on the border with Nigeria in the Far North Region. According to media, on March 3, heavily armed Boko Haram and ISIS-WA terrorists attacked the locality of Assighassia in Mayo-Moskota Subdivision of the Far North Region, killing three civilians in their homes.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities during the year.

## c. Torture and Other Cruel, Inhuman, or Degrading

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 301 of 352

# Treatment or Punishment, and Other Related Abuses

Although the constitution and law prohibited such practices, anecdotal reports and survivor testimony suggested government officials employed them.

Human rights NGOs documented at least one case in which traditional authorities severely abused civilians.  In the North Region, bodyguards of traditional leader Lamido of Tcheboa detained Woulvang (no last names) following a dispute.  The bodyguards reportedly administered 120 lashes and held Woulvang in a cell without food and water for 72 hours.  The CHRC found the allegations credible, but the office of the local prosecutor claimed it had insufficient evidence to file charges.

There were reports lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons were beaten and physically abused by ordinary citizens, with little or no action by the government to protect them or pursue their attackers.

The government took steps to identify, prosecute, and punish some abusive officials, but such action was not consistent.  Outcomes of such procedures were rarely disclosed to the public.  Impunity remained a serious problem, particularly within the armed forces and police.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 302 of 352

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening due to food shortages, gross overcrowding, physical abuse, inadequate sanitary conditions, and a lack of medical care.

**Abusive Physical Conditions:**  Severe overcrowding remained a significant problem in most prisons, especially in urban centers.  Although the country's dilapidated, colonial-era prisons had a designed capacity of 19,415 persons, the government reported in June 2022 they held 32,003 inmates.  Conditions in detention cells located at gendarmerie and police stations were often worse.  Officials made extensive use of shackling as a disciplinary measure.

Lack of access to food, potable water, medical care, sanitation, heating, ventilation, and lighting was life threatening.  Inmates suffered from malnutrition and were exposed to numerous communicable diseases.  Several cases of cholera were reported at the Kondengui central prison in Yaoundé, with at least three deaths in May.  Prisoner-on-prisoner violence occurred during the year.

**Administration:**  Authorities reportedly did not address all credible allegations of mistreatment.

**Independent Monitoring:**  Independent monitoring of prisons was inconsistent.  NGOs and lawyers reported prison access was significantly

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 303 of 352

curtailed during the year.  The government did not readily allow independent human rights groups access to review prison conditions, and groups reported prison access depended greatly on relationships between group leaders and prison officials.  Organizations that implemented government-approved projects in prisons reportedly had easier access.

## d. Arbitrary Arrest or Detention

The constitution and law prohibited arbitrary arrest and detention and provided for the right of persons to challenge the lawfulness of their arrest or detention in court and receive compensation for serious injuries resulting from illegal detention.  The government did not always respect these provisions.

### Arrest Procedures and Treatment of Detainees

The law required police to obtain a warrant from a judge or prosecutor and to disclose their identity and state the reason for the arrest prior to apprehending a suspect, except when a person was caught in the act of committing a crime.  Police often did not respect these requirements.  The law provided that suspects be brought promptly before a judge or prosecutor, although this often did not occur, and citizens were detained without judicial authorization.  The law allowed police to legally detain a person in connection with a common crime without charges for up to 48 hours, which could be extended up to 96 additional hours upon written

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 304 of 352

approval of state counsel. The law provided that a terror suspect could be held indefinitely in investigative detention with the authorization of the prosecutor. Administrative authorities, such as governors and civilian government officials serving in territorial command, also could approve detentions of individuals without charge for renewable periods of 15 days. Police and gendarmes reportedly often exceeded prescribed detention periods.

The law allowed access to legal counsel and family members, although police frequently denied detainees access to both. The law prohibited incommunicado detention, but such cases reportedly occurred, especially in connection with those accused of being or supporting separatists in the Northwest and Southwest Regions. The law permitted bail, but bail was approved only on a selective basis. The law provided for the right to sue for unlawful arrest, but this right was seldom respected.

**Arbitrary Arrest:** Police, gendarmes, military officials, and other government authorities reportedly arrested and detained persons arbitrarily, often holding them for prolonged periods without charge or trial and at times incommunicado.

According to the NGO Mandela Center International, on February 12 authorities in Ekona, Fako Division, arrested 97 persons as suspected terrorists, 81 of whom were released two days later after women protested in Buea. On March 2, the Mandela Center reported members of defense

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 305 of 352

and security forces arrested 160 civilians in five villages of the Mbonge and Konye Subdivisions, Meme Division, of the Southwest Region.  A military magistrate charged 14 of them with terrorism, manufacture of weapons, and undermining state security.  The other 146 detainees were released without charge at different times, from one week to one month after their initial detention.

**Pretrial Detention:**  The law provided for a maximum of 18 months' detention before trial, but many detainees waited years to appear in court. Factors contributing to lengthy pretrial detentions included insufficient court staff, mismanagement of case files, inability to pay court fees, and the politicization of some legal proceedings that required direction from the central government.

# e. Denial of Fair Public Trial

The constitution and law provided for an independent judiciary, but the government did not always respect judicial independence and impartiality. In some instances, the outcomes of trials appeared influenced by the government, especially in politically sensitive cases.  Despite the judiciary's nominal independence from the executive and legislative branches, the president appointed all members of the bench and the legal department of the judicial branch, including the president of the Supreme Court, and could dismiss them at will.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 306 of 352

## Trial Procedures

The constitution and law provided for the right to a fair and public trial without undue delay, and defendants were presumed innocent.  Authorities did not always respect these provisions and applied the presumption of innocence in a selective manner.  Criminal defendants had the right to be informed promptly and in detail of the charges against them, with free assistance of an interpreter if needed; the quality of interpretation often was poor.  Defendants had the right to be present and to consult with an attorney of their choice, but in many cases the government did not respect this right, restricting access to lawyers, often at the preliminary investigation phase, particularly in cases of individuals suspected of complicity with separatists or political opponents.  When defendants could not pay for their own legal defense, the court could appoint trial counsel at public expense, but the process was often burdensome and lengthy, and the quality of legal assistance was often poor.  Authorities generally allowed defendants to question witnesses and to present witnesses and evidence on their own behalf but did not compel witnesses to testify.  Defendants had the right to adequate time and facilities to prepare a defense and not to be compelled to testify or confess guilt, but authorities often abused these rights. Examining magistrates sometimes attempted to induce political opponents and suspected separatists to incriminate themselves.  The law provided for the right to request recusal of judges and to sue for unlawful arrest, but

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 307 of 352

these rights were seldom respected.  Applications to recuse judges with conflicts of interest rarely succeeded, especially in politically sensitive cases.

Defendants could appeal convictions up to the Supreme Court and subsequently petition the president for pardon, but there were significant delays in appeals.  For example, on November 10 the Court of Appeals of the Far North Region in Maroua overturned a 2015 military court decision and reduced an initial death sentence, imposed by a military judge over the objection of the military prosecutor who had argued for release due to lack of evidence, to a 10-year term of imprisonment.  The defendant, a woman, was accused of acts of terrorism based on an anonymous denunciation.  According to the defendant's lawyer, no investigation was conducted, no witnesses were heard, and no victims were identified in the case.

Civilian courts also often limited the rights of defendants in politically sensitive cases.  Military tribunals were sometimes used against civilians and political opponents, bypassing defendants' procedural rights regarding their detention, prosecution, and appeals.

## Political Prisoners and Detainees

Several human rights organizations claimed they had limited access to political prisoners, alleging difficulties in securing authorization from prosecutors.  Although a reliable estimate of the number of political prisoners was not available, common purported charges used against

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 308 of 352

government critics reportedly related to the security of the state, including secession, terrorism, rebellion, revolution, and "hostility against the fatherland."  Prison sentences in many such cases went beyond the limits prescribed by law for the relevant offense.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

On May 25, the Littoral Administrative Court ruled that the government's 2020 appropriation of approximately six acres of land in the Bali-Dikolo area of Douala violated the law.  The ruling followed the government's forcible eviction of several dozen residents from the area in May 2022 as part of a project to build a five-star hotel.  Government workers and security forces bulldozed houses and deployed tear gas against protesters.  The May 25 ruling called for the reinstatement of the land certificates and associated rights of the affected displaced persons.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the constitution and law prohibited such actions, these rights were subject to restriction in the interests of the state, and there were reports

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 309 of 352

police and gendarmes abused their positions by harassing citizens and conducting searches without warrants. The law permitted a police officer to enter a private home during daylight hours without a warrant only if pursuing a person suspected of or seen committing a crime. Police and gendarmes often did not comply with this provision and entered private homes without a warrant. Unconfirmed anecdotal reports indicated the government monitored private online communications without appropriate legal authority. In contrast with 2022, there were no reports authorities punished family members for offenses allegedly committed by their relatives.

## i. Conflict-Related Abuses

There were reports of abuses associated with continuing conflicts in the Northwest and Southwest Regions, where government forces clashed with separatists. The abuses included killings and abductions by both government forces and armed separatist groups. There were also reports of abuses, including killings and abductions, committed by Boko Haram and ISIS-WA in the Far North Region.

**Killings:** There were reports government forces and separatist fighters deliberately killed numerous civilians. Although independent observers accused government forces of killing unarmed civilians, officials claimed those killed by government forces in conflict zones were in fact separatists.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 310 of 352

Separatists also attacked and killed government workers and civilians alleged to have assisted government forces or who did not observe separatist-imposed lockdowns.

According to the Center for Human Rights and Democracy in Africa, on June 24 government security forces killed five men in Ekona Town in Muyuka Subdivision of the Southwest Region. Reports differed as to whether the victims were armed at the time. The CHRC claimed the men were suspected separatists celebrating the birthday of a nonstate armed group leader known as General Sagta, noting they died during a gun battle with soldiers.

According to media reports, on the night of July 15 security forces killed five men in a compound in Bamenda's Awing neighborhood. Media sources differed on whether the men were separatists who were engaged in kidnapping. On July 17, Northwest Region Governor Adolphe Lele Lafrique alleged the deceased men had in fact kidnapped citizens in Awing before transporting them in unidentified cars to Nacho Junction and executing them in public to send a message to other citizens who might consider collaborating with government forces.

Journalists and NGOs reported numerous arbitrary and unlawful killings of civilians by nonstate armed groups. In a July report, Amnesty International reported that on January 12 armed men believed to be separatists killed six individuals in the village of Munkep. The killing was reportedly connected to several months of clashes between Fulani herdsmen and armed separatists

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 311 of 352

concerning land disputes.  The traditional chief of Munkep was among the six victims.

On February 10, armed separatists killed five workers of the Cameroon Development Corporation because they worked during a separatist-imposed lockdown ahead of a February 11 government holiday celebration.  The Ambazonia Governing Council, an armed separatist group, claimed responsibility for the attack.  On February 20 in Bali, Northwest Region, suspected separatists beheaded a teenager whom they accused of revealing separatist hideouts.  In one of the largest attacks since the conflict began, on November 6, suspected members of a nonstate armed group entered Egbekaw Village in Manyu Division of the Southwest Region, shot randomly, and set ablaze several houses.  In a November 7 statement, the government indicated the preliminary death toll from the attack was 25 persons.  The government attributed the attack to a separatist group known as the Manyu Unity Warriors, affiliated with the Ambazonian Defense Forces.  Subsequent estimates put the death toll between 40 and 60, making it the single deadliest attack of the seven-year conflict.

**Abductions:**  Armed separatists reportedly abducted several individuals for not respecting separatist-imposed lockdown measures.  Separatists held civilians as hostages, including public officials, political leaders, teachers, schoolchildren, and religious and traditional leaders.  There were reports abductors physically abused their victims.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 312 of 352

On May 19 in Kedjom Keku, Mezam Division of the Northwest Region, armed individuals abducted 30 women for denouncing separatist-imposed lockdowns and taxes. On May 20, the nonstate armed group Ambazonia Defense Forces abducted Stephen Ujambeng, ruling party Councilor for the Northwest Region, along with an unspecified number of other civilians, allegedly for participating in a May 20 national day parade.

According to official sources, on June 1, security forces rescued Fon Yakum Kevin Shumitang II, the president of the Northwest House of Chiefs, who had been abducted by armed separatists in 2021.

In August, the bodies of five government officials abducted in 2021 by separatists were exhumed. The bodies, along with the remains of four other unidentified victims, were discovered in a mass grave outside Ekondo-Titi in the Southwest Region. A former separatist fighter who had been present during the killings informed authorities of the grave location.

**Physical Abuse, Punishment, and Torture:** According to reports, both government agents and separatists physically abused civilians, as well as prisoners in their custody.

Multiple organizations reported Rapid Intervention Battalion soldier Ewome Eboko John, better known by the pseudonym "Moja Moja," continued to abuse with impunity civilians he accused of being separatists in the Southwest Region. In a March video released on social media, Moja Moja

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 313 of 352

could be seen walking on the corpses of two alleged separatists killed in the locality of Muea, Fako Division of the Southwest Region.  The posting followed a pattern in which Moja Moja recorded videos of his victims as he abused them and published the videos on his social media accounts.  In June 2022, for example, one of the videos depicted Moja Moja beating an unarmed civilian with a metal object and forcing him to confess to being a separatist fighter.  After the video was posted, a group of lawyers wrote a letter to the chief prosecutor of the Yaoundé Military Tribunal, requesting that he take appropriate action against Moja Moja.  According to the CHRC, in June the Southwest Region Military Tribunal summoned Moja Moja, but at year's end no known actions were taken against him.  CHRC officials noted complaints against Moja Moja were often anonymous because of victims' fears of reprisal, which they claimed made investigation difficult.

**Child Soldiers:**  Observers reported Boko Haram continued to recruit and use child soldiers, including girls, in attacks on civilian and military targets.  Some community groups, known as vigilance committees, were reported to use and recruit children in armed operations against Boko Haram and other nonstate armed groups.  Separatists in the Southwest and Northwest Regions recruited and used child soldiers in combat roles and to gather intelligence, according to observers.

**Other Conflict-related Abuse:**  As in the previous year, there were reports of violence directed against health workers and of the use of firearms near

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 314 of 352

health facilities by members of security forces and armed separatists. There were also reports of such incidents targeting schools and civilian residential areas.

The UN Office of the Coordinator for Humanitarian Affairs (OCHA) reported that on February 5 suspected armed nonstate elements attacked the Ouzal Health Center in Mayo-Tsanaga Division of the far North Region, looting and destroying medical equipment and supplies. The attack was the second suffered by the health facility in a three-week period.

Of the 6,515 schools expected to open during the 2022-23 academic year in the Northwest and Southwest, only 3,013 were operational as of January, with insecurity as the primary reason for this, according to OCHA and echoed in Amnesty International's July report. Nonstate armed groups announced and enforced a lockdown that delayed the start of the 2023-24 academic year in the Northwest and Southwest. The government reported only 35,000 primary students (8 percent) of the estimated 450,000 students in the region reported to classes on the September 4 school year start date. Nonstate armed groups enforced the lockdown with several violent attacks on civilians, including on two elementary school teachers in the Northwest. Schools were not permitted to reopen until September 19, when students gradually returned to school.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 315 of 352

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provided for freedom of expression, including for members of the press and other media, but the government often restricted this right, explicitly or implicitly.

**Freedom of Expression:**  Government officials reportedly denied individuals or organizations the ability to criticize or express views at odds with government policy.  Government officials also denied citizens the ability to discuss certain matters of general interest, including expression of views concerning political transition.  There were reports individuals who criticized the government privately or in public faced reprisals.

**Violence and Harassment:**  Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists. Journalists practiced self-censorship, refraining from subjects that could be perceived as critical of the government due to harassment and intimidation by the government or by those acting with impunity due to the state's failure to investigate or prosecute attacks on journalists.  Journalists and publishers reported cases of telephone harassment and intimidation.

The mutilated body of journalist Arsene Salomon Mbami Zogo, popularly

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 316 of 352

known as Martinez Zogo, was found on January 22 in a Yaoundé suburb. Zogo had been missing since January 17, when witnesses reported his abduction by unknown assailants near a gendarmerie station. Zogo had reported on sensitive topics and populist themes, such as corruption by government officials and their allies. Witness accounts pointed to signs of torture, including burn marks and severed fingers. In a January 22 release, Minister of Communication and government spokesperson René Emmanuel Sadi confirmed Zogo's body displayed signs of torture. He condemned the killing and announced an investigation was underway to find the perpetrators. The government detained several suspects for the killing, including Maxime Eko Eko, head of the General Directorate of External Research, and Justin Danwe, operations director of the same entity. In December, authorities arrested an additional suspect, Stephan Savom, Mayor of Bibey in the Central Region. At year's end, the suspects remained in detention as the government continued its investigation.

In March, the divisional officer of Nkongsamba's 2nd district, Youfedi Hamid, issued a message to security forces requesting they prevent four journalists (Riphin Ngoppe, publisher of *La Voix du Moungo*, Nana Serge of *Tribune Libre*, Hen Château of *LTM*, and Franck Lionel Diffo of *DBS TV*) from covering events taking place in his constituency until further notice. During March 12 senatorial elections, Hamid ordered Ngoppe to leave a polling station during ballot counting, thus preventing him from reporting on the voting process. Hamid used allegations the journalist had harassed civil servants in August

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 317 of 352

2022 to justify his exclusion.

**Censorship or Content Restrictions for Members of the Press and Other Media, including Online Media:** By law the Ministry of Communication required editors to submit two signed copies of their newspapers within two hours of publication, although the government did not enforce, and publishers did not comply with, this requirement. The Ministry of Communication had supervisory authority over media outlets and accredited audiovisual media organizations; the central government also accredited print media. Journalists and media outlets reported practicing self-censorship, especially if the nominally independent media regulator, the National Communication Council (NCC), had suspended them previously. Authorities threatened journalists, and the NCC suspended journalists and publishers based on public complaints and for content deemed at odds with government policy. During the year, the NCC sanctioned media professionals from seven outlets, with penalties ranging from a total ban of the outlet to three months' suspension from the practice of journalism. Prominent among the sanctions were one-month bans for English-language newspaper *The Post* and its editor after an employee mistakenly released an image of a draft front page that contained the headline "66% of Cameroonians want a military coup – Afrobarometer Survey," even though the front page in question was never actually published or disseminated to the public.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 318 of 352

**Libel/Slander Laws:**  Libel, slander, defamation, and blasphemy were treated as criminal offenses.  The law authorized the government to initiate a criminal suit when the president or other senior government officials were the alleged victims.  These laws placed the burden of proof on the defendant, and crimes were punishable by prison terms and substantial fines.  Ordinary citizens could also file libel or slander suits, but the law was often applied selectively and with deference to senior government officials and well-connected individuals.  There were no known cases prosecuted under libel, slander, or blasphemy laws during the year.

**National Security:**  Authorities often cited laws against terrorism or protecting national security to threaten critics of the government.  Several journalists remained in detention on terrorism charges, including Kingsley Njoka, who, after reporting on the conflict in the Northwest and Southwest, was accused of terrorism ("complicity with an armed gang") and held in pretrial detention for more than two years before appearing before a military tribunal in late 2022.  In January, a judge presiding over his case ordered a retrial before a new panel.  Njoka remained in detention at year's end.

**Nongovernmental Impact:**  There were several reported cases of armed separatist groups in the Southwest and Northwest Regions explicitly inhibiting freedom of expression, including for the press.  In addition, concern for personal security and restrictions on movement imposed by

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 319 of 352

armed separatists contributed to further limit freedom of expression for media members.

## Internet Freedom

The government did not restrict or disrupt internet access or censor online content.

# b. Freedoms of Peaceful Assembly and Association

Although the law provided for the freedoms of peaceful assembly and association, the government often restricted these rights.

## Freedom of Peaceful Assembly

The law required organizers of public meetings, demonstrations, and processions to notify officials in advance but did not require prior government approval for public gatherings, nor did it authorize the government to suppress public gatherings it had not approved in advance. Nevertheless, officials frequently claimed the law implicitly allowed the government to grant or deny permission for public gatherings. The government often granted permits for gatherings on a selective basis and used force to suppress gatherings for which it had not issued permits.

Authorities typically cited security concerns as the basis for deciding to block gatherings. On January 30, opposition politician Cabral Libii informed

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 320 of 352

authorities in Yaoundé of a planned public meeting to protest the killing of journalist Martinez Zogo. On January 31, authorities asked Libii to suspend the meeting due to a claimed vagueness of purpose and the risk it could lead to violence. According to the CHRC, Libii's judicial appeal of the government decision was rejected.

According to media sources and Libii's public statements, in March the Ministry of Territorial Administration twice denied Libii authorization to hold a separate public protest against electricity cuts. In the first instance, the government asserted that holding it on the proposed March 12 date (the same day as senatorial elections) would constitute political activities on election day in contravention of the law. Libii rescheduled his planned event for a week later, which the ministry then denied on the grounds that the organizers would be unable to control the crowd.

In contrast with previous years, authorities allowed the opposition party MRC to hold public meetings during the year, although often not in the venues chosen by party leaders.

## Freedom of Association

The law permitted the Ministry of Territorial Administration, on the recommendation of local officials, to suspend the activities of an association for three months on grounds the association was disrupting public order. The minister could also dissolve an association if it was deemed a threat to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 321 of 352

state security.  National associations could acquire legal status by declaring themselves in writing to the ministry, but the ministry was explicitly required to register foreign associations.  The president was required to accredit religious groups upon the recommendation of the minister of territorial administration.  The law imposed substantial fines for individuals who formed and operated any such association without ministry approval.  The law prohibited organizations that advocated goals contrary to the constitution, laws, and morality, as well as those that aimed to challenge the security, territorial integrity, national unity, national integration, or republican form of the state.

Conditions for recognition of political parties, NGOs including human rights groups, and associations were complicated, involved long delays, and were unevenly enforced.  This resulted in associations operating in legal uncertainty with their activities tolerated but not formally approved (see section 5).

On July 12, the Ministry of Territorial Administration issued a ban on the activities of the Evangelical Church of Cameroon.  The written ban cited as reasons, among other things, the threat of serious disturbance to public order.  On August 19, the ban was lifted, and regular worship services resumed.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 322 of 352

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report*
https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Although the constitution and law provided for freedom of internal movement, foreign travel, emigration, and repatriation, at times the government and nonstate armed groups restricted these freedoms.

**In-country Movement:**  Using minor infractions as a pretext, police, gendarmes, and custom officers reportedly extorted bribes and harassed travelers at roadblocks and checkpoints in cities and on highways.  Police frequently stopped travelers to check identification documents, including national identity cards, passports, residence permits, vehicle registrations, customs status, and tax receipts as security and immigration control measures.  NGOs reported problems in accessing vulnerable communities as a result.

As in the previous year, armed separatists restricted the movements of persons and goods in the Northwest and Southwest Regions, sometimes in a deliberate attempt to harass and intimidate the local population. Separatists often used weekly lockdowns referred to as "ghost towns" to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 323 of 352

enforce restrictions on movement, in which the armed separatists demanded all businesses, schools, and places of worship close, and residents stay home. Violent crime, including kidnapping by terrorists, kidnapping for ransom, armed robbery, assault, and carjacking were major impediments to in-country movement in the three northern regions as well as in part of the East Region.

Separatists continued to enforce a lockdown of the Northwest and Southwest Regions on Mondays as well as on numerous public holidays and days of public events. During the lockdown periods, all vehicles were banned from the roads in these regions. Separatists warned that any person or group of persons contravening the ban would be punished.

## e. Protection of Refugees

The government generally cooperated with the Office of the United Nations High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.

**Access to Asylum:** The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees, but implementation of this system was weak. UNHCR continued to provide documentation and assistance to the refugee population, although local authorities did not always recognize the documents as

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 324 of 352

official, which prevented refugees from traveling and engaging in employment activities.

**Freedom of Movement:**  The government generally did not provide identity documents in a timely manner to refugees and other persons in need of primary documentation, and UNHCR-issued cards were often insufficient to permit refugees to travel freely and integrate socioeconomically.  To help address the situation, a government pilot program issued national biometric identification cards to 6,000 of an estimated 200,000 refugees from the Central African Republic in the East Region.

**Employment:**  Although there were no credible reports the government restricted refugees' ability to work after their refugee status was official, government delay in the provision of identity documents was a problem as refugees without such documents faced significant obstacles to employment in the formal sector.

**Durable Solutions:**  There was no evidence the government accepted refugees for resettlement or offered naturalization to refugees residing in its territory.  The government assisted in the voluntary return of persons to Nigeria and the Central African Republic.

**Temporary Protection:**  The government continued to provide temporary and unofficial protection to individuals who might not qualify as refugees, extending this protection to hundreds of individuals, including persons who

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 325 of 352

had fled violence in the Central African Republic. Due to their unofficial status and inability to access services or support, many of these individuals were subject to harassment and other abuses by employers in the informal sector.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

According to June UNHCR estimates, there were 1,066,254 IDPs. Reports indicated IDP girls were particularly vulnerable to sexual exploitation.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center: https://www.internal-displacement.org.

# Section 3. Freedom to Participate in the Political Process

The law provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** National elections, last

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 326 of 352

conducted in March 12 indirect polling for senate seats, were reported to be generally fair and free of major irregularities.

**Political Parties and Political Participation:**  At year's end, the country had approximately 330 registered political parties.  The ruling party remained dominant at every level of government due to restrictions on opposition political parties, gerrymandering, unbalanced media coverage, the use of state funds to promote party campaigns, interference with the right of opposition parties to register as candidates and to organize during electoral campaigns, and undue influence of traditional rulers.  Traditional rulers who refused to associate with the government were either removed or threatened with the loss of all income.  Membership in the ruling party conferred significant advantages, including in the allocation of key jobs in state-owned entities and the civil service.

Human rights organizations and opposition political groups asserted the processes of drawing up voter districts and distributing parliamentary and municipal councilor seats were unfair.  They complained that small districts considered ruling party strongholds were allocated a disproportionate number of seats compared with more populous districts where the opposition was expected to poll strongly.  Managers of state-owned companies and other high-level government officials reportedly used government resources to campaign for candidates sponsored by the ruling party.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 327 of 352

**Participation of Women and Marginalized or Vulnerable Groups:**  Societal stigma and the criminalization of same-sex sexual conduct deterred members of the LGBTQI+ community from full participation in the political process, such as running for elected office.  Leaders of the Indigenous Mbororo people expressed concern their political rights were marginalized, noting no political party included a member of the Mbororo as a candidate in the March senate elections.  They also pointed out no member of their community was among the 30 senators appointed by the president.  Persons with disabilities experienced discrimination in the selection of political party candidates (see section 6, Indigenous Peoples, and also Persons with Disabilities).

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials, but the government did not implement the law effectively.  There were numerous reports of government corruption.

**Corruption:**  The government encouraged reporting of corruption by exempting whistleblowers from criminal prosecution.  The National Anti-Corruption Agency (CONAC), the National Financial Investigation Agency, the Ministry in Charge of Supreme State Audit, and the Audit Bench of the Supreme Court had roles in fighting corruption.  CONAC, the leading anti-corruption agency, was constrained by an absence of any legislative or

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 328 of 352

presidential mandate.  There were reports senior officials sentenced to prison were not always required to forfeit their ill-gotten gains.

As in the previous year, there were new allegations of corruption involving public officials.  The Special Criminal Court (TCS) prosecuted corruption cases.  On January 31, the TCS delivered its verdict in the embezzlement case of former Minister of Defense Alain Edgar Mebe Ngo'o and four codefendants, finding Mebe Ngo'o guilty of offenses including overbilling of contracts for military equipment worth almost $40 million.  His wife, Bernadette Mebe Ngo'o, was found guilty of complicity in the embezzlement of $8.3 million in public funds.  The TCS sentenced Mebe Ngo'o to 30 years' imprisonment and his wife to 10 years.  Other accomplices in the case were also found guilty and sentenced to prison terms ranging from nine to 25 years.  In addition to these sentences, the TCS ordered asset forfeitures, civil damages, and fines.

On June 14, the TCS sentenced former Camwater Managing Director Jean William Sollo to 15 years in prison, the second person convicted in a case alleging the embezzlement of $220,000 and misappropriation of additional public funds.

For additional information concerning corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 329 of 352

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

Several domestic and international human rights groups monitored and investigated human rights conditions and cases and published their findings. Government officials were rarely cooperative or responsive to their views. Government officials impeded many local human rights NGOs by harassing their members, limiting access to prisoners, and refusing to share information. Authorities took no action to investigate or prevent such occurrences.

**Retribution against Human Rights Defenders:** Some organizations continued to face difficulties renewing their accreditations following a 2021 directive by the Ministry of Territorial Administration that threatened to suspend groups that did not seek reauthorization within one month. This negatively impacted the operations of the NGO Un Monde Avenir, which could no longer open a bank account or continue to receive funding from longstanding partners. Although activists and human rights defenders reported threats to their personal safety due to their work, these reports could not be corroborated or linked specifically to the government.

**Government Human Rights Bodies:** The CHRC was established in 2019 to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 330 of 352

promote and protect human rights and prevent torture in detention facilities. The CHRC was nominally independent, although it relied on the government for funding and access to government ministries to conduct investigations. The CHRC coordinated actions with NGOs, participated in inquiry commissions, provided training on human rights for government officials, and issued statements on human rights matters. It also operated a hotline that allowed for anonymous reports of human rights abuses, including cases of torture. The CHRC did not have the authority, however, to initiate legal proceedings or otherwise hold human rights abusers accountable, which limited its effectiveness.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape but did not specify whether it applied to both women and men. The law did not address spousal rape. Penalties for conviction ranged from five to 10 years' imprisonment. The law was not enforced effectively, and police and courts rarely investigated or prosecuted rape cases, especially since survivors often did not report them. Members of the Cameroonian Bar Association attributed a lack of enforcement of gender-based violence laws in part to the expense and limited availability of rape kits and emergency medical care, which they claimed made it difficult to prosecute cases.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 331 of 352

The law did not specifically prohibit domestic violence, although assault was prohibited and punishable by imprisonment and fines. Reports suggested domestic violence was a major problem. The Organization for Economic Cooperation and Development reported 39 percent of women experienced physical or sexual violence from an intimate partner at some time in their life.

The government provided support to survivors of sexual violence and other forms of gender-based violence, including legal support, general clinical care offered in health facilities, and collection of data. Many of the prevention and basic support programs for survivors of gender-based violence were implemented by community-based organizations.

**Female Genital Mutilation/Cutting (FGM/C):** The law prohibited FGM/C. Offenders were subject to prison sentences of 10 to 20 years, or imprisonment for life if the offender habitually carried out this practice for commercial purposes or if the practice caused death. Authorities enforced the law when complainants pursued cases; however, judicial delays and societal stigma discouraged many women from filing complaints, and successful prosecutions were extremely rare.

**Other Forms of Gender-based Violence or Harassment:** Widows were sometimes forcibly married to one of their deceased husband's relatives, especially in rural communities, to secure continued use of property left by the deceased husband, including the marital home. The practice of widow

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 332 of 352

rites, by which widows were subject to certain trials such as bathing in public or movement restrictions, was prevalent in rural communities in the West Region.  Anecdotal reports suggested breast ironing, the process of forcibly flattening emerging breasts in pubescent girls, continued to exist in some rural communities.

Sexual harassment remained widespread.  There were no known reports during the year that anyone was fined or imprisoned for sexual harassment, in part due to survivor reluctance to file official complaints due to the risk of reprisal or stigmatization.

Media reported multiple cases of femicide.  Authorities reportedly investigated at least some of the cases and detained suspects.

**Discrimination:**  The constitution and law provided women and men the same legal status and rights, but the government often did not enforce the law.  Although local government officials claimed women had access to land in their constituencies, the overall sociocultural practice of denying women the right to own land, especially through inheritance, was prevalent in most regions.  There were legal restrictions to women's employment in some occupations and industries.  Within the private sector, fewer women occupied positions of responsibility than men.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 333 of 352

In most parts of the country, prenatal clinics monitored and assisted women through pregnancy and childbirth. Women also had access to emergency care, including services for the management of complications arising from abortion, even though abortion was generally not permitted. The Ministry of Public Health offered counseling services to women during prenatal visits, promoting the concept of responsible parenthood and encouraging couples to use contraception to space the timing of their children. Many women, however, lacked the means to manage their reproductive health, and societal pressures continued to reinforce taboos on discussing reproductive health within certain communities. Women's dependence on receiving spousal consent continued to be a barrier in contraception decisions.

The government did not readily provide emergency contraception or postexposure prophylaxis to survivors of sexual violence. The United Nations Population Fund provided a kit with emergency contraception to some clinical sites as part of clinical care for gender-based violence survivors.

According to a 2017 World Health Organization report, the most recent available data, the maternal mortality rate was 529 deaths per 100,000 live births. Factors that contributed to the high rate included distance to health facilities in rural areas, poverty, and security crises in the Northwest, Southwest, and Far North Regions.

Menstruation and limited access to sanitary products affected girls' access

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 334 of 352

to education.  Pregnancy and motherhood often impeded adolescent girls' access to education, and a 2022 study *Teenage Childbearing and School Dropout in a Sample of 18,791 Single Mothers in Cameroon* showed that 41.6 percent of those surveyed had dropped out of school because of pregnancy.  As a measure to encourage pregnant girls to remain in school, the Ministry of Secondary Education allowed pregnant students to continue with school until the 26th week of pregnancy, after which they could request to be placed on maternity leave.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution stated the government should protect "minorities and preserve the rights of indigenous populations in accordance with the law," but it did not identify specific groups that qualified as minorities or Indigenous populations.  The laws and regulations on decentralization and elections also protected the rights of minorities by requiring that lists of electoral candidates reflect the sociological landscape of constituencies, or that the office of president of a regional council or city mayor be held by a native of the constituency.  The government made efforts to enforce these provisions, but discrimination and violence persisted, including employment discrimination based on ethnicity.

While there were no reliable reports of governmental violence or discrimination against members of racial, ethnic, or national minorities,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 335 of 352

there were reports of societal violence along ethnic lines during the year, although it was not always clear whether ethnicity was the primary reason for the violence.

In February, after Sultan Mouhammad Nabil Mforifoum Mbombo, the traditional leader of the Bamoun community, was accused of insulting the traditional leader of the Tikar community, His Majesty Soulé Ngamon III, members of the Tikar community engaged in acts of vandalism targeting Bamoun property and businesses.

On May 24, a communal clash erupted in Sangmelima in the South Region, involving the native Bulu and nonnative Bamoun communities from the West Region.  Armed with clubs and machetes, dozens of Bulu youth ransacked Bamoun homes, injuring dozens of individuals and destroying shops.  Media reports suggested the riot was triggered when a Bamoun trader threatened a Bulu youth.  The young man eventually died, and allegations regarding the cause of his death caused the unrest.

## Indigenous Peoples

The Indigenous Baka people, including the Bakola and Bagyeli, resided primarily in (and were the earliest known inhabitants of) the forested areas of the South and East Regions.  The government did not effectively protect their civil or political rights.  Logging companies continued to destroy their forested land without compensation.  Other ethnic groups often treated the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 336 of 352

Baka as inferior and sometimes subjected them to unfair and exploitative labor practices.  The government continued long-standing efforts to provide birth certificates and national identity cards to Baka.  Nonetheless, most Baka did not have these documents, and efforts to reach them were impeded by the difficulty in reaching homes deep in the forest.

There were reports from NGOs that the Indigenous Mbororo people, nomadic pastoralists living mostly in the North, East, Adamawa, and Northwest Regions, continued to be subject to harassment, sometimes with the complicity of administrative or judicial authorities.  Mbororo leaders expressed concern their political rights were marginalized.

Amnesty International and the Mbororo Social and Cultural Development Association reported in June and September respectively that the conflict in the Northwest Region had brought to the fore simmering tensions between armed separatist groups and the local Mbororo population.  The Mbororo, many of whom were Muslim and clashed with the dominant Christian population concerning land disputes, were excluded and marginalized prior to the crisis in the Northwest.  The conflict only exacerbated their status, with armed separatists suspecting Mbororo of collaborating with the government due to a history of Mbororo voting for the ruling party.  As a result, some Mbororo joined armed vigilante groups that reportedly clashed with separatist armed groups viewed as targeting Mbororo.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 337 of 352

# Children

**Birth Registration:**  Many births went unregistered because children were not always born in health facilities.  Children without birth certificates were unable to register for official examinations to enter secondary school or secure other legally required identity documents.

**Education:**  A 2019 UN report, the most recent available data, highlighted gender disparity in education, particularly in secondary education.  According to the report, the literacy rate in 2019 was lower for women and girls (86 percent) than for men and boys (97 percent).

**Child Abuse:**  The law prohibited various forms of child abuse, including but not limited to assault, indecency, kidnapping, forced labor, rape, sexual harassment, and situations where one parent refused to disclose the identity of the other parent to the child.  Despite these legal provisions, authorities did not enforce the law effectively, and child abuse remained a problem.  Children continued to receive corporal punishment both within families and at school.

**Child, Early, and Forced Marriage:**  The minimum legal age for marriage was 18, but the law was not enforced effectively.  UNICEF's 2018 child marriage data revealed 31 percent of women between ages 20 to 24 were married before age 18 and 11 percent were married before age 15.  Early and forced marriages, as well as abusive "temporal marriages," were more prevalent in

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 338 of 352

the northern part of the country and some parts of the West Region, especially in the Noun Division.

**Sexual Exploitation of Children:**  The law prohibited the commercial sexual exploitation of children and the sale, offering, grooming, or procuring of children for sex trafficking and practices related to child pornography.  The country's legal framework required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking.  Authorities enforced laws against child pornography, but other laws against the sexual exploitation of children were not effectively enforced.

According to anecdotal reports, traffickers exploited children younger than age 18 in sex trafficking, although no statistics were available.  Anecdotal reports suggested the conflict in the Northwest and Southwest Regions had contributed to a dramatic increase in child sex trafficking and an increased number of early pregnancies, especially in areas with IDPs.  Reports identified the Bonaberi neighborhood in Douala as a hub for the sexual exploitation of underage IDP girls.  The law did not set a minimum age for consensual sex.

**Infanticide, Including Infanticide of Children with Disabilities:**  The law prohibited the practice, and the government generally enforced the law effectively.  There were isolated media reports of the practice.  For example, media reported that on April 9 in Bafoussam in the West Region, Raissa

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 339 of 352

Makoua gave birth to a baby and left the newborn in a septic tank. The child was rescued by first responders. Makoua was arrested and detained on April 11, and authorities reportedly opened an investigation. The were no known developments at year's end.

## Antisemitism

The Jewish population was very small, and there were no known reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** Consensual same-sex sexual activity between adults was illegal and punishable with imprisonment from six months to five years plus a fine. The government enforced the law. Police often detained LGBTQI+ individuals based solely on their perceived sexual orientation, gender identity, or gender expression, including individuals who had sought police assistance after being the victims of violent crimes.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 340 of 352

According to LGBTQI+ rights organizations, in January Maya Brenda was arrested and detained in Douala after being accused by the mother of a child, age 17, of having an inappropriate relationship with her daughter. Brenda was convicted of attempted corruption of a child and sentenced to five years in prison.

Sale Garba was arbitrarily detained at a Douala police station in January before being transferred to the central prison on February 9. While in police station custody, Garba was not allowed to take his HIV medication for two days. He was accused of having a romantic and sexual relationship with a child age 17. The child and his father petitioned a court to be removed from the case, but the investigating magistrate instead issued a warrant detaining Garba for a six-month renewable period. A human rights NGO reported a trial judge ordered his release on bail in October, but Garba remained detained because he lacked the resources to post bail.

On May 9, the Littoral Region Court of Appeals in Douala affirmed a 2021 trial court verdict that sentenced two transgender women to five years in prison and fines, citing legal provisions that prohibited same-sex sexual relations. Gendarmes arrested the two in Douala in 2021 and charged them with "attempted homosexuality," public indecency, and nonpossession of national identity cards. The defendants were released in July 2022 pending their appeal, and they were not reincarcerated after the ruling.

**Violence and Harassment:** LGBTQI+ human rights organizations continued

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK   Document 142-6   Filed 01/13/25   Page 341 of 352

to report arbitrary arrests of LGBTQI+ persons.  LGBTQI+ individuals faced significant stigma and violence from their families, communities, and the government, including police.  Security forces sometimes harassed, detained, and assaulted persons based on their perceived sexual orientation or gender identity, including individuals found with condoms and lubricants.

The LGBTQI+ rights NGO Colibri reported between January and March, it identified 129 cases of nonstate actor violence and harassment, including withholding of paychecks, psychological abuse, family rejection, and physical violence in the form of battery, assault, and rape.  In one case, an LGBTQI+ individual was reportedly encouraged by his family to commit suicide, although he did not do so.  In a video obtained by human rights activists through social media, a member of the LGBTQI+ community was shown cowering in the corner of a small room while unknown persons off-camera hurled blocks of concrete at him.  The activists reported the incident took place in January.

In January, NGO Humanity First Cameroon reported an attack on a gay man after he agreed to meet a man who claimed to be a contact from an LGBTQI+ group on a mobile messaging platform.  When he arrived, he was attacked by the man and three others who robbed him, stripped him, and made him admit to being gay on video, which was then disseminated to his family and friends.

**Discrimination:**  The constitution prohibited discrimination and prescribed

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 342 of 352

equal rights for all citizens; however, the law did not explicitly prohibit discrimination based on sexual orientation, gender identity or expression, or sex characteristics. The law did not specifically recognize LGBTQI+ individuals, couples, or their families. LGBTQI+ persons faced significant societal discrimination, including in employment. Risk of exposure affected individuals' willingness to access health services related to HIV and AIDS.

**Availability of Legal Gender Recognition:** Legal gender recognition was not available.

**Involuntary or Coercive Medical or Psychological Practices:** The law did not specifically address these practices. Anecdotal reports indicated some members of the LGBTQI+ community were survivors of "corrective rape," forced marriage, and forced pregnancies to compel them to change their sexual orientation or gender identity. Family members of LGBTQI+ individuals also reportedly enlisted traditional healers and psychologists to coerce LGBTQI+ individuals into abandoning their sexual orientation.

There were no reports of medically unnecessary and irreversible "normalization" surgeries performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** Although the law did not specifically prohibit their registration, LGBTQI+ organizations were not permitted to register officially as such and thus

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 343 of 352

registered either as general human rights organizations or as health-focused organizations.  Many LGBTQI+ organizations reported that operating health programs, particularly HIV prevention and treatment programs, shielded them from potential harassment or shutdown, although promoting advocacy for LGBTQI+ persons was their primary mission.

## Persons with Disabilities

Persons with disabilities were not able to access education, employment, health services, public buildings, and transportation on an equal basis with others.  The law provided protection to persons with physical, sensory, intellectual, or mental disabilities, including access to education and vocational training, employment, health services, information and cultural activities, communications, buildings, sports and leisure, transportation, housing, and other state services.  The government did not enforce these provisions effectively.  Some infrastructure projects were constructed to provide accessibility to persons with mobility impediments.  The government did not always provide information and communication on disability concerns in formats that were accessible to persons with disabilities.

There were no reports of police or other government officials inciting, perpetrating, or condoning violence against persons with disabilities.  A study during the year by a consortium of health practitioners found that

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK     Document 142-6     Filed 01/13/25     Page 344 of 352

children with disabilities were at a particularly elevated risk of abuse. The study found that physical abuse, most commonly in the form of corporal punishment or excessive labor, was the most frequent form of abuse. Persons with disabilities faced discrimination in employment and occupation.

Under the law, public education was free for persons with disabilities and children born of parents with disabilities, and some children with disabilities attended school with peers without disabilities. NGOs reported many parents of children with disabilities did not send their children to school. The government introduced inclusive education in many schools and reviewed the curriculum of teacher training colleges to include training in inclusive education skills. Other children with disabilities continued to attend separate schools, such as the Bulu Blind Center in Buea and the Yaoundé Special School for Hearing-Impaired Children.

Government inaction limited the rights of persons with disabilities to participate in civic life, including lack of access to polling sites.

## Other Societal Violence or Discrimination

According to the Association of Women Albinos of Cameroon, persons with albinism faced ostracism within their communities, including the abandonment of babies and children with albinism. The problem was particularly acute in the Far North Region. Persons with albinism also faced

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 345 of 352

obstacles accessing adequate health services despite high rates of skin cancer and vision problems. Persons with albinism faced discrimination in employment and occupation.

Persons with HIV often suffered social discrimination and were isolated from their families and society, in part due to a lack of education regarding the disease. As in the previous year, while no specific cases of discrimination in employment were available for citation, anecdotal reports indicated some discrimination occurred with respect to HIV status, especially in the private sector.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the rights of workers to form and join independent unions, bargain collectively, and conduct strikes, but with significant restrictions. The right did not apply to defined groups of workers, including defense and national security personnel, prison administration civil servants, and judicial and legal personnel. The law also prohibited antiunion discrimination and required the reinstatement of workers fired for union activity. Statutory limitations and other practices substantially restricted these rights. The law did not permit the creation of a union that included

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK   Document 142-6   Filed 01/13/25   Page 346 of 352

both public- and private-sector workers or the creation of a union that included different sectors, even if closely related. The law required that unions register with the government, have a minimum of 20 members, and formalize the union by submitting a constitution and bylaws. Founding members were also required to have clean police records. Those who formed a union and carried out union activities without registration were subject to fines. Unions were prohibited from carrying out any activity that was not related to the study, defense, development, and protection of the interests of workers.

More than 100 trade unions and 12 trade union confederations were in operation, including one public-sector confederation. Trade unions or associations of public servants were not permitted to join a foreign occupational or labor organization without prior authorization from the minister of territorial administration, who was responsible for "supervising public freedoms."

The constitution and law provided for collective bargaining between workers and management as well as between labor federations and business associations in each sector of the economy. The law did not obligate employers to bargain. The law did not apply to the agricultural or informal sectors, which included most of the workforce.

Legal strikes or lockouts could be called only after conciliation and arbitration procedures were exhausted. Workers who ignored procedures

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 347 of 352

to conduct a strike were subject to dismissal or fines. Free industrial zones were subject to labor laws, but there were several exceptions limiting worker rights. Within free industrial zones, employers had the right to determine salaries according to productivity, which could bypass minimum wage requirements, to negotiate work contracts free of labor law regulations, and to issue work permits for foreign workers without the normally lengthy government oversight process. Laws intended to target terrorists could impose harsh legal penalties on legitimate trade union activity.

The government and employers did not effectively enforce the applicable laws on freedom of association and the right to collective bargaining. Penalties for violations were rarely applied against violators and were not commensurate with those for comparable violations. Administrative and judicial procedures were infrequent and subject to lengthy delays and appeals.

Many employers continued to use subcontractors to avoid hiring workers with collective bargaining rights. Major companies, including quasi state-run and state-operated companies, reportedly engaged in the practice, according to workers from Energy of Cameroon, the water supply company Camerounaise des Eaux, cement manufacturer Cimencam, Guinness, Aluminum Smelter, Cameroon Oil Transportation Company, Ecobank, and many others. Subcontracting reportedly involved all categories of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 348 of 352

personnel, from the lowest to senior levels.  As a result, workers with equal expertise and experience did not always enjoy similar protections when working for the same business, and subcontracted personnel typically lacked a legal basis to file complaints.

Several strikes were announced.  Some were called off after successful negotiations, others were carried out peacefully, and others faced some degree of repression.

Health personnel working in various facilities, including the Yaoundé Emergency Center, began a strike on May 22, protesting what they referred to as nine years of poor working conditions, including missing salaries and bonuses and a lack of adequate equipment.  On June 5, workers escalated their protest by marching to the Ministry of Public Health.  Security forces dispersed them with tear gas and batons, arrested some of the protesters, and took them to unknown destinations.  According to the CHRC, the arrested protesters were not mistreated and were released the same day. Workers resumed duties after the government agreed to establish an interministerial committee to examine their grievances.  As of November, there were no indications the workers and their employers had secured an agreement.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 349 of 352

https://www.state.gov/trafficking in-persons-report/.

# c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's Findings on the Worst Forms of Child Labor at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:** On March 21, the government increased the minimum guaranteed wage and established three distinct minimum wages for different categories of labor. The minimum wage in all sectors was greater than the World Bank's poverty line. Premium pay for overtime ranged from 120 to 150 percent of the hourly rate, depending on the amount of overtime and whether it was weekend or late-night overtime. Despite the minimum wage law, employers often negotiated lower wages with workers, in part due to an extremely high rate of underemployment in the country. Salaries lower than the minimum wage remained prevalent in the public works sector, where many positions required unskilled labor, as well as in domestic work, where women refugees were particularly vulnerable to unfair labor practices.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 350 of 352

The law established a standard workweek of 40 hours in public and private nonagricultural firms and a total of 2,400 hours per year, with a maximum limit of 48 hours per week in agricultural and related activities.  There were exceptions for guards and firefighters (56 hours per week), service-sector staff (45 hours per week), and household and restaurant staff (54 hours per week).  The law mandated at least 24 consecutive hours of rest weekly.

**Occupational Safety and Health:**  The government set appropriate occupational safety and health (OSH) standards in the workplace.  The minister of labor and social security established a list of occupational diseases in consultation with the National Commission on Industrial Hygiene and Safety.  Ministry inspectors and occupational health physicians were responsible for monitoring OSH standards.

**Wage, Hour, and OSH Enforcement:**  The Ministry of Labor and Social Security was responsible for enforcement of the minimum wage, overtime, and OSH laws but did not do so effectively.  Labor inspectors were permitted to conduct unannounced inspections and attempted to do so when they had derogatory information regarding a business.  Unannounced visits were sometimes thwarted due to a lack of political will in some sectors, like mining, the target business's lack of cooperation, and, in some instances, physical threats from business employees.  Penalties for violations of the law were not commensurate with those for comparable crimes, such as negligence.  Penalties were rarely applied against violators.  Unconfirmed

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK    Document 142-6    Filed 01/13/25    Page 351 of 352

but credible reports suggested some businesses did not provide health services to their employees, as required by law but rarely enforced. The government more than doubled the total number of labor inspectors during the year, but the number was still insufficient, and the ministry lacked the resources for a comprehensive inspection program. During the year, the state-owned National Mining Corporation implemented a public awareness campaign to reduce child labor in mines.

The International Labor Organization reported informal workers made up 90 percent of the labor force in the country. The government did not enforce labor laws and regulations in the informal sector.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Case 4:22-cr-00261-RK      Document 142-6      Filed 01/13/25      Page 352 of 352